Evan J. Spelfogel
espelfogel@ebglaw.com
Margaret C. Thering
mthering@ebglaw.com
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, NY 10177
(212) 351-4500
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MAZHAR SALEEM and JAGJIT SINGH, individually :
and on behalf of all others similarly situated, :
                        :
                  Plaintiffs,   :
                        :
              - against -   :
                        :
                        :
CORPORATE TRANSPORTATION GROUP, LTD., :
et al.,   :
                        :
              Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF CASE

12 CV 08450 (JMF)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER ENJOINING DEFENDANTS' IMPROPER COMMUNICATIONS WITH CLASS MEMBERS AND FOR CORRECTIVE NOTICE

## Table of Contents

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ......................................................................................1

I.   Background ....................................................................................................1

II.   Eduard Slinin ...............................................................................................1

III.  Hassan Siblini .............................................................................................2

    A.   Siblini travels to Lebanon ...................................................................3

    B.   Siblini Returns to New York City .......................................................4

    C.   July 1, 2013 Meeting at Dunkin Donuts .............................................5

    D.   Ramadan ...............................................................................................6

    E.   Sibilini Meets with CTG's Attorneys .................................................7

IV.  Sanjeev Kumar .............................................................................................8

    A.   Kumar's Recent Conversation with Jagjit Singh ...............................10

V.   Joseph Civello ............................................................................................11

VI.  Plaintiffs' Harassment of Defendants and Tortious Interference with Defendants' Business Relationships ...................................12

ARGUMENT ........................................................................................................13

    I.  NO AGENT OF CTG HAS THREATENED OR IMPROPERLY COMMUNICATED WITH CLASS MEMBERS.  THEREFORE, NO COURT ORDER OR CORRECTIVE NOTICE IS NECESSARY. ...........................13

    II.  ASSUMING, *ARGUENDO*, THAT ABUSES OCCURRED, THIS COURT MAY ONLY ISSUE THE NARROWEST POSSIBLE RELIEF, AND CORRECTIVE NOTICE SENT AT DEFENDANTS' EXPENSES TO ALL PUTATIVE PLAINTIFFS IS NOT NARROWLY TAILORED TO RECTIFY ANY ALLEGED HARM. ................15

CONCLUSION ......................................................................................................16

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

C<small>ASES</small>

*Burrell v. Crown Cent. Petroleum,*
    176 F.R.D. 239 (E.D. Tex. 1997) ..................................................................................13

*Gulf Oil v. Bernard,*
    452 U.S. 89 (1981)............................................................................................13, 15

*Haffer v. Temple of the Commonwealth Sys. of Higher Ed.,*
    115 F.R.D. 506 (E.D. Pa. 1987)..................................................................................16

*Hampton Hardware v. Cotter & Co.,*
    156 F.R.D. 630 (N.D. Tex. 1994)...........................................................................13, 15

## PRELIMINARY STATEMENT

No agent or supervisor of defendant Corporate Transportation Group, Ltd. ("CTG") or any of the other defendants in this action has threatened, intimidated, or otherwise improperly communicated with any plaintiffs or putative plaintiffs in this lawsuit. Therefore, no court order or corrective notice is necessary or warranted.

## STATEMENT OF FACTS

### I.   Background

CTG is essentially a clearinghouse that performs referral, billing, and payment services for franchisees of certain of the defendants. Affidavit of Eduard Slinin ("Exh. A. or Slinin Aff.") ¶ 3. NYC 2 Way International, Ltd. ("NYC 2 Way"); AllState Private Car & Limousine, Inc.; Aristacar & Limousine, Ltd.; TWR Car and Limo, Ltd.; Excelsior Car and Limo, Inc.; and Hybrid Express, Inc. sell franchises to individuals and corporations in the black car industry. Slinin Aff. ¶ 4.

### II.   Eduard Slinin

Eduard Slinin is the president of CTG. Slinin Aff. ¶ 6. He is being sued by drivers who allege they were wrongly classified as independent contractors. Slinin Aff. ¶ 7. Slinin has not communicated with drivers about this lawsuit, nor has he discouraged or tried to discourage any drivers from joining this lawsuit. Slinin Aff. ¶¶ 9-10.

