UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MAZHAR SALEEM and JAGJIT SINGH, individually    :
and on behalf of all others similarly situated,    :
                     Plaintiffs,    :

         - against -    :
   :
CORPORATE TRANSPORTATION GROUP, LTD.,    :
et al.,    :
   :
                   Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>ECF CASE</u>

Case No. 12-CV- (JMF)

 

 

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

 

Dated:  September 13, 2013

 

**EPSTEIN BECKER & GREEN, P.C.**
250 Park Avenue
New York, NY 10177
Tel: 212.351.4500
Evan J. Spelfogel
Margaret C. Thering
Attorneys for Defendants

TABLE OF CONTENTS

PAGE

I.  PRELIMINARY STATEMENT ................................................................................. 1

II. PROCEDURAL HISTORY .................................................................................... 2

III. STATEMENT OF FACTS ..................................................................................... 2

  A.  Investment by Drivers.................................................................................... 3

  B.  Work and Earnings Opportunities ................................................................. 5

  C.  Lack of Common Control ............................................................................. 12

IV. ARGUMENT ....................................................................................................... 12

  A.  Plaintiffs Have Not Shown That There Are Common Questions of Law or
      Fact That Can Be Commonly Answered Through a Class Action ................... 13

  B.  Plaintiffs have failed to show predominance ................................................. 20

  C.  Class Action is Not a Superior Method of Adjudication in This Case ............. 23

  D.  Class Certification is Not Appropriate Where A Substantial Number of
      Putative Class Members Oppose Plaintiffs' Action And Any Attempt At
      Reclassification As Employees ...................................................................... 24

V.  CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bayles v. American Med. Response,*
    950 F. Supp. 1053 (D. Colo. 1996)........................................................................................1

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426 (2013)..................................................................................20, 21, 22, 23

*Cuevas v. Citizens Fin. Group, Inc.,*
    No. 12-2832-CV, 2013 U.S. App. LEXIS 10737 (2d Cir. May 29, 2013).........................13, 16

*Edwards v. Publishers Circulation Fulfillment, Inc.,*
    268 F.R.D. 181 (S.D.N.Y. 2010) ................................................................................ 15-16

*Fernandez v. Wells Fargo Bank, N.A.,*
    No. 12 Civ 7194, 2013 U.S. Dist. LEXIS 124692 (S.D.N.Y. Aug. 27, 2013) ...........13, 20, 21

*Jacob v. Duane Reade, Inc.,*
    No. 11 Civ. 0160, 2013 U.S. Dist. LEXIS 111989 (S.D.N.Y. Aug. 8, 2013) .............17, 21, 23

*Lynne Wang v. Chinese Daily News, Inc.,*
    709 F.3d 829 (9th Cir. 2013) .....................................................................................13

*Meyer v. U.S. Tennis Ass'n,*
    No. 11 Civ. 6268, 2013 U.S. Dist. LEXIS 60091 (S.D.N.Y Apr. 25, 2013). ..........................17

*Myers v. Hertz Corp.,*
    No. 02-cv-4325, 2007 U.S. Dist. LEXIS 53572 (E.D.N.Y. July 24, 2007),
    *aff'd,* 624 F.3d 537 (2d Cir. 2010) ...........................................................................16

*Myers v. Hertz Corp:*
    624 F.3d 537 (2d Cir. 2010)....................................................................................25

*Narayan v. EGL, Inc.,*
    285 F.R.D. 473 (N.D. Cal. 2012)........................................................................18, 19

*Roach v. T.L. Cannon Corp.,*
    No. 3:10-CV-0591, 2013 U.S. Dist. LEXIS 45373 (N.D.N.Y. Mar. 29, 2013) ..........13, 22, 23

*Shayler v. Midtown Investigations, Ltd.,*
    No. 12 Civ. 4685, 2013 U.S. Dist. LEXIS 29540 (S.D.N.Y. Feb. 27, 2013) .................... 17-18

*Spencer v. Beavex, Inc.,*
    No. 05-cv-1501, 2006 U.S. Dist. LEXIS 98565 (S.D. Cal. Dec. 16, 2006) ......................19, 24

*RBS Citizens, N.A. v. Ross*,
  133 S. Ct. 1722 (2013) .................................................................................................21

*Tracy v. NVR, Inc.*,
  No. 04-cv-06541L, 2013 U.S. Dist. LEXIS 62407 (W.D.N.Y. Apr. 29, 2013) ......................22

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009) ......................................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ......................................................................................... passim

*Xuedan Wang v. Hearst*,
  No. 12-cv-00793, 2013 U.S. Dist. LEXIS 65869 (S.D.N.Y. May 8, 2013) ..........16, 20, 21, 24

**RULES AND STATUTES**

Fed. R. Civ. P. 23 ......................................................................................................... passim

Fed. R. Civ. P. 26(b)(3)...................................................................................................23

FIRM:23794468v1

## I.  PRELIMINARY STATEMENT

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2550 (2011) (quotation marks and citations omitted).

"[A] collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. . . .  **It is oxymoronic to use such a device in a case where proof regarding each individual plaintiff is required to show liability**." *Bayles v. American Med. Response,* 950 F. Supp. 1053, 1065 (D. Colo. 1996) (emphasis added).

The basic tenet of a class action is that multiple plaintiffs may have such common and factually similar claims that it would be inefficient to try the same case over and over again, and that liability – and damages – can instead be determined at a single trial.  This is not such a case.

The record developed so far in this case, including from Plaintiffs' own words, reveals that any determination of liability for considering and treating "black car" drivers as independent contractors, and thus not subject to New York state overtime laws, necessarily requires an examination of the work performed by each one of those independent drivers.  This is because the legality of the independent contractor classification turns on the work actually performed by each individual driver on a day-to-day basis.  The record in this case demonstrates that drivers have dramatically different situations and experiences that are based on the way they each choose to perform (or not perform) their functions.

Plaintiffs' motion for class certification should be denied because Plaintiffs have not met their burden under Fed. R. Civ. P. 23 of proving commonality, predominance, and superiority.  Since the U.S. Supreme Court's decision in *Dukes* in 2011, class certification under Fed. R. Civ. P. 23(b)(3) is no longer a "rubber stamp."  Instead, district courts must conduct rigorous analyses of the facts and issues to determine whether a common answer may be derived through class adjudication.  For that reason, determining the fate of each and every one of over 1,200 current

1

and former putative class member drivers based on the alleged experiences of two named plaintiffs and a handful of opt-ins who have been deposed is fraught with due process concerns that should not be ignored for the sake of "judicial economy" or "expediency."  Because individual issues of liability and damages here will eclipse any common questions of law or fact, plaintiffs' motion for class certification should be denied.

