Evan J. Spelfogel
espelfogel@ebglaw.com
Margaret C. Thering
mthering@ebglaw.com
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, NY 10177
(212) 351-4500
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ x

MAZHAR SALEEM and JAGJIT SINGH, individually and on behalf of all others similarly situated,

                            Plaintiffs,

                - against -

CORPORATE TRANSPORTATION GROUP, LTD., et al.,

                          Defendants.

------------------------------------------ x

**ECF CASE**

12 CV 08450 (JMF)

**AFFIDAVIT OF EDUARD SLININ**

I, EDUARD SLININ, duly sworn, deposes and states:

1.     I am a defendant in this lawsuit.

2.     I am the president of all of the corporate entities in this lawsuit: Corporate Transportation Group, Ltd. ("CTG"); Corporate Transportation Group International; Corporate Transportation Group Worldwide, Inc.; NYC 2 Way International, Ltd. ("NYC2Way"); AllState Private Car & Limousine, Inc. ("AllState"); Aristacar & Limousine, Ltd. ("Aristacar"); TWR Car and Limo, Ltd. ("TWR"); Excelsior Car and Limo, Inc. ("Excelsior"); and Hybrid Express, Inc. ("Hybrid").

3.     My wife, Galina Slinin, has no involvement with running the business of, participating in any decision making with respect to, or handling any driver-related matters with respect to the Defendant companies. Although she served as the manager of accounts receivable

1

for Corporate Transportation Group Ltd. until May 2006, she has not served as Corporate Transportation Group, Ltd.'s manager of accounts receivable, nor performed that or any other function for that company or any of the other Defendant companies from May 2006 to the present. She was not deposed, nor did anyone seek to take her deposition.

4.      NYC2Way, AllState, Aristacar, TWR, Excelsior, and Hybrid (collectively, the "Franchisors") sell franchises to individuals and corporations in the black car industry.

5.      CTG performs referral, billing, voucher processing, and payment services for franchisees of the Franchisors, as well as for drivers of 126 unrelated black car and/or livery companies.

6.      CTG also provides dispatching services for the Franchisors, as well as other black car companies.

7.      Through its dispatching services, CTG matches up people who want rides (prospective customers) with people who wish to provide rides (for-hire drivers).

8.      CTG is paid for its dispatching services.

9.      Corporate Transportation Group International and Corporate Transportation Group Worldwide, Inc. facilitate the provision of transportation services abroad and in the western United States.

10.      None of the Plaintiffs in this lawsuit has ever provided services for Corporate Transportation Group International or Corporate Transportation Group Worldwide, Inc.

11.      Two Plaintiffs, Jose Pinto and Ismael Majia, have never provided driving services for any of the Defendants or otherwise been affiliated with any of the Defendants.

12.      Plaintiffs in this case own or operate franchises with the Franchisors.

13.     Plaintiffs are engaged in common carrier transportation, which is private automobile transportation service.

14.     Plaintiffs provide transportation services, on demand, to a variety of customers.

15.     Plaintiffs are never required to book into CTG's dispatch system.

16.     Anyone can purchase a franchise from one of the Franchisor companies—there are no restrictions regarding who may purchase a franchise.

17.     Plaintiffs are not required to disclose to Defendants other black car companies for which they drive.

18.     After a driver decides with which Franchisor company to be associated, the driver fills out an application in order to be associated with the Franchisor as a base.

19.     Drivers who decide to purchase a franchise must execute a franchise agreement.

20.     In accordance with law, Franchisors file a franchise disclosure statement, which includes the franchise agreements, with the Attorney General's office.

21.     The different Franchisor companies have different franchise agreements.

22.     Drivers who do not purchase a franchise outright can rent a franchise by paying a $2,000 deposit plus weekly rent, which can range from $130 to $150.

23.     Approximately 60% of Plaintiffs own (or have owned) franchises, and 40% rent (or have rented) franchises. (Attached as Exhibit A is a spreadsheet indicating whether Plaintiffs rented or owned their franchises.)

24.     Not all Plaintiffs bought or rented franchises directly from one of the Franchisors.

25.     Among the Plaintiffs who own franchises, approximately 20% to 25% purchased them from private individuals and not from any of the Defendants.

26.     The drivers can have anyone else drive for them, and per TLC regulations, they have to tell the base if they are using another driver to ensure that the other driver has the requisite insurance and TLC license.