Additionally, Slinin has never made threatening or intimidating statements to any plaintiff, opt-in plaintiff, or prospective class member about this lawsuit. Slinin Aff. ¶ 27. He has neither encouraged nor authorized his agents to make threatening or intimidating statements to any plaintiff, opt-in plaintiff, or prospective class member about this lawsuit. Slinin Aff. ¶ 28.

1

Moreover, he has not attempted to prevent any plaintiff, opt-in plaintiff, or prospective class member from participating in this lawsuit. Slinin Aff. ¶ 29.

## III.   Hassan Siblini

Hassan Siblini is a driver-owner of two NYC 2 Way franchises. Slinin Aff. ¶ 11; Affidavit of Hassan Siblini ("Siblini Aff.") ¶ 2. He also works as a router on a special account that CTG has. Slinin Aff. ¶ 11; Siblini Aff. ¶ 7. Siblini does this routing work from his home or from 335 Bond Street in Brooklyn, as he chooses. Siblini Aff. ¶ 8. He typically spends a few hours per day assisting with this routing work. Siblini Aff. ¶ 9.

Siblini sometimes does this routing work in a small room at 335 Bond Street. Siblini Aff. ¶ 10. The small room in which he does the routing work is not the same room in which dispatchers work sending out job offers to franchise drivers who wish to use CTG's dispatch services. Siblini Aff. ¶ 11. When Siblini does the routing work at 335 Bond Street, he shares a room with approximately seven other people who also do routing work for CTG. Siblini Aff. ¶ 14.

If issues arise with routing work, Siblini speaks with Fadi Toska, a CTG supervisor who also sits in this room. Siblini Aff. ¶ 15. The other people who do routing work also speak with Toska if routing issues arise.

Siblini is not an executive, officer, supervisor, owner, or agent of any of the defendants in this lawsuit. Slinin Aff. ¶ 22; Siblini Aff. ¶¶ 17-18. In his capacity as a router for one of CTG's accounts, Siblini makes sure all ride requests that come for that account are filled, but he does not actually fill those requests, and he has no decision making authority regarding what franchises will actually provide the driving services for this client. Slinin Aff. ¶ 23. Siblini has no communications with any franchisees or drivers about or in connection with the routing work

that he does.  Slinin Aff. ¶ 24.  Accordingly, Siblini does not set schedules of any employees of CTG nor does he dispatch rides to drivers of franchisees of NYC 2 Way or of any of the defendants.  Slinin Aff. ¶ 25.  Similarly, Siblini has no authority to hire, fire, promote, assign, order, or discipline CTG's employees, nor does anyone seek Hassan Siblini's input on such decisions.  Slinin Aff. ¶ 26; Siblini Aff. ¶ 20.

A.   *Siblini travels to Lebanon*

On June 14, 2013, Siblini traveled from New York City to the country of Lebanon with his wife and children on a vacation trip.  Siblini Aff. ¶ 26.  He and his family stayed in Lebanon until June 24, 2013.  Siblini Aff. ¶ 27.  Siblini knew nothing about this lawsuit until June 21, 2013.  Siblini Aff. ¶ 25.  On June 21, 2013, he went to a beach resort in southern Lebanon. Siblini Aff. ¶ 28.  While at this beach resort, another tourist heard him speaking English.  Siblini Aff. ¶ 29.  This other tourist and Siblini began talking and realized they both drove black cars in New York City.  Siblini Aff. ¶¶ 30-35.  The other man told Siblini that he drives a black car through Executive Transportation Group ("ETG"), a company that is not related to CTG in any way.  Siblini Aff. ¶ 36.  This other man then told Siblini that drivers at ETG were suing ETG, alleging they were wrongly classified as independent contractors.  Siblini Aff. ¶ 37.  He told Siblini that they tried to get him to join the lawsuit, but he did not join.  Siblini Aff. ¶ 38.  He then told Siblini he was glad he did not join because if he joined, he would have to pay much more money in taxes in the future and would also have to pay back taxes for six years if he were reclassified as an employee.  Siblini Aff. ¶ 39.  Specifically, he told Siblini that he would have to pay 33% of his income in taxes each year if reclassified as an employee.  Siblini Aff. ¶ 40.  He also said that he and other drivers would be in trouble with the government because they filed their taxes as independent business persons by swearing they were businessmen and not

employees on their Schedules C. *Id.* This man then told Siblini that drivers had also brought a similar lawsuit against CTG and that the same lawyers sued the companies in both cases. Siblini Aff. ¶ 41. This man told Siblini to be careful and warned Siblini that joining the lawsuit would mean he would owe six years of back taxes. Siblini Aff. ¶¶ 43-44. He also warned Siblini that he would have to pay 33% of his income for future years as well as for the past six years in taxes to the government should plaintiffs win the lawsuit. Siblini Aff. ¶ 45.