## II.  PROCEDURAL HISTORY

This is a wage and hour collective and class action brought under federal and New York State law.  The named and opt-in plaintiffs allege that defendants misclassified them and other "black car" drivers as independent contractors.  *See generally* Complaint.  Plaintiffs have named as defendants nine corporations: Corporate Transportation Group, Ltd.; Corporate Transportation Group International; Corporate Transportation Group Worldwide, Inc.; NYC 2 Way International, Ltd.; AllState Private Car & Limousine, Inc.; Aristacar & Limousine, Ltd.; TWR Car and Limo, Ltd.; Excelsior Car and Limo, Inc.; and Hybrid Express, Inc.  Plaintiffs have also named Eduard Slinin and his wife Galina Slinin as individual defendants.  While Eduard Slinin is a shareholder and officer of the defendant corporations, Galina Slinin is not a proper party to this action because she has not had any participating role in the defendant-businesses in over six years.   In the instant motion, plaintiffs invoke Fed. R. Civ. P. 23(b)(3) to seek certification of a class action for resolution of alleged violations of New York Labor Law.

## III. STATEMENT OF FACTS

Corporate Transportation Group, Ltd. ("CTG") is essentially a clearinghouse or data processing company that performs referral, billing, and payment services for franchisees of the Franchisors (defined below).[1]   Corporate Transportation Group International and Corporate

---

[1] Dep. of J. Civello p. 37 ("CTG is basically like the PayPal . . . It's a payment processing company, processes vouchers, credit card slips.") (All portions of cited depositions cited in this

Transportation Group Worldwide, Inc. facilitate the provision of transportation services abroad and in the western United States.  NYC 2 Way International, Ltd.; AllState Private Car & Limousine, Inc.; Aristacar & Limousine, Ltd.; TWR Car and Limo, Ltd.; Excelsior Car and Limo, Inc.; and Hybrid Express, Inc. ("Franchisors") sell or lease franchises to individuals and corporations in the black car industry who wish to use CTG's services.[2]

Differences among drivers abound as to how they choose to operate their businesses as black car drivers.  For example, franchisees may incorporate their businesses (but do not have to); 70 of the putative plaintiffs in this action are corporations.  CTG000352.  Driving services may be performed by the franchisees, or the franchisees may choose (on their own, without CTG's or the Franchisor's permission) to retain third-party drivers who possess the requisite licenses and insurance required by the Taxi and Limousine Commission ("TLC") to operate for-hire vehicles and perform driving services on their behalf.[3]

A.  Investment by Drivers

Putative plaintiffs procured their franchises in a variety of ways.  Some purchased their franchises directly from one of the defendants, whereas others bought a franchise from another franchise owner – and for drastically disparate amounts.[4]  Many putative plaintiffs do not even

---

memorandum of law are attached to the declaration of Margaret C. Thering ("Thering Decl.") and organized in alphabetical order by deponent.)

[2] Dep. of J. Civello p. 39-42.

[3] Dep. of J. Civello p. 267 ("Is it true that franchise owners have to get written permission from CTG in order to have someone else operate the franchise?  A.  Not written permission per se, but you need to make sure – we need to make sure or they need to make sure that the driver is properly licensed by the TLC, has a valid driver license, and so forth.  That would be the only stipulation.")

[4] Luis Perez and Miriam Solorzano both testified they bought franchises directly from one of the defendants and paid $14,000 and $37,000 respectively.  Dep. of L. Perez p. 29; Dep. of M. Solorzano p. 25.  Other putative plaintiffs bought their franchises through sources other than one

own a franchise; some simply rent a franchise from another franchise owner. Other drivers rent and eventually decide to buy a franchise, while others rent indefinitely, and still others start out owning a franchise, then switch to renting.[5] Additionally, while some putative plaintiffs own no franchises, some own one franchise, and others own multiple franchises.[6] Moreover, some franchise owners are the only drivers for that franchise, while other franchise owners seek out drivers to rent their franchise(s) at all times, and others only seek driving assistance when on vacation. The drivers make these decisions regarding incorporating, owning or renting franchises, and whether to perform services personally. The defendants do not make any of these decisions, and the variations of these decisions, and the consequences thereof, results in material differences in the relationship between putative plaintiffs and defendants.

Drivers also invest varying amounts in their businesses as a result of not just what they pay for their franchise agreement, but what they pay for their car(s) – and how they obtain their car(s). Some rent cars from other individuals, some rent cars from one of the defendants, some purchase a car from one of the defendants, some purchase cars from private dealerships, and

---

of the defendants. Dep. of A. Bhatti p. 64-65 ("Who did you buy the franchise from?...Tarik, B-U-D-I-K."); Dep. of A. Ali p. 22:20-23 ("You didn't go to Eddie to get – to buy your franchise, did you? I said previously that I bought it from Helmi."); Dep. of M. Pinedo p. 9 ("And I bought [my franchise] from my brother."). Franchisees who purchased from other franchisees paid varying amounts. Dep. of A. Ali p. 21 ("What did you pay for it? I don't remember exactly. Can you give me an approximate amount? I would say two or 3,000."); Dep. of M. Pinedo p. 9 ("How much did you pay him for the franchise? Around 5,000."); Dep. of J. Bautista p. 25 ("I paid $18,000, plus the transfer fee."); Dep. of M. Saleem p. 56 ("What did you pay for the franchise? $3,000."); Dep. of M. Siddiqui 130 ("...he sold it to me for a thousand.").

[5] Dep. of A. Bhatti p. 65 ("Why did you buy the franchise? Before – because before that I – it was – I had rented one."); Dep of A. Koura p. 20, 22 ("Did you sell that franchise? Yes. When did you sell it? 2008. . . . From 2009 until 2012. Did you own a franchise then? No. Did you rent a franchise? Yes.").

[6] Dep. of J. Singh p. 55 ("Did you ever own a franchise with NYC? Never."); Dep. of J. Choudhary p. 17 ( "Do you own a franchise? Yes."); CTG000352. (*See* para. 17 of Thering Decl.)

some purchase cars from private individuals. [7]   Additionally, while most putative plaintiffs service and maintain their own vehicles, one plaintiff testified that CTG did the maintenance work for his vehicle [8]   Differences in how drivers view their responsibility for procuring and maintaining their vehicles goes squarely to the issue of independent contractor classification, and no one driver can fairly or appropriately provide representative testimony about his or her experience in that regard because the experiences are so different.

### B.  Work and Earnings Opportunities

Drivers receive work from CTG's dispatch system by "booking in" to a "zone" – that is by telling the dispatchers, though a smartphone application, that the driver is available to receive work and in what geographical location in the greater New York area the driver wishes to receive work. [9]   "Booking in" to CTG's smartphone application however, is not the only way drivers get jobs.  In lieu of using CTG's smartphone application, some drivers choose to be "pre-offered"

---

[7] Dep. of M. Solorzano p. 39 ("Does your husband drive a black car? Yes….Does he own the Lincoln Town Car he drives? No. Does it rent it? Yes. Do you know who he rents from? To my father."); Dep. of J. Singh p. 42 ("No. It was on rent. Who did you rent from? It's from a person named Mark."); Dep. of L. Perez p. 82 ("Did you get better jobs because you rented a car from Eddie Slinin? It was the verbal agreement I made with him."); Dep. of J. Solorzano p. 106 ("Whom did you purchase it from? Eddie."); Dep. of J. Choudhary p. 37 ("Do you own a car? Yes . . . Where did you buy it? I bought it here in Manhattan on 102nd Street and Park Avenue. There is a shop there."); Dep. of M. Solorzano p. 37 ("Did you purchase the Camry Toyota? Yes. . . . Who did you purchase that from? Through Toyota. Through Toyota, a dealer? Dealer."); Dep. of M. Pinedo p. 55-58 ("You testified that you own a Lincoln. How much did you pay for that Car? About 8,000, 9,000. Did you finance it? No. Did you pay cash? Yes. Do you remember who you paid the cash to? No. . . .How did you learn that the car was for sale? Oh, we went to check it on YouTube and I said what? My sister checked it out on the Internet, and we went to – we went – I went to buy it.").