27.     When a driver performs a job that is processed through CTG's dispatch system, CTG's billing system creates a voucher based on how much the client was charged for the ride.

28.     Drivers are paid the full fare for the rides that they provide, less commissions, voucher processing fees, and authorized deductions.

29.     Defendants do not control when Plaintiffs provide driving services.

30.     Because Defendants exercise no control over the drivers and cannot guarantee that cars will be available at a certain time, clients sometimes offer incentive payments to the drivers to get them to drive at times when there are shortages of cars.

31.     For jobs dispatched for the Franchisors, CTG receives a $1 voucher processing fee for each voucher it processes.

32.     Other black car and/or livery companies that are unrelated to the Franchisors pay CTG to use its voucher processing and dispatch serving services.

33.     The Franchisors make money from commissions they receive from offering rides to drivers.

34.     In contrast to the drivers, CTG currently has approximately 162 employees who are paid on W-2 forms and operate a dispatch service, billing department, customer service department, driver relations department, and sales department.

35.     Employees of CTG do not see drivers frequently, nor are drivers required to report to the base at 335 Bond Street in Brooklyn every day.

36.     None of the Defendants rent or sell vehicles to Plaintiffs.

37.     If a driver wishes to set up a payment plan to pay third parties for supplies, maintenance, or vehicles, CTG will agree to set up automatic deductions for that driver, so that the driver can have the third party paid directly from his/her voucher payments.

38.     CTG's dispatch operations rely on the skills of the drivers to operate their cars, maintain their licenses, and navigate their way around the city.

39.     Defendants have no rules against drivers using their cars for personal reasons.

40.     Nothing prevents drivers from putting signs for other black car companies on their cars.

41.     Defendants do not reimburse any expenses to franchisees.

42.     Customers are billed for tolls, parking, and other disbursements, which are in turn remitted to the driver, provided the customer pays the same.

43.     Drivers are responsible for obtaining their own insurance.

44.     Bahgat Ahmed ("Bahgat") does not have a position at CTG or at any of the other Defendant companies.

45.     Other than the rent Bahgat pays to lease office space at 335 Bond Street in Brooklyn, none of the Defendants receive any sort of financial benefit from Bahgat's sale of insurance at 335 Bond Street.

46.     Only approximately 40% of Plaintiffs purchased insurance from Bahgat.

47.     The Plaintiffs who purchased insurance from Bahgat purchased the insurance as business insurance.

48.     Bahgat's company, Target Brokerage Corp., is a separate and unrelated entity to any of the Defendants in the case.

49. To obtain black car services, customers can request a black car via telephone, website, or smartphone app.

50. Drivers can book in and accept or reject job offers through CTG's mobile device application ("app").

51. CTG's app is a self-contained program that can be downloaded by a driver to a mobile device, such as a smart phone. A driver who downloads the app onto a smart phone can monitor CTG's dispatch system for job offers and accept, reject, or ignore them. "Apps" can perform the same functions that previously required industry-specific hardware and are becoming prevalent in the black car industry as a way for drivers to monitor different companies' dispatch systems and contract for jobs.

52. Drivers are free to accept or reject job offers.

53. Drivers can engage in any activity (personal or otherwise) while booked in and waiting for job offers from CTG.

54. When drivers receive a job offer from CTG's dispatch system, they can accept or reject it. If the driver rejects the offer, the driver goes to the bottom of the queue and is offered the next available job in the zone when the driver is back at the top of the queue. If the driver accepts the offer, the driver is then given detailed information about the job, including the pick-up and drop-off location and pay rate of the job. After getting this information, the driver then decides whether to ultimately do the job. If the driver chooses to complete the job, the driver does not need to take any further steps (other than completing the job). If the driver chooses not to complete the job (because, for example it does not pay enough or is not in a geographically desirable location), then the driver can "bail out" of a job. "Bailing out" of a job simply means rejecting a job once getting full details about the job.

55.     If a driver "bails out" of a job, the driver is taken off the air for three hours per the Security Committee. I did not establish, nor do I enforce this rule. The Security Committees (described below) established this rule because they found that too many "bail outs" caused it to take longer for customers to get cars, thereby causing some customers to go to other car service companies (which were providing car services more quickly), thereby decreasing the value of their franchises.

56.     If "bailed out," drivers can get line jobs (described below), process jobs for private customers through CTG's dispatch, provide services for competitor black car companies, provide services for private clients, engage in personal activities, or do nothing at all. Though illegal, drivers also pick up "street hails" during this time.