 B.   *Siblini Returns to New York City*

On June 24, 2013, Siblini returned to New York with his family. Siblini Aff. ¶ 51. Siblini was very worried about what the man in Lebanon told him, and he thought he should tell the other drivers what the man in Lebanon told him, especially since he was chairman of the NYC 2 Way Franchisees Communications Committee, a committee made up of drivers who own NYC 2 Way franchises. Siblini Aff. ¶¶ 52-54.

There is also a Franchisees Security Committee at NYC 2 Way. Siblini Aff. ¶ 55. The Security Committee is made up of drivers and elects a Chairman and Co Chairman. Siblini Aff. ¶ 56. The Security Committee makes rules and enforces rules for the drivers to protect the interests of franchisees so that everyone's business remains valuable and profitable. Siblini Aff. ¶ 57. Mohammad Siddiqui is the current Chairman of the Security Committee, and Anjun Ali is the Co-Chairman. Siblini Aff. ¶ 58. Anwar Bhatti used to be the chair of the Security Committee.[1] Thering Decl., Ex. A at 105-06.

---

[1] A true and correct copy of relevant excerpts from the rough deposition transcript of the deposition of Anwar Bhatti, dated July 25, 2013 are attached to the July 26, 2013 Declaration of Margaret C. Thering as Exhibit A. ("Thering Decl., Ex. A at ___".).

During the last week of June 2013, entirely on his own, Siblini decided he should tell the drivers about what the ETG driver he met in Lebanon had told him. Siblini Aff. ¶ 59. Siblini therefore called Mohammad Siddiqui and asked that he set up a meeting with Siblini, Siddiqui (as the head of the Security Committee), Ali (as co-chair of the Security committee), and maybe some other drivers. *Id.* Siblini did not tell Siddiqui what the meeting was about, nor did Siblini call anyone else about this meeting. Siblini Aff. ¶ 60.

C.    *July 1, 2013 Meeting at Dunkin Donuts*

On July 1, 2013, Siddiqui, Siblini, Ali, and Anwar Bhatti met at a Dunkin Donuts on Smith Street in Brooklyn. Siblini Aff. ¶ 61. They met at 6:00 p.m. for over an hour. Siblini Aff. ¶ 62. Siblini was friendly with these men. Siblini Aff. ¶ 66; Thering Decl., Ex. A at 137-38. While at the Dunkin Donuts, Siblini told Ali, Bhatti, and Siddiqui about what the man in Lebanon told him, and he showed them a copy of Schedule C. Siblini Aff. ¶ 67. The three men told Siblini that they had already signed some papers and joined the lawsuit, and they encouraged Siblini to join too. Siblini Aff. ¶ 68. They said their taxes were fine. *Id.* Siblini asked, "how about the taxes of all the other drivers? " *Id.* Siblini also mentioned a "whisper law" that the person in Lebanon had told him about and asked if they had ever heard of it. *Id.* They said "no" and asked what it was all about. *Id.* Siblini told them it was another way the lawyers could collect money while the drivers did not get anything and might have to pay more taxes. *Id.*

Siblini also told the men he was not going to join the lawsuit because the man in Lebanon told him he could get into trouble with the government and that the attorneys for the drivers in the lawsuit were trying to "throw the drivers under a bus" because even if the drivers had to pay six years of back taxes and taxes in future years, all at a rate of 33%, the lawyers would still get paid their fees in the lawsuit. Siblini Aff. ¶ 69. When Siblini stated these concerns at this

meeting, Siddiqui told him he was not worried because "Allah is with him." Siblini Aff. ¶ 70. Siblini replied that Allah does not protect those who "throw themselves in the middle of busy streets." Siblini Aff. ¶ 71. This is a saying from Islam meaning that Allah does not protect those who put themselves in harm's way or those who put themselves in Hell. *Id.*

While at the Dunkin Donuts, one of the other men told Siblini that he would drop the suit if Slinin fired Fadi Toska and Joseph Civello. Siblini Aff. ¶ 72. This man also referred to Toska and Civello as "cancer." Siblini Aff. ¶ 73.