[8] Drivers generally paid for their own maintenance, including car washes and oil changes. Dep. of J. Choudhary p. 42 ("Who pays for the maintenance work? I, myself."); Dep. of M. Pinedo p. 32 ("Who pays for the car washes? I do. Who pays for the oil changes? Me."); Dep. of L. Perez 84:23-24 ("Who paid for the repairs? CTG.").

[9] Dep. of J. Singh p. 58 - 63.

jobs through CTG's MTA program.[10]   Additionally, some drivers testified that they did private

jobs for CTG top management employees.[11]

   Not only do drivers choose the locations in which they accept or reject jobs, drivers also have

complete control over how often – and when - they do or do not work.   Some drivers, like

Jamshed Choudhry worked nearly every day before choosing to take one or two months off.

Others, like Wilman Martinez, generally took one to two days per week off, with an occasional

one to two week vacation [12]   When taking time off, many of the drivers had other persons drive

for them.[13]   Drivers book in on different days and at different times for different reasons.   Some

book in at the times they think will be most profitable, while some only book in during the hours

of the day they like to work.   For example Marlene Pinedo testified that she drives Sundays

through Fridays "because those are the days when there is the most work," while Anjum Ali

testified that he works at night because his friends work at night, and he is used to working at

night, and Avneet Koura testified he never drove on Sundays.[14]   Critically, for purposes of this

---

[10] Dep. of L. Perez p. 39 - 42 ("How did you get those passengers? CTG would pre-assign them to me. How? The night before they would send me the information . . . Were all of your jobs preassigned to you? Yes.")

[11] Dep. of L. Perez p. 79 ("Were you Eddie Slinin's personal driver? It is what he told everybody.")

[12] Dep. of J. Choudhary p. 61 (Did you take a long vacation beginning in November of 2010 and ending in January of 2011? A. Yes."); Dep. of A. Ali p. 121 ("When you took five weeks off to go to Pakistan, did you have permission of anybody to do that? No"); Dep. of M. Saleem p. 40 - 42 ("How long were you in Pakistan on vacation in 2010? Three to four months… How long did you go for in 2011? It was over two months.")

[13] Dep. of J. Choudhury p. 35 ("Has anyone ever driven your car while you have been on vacation?... Yes")

[14] Dep. .of M. Pinedo p. 40; Dep. of A. Ali p. 96 ("Q. Tell me, please, every reason that went into your decision to drive the evening shift and not the morning shift? A. First reason, I am used to it. Second reason, is my friends who – the people who are my friends who are also working in the night shift, the ones who trained me to be a black car driver, they also work in the evening

motion, there is no single, representative way to describe when, where, or why drivers choose to book in or not book in at any particular time or location.

CTG exercises no control over when and where drivers book in or what jobs, if any, drivers accept or reject, and there is a great disparity with respect to this.  For example, from May 2010 to May 2013, Wilman Martinez never rejected a CTG job offer but Ranjit Bhullar rejected 949; in March 2011, Bhavesh Shah accepted 83 job offers and rejected nine; Jamshed Choudhry accepted 148 job offers and rejected 12; Jose Solorzano accepted only 15 while Jose Cabrera was in the midst of taking the entire year of 2011 off.  (He drove again in 2012.)[15]  Some drivers claim they accepted fewer jobs due to a lack of job availability.   Comparative analysis of accept/reject data with respect to book-in numbers, however, reveals that drivers who booked in more accepted more jobs month-to-month than drivers who booked in less frequently.   For example, during the period April 2011 to August 2013, Jamshed Choudhry booked in 8,163 times and accepted 2,769 job offers; but Rajan Kapoor booked in only 427 times, and accepted only 176 jobs.[16]

One of the primary issues is the degree of control retained by the drivers over whether and to what extent they can book in to potential jobs or choose not to work on a particular day or time.  Each individual driver's experience necessitates proof as to whether *that* particular driver was properly classified as an independent contractor.   Indeed, not only did some drivers reject numerous job offers, some drivers requested to be taken off accounts they did not like.  Anjum

---

shift… I used to take their help. So then become [sic] a routine with me to work in the evenings."); Dep. of Avneet Koura p. 29 ("Q. Did you ever see a job on your BlackBerry on Sunday? A. I didn't turn it on.  Q. You didn't turn your BlackBerry on on Sundays? A. No.).

[15] CTG16554; CTG16550; CTG16551.  *See* para. 18 of Thering Decl.

[16] CTG16550; CTG16551.  *See* para. 18 of Thering Decl.

FIRM:23794468v1

Ali, for example, testified that he asked to be taken off the Chase Bank and Citibank accounts because he did not think they paid enough, and Avneet Koura testified he asked to be taken off the MTA, Chase, and Goldman Sachs accounts for similar reasons.[17]

Drivers earned very different amounts of money depending on where and how much they chose to work. According to CTG's check registers, on a week-to-week basis, gross pay for each driver can vary by several thousand dollars – a fact that is reflected in the wide disparity among the annual pre-tax gross incomes of the plaintiffs.[18] In 2009, for example, Jagjit Singh's IRS Form 1099 from CTG shows earnings of $177,170.35, Anwar Bhatti's shows $63,614.93, Khushwant Singh's shows $35,113.11, Avneet Koura's shows $18,828.95, and Jose Solorzano's shows $1,517.67.[19]

One of the key allegations in Plaintiffs' Complaint is that drivers worked over 40 hours per week and should be reclassified as employees and paid time and one half for those hours. Yet the record shows that the amount of hours worked and indeed, whether a particular driver worked any "over-time" and how much can only be determined on a case by case basis. Drivers choose how much to get paid, not just through their decisions regarding where and when to book in, but through the amount they choose to be taken out from their voucher pay for CTG's commission from invoices they submit to CTG. Most of the customers obtained through CTG's

---

[17] Dep. of A. Ali p. 29 - 30 ("Q. You don't drive at all for any customers for Chase Bank, do you? A. In the beginning I did. Q. When did you stop?... A. When they decreased their rate even further... Q. And when did you stop take [sic] dispatches for Citibank customers? A. When Mr. Eddie took the account for Citibank, Mr. Eddie got this account at the lowest price... Q. Do you drive for Citibank now? A. No. Q. When did you stop driving for Citibank? A. Not since last year."); Dep. of A. Koura p. 63 ("Q. Did you ever take yourself off of an account? A. Yes. Q. Which accounts? A. There was MTA, and Chase, and Goldman Sachs.").