57.     A driver who rejects a job is simply removed from the top of the list and is allowed to immediately book back in to any zone and get in line in the zone queue, and will receive another job offer as soon as he or she is at the top of the list.

58.     In lieu of rejecting jobs or bailing out of jobs, drivers can request not to provide services for certain accounts. Drivers usually make these requests because they do not think the accounts they do not wish to drive for pay enough. Drivers who request to be taken off of an account are, indeed, taken off of that account and not put back on the account unless the driver specifically requests to be put back on the account.

59.     Approximately 16% of Plaintiffs have requested to be taken off of accounts, and some have asked to be taken off of more than one account. Specifically, the following Plaintiffs requested to be taken off the following numbers of accounts:

| Plaintiff | Number of accounts plaintiff requested to be off |
|---|---|
| Mark Shinder | 9 |
| Mohammad Siddiqui | 8 |

| | |
|---|---|
| Kuldip Singh | 8 |
| Mikhail Gerber | 6 |
| Edgar Acuapina | 5 |
| Babar Hafeez | 5 |
| Avneet Koura | 5 |
| Issa Feras | 4 |
| Inderjit Singh | 4 |
| Khushwant Singh | 4 |
| Dongseog Yoo | 4 |
| Anjum Ali | 3 |
| Abdelilah El Karhat | 3 |
| Marlene Pinedo | 3 |
| Mustapha Rahmouni | 3 |
| Aziz Urrehman | 3 |
| Luis Aucapina | 2 |
| Walid Hamcho | 2 |
| Ibrahim M. Desooki | 2 |
| Jose Mogrovejo | 2 |
| Ranjit Bhullar | 2 |
| Juan Soto | 2 |
| Mei Yao | 2 |
| Jose Cabrera | 1 |
| Norman Ho | 1 |
| Jeewan Singh | 1 |
| Mena Michael | 1 |
| Gurmail Singh | 1 |
| Joginder Singh | 1 |
| Leo Stewart | 1 |
| Harnek Whar | 1 |
| Sheng Zhong Xu | 1 |

60.     Sometimes Defendants are unable to fulfill a customer's request for a car because no driver wants to accept the job, often because it does not pay enough. Customers will cancel rides, often if the wait time for a car is too long because Defendants are unable to fulfill customer requests fast enough due to the unavailability or unwillingness of drivers to accept the jobs. (Attached as Exhibit B is chart showing the number of jobs that were not serviced due to cancellation. Attached as Exhibit B-1 is a professional graphic artist's rendition of this data so that it is easier for the Court to read.)

61.     There were instances when a job was pushed to a particular driver at the request of a customer. Sometimes a job is not given to a driver who is at the top of the queue because a client has asked that certain drivers not provide services for the client's account. In this event, the driver to whom the job was not offered remains at the top of the queue and is offered the next available job.

62.     From 2009-2012, the following Plaintiffs were removed from the following accounts at the client's request:

| PLAINTIFF | CLIENT |
|---|---|
| Tamer Rashdan | Administration for Children's Services |
| Mazhar Saleem | Ernst & Young |
| Rangdev Multani | New York Life Insurance Co. |
| Ashwin Kumar | Horizon Blue Cross Blue Shield |
| Daniel Alexis | Ernst & Young |
| Anjum Ali | Ernst & Young |
| Francois FanFan | Merrill Lynch |

63.     In lieu of using CTG's smartphone application, or in addition to using it, drivers may choose to obtain jobs at 10 lines (queues of cars that wait on the street outside high volume clients) at various points in Manhattan.

64.     Drivers are free to join or leave a line at any time they choose.

65.     Some Plaintiffs frequently get jobs through the lines.

66.     Some Plaintiffs rarely get jobs through the lines.

67.     Drivers will identify with one of the Franchisors to sit in one of these lines because the businesses only allow certain car service companies to provide services for their lines.

68.     If a driver is going to wait in "lines" in front of specific clients, the clients require the drivers to have a scannable bar code (that the clients provide) available in their vehicle to verify they are actually affiliated with the company with which the client has an agreement.

69.     Drivers can also choose to service the MTA Account. Approximately 60% of Plaintiffs have chosen to drive for the MTA account at some point.

70.     CTG also enters into affiliate agreements with outside companies to service the MTA account. CTG does this because some of the Franchisor drivers refuse to service the MTA account because they believe it does not pay enough and/or because they do not like the geographic locations of its jobs.