Until July 1, 2013, all Siblini knew about this lawsuit was what the man in Lebanon told him. He did not do any independent research about this lawsuit, and no one instructed him – or encouraged him – to meet with the men at the Dunkin Donuts. Siblini Aff. ¶ 76. In fact no one else told him anything about this lawsuit until the meeting at the Dunkin Donuts. Siblini Aff. ¶ 78. (Siblini did not receive notice in the mail about this lawsuit before the July 1, 2013 Dunkin Donuts meeting, and Siblini did not open the notice he did receive until July 12, 2013. Siblini Aff. ¶ 80.) Siblini did not tell Slinin – or anyone else in CTG management – about his conversation with the men at the Dunkin Donuts until Slinin and Slinin's attorneys specifically asked Siblini about it. Siblini Aff. ¶ 81.

   D.   *Ramadan*

On July 9, 2013 at 7:00 p.m., Siblini called Ali to wish him a happy Ramadan. Siblini Aff. ¶ 83. The two men spoke for one minute. Siblini Aff. ¶ 84. Ali and Siblini did not discuss this case, nor did they discuss Ali's upcoming deposition. Siblini Aff. ¶ 86. At the time of the July 9, 2013 phone call, Siblini did not know that Ali was going to be deposed on July 10, 2013. *Id.* Siblini did not even know what a deposition was on July 9, 2013. Siblini Aff. ¶ 87. Also on July 9, 2013, Anwar Bhatti called Sibilini to wish him a happy Ramadan. Siblini Aff. ¶¶ 88-89;

Thering Decl., Ex. A at 155-56.  Bhatti and Siblini did not discuss the lawsuit during this call.
Siblini Aff. ¶ 89.

      E.     *Sibilini Meets with CTG's Attorneys*

      Until July 9, 2013, Slinin had no conversations with Siblini about this lawsuit.  Slinin
Aff. ¶ 12; Sibilini Aff. ¶¶ 93, 100.  On July 9, 2013, Slinin called Siblini because his attorneys
told him they had received a call from one of plaintiffs' attorneys alleging that Siblini had
threatened Anjum Ali, Anwar Bhatti, and Mohammad Siddiqui, plaintiffs in this action, and had
tried to intimidate them to get them to drop out of this lawsuit.  Slinin Aff. ¶ 13; Sibilini Aff. ¶
94.  Siblini told Slinin that he met with Ali, Bhatti, or Siddiqui at the Dunkin Donuts on July 1,
2013, but that he did not threaten them.  Slinin Aff. ¶¶ 13-15; Sibilini Aff. ¶¶ 94-96.  Siblini also
told Slinin that one of the men told him that he would drop the lawsuit if Slinin fired Civello and
Toska.  Sibilini Aff. ¶ 99.

      On July 11, 2013, Slinin went to the office of Epstein, Becker & Green, P.C. with Hassan
Siblini so that CTG's attorneys could interview him about the alleged threats.  Slinin Aff. ¶ 16;
Sibilini Aff. ¶¶ 101-02.  Slinin, Eduard Slinin, Siblini, Evan Spelfogel, Esq., Margaret Thering,
Esq., and Dustin Stark, Esq. listened to the recording plaintiffs' attorneys produced of the alleged
threats Siblini had made, but the recordings contained no threats.  Slinin Aff. ¶¶ 17-18; Sibilini
Aff. ¶ 107.  During this meeting, the attorneys asked Siblini why there was a reference to
throwing someone under a bus.  Sibilini Aff. ¶ 110.  Siblini explained this was an expression
meaning the attorneys for the drivers were throwing the drivers under a bus because the drivers
would have to pay back taxes, but the attorneys would still get paid.  Sibilini Aff. ¶ 111.  The
attorneys also asked Siblini why there was a reference to Allah not protecting people in traffic.
Sibilini Aff. ¶ 112.  Siblini explained that this was a saying from Islam that means Allah does not