[18] CTG8921–CTG9236; CTG9995–CTG12293. *See* para. 19 of Thering Decl.

[19] CTG000188; CTG00454; CTG00476, CTG00517. *See* para. 20 of Thering Decl.

FIRM:23794468v1

dispatch system pay by credit card or corporate vouchers, and in these cases, drivers submit invoices to CTG.  The drivers receive all money paid by the customer less a commission, or a fee, of between 18-22% for the use of CTG's services (and certain other deductions agreed to by each driver).  This fee varies depending on which Franchisor the driver is affiliated with and how quickly the driver wishes to get his or her check.  The drivers decide how quickly, how much, and when to get paid, and they get paid disparate amounts at different times at varying frequencies based on their individual decisions.[20]

Additionally, individual driver business decisions affect their individual compensation.  For example, many drivers testified they have their own customers, independent of CTG or the Franchisors.  Many of these drivers have their own credit card merchant processing accounts so their private customers may pay them directly by credit card.  In contrast, some drivers did not have their own customers. [21]  Further, some of the drivers advertised their businesses, while

---

[20] Dep. of A. Ali p. 70 ("Q. Did you get more of the money if you waited for your paycheck a little bit longer?"… A. Yes. Q. You would get less of the payment if you wanted your money quicker; is that right? A. Correct"); Dep. of J. Bautista p. 89 ("Q. How often did you get paid? A. Oh, TWR is three options. Q. What are those options? A. Fifteen percent, seventeen and twenty. Q. What's the difference between those? A. Twenty percent I put the vouchers, and three weeks later they give me the check. I almost never worked with 17. 15 percent, and at 20. 20 percent they give them the vouchers on Wednesday and then on Thursday I would have the checks, but they take away 20 percent."); Dep. of J. Solorzano p. 104 ("Q. Were there any other options for processing fee? A. There were other options. There was a 15 percent and 20 percent, and I forget what the other percentage would have been; the way that one would want to cash their money."); Dep. of M. Saleem p. 114 ("A. The 17 and a half percent we received the check after four weeks. The one which was 22 percent, we received the check for that two or three days later.")

[21] Dep. of J. Solorzano p. 38-39 ("Q. Do you have any credit card merchant accounts? A. No, not accounts. It's a machine which goes directly to -- which goes directly to my account. Q. Where did you get this machine? A. By way of the bank… Q. Did you have to buy it? A. It was rented… Q. When a customer would pay using that machine, did the money go directly into your bank account? A. Yes. Q. Did the money go through TWR? A. No."); Dep. of A. Ali p. 37 ("Q. And does Intuit then pay you the money that was charged to the account? A. Yes. Q. And what do you do with the money… Did you turn it in to NYC 2 Way or to Eddie? A. No. Q. You keep it for yourself, don't you? A. Yes"); Dep. of M. Saleem p. 112 ("…Q. Do you have any credit card merchant accounts? A. Yes. Q. With whom? A. Intuit."); Dep. of M. Siddiqui p. 112:22-24

FIRM:23794468v1

others did not.[22]

Not only did some drivers have their own private customers, but some even drove for competitor black car companies concurrently while using CTG's dispatch system.[23]   Many

---

("And when they paid you by credit card, do you have your own merchant processing account? Intuit, I have Intuit merchant account.") Dep. of A. Ali p. 108-110 ("Q. Do you – do you have any repeat private customers? A. There is one. Q. Who is that?... A. Ken Malloy... Q. And when he pays you, when you get the money from Intuit, you keep that money for yourself, right?.. You don't turn over any part of that money at all to NYC 2 Way or CTG, do you? A. It is correct, what you say is correct."); Dep. of J. Choudhary p. 41 ("Q. Do you have personal customers? A. These are the ones that I have. Q. The three that you mentioned? A. Yes."); Dep. of A. Koura p. 52 ("Q. Did any passenger call you directly for a ride? A. Yes... Q. Between 2006 and 2008... approximately how often did a passenger call you for a ride? A. Once or twice a week. Q. How many passengers approximately called you for a ride? A. Three.); Dep. of J. Solorzano p. 36-37 (Q. Do you have any personal customers? A. Yes. Q. How many? A. About two. Now I only have one."); Dep. of J. Bautista p. 77 ("Q. Has any passenger ever called you and asked for a ride? A. No. Has any passenger ever texted you and asked for a ride? A. No. Has any person ever emailed you and asked for a ride? A. No. Has any passenger ever Facebook messaged you to ask for a ride? A. No."); Dep. of M. Solorzano p. 63 ("Has any passenger ever called you directly to see if you could pick them up or take them anywhere? No.); Dep. of M. Siddiqui p. 111 ("Q. Have you ever had any of your own private customers? A. Private customers, no.").

[22] Dep. of M. Solorzano p. 81 ("Q. Did you ever make up business cards for your driving services? A. Yes."); Dep. of J. Solorzano p. 90-91 ("Q. Have you ever had a business card? A. Yes... MS. THERING: I would like to note for the record that the business card says, "Jose M. Solorzano Transportation Service." It says, "Airports, JFK, LaGuardia, Newark. Cell phone (347) 528-3584. E-mail, JoseS65@ Yahoo.com and JoseS652@HTmail.com. Reservations in New York, Visa, Discover, Master Card."); Dep of M. Siddiqui p. 272 ("Do you have a business card? No, I don't."); Dep. of J. Bautista p. 97:17-18 ("Do you have a business card? A. No."); Dep. of J Singh p. 76 ("Q. Did you use a business card of any kind when you were working with NYC? A. No.).

[23] Dep. of A. Ali p. 36 ("Q. At any time in 2011, 2012 or 2013, have you ever driven for any other black cars, for any other black car company other than NYC 2 Way or Eddie? A. Yes. Q. Please name them. A. New York Limo Pros. I have given you the 1099 for the names of all of the companies I have worked for. Q. Was one of those companies Basking Ridge Express Car and Limo? A. Yes. Q. Was another one Platinum Class Limo? A. Yes. Q. Was another one Cartier Limo? A. Yes. Q. Was another one Communicar? A. Yes."); Dep. of M. Saleem p. 20 ("Q. Have you ever done black car work for other companies besides NYC? A. Sometimes. Q. Could you please name those companies? A. New York Limo Pros, Cartier Limo, Basking Ridge Express, Newport Car & Limo. As far as I remember, these."); Dep. of M. Siddiqui p.93-94 ("Q. . . . in the past six years, other than Communicar and CTG, have you ever been affiliated or done work with any other car companies? A. . . . Yes. Q. Please identify those companies. A. Limo Pros, Unilimo, and CTK, I believe."); P00955; CTG 16150; CTG 16147; P001009; P001008;