71.     CTG does not have an exclusive contract with the MTA.

72.     The majority of Defendants' business does not come from the MTA.

73.     Drivers also receive calls directly from customers, and Plaintiffs have received calls directly from customers for which they processed job payments through CTG's voucher processing services. Approximately 40% of Plaintiffs performed trips for personal customers that were processed through CTG's voucher processing service. Specifically, from April 2012 until December 2013, the following Plaintiffs performed trips for personal customers and processed them through CTG's data processing service:

| NAME | PRIVATE TRIPS | NOTES |
|------|---------------|-------|
| Harvinder S. Bhamra | 475 | One customer accounted for 218 of Bhamra's trips. |
| Harnek Whar | 413 | One customer accounted for 111 of Whar's private trips. |
| Prakash Badlani | 304 | |
| Rangdev Multani | 300 | One customer accounted for one-third of Multani's private trips. |
| Adam Klag | 290 | Two customers accounted for over 90% of Klag's private trips. |

| NAME | PRIVATE TRIPS | NOTES |
|---|---|---|
| Jamshed Choudhry | 285 | |
| Edgar Aucapina | 281 | One customer accounted for 24% of Aucapina's private trips. |
| Mohammad Siddiqui | 259 | |
| Anjum Ali | 228 | |
| Kouri Baudwin | 215 | |
| Luis Aucapina | 212 | One customer accounted for one-third of Aucapina's private trips. |
| Inderjit Singh | 209 | One customer accounted for 65% of Singh's trips. |
| Harrikisoon Seejattan | 187 | Two customers accounted for 77% of Seejattan's private trips. |
| Ahmed Nisar | 164 | Three customers accounted for 76% of Nisar's private trips. |
| Mena Michael | 161 | One customer accounted for one-quarter of Michael's private trips. |
| Nestor Teran | 135 | |
| Kuldip Singh | 109 | One customer accounted for more than 70% of Singh's private trips. |
| Felix Caraballo | 103 | |
| Khushwant Singh | 102 | |
| Edisson Barros | 96 | |
| Saad Attia | 91 | |
| Jagjit Singh | 91 | |
| Bhavesh Shah | 86 | |
| Arcelia Barros | 84 | |
| Wilman Martinez | 80 | |
| Mazhar Saleem | 76 | |
| Gustavo Garcia | 69 | One customer accounted for more than half of Garcia's private trips. |
| Pedro Pazmino | 67 | |
| Wei Xiong Ni | 63 | |
| Aziz Urrehman | 62 | |
| Anwar Bhatti | 55 | |
| Mikhail Zemka | 48 | |
| Mohammed Mian | 47 | |
| Joginder Singh | 46 | |
| Daniel Alexis | 43 | |
| Jose Cabrera | 41 | |
| Nwala Gabriel | 41 | |
| Irfan Shafi | 37 | |

| NAME | PRIVATE TRIPS | NOTES |
|---|---|---|
| Marlene Pinedo | 31 | |
| Harvinder Singh | 36 | |
| Avneet Koura | 28 | One customer accounted for 27 of the 28 trips. |
| Euclides Pena | 24 | |
| Jeff Gravesande | 20 | |
| Mikhail Gerber | 17 | |
| Norman Ho | 17 | |
| Luis M. Vasquez | 16 | |
| Ranjit Bhullar | 14 | |
| Gurmail Singh | 14 | |
| Miriam Solorzano | 14 | |
| Jairo Bautista | 13 | |
| Luis Sanchez | 12 | |
| Shahidullah Dulal | 11 | |
| Mohammed Gazi Ali | 10 | |
| Mustapha Rahmouni | 10 | |
| Imtiaz Quereshi | 7 | |
| Firozuddin Syed | 7 | |
| Man Cheng | 6 | |
| Ahmed Ismail | 5 | |
| David A. Sanhez | 5 | |
| Maninder Singh | 5 | |
| Mohammad Choudhry | 4 | |
| Liang Hua Ma | 4 | |
| Firoz Ahmed | 3 | |
| Socrates Gregoriadis | 3 | |
| Mario Guerrero-Bajana | 3 | |
| Ke Shi | 3 | |
| Mohammed M. Islam | 2 | |
| Ashwin Kumar | 2 | |
| Wenzhong Li | 2 | |
| Xiangbo Li | 2 | |
| Nobel A. Young | 2 | |
| Roxana Zetino-Beltran | 2 | |
| Xun Li Fan | 1 | |
| Shuhrat O. Khakberdiyev | 1 | |