protect those who put themselves in harm's way and that he thought joining the lawsuit would put the drivers in harm's way. Sibilini Aff. ¶ 113. Siblini explained he was not threatening to push anyone into traffic. Sibilini Aff. ¶ 115. Additionally, Siblini explained that no one asked him to conduct the meeting at the Dunkin Donuts. Sibilini Aff. ¶¶ 116-17. He also said that he never threatened anyone about this lawsuit. Sibilini Aff. ¶ 120. Specifically, he never told Ali that he would be thrown into jail or that he or his wife or his children would be injured. Sibilini Aff. ¶ 121. He also never told Ali that he was not going to be able to spend Ramadan with his family. Sibilini Aff. ¶ 123.

**IV.   Sanjeev Kumar**

Sanjeev Kumar is an employee of CTG who works in driver relations. Kumar Aff. ¶ 1. He has held that job for approximately eight to 10 years. Kumar Aff. ¶ 2. At his job, he sits alone in a small office close to the front entrance at 335 Bond Street, Brooklyn, New York. Kumar Aff. ¶ 3. Besides Kumar, there are two other workers who work in driver relations at 335 Bond Street - Yuseff and Ergys. Kumar Aff. ¶ 4.

Kumar's job consists of two main functions. Kumar Aff. ¶ 5. The first function of his job involves talking with potential new drivers who are interested in driving for the transportation companies that operate out of 335 Bond Street. Kumar Aff. ¶ 6. There are multiple such companies that operate out of this location. *Id.* In this function of his job, if a potential driver comes to him and is interested in driving for one of the companies, Kumar explains the differences between each company to the potential driver, and the different options associated with each company. He also explains the differences associated with renting as opposed to buying a franchise, and the various costs associated with the process. Kumar Aff. ¶ 7.

Due to the fact that there are many differences in the costs associated with each of the multiple companies operating out of 335 Bond Street, Kumar takes his time to carefully explain the differences to any potential new driver. Kumar Aff. ¶ 8. The multiple companies charge different commission amounts, have different periods of time for which a driver must wait to be paid for the vouchers he submits, and some charge different franchise fees while others charge no franchise fee at all. *Id.* For example, a few companies have a refundable Radio Club fee, while other companies do not. Kumar Aff. ¶ 9. NYC 2 Way allows drivers to choose commission rates of either 22% or 17.5%, gives drivers the choice of being paid for vouchers submitted either the next day or after a two week period, and charges weekly franchise fees. *Id.* In contrast, Excelsior Car and Limo, Inc., and Allstate Private Car & Limousine, Inc., have a 30% commission rate, pay drivers weekly for vouchers submitted, and do not charge franchise fees. *Id.* Aristacar & Limousine, LTD., and TWR Car and Limo, LTD., allow drivers to choose commission amounts that range from 15% to 22%, and payment times that range from three weeks to next day payment. Hybrid Limo Express, Inc., has a 20% commission fee, charges a franchise fee and pays drivers weekly. *Id.* Each company also varies greatly in the number of rides dispatched and the general volume of business. Kumar Aff. ¶ 10.

After explaining this information to the potential driver, the driver will then consider whether he or she prefers to rent or buy a franchisee, and with which company he or she prefers to be associated. Kumar Aff. ¶ 11. If the driver wishes to buy a franchise rather than rent one, Kumar gives the driver a copy of a franchise agreement. *Id.*

After the driver decides which company he wants to be associated with, Kumar arranges for a base association or base transfer with the Taxi and Limousine Commission ("TLC"). Kumar Aff. ¶ 12. A base transfer is required by the TLC rules for a driver already associated

with a base and involves switching the base for the driver in the TLC database. *Id.* According to TLC rules, a driver can only be associated with one base at a time. *Id.*

The second function of Kumar's job involves handling administrative issues and facilitating matters to resolve clerical mistakes. Kumar Aff. ¶ 13. In carrying out this function, Kumar helps drivers with small issues they may have, such as if the driver lost a voucher and needs a new one printed, or if a clerical mistake was made in a payment to a driver. Kumar Aff. ¶ 14. When a driver comes to Kumar with problems such as these, he takes down the information and looks to see if I can help resolve the problem, or he will check with bookkeeping to see if they can resolve the problem. *Id.*