10

drivers earned significant amounts of money from other car companies unrelated to defendants here.  In 2008, for example, Ranjit Bhullar earned $71,743.02 from Executive Charge and $55,317.67 from CTG.  In 2009, Mohammed Siddiqui earned $77,778.00 from Communicar, $9,603.49 from NY Limo Pros, and $36,345.52 from CTG.[24]  Additionally, some putative plaintiffs drove for competitor black car companies, but not at the same times that they used CTG's dispatch system to procure work.[25]  Further, some drivers pick up street hails who pay the drivers directly.  (The drivers pocketed all the money paid by street hails and did not process any of this through CTG.).[26]

Yet another difference among the drivers that mitigates against class certification is that some take breaks during the day, but some do not.  These drivers break for meals, to sleep, to

---

P001007; CTG 12524; CTG 12522; CTG 12523; CTG 12524; P002457; P002458; P002455; P002463; P002454; P002460;P002456; P002464; CTG 12578; CTG 12577; CTG 12588; CTG 12591; CTG 12590; CTG 12589; CTG 12560; P001152; CTG 16148; P 001153.  *See* para. 20 of Thering Decl.  (Note that many of the documents that indicate putative plaintiffs drove for other black car companies have a "CTG" Bates number because they were procured by responses to subpoenas served on behalf of Defendants.)

[24] CTG12524; CTG12435; P000955; CTG16150; CTG000167.  *See* para. 20 of Thering Decl.

[25] Dep. of A. Koura p. 17 ("Q. Did you ever do any work for any other black car companies? A. No.")

[26] Dep. of A. Bhatti p. 80 ("I did take a street hail once three or four years ago"); Dep. of A. Ali p. 92 ("But you still pick up street hails, don't you? Yes."); Dep. of L. Perez p. 70 ("Q Have you ever picked up a person who was trying to hail a black car in the street? A Yes."); Dep. of M. Saleem p. 79 ("Q. Did you also pick up street hails during that period of time? A. Yes. Did you regularly pick up street hails while you were performing black car services for NYC? A. Sometimes."); Dep. of M. Siddiqui p. 111 ("Q. Have you ever done a street hail? A. Yes… Q. How often do you do street hails? When I don't have work, I try. And sometimes they come to me."); Dep. of M. Pinedo p. 32 ("Q. Do you recall ever picking up a street hail?... A. No"); Dep. of M. Solorzano p. 54 ("Q. During that down time, do you ever pick up a street hail? A. No, never.); Dep. of J. Bautista p. 79 ("Q. Have you ever picked up a street hail? A. No, that's illegal."); Dep. of A. Koura p. 17 ("I did not do street hails."); Dep. of J. Solorzano p. 78-79("Q. Have you ever picked up a street hail? A. No. No. That's illegal."); Dep. of J. Singh p. 73 ("Q. Did you ever pick up a street hail? A. Never I did. Never did. Q. Do you know if other drivers do? A. They do.")

11

return home, to have their cars washed or serviced, or to take care of personal matters.  If the drivers are determined to be employees, individualized inquires will be required to explore this and to calculate precisely how many hours a day or a week each driver actually engaged in compensable activities.[27]

### C. Lack of Common Control

Plaintiffs argue that all putative class members are subject to the same rules that are strongly influenced by CTG's management.  This is untrue.  Rather, years ago (long before this litigation), drivers themselves created their own rules and rulebooks, and such rules have been periodically revised and enforced by franchise driver's, through their own driver Security and Communications Committees.[28]

## IV. ARGUMENT

**Plaintiffs' Proposed Class Should Not Be Certified Because Plaintiffs Have Not Met Their Burden Under Fed. R. Civ. P. 23 of Proving Commonality, Predominance, and Superiority**

---

[27] Dep. of A. Ali p. 88 ("Q. Tell me some examples of reasons why you would push reject. A. Same zone? Q. Yes. A. Only, for example, I need to go to a restroom or rush home at that time or a restaurant or I am very hungry."); Dep. of M. Solorzano p. 79 ("Q. During your typical day you've told us about, from 4 a.m. until either 5 or 9 p.m., did you break for a meal twice a day? A. Every day 30 minutes."); Dep. of J. Bautista p. 66-67 ("Q. When driving for NYC 2 Way or TWR at any time since 2006, did you ever take a break to eat? A. Normally when there was no work. Q. How long of a break did you take? A. Depends. 15 minutes, 20, a half hour. Sometimes one was waiting for work and sometimes you have to eat quickly and do the job."). *Id.* p. 97 ("Q. Did you ever take a nap while waiting? A. Sometimes, yes... Q. Did you ever talk on your phone while waiting for jobs? A. Yes, yes. I would call my family. I would talk to my family.).

[28] Dep. of M. Singh p. 52-53 ("Who were the members of the security committee at NYC when you were working there? . . . Were they all drivers?  Yes, they are drivers."); Dep. of M. Saleem p. 71-72 ("What's the communications committee?  They – it makes rules and – and they have checks over the dispatcher.   And the drivers who work with NYC members of the communications committee?   Yes."); Dep. of J. Civello p. 79, 94 ("What is the security committee?   It's a committee of drivers elected by the drivers to uphold their rules and regulations. . . . Did you review the rulebook?  I have looked it over time.  Did you give them any input as to the content?  No.  Did you communicate with them again about the rulebook at all after you looked at it?  No.  Who wrote the rulebook?  The drivers themselves.")

FIRM:23794468v1

To certify a class, the moving party must show, by a preponderance of the evidence, that all of the requirements of Fed. R. Civ. P. 23: numerosity; commonality; typicality; and adequacy of representation – have been met. Fed. R. Civ. P. 23(a). Under Fed. R. Civ. P. 23(b)(3), Plaintiffs must also prove that common questions of law or fact predominate over individual questions and that a class action would be a superior method of adjudication. While plaintiffs may have met their burden on the numerosity and adequacy of representation prongs of Rule 23, plaintiffs have not met their burden on the commonality, predominance, or superiority prongs.

A. Plaintiffs Have Not Shown That There Are Common Questions of Law or Fact That Can Be Commonly Answered Through a Class Action

In order to meet their burden on the commonality prong of Rule 23, plaintiffs must show that class certification will yield common answers capable of resolving the litigation. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Prior to *Dukes*, the commonality prong of Rule 23 was too often simply a "check the box" proposition. That is no longer the case, as the U.S. Supreme Court gave teeth to the commonality prong of Rule 23 in *Dukes*. Plaintiffs have failed to show that they meet the heightened post-*Dukes* standard of commonality, which applies not only in discrimination cases, but also in wage and hour cases. *Lynne Wang v. Chinese Daily News, Inc.*, 709 F.3d 829, 833 (9th Cir. 2013); *Cuevas v. Citizens Fin. Group, Inc.*, No. 12-2832-CV, 2013 U.S. App. LEXIS 10737 (2d Cir. May 29, 2013) (J. Kaplan); *Fernandez v. Wells Fargo Bank, N.A.*, No. 12 Civ. 7194, 2013 U.S. Dist. LEXIS 124692 (S.D.N.Y. Aug. 27, 2013) (J. Castel); *Roach v. T.L. Cannon Corp.*, No. 3:10-CV-0591, 2013 U.S. Dist. LEXIS 45373 (N.D.N.Y. Mar. 29, 2013) (J. McAvoy).