74. All drivers are free to participate in a Sunshine Fund.

75. Drivers are free to start or stop participating in a Sunshine Fund at any time.

76. I do not benefit financially from the existence of the Sunshine Funds.

77. No one from management benefits financially from the existence of the Sunshine Funds.

78. I have nothing to do with the bank accounts for the Sunshine Funds.

79. The New York City Taxi and Limousine Commission ("TLC") is the agency responsible for licensing and regulating (among other thing) New York City's for-hire vehicles (including black cars), and paratransit vehicles.

80. The Franchisors are regulated by the TLC.

81. Plaintiff drivers are regulated by the TLC.

82. Defendants do not have any involvement with drivers being disciplined by the TLC.

83. While CTG and the Franchisors prefer that drivers be "professionally dressed," neither I nor any other Defendants take or have taken any actions against drivers who choose not to dress professionally.

84. Defendants have never fined any Plaintiffs. There were instances in which Defendants would learn that a driver fraudulently billed a passenger (e.g., such as for going through a toll booth the passenger did not go through) and then reverse the fraudulent charge and recoup the overpayment from the Plaintiff; however, Defendants did not impose monetary fines on Plaintiffs to penalize them for engaging in any sort of behavior.

85. Franchisees are free to incorporate their businesses.

86. When the Franchisors were formed, the drivers who bought franchises decided to form Communications and Security Committees because they had established and run such committees when affiliated with previous franchisor companies, and they believed that the establishment of such committees would help protect their investments in their franchises.

87. All of the Security Committees and Communication Committees were formed by drivers and are comprised entirely of drivers.

88. Stephen Aliberti was retained by me on behalf of CTG to act as a consultant for the MTA Account.

89. Upon its request, I granted permission to the Security Committee of NYC2Way to use Stephen Aliberti to assist them with inspections. The Security Committee requested permission to use Stephen Aliberti to help them with inspections because its members wanted to enforce the security committee rules, but preferred to outsource that function in favor of driving. Granting this permission benefitted the NYC2Way Security Committee by providing an additional person to help the Committee enforce its rules.

90. Stephen Aliberti did not have the authority to terminate franchise agreements or otherwise terminate services provided by drivers. Stephen Aliberti did not have the authority to discipline drivers, unless acting at the direction of the Security Committee. In late 2011, Stephen Aliberti ceased being a contractor for CTG.

91. In April of 2012, I retained Joseph Maydwell as a contractor for CTG.

92. On October 22, 2011, I was invited, by Security Committee members, to speak at a meeting of all NYC2Way drivers. Among items on the agenda was the election of the chairs and members of the NYC2Way Security Committee. The Committee asked me to come to speak about the current state of the black car industry and what innovations, if any, CTG was making

in its dispatching services. I accepted this request. Although I spoke at the meeting, I did not vote in the election, nor did I supervise the election, influence the election results, or change the election results. I have never engaged in any such conduct.

93.     From time to time, the dispatchers or I may make recommendations to Security Committees regarding penalties for drivers who have broken security committee rules. These recommendations do not have to be followed.

94.     Franchisee drivers choose which type of franchise they want to purchase based on which is the right fit for them. Drivers may decide that purchasing a franchise is not the right fit for them and decide that renting a franchise is a better choice for them.

95.     Sometimes Plaintiffs told Sanjeev Kumar, a driver relations worker at CTG, that they were looking to buy, sell, or lease a vehicle, and Kumar put people together who wanted to buy or rent vehicle. Neither I nor anyone else from Defendants benefitted financially when Kumar did this.

96.     Plaintiffs are not required to wear clothing bearing any CTG or Franchisor logos.

97.     Plaintiffs generally earned more money if they were strategic about accepting jobs. Additionally, if Plaintiffs retained people to work for them and purchased or rented more than one franchise, they generally earned more money.

98.     I declare under penalty of perjury that the foregoing is true and correct.

_____
EDUARD SLININ

Sworn to before me this 14
day of January, 2014
*Marina Kurbanov*
Notary Public

MARINA KURBANOV
NOTARY PUBLIC, STATE OF NEW YORK
No. 01KU6089420
Qualified in Kings County
Commission Expires March 24, 2016

15