Kumar does not train any drivers. Kumar Aff. ¶ 15. Additionally, he is not an owner or supervisor of any of the companies operating out of 335 Bond Street. Kumar Aff. ¶ 16. He does not hire, fire, give orders or directions to, or discipline employees of any of the companies operating out of 335 Bond Street. Kumar Aff. ¶ 18. He also does not make recommendations about hiring, firing, or disciplining employees of any of the companies operating out of 335 Bond Street. Kumar Aff. ¶ 19. Likewise, he does not give any assignments to nor set schedules of employees of any of the companies operating out of 335 Bond Street. Kumar Aff. ¶ 20. Additionally, he does not give assignments to any franchise drivers of any of the companies operating out of 335 Bond Street. Kumar Aff. ¶ 21. Kumar does not speak for or on behalf of Slinin, nor does he speak for or on behalf of any director or supervisor of any of the companies operating out of 335 Bond Street. Kumar Aff. ¶ 24.

A.    *Kumar's Recent Conversation with Jagjit Singh*

On Friday, July 12, 2013 or Saturday, July 13, 2013, Kumar received two missed calls on his cellphone from a phone number he did not recognize. Kumar Aff. ¶ 25. The phone number

had a "917" area code. *Id.* On or about Sunday, July 14, 2013, Kumar called back this unrecognized number to see who it was. Kumar Aff. ¶ 26. When the person on the other end answered the phone, Kumar recognized his voice and realized it was Jagjit Singh, as he had been associated with a company at 335 Bond Street for many years. *Id.* This is the only conversation Kumar had with Singh in 2013. Kumar Aff. ¶ 27.

During the July 14, 2013 phone call, Kumar told Singh he called him back because he had two missed calls from him. Kumar Aff. ¶ 28. Singh asked him how work was, and Kumar said it was "good." *Id.* Singh then then asked Kumar if he could come back to work for the company. *Id.* Kumar responded that he did not know any reason why he could not and that he was not even sure why he left in the first place. *Id.* Singh then told Kumar he was coming to New York. *Id.* This short conversation lasted no more than a few minutes. *Id.* During this call, Kumar did not discuss this lawsuit, depositions, travel costs, travel cost payments, testifying, or reasons for traveling to New York. Kumar Aff. ¶ 29. Slinin never spoke to Kumar about this lawsuit, and Kumar never told him or anyone else from CTG's management about his conversation with Singh. Kumar Aff. ¶ 30. Additionally, no owner, executive, officer, or manager any of the companies operating out of 335 Bond Street spoke to Kumar about this lawsuit, and no one told him or asked him to speak to Singh or any other driver about the lawsuit. Kumar Aff. ¶ 31. Kumar never threatened Singh or anyone else in any way about this lawsuit, nor did he ever say anything to anyone intending to intimidate them or convince them not to participate in this lawsuit. Kumar Aff. ¶ 34.

## V.   Joseph Civello

Joseph Civello is an employee of CTG. Civello Aff. ¶¶ 1-2. He works in dispatch operations. *Id.* Slinin has instructed Civello not to speak to drivers in an attempt to dissuade

them for joining this lawsuit.  Civello Aff. ¶ 5.  Civello has never spoken with Bhatti – or any

other drivers – regarding this lawsuit or the tax consequences thereof.  Civello Aff. ¶ 4

VI.  **Plaintiffs' Harassment of Defendants and Tortious**
     **Interference with Defendants' Business Relationships**

     Mohammad Shah is a black car driver who sometimes works as an on-site dispatcher for

large events held by clients of CTG.  Shah Aff. ¶ 3.  On the night of July 26, 2013, Shah was

working as an on-site dispatcher for a large client event.  Shah Aff. ¶ 4.  The event was being

held at 355 West 16th Street, New York, New York 10011.  *Id.*  At approximately 9:15 p.m.,