While our case may involve an ultimate common question: were all drivers properly classified and treated as independent contractors – there is no common answer to this question

FIRM:23794468v1

because plaintiffs do not all perform the same duties for Defendants in the same ways for the same number of hours and at the same compensation level.  Rather, as described above:

- some drivers own franchises, while others do not;

- some drivers rent out their franchises to other drivers, while some do not;

- some drivers drive for their franchises, while others do not (and instead retain others to provide driving services for their franchises);

- some drivers have private customers, while others do not;

- some drivers drive concurrently for competitor black car companies, while others drive exclusively for one of the Defendants;

- some drivers procure jobs by using CTG's smartphone app to choose jobs, while others choose to have CTG's dispatch pre-offer jobs to them;

- some drivers fill the time between accepting jobs offered by defendants with driving for other unrelated and, indeed, competitor car companies, or merely taking care of personal matters or napping;

- some drivers reject jobs frequently, while some rarely reject jobs;

- drivers select the time of day (if any) they choose to drive, with some choosing the times of day they think will be most profitable and others choosing the times of day they most enjoy working;

- some, but not all, drivers pick up street hails;

- some franchisees incorporate their businesses while some do not;

- some putative plaintiffs have their own credit card merchant processing accounts, while others do not;

- some drivers advertise, while others do not;

FIRM:23794468v1

- some putative plaintiffs served on or even chaired the driver committees and were participants in the very discipline system other plaintiffs complain about.

There will have to be individualized inquiries into the circumstances of each putative plaintiff's relationship with Defendants, not only to evaluate these factors to decide whether any particular driver is an employee or independent contractor, but also to determine the individualized measure of damages for each, should liability be found.

Ultimately in *Dukes*, there was no "glue holding the alleged reasons for all those decisions together," and thus the examination of all class members' claims failed to "produce a common answer to the crucial question" (of whether a worker was discriminated against). 131 S. Ct. at 2545 (citations omitted). It will be just as impossible in the instant case to conclude that an analysis of all putative class members' claims will produce a common answer to the "crucial question" of, "was I properly classified as an independent contractor?" As in *Dukes*, allegations that defendants here engage in a practice of misclassifying drivers do not raise a question that lends itself to a common answer. Simply because plaintiffs contend that Defendants may fail to prove the independent contractor classification in a large number of instances – i.e., the alleged common practice – does not mean that there will not be a large and unwieldy number of questions that a jury will have to answer regarding individual class members.

Because not all putative plaintiffs perform the same functions in the same way for Defendants, and because defendants' degree of control, if any, will vary from driver-to-driver, even if there are similar contracts and policies that govern all drivers (which defendants dispute), class certification should not be granted where, as here, there are so many differences as to how any common policies were/are applied. *Edwards v. Publishers Circulation Fulfillment, Inc.*, 268 F.R.D. 181, 184 (S.D.N.Y. 2010) (J. Kaplan) (class certification denied because "while forms of

agreement and other standardized documents surely are pertinent to the analysis, they are not necessarily dispositive of what, ultimately, would be an individualized determination of the degree of control that [defendant] actually exercised over each of the putative class members."); *see also Cuevas*, 2013 U.S. App. LEXIS 10737 (Second Circuit vacated the district court's finding that class certification was appropriate because the district court had simply relied on a blanket policy to certify the class, rather than rigorously analyzing the conflicting evidence about whether the blanket policy actually governed the work performed by all the putative plaintiffs.); *Xuedan Wang v. Hearst*, No. 12-cv-00793, 2013 U.S. Dist. LEXIS 65869, at *19-20 (S.D.N.Y. May 8, 2013) (J. Baer) (class certification denied because "while a close question, the commonality requirement is not satisfied [here] because Plaintiffs cannot show anything more than a uniform policy of unpaid internship. . . . That policy alone cannot answer the liability question, which turns on what the interns did and what benefits they received during their internship."); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009) (district court did not abuse its discretion in declining to adopt plaintiffs' proposed approach of certifying a class whenever an employer uniformly classifies a group of employees as exempt because, notwithstanding such a policy, an individualized inquiry into the manner in which each putative plaintiff performed his or her work would still be required.); *Myers v. Hertz Corp.*, No. 02-cv-4325, 2007 U.S. Dist. LEXIS 53572 (E.D.N.Y. July 24, 2007) (J. Kogan) (class certification denied because a common corporate policy was not determinative of plaintiffs' claims that they were improperly classified), *aff'd*, 624 F.3d 537 (2d Cir. 2010).

If, as here, there is no common policy regarding the actual duties (as opposed to just the classification) of putative plaintiffs, class certification is inappropriate. *See Wang,* 2013 U.S. Dist. LEXIS 65869.  While plaintiffs attempt to bolster their argument with post-*Dukes* worker

misclassification cases in which class certification was granted, those cases, such as *Meyer v. U.S. Tennis Ass'n.,* No. 11 Civ. 6268, 2013 U.S. Dist. LEXIS 60091, at *16 (S.D.N.Y. Apr. 25, 2013) and *Jacob v. Duane Reade, Inc.*, No. 11 Civ. 0160, 2013 U.S. Dist. LEXIS 111989 (S.D.N.Y. Aug. 8, 2013) are cases in which there was no dispute that the workers all performed the same duties and generally performed them in similar locations at similar times.  In contrast, in our case there are a myriad of ways in which putative plaintiffs perform driving services (*e.g.,* some perform services personally, some retain others to perform driving services for them, some incorporate their businesses, some never even buy a franchise).  Accordingly, plaintiffs have not met their burden on the commonality prong of Rule 23.  Additionally, because of the numerous differences with respect to what work putative plaintiffs perform and how they perform such work, a fact-finder will have to apply the factors of the economic realities test to each putative plaintiff individually.  As Judge Forrest said earlier this year:

> Plaintiffs argue that the predominate fact and legal issues relate to whether they received overtime due, whether there were records kept and whether there was willful conduct.  These allegedly common questions of law and fact, are accompanied, however, by the serious threshold inquiry as to whether certain plaintiffs are independent contractors and therefore have no basis for an NYLL claim against defendants. . . . The inquiry as to whether an individual is an independent contractor or an employee is fact specific and may be employee specific: where did he or she work and what were the conditions there?  Who was the supervisor and were representations made?  How was he/she compensated?  For how long a period was he/she employed?

> It is undisputed that at least some of the security guards agreed to work as independent contractors . . . and received 1099's; but plaintiffs claim that they were in fact employees.  In addition, there are differences between where the various guards worked/when and in what capacity.  For instance, some were supervisors, floaters, or relief guards.  There is no evidence as to which guards filled which roles. . . . This court cannot -- consistent with the requirements of Wal-Mart -- assume a key liability issue in plaintiff's favor.  Plaintiffs have not met the predominance requirement.