Shah walked a client who was leaving the event to the line of cars to deliver the client and a

voucher to the driver that would take the client home.  Shah Aff. ¶ 5.  As Shah approached the

line, he noticed a person standing by the line of cars who was not one of the drivers working the

event that night.  At first he did not recognize this person.  Shah Aff. ¶¶ 5-6.  As he got closer, he

realized it was Carlota Briones, one of the opt-in plaintiffs in this lawsuit.  Shah Aff. ¶ 6.  He

asked Ms. Briones what she was doing at the client event, given the fact that she was no longer

driving for the company.  Ms. Briones responded by becoming hostile, and accused Shah of

being a "lapdog" and demanding that he "leave [her] alone."  Shah Aff. ¶ 7.  At this time, Shah

also noticed that Ms. Briones was handing out flyers to the drivers who were in line at the client

event.  Shah Aff. ¶ 8.  Shah responded to Ms. Briones by asking that she not cause any trouble,

and politely requesting that she leave the client event, as it was his job to make sure everything

ran smoothly that night.  Shah Aff. ¶ 9.  He did not want a scene to be caused in front of an

important client, but Ms. Briones refused his request to leave.  *Id.*

     In an effort to resolve the matter, Shah spoke with the security guards who worked for the

hotel where the client event was taking place.  Shah Aff. ¶ 10.  The security guards approached

Ms. Briones and asked her to please leave.  Shah Aff. ¶ 11.  Ms. Briones then walked across the block and was joined by another man whom Shah did not recognize.  *Id.*  Ms. Briones and this man walked to the corner of the block and attempted to distribute flyers to any drivers who passed by.  *Id.*

## ARGUMENT

### I.   NO AGENT OF CTG HAS THREATENED OR IMPROPERLY COMMUNICATED WITH CLASS MEMBERS.  THEREFORE, NO COURT ORDER OR CORRECTIVE NOTICE IS NECESSARY.

An order limiting communications between parties and potential class members may only be entered if there is a clear record with specific findings that reflect a need for infringing upon the parties' First Amendment rights.  *Gulf Oil v. Bernard*, 452 U.S. 89, 101-02 (1981) ("an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties.  Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23."); *Burrell v. Crown Cent. Petroleum*, 176 F.R.D. 239, 244 (E.D. Tex. 1997) ("Absent a clear record and specific findings of realized or threatened abuses, an order cannot be justified under the relevant standard."); *Hampton Hardware v. Cotter & Co.*, 156 F.R.D. 630, 632 (N.D. Tex. 1994) ("Before a district court can issue an order limiting class contact the Supreme Court requires 'a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties.") (citation omitted). The existence of a "potentially coercive" situation is not enough to warrant a court order. Rather, plaintiffs must produce "evidence that justifies an interference with Defendant[s'] speech." *Burrell*, 176 F.R.D. at 244.

Because there is no evidence to support the allegation that class members or putative class members were threatened, intimidated, misled, or discouraged from joining this case by any agents or supervisors of CTG (or any of the other defendants), this Court does not have the necessary evidence to impose any limitations on defendants' communications with plaintiffs or putative plaintiffs. Not only is Sibilini not a supervisor at (or agent of) CTG (or any of the other defendants), but he has not threatened or intimidated any class members in connection with their giving testimony. Additionally, plaintiffs have produced no evidence that Slinin intimidates drivers or "manages" them with "displays of force," Plaintiff's Memorandum of Law in Support Motion for an Order Enjoining Defendants' Improper Communications with Class Memebers and for Corrective Notice at page 6, nor can plaintiffs, since these allegations are not true. Accordingly, there are no actions by defendants for this Court to prohibit.

Additionally, defendants are the ones who are being harassed and intimidated in this case. On July 24, 2013, opt-in plaintiff Carlota Briones attempted to interfere with a large event for which CTG was providing dispatch services. Shah Aff. ¶¶ 4-9. Additionally, Anwar Bhatti surreptitiously tape recorded his meeting with Siblini, and his deposition testimony could give rise to an inference that he was told to tape record the conversation – and may have been given specific phrases to goad Siblini into saying – in an attempt to distract defendants from the merits of this suit with yet another discovery motion. Thering Decl., Ex. A at 134-35.