17

*Shayler v. Midtown Investigations, Ltd.*, No. 12 Civ. 4685, 2013 U.S. Dist. LEXIS 29540, at *27-28 (S.D.N.Y. Feb. 27, 2013) (J. Forrest) (citation omitted).

If a class is certified in this case, hundreds of mini-trials will have to be conducted to determine whether each putative plaintiff was properly classified as an independent contractor, and, if found to be an employee, what the measure of individualized damages would be. Such mini-trials will have to examine issues, including, but not limited to, whether putative plaintiffs provided driving services personally or through the retention of others and whether putative plaintiffs provided driving services for competitors of defendants or for individuals outside of defendants' dispatch system. Because so many mini-trials would be required in this case to determine whether each driver was properly classified as an independent contractor and/or paid proper amounts, and what each did between and while waiting for the next job offer from defendants, plaintiffs' motion for class certification should be denied. In *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 478-80 (N.D. Cal. 2012), a case in which plaintiffs alleged misclassification of drivers as independent contractors, the court denied class certification, in part, because:

> [some] putative class members hired sub-drivers at one time or another. These drivers have retained anywhere from one to more than ten sub-drivers during the course of their relationships with defendants. Some putative class members transitioned to "owner only" roles after hiring sub-drivers, i.e., they had their sub-drivers drive on their behalf for CEVA while personally providing services to other companies. In addition, some putative class members provided pick-up and delivery services to other companies concurrently with performing services for CEVA. In contrast, other class members did not have sub-drivers and/or drove exclusively for CEVA while their contract was in force. Thus, it appears that some putative class members might be found to have been operating businesses distinct from CEVA's business, while for other drivers this factor would weigh in favor of finding an employment relationship. . . .
>
> There appears to be room in the "distinct business" inquiry to consider the differences in the class members' operations, such as whether they hired sub-drivers and whether they contracted with other companies. Plaintiffs argue that this conduct would not transform drivers from employees to independent contractors "any more than a law firm's secretary moonlighting for another firm,

18

or even operating her own independent trucking business, would cause her to cease being an employee of the law firm," but plaintiffs cite no authority, and the analogy is inapposite. . . . The court believes there is a difference between holding multiple jobs and operating a business that provides services to multiple companies, even if both entail personally providing labor to each employer or customer.  It is for a factfinder to decide which description better fits each class member. . . .

To ignore the differences in defendants' operations and certify a class would be tantamount to making a substantive finding that this evidence cannot change the outcome. . . . The court does not ignore the fact that CEVA has standardized many if not all aspects of its relationship with drivers. . . . However . . . the court cannot look only to the details of the relationship as specified between the two parties but must also consider the employer's and presumptive employee's situations. . . . Thus, in light of the record in this case, and the issues that must still be resolved in order to adjudicate the class claims, the court finds that common questions do not predominate.

Like in *Narayan*, some putative plaintiffs in the instant case retain sub-drivers, with some retaining or having retained multiple sub-drivers.  Additionally, here, as in *Narayan*, some putative plaintiffs simply act as owners, not drivers.  Furthermore, here, as in *Narayan*, some putative plaintiffs concurrently provide services for competitors, while some do not.

The need for the court to determine a myriad of highly individualized questions of fact mandates that plaintiffs' proposed class should not be certified.  *See also Spencer v. Beavex, Inc.*, No. 05-cv-1501, 2006 U.S. Dist. LEXIS 98565, at *46 (S.D. Cal. Dec. 16, 2006) (denying class certification in a case alleging improper classification of drivers as independent contractors because "[t]he issue of what use different drivers make of the option to use back-ups and subs is a highly individualized question of fact. . . .   The individualized question of whether a given driver can be said to be engaged in a business distinct from that of the Defendant is the core dispute in this case, and – judging from the evidence before the Court at this time – an inquiry that varies significantly from driver to driver.  Thus, the central question in this case is also the most highly individualized.").

FIRM:23794468v1

B. <u>Plaintiffs have failed to show predominance</u>

For the same reasons that plaintiffs cannot show commonality, they also cannot show predominance. *Fernandez v. Wells Fargo Bank, N.A.*, No. 12 Civ. 7194, 2013 U.S. Dist. LEXIS 124692, at *41-42 (S.D.N.Y. Aug. 28, 2013) ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than <u>Rule 23(a)</u>.") (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)); *Xuedan Wang v. Hearst*, No. 12-cv-00793, 2013 U.S. Dist. LEXIS 65869, at *24 (S.D.N.Y. May 8, 2013)) ("As explained above, Plaintiffs fail to satisfy the predominance requirement because the record shows there is no uniform policy . . . with respect to . . . interns' duties. . . . such that the analysis . . . would have to be individualized.").

Not only is there no predominance in this case because of the individualized inquires that would have to be conducted with respect to liability, there is also no predominance because if putative plaintiffs were found to be employees, all damages assessments would have to be conducted individually because:

- not all drivers work more than 40 hours per week;

- some drivers treat time waiting for a job offer from CTG's dispatch as "working" time and do nothing during that time, while others are entrepreneurial during such times, driving for other black car companies, driving personal customers, or picking up street hails, while still others engage in personal matters, such as napping or talking on the phone, while waiting for jobs;

- not all drivers have a pattern regarding when – and how much – they drive;

- some drivers decide to and take off long periods of time (upwards of two months) at various points throughout the year, while some rarely, if ever, take extended periods of time off; and

FIRM:23794468v1

- some drive seven days a week while some drive only a few days per week.

Because these differences will require individualized assessments of damages that will eclipse any common questions, class certification should be denied. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (prospect of individual damages calculations overwhelming common questions is a reason to deny class certification).

Plaintiffs incorrectly argue in their memorandum of law that *Comcast* does not apply outside of the anti-trust context. Just a few months ago, Judge Baer told Adam Klein, Esq. and Michael Scimone, Esq. (plaintiffs' counsel here) that *Comcast* <u>did</u> apply outside of the antitrust context. *Wang*, 2013 U.S. Dist. LEXIS 65869, at *27 ("[a]lthough Plaintiffs argue that *Comcast* is limited to anti-trust cases, the majority opinion explicitly rejected that very proposition.") (citation omitted). Plaintiffs argue in their July 31, 2013 brief that "[s]ince *Comcast* was decided, numerous courts have declined to extend its holding beyond the antitrust context." Plaintiffs, however, base this argument, in part, on a case that was decided <u>before</u> *Comcast*. Plaintiffs also ignore the fact that Judge Baer told them previously that the U.S. Supreme Court's decision to vacate and remand a Seventh Circuit decision affirming the denial of class certification in a misclassification case showed that *Comcast* applies outside of the anti-trust context. *Id*. at *28 (citing *RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013)).