Furthermore, while plaintiffs' counsel claims that Siblini's statements to Bhatti, Ali, and Siddiqui were threatening, intimidating, and misleading, this statement is belied by the fact that Bhatti, Ali, and Siddiqui all appeared for their depositions. Moreover, this statement is further refuted by Bhatti's deposition testimony that he did not remember what was said at the Dunkin Donuts meeting, and he could not remember if he was upset by the conversation. Thering Decl.,

Ex. A at 136-43, 149-50.  CTG did not threaten, mislead, or coerce any plaintiffs or putative

plaintiffs, and the fact that Bhatti, one of the intended threat recipients, could not remember

anything specific about the conversation at the Dunkin Donuts at his deposition on July 24, 2013

(until after his attorneys removed him from the deposition room for nearly half an hour, likely to

refresh his recollection) undermines plaintiffs' argument that any threats were made.  Thering

Decl., Ex. A at 234-36.  Despite plaintiffs' allegations of intimidation and coercion, both named

plaintiffs – and all other plaintiffs for whom depositions have been scheduled – have appeared at

their depositions, all opt-in plaintiffs continue to fully prosecute their claims, and the number

(and percentage) of people who have opted-in to this case since the subject conversations

continues to be significant – and typical of most opt-in cases.  Plaintiffs have produced no

evidence that any individual was actually dissuaded – or chilled – from participating in this

lawsuit.

## II.     ASSUMING, *ARGUENDO*, THAT ABUSES OCCURRED, THIS COURT MAY ONLY ISSUE THE NARROWEST POSSIBLE RELIEF, AND CORRECTIVE NOTICE SENT AT DEFENDANTS' EXPENSES TO ALL PUTATIVE PLAINTIFFS IS NOT NARROWLY TAILORED TO RECTIFY ANY ALLEGED HARM.

Defendants do not concede that any abuse of Rule 23 has occurred; however, assuming

that an abuse did occur, requiring CTG to mail corrective notice, signed by Slinin, at CTG's

expense to all putative class members is too broad of a remedy.  When remedying a potential

abuse of the class opt-in process, any court order must be narrowly tailored to limit speech as

little as possible. *Gulf Oil v. Bernard*, 452 U.S. 89, 101-02 (1981); *see also Hampton Hardware*

*v. Cotter & Co.*, 156 F.R.D. 630, 632 (N.D. Tex. 1994) ("in issuing such an order the district

court must give 'explicit consideration to the narrowest possible relief which would protect the

respective parties.'").

15

Corrective notice is not appropriate prior to class certification where no harm has been shown. *Id.* at 635 ("although a clear potential for abuse was established there was little evidence of actual harm. Moreover, the class has yet to be certified. To send a corrective notice at this point with little evidence of actual harm prior to the court's certification of this class, would be premature and potentially confusing. If the Court determines that the class should be certified, its notice to class members will provide objective information about the case to members as required by Rule 23(c). For these reasons, a corrective notice should not be sent."). Because the class in this case has not yet been certified, and plaintiffs have shown no harm from any of the alleged actions, corrective notice is inappropriate.

Even if corrective notice were appropriate (which it is not), sending the corrective notice to all putative class members is not a narrowly tailored remedy. If any corrective notice is deemed necessary, it should only be given to the alleged recipients of the purported threats (i.e., Ali, Bhatti, Siddiqui, and Singh). *See Haffer v. Temple of the Commonwealth Sys. of Higher Ed.*, 115 F.R.D. 506, 512-13 (E.D. Pa. 1987). Additionally, any corrective notice should be given orally because the threat came orally.

## CONCLUSION

No restraining order is necessary because neither CTG nor any of its supervisors, agents, servants, employees, or attorneys – or any of the other defendants – have engaged in any threatening or intimidating behavior toward prospective class members, nor have any of these persons communicated directly with prospective class members about any tax or other legal issues related to this lawsuit. Even if the alleged behavior had occurred (which it did not), corrective notice should only be sent to the alleged victims of this behavior (plaintiffs have alleged that there are four victims), not to every member of the putative class.

16

Dated: New York, New York
July 26, 2013

EPSTEIN BECKER & GREEN, P.C.

/s/ Evan J. Spelfogel
Evan J. Spelfogel
Margaret C. Thering
250 Park Avenue
New York, NY 10177
(212) 351-4500
Attorneys for Defendants