A number of other cases in the Southern District have come to the same conclusion. *See Fernandez v. Wells Fargo Bank, N.A.*, No. 12 Civ. 7194, 2013 U.S. Dist. LEXIS 124692, at *43-45 (S.D.N.Y. Aug. 28, 2013) (citing *Comcast* while denying class certification in a misclassification case brought under the New York Labor law); *Jacob*, 2013 U.S. Dist. LEXIS 111989, at *62 ("Comcast brings damages to the forefront of the class certification inquiry a holding that, when combined with Dukes' discussion of trial by formula, suggests that where

individualized damages questions so predominate over damages questions capable of classwide proof, certification is inappropriate and raises due process concerns for defendants.") *Roach v. T.L. Cannon Corp.*, No. 3:10-cv-0591, 2013 U.S. Dist. LEXIS 45373, at *9 (N.D.N.Y. Mar. 29, 2013) ("In the instant case, Plaintiffs have not offered a damages model susceptible of measurement across the entire class, arguing instead that this issue is separate from the question of liability. Plaintiffs contend that damages need not be considered for Rule 23 certification even if such damages might be highly individualized. . . . This position is in contravention of the holding of *Behrend.*"); *Tracy v. NVR, Inc.*, No. 04-cv-06541L, 2013 U.S. Dist. LEXIS 62407, at *18 (W.D.N.Y. Apr. 29, 2013) (J. Larimer) (citing *Comcast* while denying class certification in a misclassification case brought under the New York Labor law because assessment of liability and damages where all workers do not perform the same duties "are too highly individualized to form the basis for a class action.") (citation omitted).

In our case, all damages inquiries would have to be completely individualized because not all drivers drive more than 40 hours a week, and not all drivers even book in for more than 40 hours per week. It is not at all clear that every one of the opt-in plaintiffs could even claim a violation of the FLSA's or NYLL's overtime requirements even assuming any of them would be successful in claiming he or she were an "employee" rather than an independent contractor. With respect to the drivers who have driven or booked in for more than 40 hours per week, all of that time will have to be individually analyzed. Some drivers testified they did nothing but drive and then wait hours for work. Other drivers testified that while they were waiting for work they drove for competing black car companies, picked up street hails, called family and friends, serviced their black cars and/or napped. None of those things are compensable, all are highly individualized, and all will have to be excluded from any overtime calculations.

Plaintiffs' failure even to suggest a workable damages model strengthens the argument that class certification should be denied in this case because individualized damages inquiries are just too pervasive and too varied for class purposes. *See Roach,* 2013 U.S. Dist. LEXIS 45373 (class certification should be denied when plaintiffs offer no indication of how damages could be assessed on a classwide basis). Even if Plaintiffs were to propose a common formula for calculating damages, class certification still would not be appropriate. *Jacob v. Duane Reade, Inc.*, No. 11 Civ. 0160, 2013 U.S. Dist. LEXIS 111989, at *36 (S.D.N.Y. Aug. 8, 2013) ("reading *Dukes* and *Comcast* together, it appears that there are due process implications for defendants, which render the so-called 'trial by formula' approach, whereby representative testimony is utilized to determine damages for an entire class, inappropriate where individualized issues of proof overwhelm damages calculations.")

Plaintiffs argue that, if individualized damages assessments will be necessary, this court should certify the class as to liability only. This argument should be rejected, however, because when, as here, "'noncommon issues are inextricably entangled with common issues or . . . the noncommon issues are too unwieldy or predominant to be handled adequately on a class action basis,' bifurcation or limited certification under Rule 23(c)(4) is inappropriate." *Jacobs*, 2013 U.S. Dist. LEXIS 111989, at *40 (citation omitted); *Roach*, 2013 U.S. Dist. LEXIS 45373. As discussed *supra*, both the damages and liability assessments in this case will have to be individualized. Therefore, class certification is inappropriate under both Fed. R. Civ. P. 26(b)(3) and Fed. R. Civ. P. 23(c)(4).

C. Class Action is Not a Superior Method of Adjudication in This Case

Because resolving issues of damages and liability for one putative plaintiff will not resolve those issues for another putative plaintiff, nor will a finding of liability in this case necessarily result in a finding of damages, a class action is not a superior mechanism of resolving

FIRM:23794468v1

this dispute. *Xuedan Wang v. Hearst*, No. 12-cv-00793, 2013 U.S. Dist. LEXIS 65869, at \*28 (S.D.N.Y. May 8, 2013) ("While there is undeniable efficiency that stems from consolidating and concentrating the litigation of similar claims, the individualized nature of proofs in this case signals that case management would be more difficult, if not near impossible, and separate actions may be more appropriate."); *see also Spencer v. Beavex, Inc.*, No. 05-cv-1501, 2006 U.S. Dist. LEXIS 98565, at \*46-47 (S.D. Cal. Dec. 16, 2006) ("Even assuming, *arguendo* that the common questions of law and fact could be efficiently resolved in a class action, the Court does not find that this would be a superior method of adjudication.   Every individual driver's particular case would essentially need to be relitigated after the determination of the common questions of fact and law.").

D.   Class Certification is Not Appropriate Where A Substantial Number of Putative Class Members Oppose Plaintiffs' Action And Any Attempt At Reclassification As Employees

A class action is not a superior method of adjudicating the claims in this case for another important reason.   As of the cutoff date set by the Court, only approximately 200 putative class members had opted into the lawsuit out of a potential class of over 1,200 members.   Now, there appears to be a substantial number of putative class members who not only have decided not to opt-in to the Rule 216 class, but who are actively opposing this action.   On September 13, 2013, a group of 23 franchise owners, representing 140 drivers, filed a petition to file an amicus brief in this action arguing that they are independent contractors, should not be reclassified as employees, do not wish to be reclassified as employees, and that reclassification of employees would harm their business and pecuniary interests.[29]   Because of antagonistic positions among the putative plaintiffs themselves, class adjudication is not a superior method of resolving this dispute, and plaintiffs' motion for class certification should be denied.

---

[29] *See* Declaration of Kevin M. Brown.

FIRM:23794468v1

## V.  CONCLUSION

Plaintiffs here should not be allowed to dictate through the class certification method that defendants' classification of the drivers as independent contractors be determined through "representative evidence," particularly where the relevant factors going to the heart of that determination are simply not susceptible to common proof.  That is the overarching lesson of *Dukes,* and the Second Circuit in *Myers v. Hertz Corp:* 624 F.3d 537 (2d Cir. 2010): certification is inappropriate under Rule 23(b)(3) where, as here, the determination is a complex, disputed issue, and its resolution turns on employee status, which in turn will require the district court to decide many crucial questions involving each individual plaintiff's actual job characteristics and duties.

Plaintiffs have failed to meet their burden under Rule 23 of showing class adjudication is appropriate in this case.  Plaintiffs have failed to show commonality, predominance, or superiority.  Because plaintiffs have not met their burden under Rule 23, and because any class adjudication in this case would devolve into a plethora of mini-trials, plaintiffs' motion for class certification should be denied.

New York, New York
September 13, 2013

EPSTEIN BECKER & GREEN, P.C.

By: _____
    Evan J. Spelfogel and Margaret C. Thering
250 Park Avenue
New York, New York  10177-1211
Phone:  (212) 351-4500
*Attorneys for Defendants*