Evan J. Spelfogel
espelfogel@ebglaw.com
Margaret C. Thering
mthering@ebglaw.com
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, NY 10177
(212) 351-4500
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| MAZHAR SALEEM and JAGJIT SINGH, individually and on behalf of all others similarly situated, | : | ECF CASE |
|  | : |  |
|  | : | 12 CV 08450 (JMF) |
|  | : |  |
| Plaintiffs, | : | **DEFENDANTS' RULE 56.1** |
|  | : | **STATEMENT** |
| - against - | : |  |
|  | : |  |
| CORPORATE TRANSPORTATION GROUP, LTD., et al., | : |  |
|  | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendants, by and through their undersigned counsel, respectfully submit, pursuant to Fed. R. Civ. P. 56 and L. Civ. R. 7.1 and 56.1, this Statement of Material Facts Not in Dispute ("Statement").[1]

## PROCEDURAL HISTORY

1.      Plaintiffs have brought a wage and hour collective and class action under federal

---

[1] All cited deposition transcript pages referenced in this Statement are attached to the Declaration of Margaret C. Thering ("Thering Decl.").

and New York State law.  Complaint ¶ 5.[2]

2.      Plaintiffs allege that Defendants misclassified them and other "black car" drivers as independent contractors.  Complaint ¶ 3.

3.      Plaintiffs assert they should be retroactively re-classified as "employees" and have named as defendants nine corporations: Corporate Transportation Group, Ltd. ("CTG"); Corporate Transportation Group International; Corporate Transportation Group Worldwide, Inc.; NYC 2 Way International, Ltd. ("NYC2Way"); AllState Private Car & Limousine, Inc. ("AllState"); Aristacar & Limousine, Ltd. ("Aristacar"); TWR Car and Limo, Ltd. ("TWR"); Excelsior Car and Limo, Inc. ("Excelsior"); and Hybrid Limo Express, Inc. ("Hybrid").[3]  Plaintiffs have also named Eduard Slinin and his wife Galina Slinin as individual defendants.  Complaint ¶ 21.

4.      On June 17, 2013, Judge Furman conditionally certified a FLSA collective action. ECF No. 67.

5.      On July 31, 2013, Plaintiffs moved to certify a Rule 23 class in connection with their state law claims.  ECF No. 160.

6.      On September 13, 2013, Defendants opposed this motion.  ECF No. 368.

7.      On November 15, 2013, Judge Furman ruled that there were too many dissimilarities among the Plaintiffs to allow a Rule 23 class to be certified, explaining: "In short, the Court concludes that the common question - whether CTG drivers were misclassified as independent contractors - will not yield a common answer.  Instead,

---

[2] Complaint, ECF No. 1.

[3] Collectively, NYC2Way, AllState, Aristacar, TWR, Excelsior, and Hybrid will be referred to as the "Franchisors."

answering that question as to each driver will require a fact-specific and driver-specific examination of the degree of control that CTG exercised in fact."  ECF No. 430, pp. 12-13.

8.      Additionally, on November 15, 2013, Judge Furman ruled: "Some drivers owned their own vehicles, maintained their own vehicles, had private customers, and drove for competitor car companies.  Some drivers, however, did not have private customers, did not own their vehicles, did not perform their own maintenance, and did not drive for competitor companies.  These differences among drivers are likely to be significant - and could even be outcome determinative."  ECF No. 430, pp.10-11.

9.      On September 16, 2013, 23 franchise owners/drivers moved to file an *amici curiae* brief, arguing that they and all other franchise owners are independent contractors and not employees of defendants.  ECF Nos. 371-374.

10.      In the text of their proposed brief, the *amici* specify that they sought to file the brief in order to protect their investments in their franchises. ECF Nos. 371-374.

## CORPORATE TRANSPORTATION GROUP, LTD.

11.      CTG is a data processing company that performs billing and payment, bookkeeping, brokerage and accounting services, and processes vouchers and credit card slips for franchisees of the Franchisors, as well as for drivers of 126 unrelated black car and/or livery companies.  Civello Dep. p. 37:7-12; Kumar Dep. p. 12:21-22; Slinin Dep. p. 118:17-25; Slinin Aff. ¶ 5.

12.      CTG also provides dispatching services for Franchisors and unrelated black car and/or livery companies.  Slinin Aff. ¶ 6.

13.      Through its dispatching services, CTG matches up people who want rides (prospective customers) with people who wish to provide rides (for-hire drivers).  Slinin

Aff. ¶ 7.

14.     Corporate Transportation Group International and Corporate Transportation Group Worldwide, Inc. facilitate the provision of transportation services abroad and in the western United States.  Slinin Aff. ¶ 9.

15.     None of the plaintiffs in this lawsuit have provided services for Corporate Transportation Group International or Corporate Transportation Group Worldwide, Inc. Slinin Aff. ¶ 10.

16.     From 2006 through the present, Galina Slinin had no involvement with running the business of the Franchisor Defendants.  G. Slinin Aff. ¶¶ 2 - 11; Slinin Aff. ¶ 3.

17.     Although Galina Slinin is listed as the Chief Executive Officer and Principal Executive Officer of CTG Worldwide, Inc. in the New York State Department of State records, she has had no involvement with the business operations or business decisions of the company at any point from 2006 to the present.  G. Slinin Aff. ¶ 6; Slinin Aff. ¶ 3.

18.     Although Galina Slinin is named as the Chief Executive Officer of Excelsior Car & Limo and Hybrid Limo Express in New York State Department of State records, she has had no involvement with the business operations or business decisions of the company at any point from 2006 to the present.  G. Slinin Aff. ¶ 7; Slinin Aff. ¶ 3.

19.     Galina Slinin is not an executive, officer, supervisor, or agent of any of the Franchisor Defendants in this lawsuit.  G. Slinin Aff. ¶¶ 2-11.

20.     Galina Slinin does not set schedules of any employees of CTG or of the Franchisor Defendants.  G. Slinin Aff. ¶¶ 2, 5, 11.

21.     Galina Slinin does not have authority to hire, fire, promote, reassign, or discipline CTG's employees or employees of the Defendant Franchisors, nor does anyone seek her input on such decisions.  G. Slinin Aff. ¶¶ 2, 5, 11.

22.     Plaintiffs' counsel never sought to take the deposition of Galina Slinin.  Slinin Aff. ¶ 3.

23.     The Franchisors sell or lease franchises to individuals and corporations in the black car industry who wish to use CTG's services.  Slinin TRO Aff. ¶ 4, ECF No. 139.

24.     Eduard Slinin is the president of the Defendant corporate entities.  Slinin Aff. ¶ 2.

25.     Plaintiffs own or operate franchises with NYC2Way, AllState, Aristacar, TWR, Hybrid Limousine, and Excelsior.  Of the Plaintiffs in this case, 115 are affiliated with NYC2Way; 53 are affiliated with AllState; 19 are affiliated with Aristacar; 17 are affiliated with TWR; seven are affiliated with Excelsior; and two are affiliated with Hybrid.  Some plaintiffs are affiliated with more than one company.  Slinin Aff., Ex. A.

26.     CTG does not have clients.  The clients are from NYC2Way, Aristacar, and all the other affiliated companies.  Civello Dep. p. 38:13-15.

## **WHAT THE PLAINTIFFS DO**

27.     Plaintiffs are engaged in common carrier transportation, which is private automobile transportation service.  Slinin Dep. pp. 302:18-21, 316:11-25; Slinin Aff. ¶ 13.

28.     Plaintiffs typically operate small motor vehicles.  Slinin Dep. pp. 302:22-303:1, 317:16-23.

29.     In these small motor vehicles, Plaintiffs transport persons and such property as they may carry with them to any requested destination in the community.  Slinin Dep. p. 303:2-10.

30.     Plaintiffs provide transportation services on demand to a variety of customers. Slinin Dep. p. 303:11-24, Slinin Aff. ¶ 14.

31.     Plaintiffs do not drive fixed routes.  Slinin Dep. p. 303:16-18.

32.     Defendants do not dictate the routes Plaintiffs take to transport customers.  Plfs.' Response to Defendants' RFA ¶ 82.[4]

33.     Plaintiffs drive predominantly in the tri-state area (New York, New Jersey, and Connecticut).  Slinin Dep. p. 303:13-15.

34.     The customer determines the time of the trip.  Slinin Dep. p. 303:19-21.

35.     The customer determines the destination of the trip.  Slinin Dep. p. 303:22-24.

36.     Plaintiffs typically only carry one fare at a time.  Slinin Dep. p. 304:9-11.

## DEFENDANTS ARE REGULATED BY THE TLC

37.     The Franchisors each have a base license which entitles them to operate a taxi service within the tri-state area in New York City.  Slinin Dep. pp. 12:19-13:2; Civello Dep. pp. 39:23-42:20.

38.     The Franchisors are regulated by the TLC.  Slinin Aff. ¶ 80.

39.     Per TLC regulations, each black car must be affiliated with a base, but can lawfully be affiliated with only with one base at a time.  Civello Dep. p. 16:16-20; Kumar Dep. pp. 34:17-35:7; Slinin Dep. p. 26:15-17.

40.     Per TLC regulations, Plaintiffs must have TLC licenses and abide by the TLC rules and regulations.  Pls.' Responses to RFA ¶¶ 85-86, 95.

_____

[4] Plaintiffs' Responses to Defendants' Requests For Admission are attached to the Thering Decl. as Exhibit 1.

41.     Approximately 700 black cars are currently affiliated with the Franchisors.  Slinin Dep. p. 26:18-21.

42.     Because they facilitate and serve the transportation needs of the public, customer safety and public safety are constant and important concerns in CTG's and the Franchisors' businesses.  Slinin Dep. pp. 131:19-132:3.

43.     Plaintiff Miriam Solorzano was disciplined by the TLC for refusing to allow a blind passenger to bring his "seeing eye dog" into her vehicle.  P 000021, 000022, 000180.[5]

### HOW DOES ONE PROVIDE SERVICES FOR ONE OF THE FRANCHISORS?

44.     One can buy a franchise directly from one of the Franchisors.  Kumar Dep. pp. 15:23-16:17.

45.     If purchased directly from a Franchisor, Allstate franchises cost $20,000; Aristacar and TWR franchises cost $32,000; NYC franchises cost $40,000; and Excelsior franchises cost $60,000.  CTG 12644, 13417, 13739, 14428, 000351 p.1, 15923.[6]

46.     One can also buy a franchise directly from a franchisee in the secondary market.  Ali Dep. p. 22:20-23; Malchikov Declaration ¶ 3, ECF No. 374; Kumar Dep. p. 198:9-11.

47.     Plaintiffs bought and sold franchises on the secondary market (i.e., not from any of the defendants).  Slinin Aff. ¶ 25.

48.     For example, Anjum Ali and Mazhar Saleem bought their franchises from Helmy Hussein for $1,000.  P 001144, 002052.[7]

---

[5] These documents are attached to the Thering Decl. as Exhibit 61.

[6] These documents are attached to the Thering Decl. as Exhibits 24-30.

[7] These documents are attached to the Thering Decl. as Exhibit 30.

49.     Some Plaintiffs rented their franchises from Franchisors or on the secondary market.  M. Singh Dep. p. 36:17-19; M. Solorzano Dep. p. 27:10-15.

50.      Plaintiffs decide whether to rent or buy a franchise and with which company to be associated.  Kumar TRO Aff. ¶ 11, ECF No. 143; *see also* Kumar Dep. p. 24:13-25.

51.     Franchisee drivers choose which type of franchise they want to purchase based on which is the right fit for them.  Slinin Aff. ¶ 94.

52.     Drivers may decide that purchasing a franchise is not the right fit for them and decide that renting a franchise is a better choice for them.  Slinin Aff. ¶ 94.

53.     If a driver does not purchase a franchise outright, the driver can pay a $2000 deposit and pay a weekly rent, which can range from $130 to $150.  Slinin Aff. ¶ 94; CTG 12644, CTG 13417, CTG 13393, CTG 000351 p.1.[8]

## HOW PLAINTIFFS ARE PAID

54.     When a Plaintiff picks up a customer of one of the Franchisors, per the terms of the franchise agreement, the Plaintiff processes the billing through CTG.  *See, e.g.,* CTG 13750, 14437.[9]

55.     When a Plaintiff picks up his or her own client (i.e., one that is not obtained by through one of the Franchisor Defendants), the Plaintiff may process it through whatever method he or she chooses, including his or her own bank account or credit card merchant service account.  Siddiqui Dep. p. 111:24-112:3; Slinin Dep. p. 64:1-8.

---

[8] These documents are attached to the Thering Decl. as Exhibits 24-30.

[9] These documents are attached to the Thering Decl. as Exhibits 26 and 27.

56.     After completing a job for one of the Franchisors' customers, the Plaintiff asks the customer to sign a voucher.  Kandov Dep. p. 31:12-16; Kumar Dep. pp. 38:15-39:13, 213:8-15.

57.     Plaintiffs submit these vouchers to CTG for payment.  Pls.' Response to RFA ¶ 116.

58.     Each voucher represents one trip.  Kandov Dep. pp. 36:22-37:4.

59.     Plaintiffs are paid the full fare for the rides that they provide, less commissions, voucher processing fees, and authorized deductions.  Slinin Aff. ¶ 28.

60.     CTG charges a $1 processing fee per voucher regardless of voucher amount.  Kumar Dep. pp. 42:13-43:4.

61.     To get paid, Plaintiffs bring their vouchers to CTG's office at 335 Bond Street.  Choudhary Dep. p. 53:5-7; Kandov Dep. p. 31:12-16; Kumar Dep. p. 213:12-23; Pinedo Dep. p. 50:17-19.

62.     Plaintiffs decide when and how often to drop off their vouchers and pick up their voucher payments.  Pls.' Response to RFA ¶ 121; Civello Dep. pp. 158:11-20, 309:15-311:18; Kandov Dep. p. 31:17-19; M. Singh Dep. p. 59:17-19, 21.

63.     Whenever a driver submits a voucher, CTG's billing system processes the vouchers and pays the driver.  Kandov Dep. p. 31:14-16; Kumar Dep. pp. 38:22-39:3.

64.     Plaintiffs choose when to get paid.  Pls.' Response to RFA ¶ 121.

65.     Plaintiffs pay a commission to the Franchisor Defendants.  CTG 12622, CTG 13393, CTG 13749, CTG 13750, CTG 14437, CTG 14439, CTG 000351, CTG 15901.[10]

_____

[10] These documents are attached to the Thering Declaration as Exhibits. 24- 29.

66.     Plaintiffs choose the amount of commission to pay.  CTG 12622, 13393, 13749-13750, 000351 p.8, 15901.[11]

67.     Plaintiffs are not paid by direct deposit.  Civello Dep. p. 326:7-9.

### PURCHASING A FRANCHISE

68.     There are no restrictions regarding who may purchase a franchise.  Slinin Aff. ¶ 16.

69.     The only requirement to purchasing a franchise is the procurement of a valid TLC license.  Kumar TRO Aff. ¶¶ 22-23, ECF No. 143.

70.     If a person decides to purchase a franchise, he or she must execute a franchise agreement, which may be reviewed with an attorney and negotiated prior to executing.  Kumar Dep. pp. 31:19-32:9; CTG 12660-12661, 13792, 000351, 15939.[12]

71.     Negotiations between Plaintiffs and the Franchisors take place over the terms of the franchise agreements and often focus on items such as the purchase or rental price the Plaintiff and Franchisors will agree upon for the franchise, or whether the franchise will be a "rent-to-buy" arrangement.  Kumar Dep. pp. 197:12-201:8.

72.     The different Franchisors have different franchise agreements.  CTG 12622, 12644, 12647, 12649, 12652, 12658, 12660-12661, 13382-13475, 13393, 13417, 13420, 13425, 13432. 13739, 13749, 13750, 13764, 13781, 13783, 13789, 13792, 14437, 14439,

---

[11] These documents are attached to the Thering Decl. as Exhibits 24, 26, 28, and 29.

[12] These documents are attached to the Thering Decl. as Exhibits 24, 26, 28, and 29.

14453, 14470, 14473, 14481, 00351, 15901, 15913, 15923, 15927, 15928, 15930, 15939, 000351;[13] Slinin Aff. 21.

73.     While there are differences among all of the franchise agreements, there are also similarities.  For example, all franchise agreements contain the provision: "Franchisee shall at all times be free from the control or direction of Franchisor in the operation of Franchisee's Vehicle, and Franchisor shall not supervise or direct the services to be performed by Franchisee."   CTG 12613-12709, 13382-13475, 13739-13850, 000351, 15891-15980.[14]

74.     The franchise agreements all state that those who perform driving services for one of the Franchisors are independent contractors.  CTG 12658, 13432, 13789, 000351 p.14, 15936.[15]

75.     The franchise agreements also all provide: "Franchisee is not an employee or agent of Franchisor, but merely a subscriber to the services which Franchisor provides." CTG 12658, 13432, 13789, 000351 p.14, 15936.[16]

## BECOMING AFFILIATED WITH ONE OF THE FRANCHISORS

76.     After a driver decides which company to be associated with, the driver fills out an application with the Franchisor as a base so that a "base transfer" may take place if the driver is already affiliated with a base, or so that a driver may become affiliated with a base if not yet affiliated.  Slinin Aff. ¶18.

---

[13] Excerpts from the franchise agreements are attached to the Thering Decl. as Exhibits 24-30.

[14] These documents are attached to the Thering Decl. as Exhibits 24-30.

[15] These documents are attached to the Thering Decl. as Exhibits 24-30.

[16] These documents are attached to the Thering Decl. as Exhibits 24-30.

77.    The "base transfer" process is required by TLC rules.  Kumar TRO Aff. ¶ 12; *see also* Kumar Dep. pp. 34:21-35:7.

78.    TLC rules provide that a Plaintiff can only be associated with one base at a time. Kumar Dep. pp. 34:21-35:7.

79.    CTG keeps the application on file with its drivers' relations department for those who perform driving services for one of the Franchisors.  Kumar Dep. p. 37:2-16.

80.    The application includes basic information about the driver and the driver's vehicle and a "deduction agreement" sheet listing the agreed upon deductions to be deducted from payments to that driver.  Kumar Dep. 37:7-16.

81.    These deductions are not made without driver authorization.  Kumar Dep. 37:17-38:17.

82.    These deductions codes are entered into CTG's billing/payment system, and the process is carried out through automated calculations and deductions from each check issued to a specific driver.  Kandov Dep. pp. 39:13-15, 40:15-22, 92:4-10.

83.    Plaintiffs are not required to disclose to Defendants other black car companies for which they drive.  Slinin Aff. ¶ 17.

84.    None of the Defendants perform a background check for criminal history or outstanding TLC violations.  Civello Dep. p. 331:9-23; Kumar Dep. pp. 60:19-61:7.

85.    The TLC does this before issuing its license.  Civello Dep. p. 331:18-23.

86.    If a driver is going to wait in "lines" in front of specific clients, the clients require the drivers to have a scannable bar code (which the clients provide) available in their vehicle

to verify they are actually affiliated with the black car company with which the client has an agreement.  Slinin Aff. ¶ 68.

### FRANCHISES ARE TRANSFERABLE AT FRANCHISEES' WILL

87.    All of the franchise agreements for the Franchisors provide that the franchise may be leased or rented to a third party with the prior written consent of the Franchisor, which consent *shall not be unreasonably withheld*.  CTG 12649, 13422, 13780-13781, 000351 p.5, 15927-8.[17]

88.    One can purchase as many franchises as one wants, and some Plaintiffs own or have owned franchises with more than one company.  For example, Plaintiff Keith Daniel owns an Allstate franchise and rents a NYC2Way franchise.  Plaintiff Xun Li Fan owns an Allstate franchise and has rented NYC2Way and Aristacar franchises.  Plaintiff Samson Liao owns a NYC2Way franchise and rents an Allstate franchise.  Plaintiff Luis Perez owns NYC2Way and Allstate franchises.  Plaintiff Hafjur Rahman owns an Allstate franchise and rents a NYC2Way franchise.  Plaintiff Wilson Antonio Santos owns Aristacar and Allstate franchises.  Slinin Aff., Ex. A.

89.    Mark Malchikov, a former driver and current franchise owner, purchased more than two dozen franchises.  Malchikov Decl. ¶ 1, ECF No. 374.

90.    Franchisees view their purchase of franchises as an investment.  Slinin Dep. 66:12-16; Malchikov Decl. ¶ 1, ECF No. 374; Dizengoff Aff. ¶ 15; Avagyan Aff. ¶ 10; Mughal Aff. ¶ 10; Vishin Aff. ¶ 10.

---

[17] These documents are attached to the Thering Decl. as Exhibits 24-30.

91.     Some Plaintiffs in this lawsuit are currently trying to sell their franchise(s). Bautista Dep. p. 26:2; Chowdhury Dep. p. 53:14-16; J. Solorzano Dep. p. 39:18-19; M. Solorzano Dep. p. 26:13-15.

92.     Some Plaintiffs have rented out or are currently renting out their franchises to other third-party individuals or entities that have no direct affiliation with (and are not controlled by) the Franchisor Defendants.  Bhatti Dep. pp. 67:3-7, 10, 16-18, 21-25-68:2-3; Choudhary Dep. pp. 18:18-25-19:2-8.

93.     Additionally, drivers, including Plaintiff Atif Razaq, have placed ads in Black Car News regarding the rental of franchises.  Black Car News issues April-July 2010, and March-December 2013.[18]

94.     Approximately 60% of Plaintiffs own (or have owned) franchises and 40% rent (or have rented) franchises.  Slinin Aff. ¶ 23.

95.     Among the Plaintiffs who own franchises, approximately 20% to 25% purchased them from private individuals and not from any of the Defendants.  Slinin Aff. ¶ 25.

96.     One can cease to be a franchise owner, yet still provide services through the CTG network by renting a franchise.  Koura Dep. p. 22:5-8.

**THE PROVISION OF GROUND TRANSPORTATION SERVICES**

97.     Each Plaintiff operates and runs his or her own business.  Slinin Dep. p. 53:17-19; Pls.' Tax Returns.[19]

98.     Plaintiffs are free to incorporate their businesses.  Slinin Aff. ¶ 85.

99.     Some Plaintiffs incorporated their businesses.  Pls.' Response to RFA ¶ 4.

---

[18] These documents are attached to the Thering Decl. as Exhibit 64.

[19] These documents are attached to the Thering Decl. as Exhibits 41 – 54.

100.   Nick Wijesinghe bought a franchise from Excelsior and incorporated his business as Point to Point Car & Limo.  Slinin Aff., Ex. A; New York Secretary of State Business Entity Report for Point to Point Car & Limo.[20]

101.   Sukhdev Singh rented a franchise from NYC2Way and incorporated it as Paplu Cab Corp.  Slinin Aff., Ex. A; New York Secretary of State Business Entity Report for Paplu Cab Corp.[21]

102.   In 2013, Sukhdev Singh's business made $98,000.  New York Secretary of State Business Entity Report for Paplu Cab Corp.[22]

103.   Odishi Inc., through Joseb Rusia, CEO, bought an Allstate franchise.  Slinin Aff., Ex. A; New York Secretary of State Business Entity Report on Odishi, Inc.[23]

104.   Arcelia Barros, the person who will accept service on behalf of Unicar Luxury, Inc., a business owned by Marlene Pinedo, bought a franchise from Aristacar.  Slinin Aff., Ex. A; New York Secretary of State Report on Unicar Luxury, Inc.[24]

105.   In 2011, Unicar Luxury, Inc. earned $99,000.  Dunn & Bradstreet report on Unicar Luxury Inc.[25]

---

[20] The latter document is attached to the Thering Decl. as Exhibit 74.

[21] The latter document is attached to the Thering Decl. as Exhibits 68-89.

[22] This document is attached to the Thering Decl. as Exhibit 69.

[23] The latter document is attached to the Thering Decl. as Exhibit 67.

[24] The latter document is attached to the Thering Decl. as Exhibit 71.

[25] This document is attached to the Thering Decl. as Exhibit 70.

106. Garnell Wrighten bought a franchise from Allstate and incorporated his business as The Rite Car Service, Inc., which earned $257,000 in 2013. Slinin Aff., Ex. A; Experian report on The Rite Car Service, Inc.[26]

107. Wrighten advertises his business on LinkedIn where he lists himself as the owner of The Rite Car Service, Inc., states that he studied business administration, and states that he is a member of the National Limousine Association and a group pertaining to Airport Transfers & Ground Transportation. LinkedIn Page of Garnell Wrighten.[27]

## FRANCHISEES DO NOT HAVE TO PROVIDE DRIVING SERVICES PERSONALLY

108. Franchisees do not have to provide driving services personally. Civello Dep. p. 305:22-24.

109. Plaintiffs could and did rent out their franchises and retain others to provide ground transportation services on their behalf. Pls.' Response to RFA ¶ 78; Bhatti Dep. p. 67:3-4; Choudhary Dep. pp. 18:18-25-19:2-8.

110. Drivers told the base if they were using another driver to ensure that the other driver had the requisite insurance and TLC license. Slinin Aff. ¶ 26.

## PLAINTIFFS DECIDE WHEN TO PROVIDE DRIVING SERVICES

111. The franchise agreements entered into between Defendants and Plaintiffs do not guarantee a certain amount of work to Plaintiffs. Pls.' Response to RFA ¶ 11.

112. Plaintiffs had no fixed schedule and decided for themselves when to provide ground transportation services. Pls.' Response to RFA ¶ 9; Pls.' Response to RFA ¶ 21; Pls.' Response to RFA ¶ 22; Pls.' Response to RFA ¶ 23; Pls.' Response to RFA ¶ 24; CTG

---

[26] The latter document is attached to the Thering Decl. as Exhibit 72.

[27] This document is attached to the Thering Decl. as Exhibit 65.

12658, 13432, 13789, 000351 p.14, 15936; Civello Dep. p. 298:2-24; Pinedo Dep. pp. 40:24-41:5;[28] J. Singh Dep. pp. 58:24-59:2; Slinin Dep. p. 303:16-18; J. Solorzano Dep. p. 81:14-17; Toska Dep. pp. 182:21-22, 24;183:9-10, 12.

113.    Some Plaintiffs elected to drive when their friends were driving.  Ali Dep. p. 96:2-14.

114.    Some Plaintiffs elected to drive when they thought they could get the most jobs. Bautista Dep. p. 106:18-23.

115.    Plaintiffs could cease providing driving services whenever they wanted.  Civello Dep. p. 305:22-24; Toska Dep. p. 186:8-13.

116.    Some Plaintiffs elected to abstain from providing driving services for extended periods of time.  Pls.' Response to RFA ¶ 81.

117.    Plaintiffs are not required to tell Defendants if they are going to refrain from providing driving services for a period of time.  Pls.' Responses to RFA ¶¶ 79-80; Civello Dep. pp. 305:25-306:1-23.

118.    Plaintiffs who ceased providing driving services could resume providing driving services whenever they wanted without penalty of any kind.  Toska Dep. p. 186:14-20.

119.    Some Plaintiffs took months off from driving and then returned to driving.  Ali Dep. p. 121:7-10; Civello Dep. pp. 305:25-306:1-23; Choudhary Dep. p. 61:12-14; Saleem Dep. pp. 40:15-17, 42:23-24; CTG 16651.[29]

### SIGNALING ONE'S AVAILABILITY AND WILLINGNESS TO WORK

_____

[28] These documents are attached to the Thering Decl. as Exhibit 16.

[29] This document is attached to the Thering Decl. as Exhibit 31.

120. To obtain black car services, customers can request a black car via telephone, website, or smartphone app.  Slinin Aff. ¶ 49.

121. To signal their willingness and ability to work, Plaintiffs "log in" (otherwise known as "booking in") to CTG's dispatch system.  Pls.' Responses to RFA ¶¶ 12-13.

122. Logging in to CTG's dispatch system involves turning on a smart phone app, opening the phone, signing on, and then booking in.  Toska Dep. p. 181:16-20.

123. Plaintiffs are never required to book into CTG's dispatch system.  Slinin Aff. ¶ 15.

124. Plaintiffs booked into CTG's dispatch system a widely disparate number of times.  Pls.' Response to RFA ¶ 19; Civello Dep. p. 318:21-22; CTG 16651.[30]

125. By turning on the CTG app, a Plaintiff is able to see what jobs are available in what "zones," *i.e.* geographic locations of the city.  Civello Dep. p. 174.

126. After logging in to the dispatch system, Plaintiffs "book in" to a zone by entering the zone number they chose and pressing send.  Toska Dep. pp. 180:22-181:24.

127. The city is geographically broken up into zones.  Thering Decl Exh. 35..

128. Plaintiffs book into a zone and wait for a job to be offered to them when they become the first car in line in that zone.  Chowdhury Dep. pp. 65-66.

129. On a real time basis, the dispatch computer system automatically scans a data field containing a listing of Plaintiffs who are booked in and queued up to accept rides in a specific zone.  Toska Dep. p. 41:7-12, 17-18, 23.

---

[30] This document is attached to the Thering Decl. as Exhibit 31.

130.   If there are no drivers booked in to a zone where a customer needs to be picked up, the dispatch computer system can scan a neighboring designated "backup" zone.  Toska Dep. p. 45:11-19.

131.   All non-airport zones have theoretical-only limits of approximately 9,999 book-ins, which is realistically unreachable.  Toska Dep. p. 185:16-20.

132.   The only zones with realistically reachable limits are the three airport zones: LaGuardia, JFK and Newark, which are zones 50, 59 and 70, respectfully.  Civello Dep. pp. 206:24-207:1-5.

133.   The airport zone limits were imposed by Security Committees, not by anyone in CTG management.  Toska Dep. pp. 185:23-25-186:3-4.

134.   Plaintiffs can book into whatever zone they want.  Pls.' Response to RFA ¶ 28; Choudhary Dep. p. 58:10-11; J. Singh Dep. p. 64:17-18; M. Solorzano Dep. p. 109:22-25.

135.   Different plaintiffs favored and disfavored different zones.  Pls.' Response to RFA ¶ 30; Bautista Dep. p. 80:7-8; J. Singh Dep. p. 65:23-25; CTG 16650, 16551, and 16554.[31]

136.   Once booked in to a particular zone, Plaintiffs receive job offers from CTG's dispatch system.  Civello Dep. p. 87:7-22; Slinin Dep. p. 112:13-21; Toska Dep. pp. 180:15-21, 182:9-16.

137.   Typically the job offers are given out in a "first come first serve" fashion.  Slinin Dep. p. 115:1-4; Toska Dep. p. 169:20-24.

---

[31] Thering Decl. Exhibit 31.  Thering Exhibit 32 contains graphics produced by a professional graphic design company visually representing data culled from CTG's dispatch data.

138.   If a Plaintiff rejects a job offer, the job offer is given to the next Plaintiff booked in on the queue.  Pls.' Response to RFA ¶ 43.

139.   There were instances where a job was pushed to a particular driver at the request of a customer.  Slinin Aff. ¶ 61.

140.   Sometimes a job is not given to the driver who is at the top of the queue because the client has asked that certain drivers not provide services for the client's account.  From 2009-2012, the following Plaintiffs were removed from the following accounts at client request:

| PLAINTIFF | CLIENT |
|---|---|
| Tamer Rashdan | Administration for Children's Services |
| Mazhar Saleem | Ernst & Young |
| Rangdev Multani | New York Life Insurance Co. |
| Ashwin Kumar | Horizon Blue Cross Blue Shield |
| Daniel Alexis | Ernst & Young |
| Anjum Ali | Ernst & Young |
| Francois FanFan | Merrill Lynch |

Slinin Aff. ¶ 62.

141.   Sometimes a job is not given to the driver at the top of the queue due to a customer's specific vehicle request.  Civello Dep. p. 206:1-19; Slinin Dep. p. 113:1-10.

142.   Drivers who receive a job offer choose whether to accept or reject the job.  Malchikov Decl. ¶ 8, ECF No. 374; Choudhary Dep. p. 68:15-17.

143.   Plaintiffs are free to – and do - choose how many rides to accept from Defendants each day, week, month, and year.  Pls.' Responses to RFA ¶¶ 47-56.

144.   Different Plaintiffs accepted different numbers of rides, and different Plaintiffs accepted different percentages of rides offered to them.  Pls.' Responses to RFA ¶¶ 59-60.

145.   Plaintiffs have the right to reject jobs.  Toska Dep. p. 170:9-10, 12.

146.   Plaintiffs exercised their right to reject job offers.  Pls.' Response to RFA ¶ 32.

147.   Different plaintiffs rejected different numbers of rides and different percentages of rides offered to them.  Pls.' Responses to RFA ¶¶ 41-42.

148.   For example, from May 2010 to May 2013, Wilman Martinez never rejected a CTG job offer, but Ranjit Bhullar rejected 949; in March 2011, Bhavesh Shah accepted 83 job offers and rejected nine; Jamshed Choudhry accepted 148 job offers and rejected 12; Jose Solorzano accepted only 15 while Jose Cabrera was in the midst of taking the entire year of 2011 off.  (He drove again in 2012.)  CTG 16554; CTG 16550; CTG 16551.[32]

149.   A driver who does not want to drive for a certain client can tell dispatch that he wants to be taken off of that account.  Kumar Dep. p. 134:18-23; Toska Dep. pp. 183:25-184:2-3.

150.   Plaintiffs have asked to be taken off of accounts.  Pls.' Responses to RFA ¶¶ 44 and 46; Ali Dep. pp. 29:17-25–30:2-4; Koura Dep. p. 63:8-13.

151.   Approximately 16% of Plaintiffs have requested to be taken off of accounts, and some have asked to be taken off of more than one account.  Specifically, the following plaintiffs requested to be taken off the following numbers of accounts:

| Plaintiff | Number of accounts plaintiff requested to be off |
|---|---|
| Mark Shinder | 9 |
| Mohammad Siddiqui | 8 |
| Kuldip Singh | 8 |
| Mikhail Gerber | 6 |
| Edgar Acuapina | 5 |
| Babar Hafeez | 5 |
| Avneet Koura | 5 |
| Issa Feras | 4 |
| Inderjit Singh | 4 |
| Khushwant Singh | 4 |

---

[32] Thering Decl. Exhibit 31.

| Dongseog Yoo | 4 |
|---|---|
| Anjum Ali | 3 |
| Abdelilah El Karhat | 3 |
| Marlene Pinedo | 3 |
| Mustapha Rahmouni | 3 |
| Aziz Urrehman | 3 |
| Luis Aucapina | 2 |
| Walid Hamcho | 2 |
| Ibrahim M. Desooki | 2 |
| Jose Mogrovejo | 2 |
| Ranjit Bhullar | 2 |
| Juan Soto | 2 |
| Mei Yao | 2 |
| Jose Cabrera | 1 |
| Norman Ho | 1 |
| Jeewan Singh | 1 |
| Mena Michael | 1 |
| Gurmail Singh | 1 |
| Joginder Singh | 1 |
| Leo Stewart | 1 |
| Harnek Whar | 1 |
| Sheng Zhong Xu | 1 |

Slinin Aff. 59.

152.   If a Plaintiff accepts a job, but does not like the job due to its location, pay, or any other reason, the Plaintiff can "bail out" of the job.  Mastrangelo Dep. pp. 45:19-21, 53:13-15; Maydwell Dep. p. 288:7-19; Slinin Dep. p. 310:10-15.

153.   Some Plaintiffs frequently bail out of jobs.  CTG 38248.[33]

154.   Some Plaintiffs rarely bail out of jobs.  CTG 38248.[34]

155.   Some Plaintiffs bail out of jobs because they believe the job is a "bad job" or a "lousy job" and is not worth the money, and they can earn more money elsewhere. Choudhary Dep. p. 34:9-13.

---

[33] This document is attached to the Thering Decl. as Exhibit 33.

[34] This document is attached to the Thering Decl. as Exhibit 33.

156.   A driver who is number one in a zone queue and rejects a job as opposed to bailing out of a job previously accepted, simply moves to the bottom of the queue and then receives another job offer when back up at the top of the queue.  Slinin Aff ¶ 54.

157.   Some Plaintiffs frequently reject jobs. Ali Dep. pp. 96:22-97:4; CTG 16554.[35]

158.   Sometimes Defendants are unable to fulfill a customer's request for a car because no Plaintiff wants to accept the job because it does not pay enough.  Mastrangelo Dep. p. 33:15-18; Slinin Aff. ¶ 60.

159.   "Booking in" to the system is not the only way a Plaintiff can get a job.  A Plaintiff can also get a job by going to a "line."  Mastrangelo Dep. p. 61:15-23; Slinin Dep. pp. 157:25-159:2.

160.   A "line" is a queue of cars that wait outside certain businesses, such as Goldman Sachs, Bank of America, and Citibank.  Civello Dep. pp. 196:19-197:3; Mastrangelo Dep. p. 61:20-23; Slinin Dep. pp. 157:25-159:2.

161.   CTG operates 10 lines.  Slinin Aff. ¶ 63.

162.   The lines only allow certain car services to service their lines.  Accordingly, drivers not affiliated with a Franchisor cannot go to a line.  Slinin Aff. ¶ 67.

163.   Some Plaintiffs frequently get jobs through the lines.  Slinin Aff. ¶ 65.

164.   Plaintiffs are free to join or leave a line at any time they wish. Slinin Aff. ¶ 64.

165.   Another way Plaintiffs can get jobs is through the MTA client.  Civello Dep. p. 15:12-17:5; Mastrangelo Dep. pp. 12:24-13:4; Slinin Dep. pp. 37:22-38:11, 135:20-136:2.

---

[35] Thering Decl. Exh. 31.

166.   CTG has a contractual relationship with the New York City Metropolitan Transit Authority ("MTA") that involves picking up passengers who are too sick to travel via public transportation.  Civello Dep. p. 73:15-22.

167.   Plaintiffs who want to work MTA jobs must go through City of New York and Access-A-Ride training pursuant to MTA guidelines.  Slinin Dep. pp. 136:19-137:11.

168.   MTA jobs are pre-routed the day before the jobs are to be filled.  Slinin Dep. pp. 287:17-288:5; Toska Dep. pp. 43:16-18, 47:25-48:6.

169.   Every evening between 6:00 p.m. and 10:00 p.m., CTG receives a "manifest" from the MTA command center, listing jobs/passenger pick-ups that need to be serviced the following day.  Civello Dep. p. 15; Slinin Dep. pp. 287:21-288:7; Toska Dep. p. 173:9-10.

170.   In accordance with the requirements of its contract with the MTA, once CTG receives the MTA "manifest," CTG works with the data from the manifest to develop pre-planned routes via a computer-assisted process to figure out the most efficient routes for picking up sick passengers who require the assistance of the MTA's paratransit division. Civello Dep. pp. 15:12-23, 73:15-22; Slinin Dep. p. 288:5-15; Toska Dep. p. 173:5-7, 9-20.

171.   Plaintiffs who wish to be assigned MTA jobs call a special hotline to request MTA ride assignments.  Slinin Dep. pp. 287:24-288:1; Toska Dep. p. 173:14-20.

172.   Plaintiffs relay information over the hotline regarding what dates, times, starting locations, and finishing locations they would like MTA jobs.  Slinin Dep. pp. 288:21-289:4; Toska Dep. pp. 171:23-172:11.

173.   CTG electronically, through its computer systems, matches the requests from the Plaintiffs to jobs on the MTA manifest.  Slinin Dep. pp. 288:21-289:11; Toska Dep. p. 173:15-20.

174.   Some Plaintiffs have elected never to drive for the MTA account.  Slinin Dep. pp. 135:20-136:2.

175.   Some Plaintiffs frequently drive for the MTA account.  Slinin Dep. pp. 135:20-136:2.

176.   From 2009 to 2012, Jose Solorzano drove almost exclusively for the MTA account.  P 000030-000097.[36]

177.   Approximately 60% of Plaintiffs have chosen to drive for the MTA account at some point.  Slinin Aff. ¶ 69.

178.   Some plaintiffs who elected to drive for the MTA account later have decided to stop driving for the MTA account primarily because they did not believe they were earning enough money on the MTA jobs.  Koura Dep. pp. 63:20-643.

179.   Because the MTA account pays less than many other accounts, CTG is not always able to fill MTA jobs with Plaintiffs or other Franchisor-drivers.  Civello Dep. p. 288:5-15; Slinin Dep. pp. 286:24-287:5.

180.   Accordingly, CTG reaches out to unrelated livery cab companies to fill these jobs. Civello Dep. pp. 72:15-73:1, 75:4-8, 288:5-15; Slinin Dep. pp. 37:22-38:14, 286:24-287:5.

181.   These livery cab companies are not owned or operated by any of the Defendants. Civello Dep. p. 288:13-15; Maydwell Dep. p. 373:17-24; Slinin Dep. pp. 17:17-22, 19:3-6.

182.   CTG enters into affiliate agreements with some of these companies.  Slinin Aff. ¶ 70.

---

[36] This document is attached to the Thering Decl. as Exhibit 34.

183. CTG does not have an exclusive contract with the MTA, and MTA work does not comprise the majority of Defendants' business.  Civello Dep. p. 73:6-8; Slinin Aff. ¶¶ 71-72.

184. Getting jobs through CTG's dispatch system, through lines, or through the MTA account are not the only ways plaintiffs can get jobs.  They can also get jobs directly from their own personal customers.  Pls.' Response to RFA ¶ 75; Choudhary Dep. p. 41:14, 17, Koura Dep. p. 52:13-15; J. Solorzano Dep. pp. 36:25-37:2.

185. Per the terms of the franchise agreements, Plaintiffs who get calls directly from Franchisor customers service the Franchisor customer without the use of CTG's dispatch system, but they still process the vouchers through CTG's voucher processing services. Slinin Aff. ¶ 73.

186. Approximately 40% of Plaintiffs performed trips for personal customers that were processed through CTG's voucher processing service.  Specifically from April 2012 until December 2013 the following Plaintiffs performed trips for personal customers and processed them through CTG's data processing service:

| NAME | PRIVATE TRIPS | NOTES |
|------|---------------|-------|
| Harvinder S. Bhamra | 475 | One customer accounted for 218 of Bhamra's trips. |
| Harnek Whar | 413 | One customer accounted for 111 of Whar's private trips. |
| Prakash Badlani | 304 | |
| Rangdev Multani | 300 | One customer accounted for one-third of Multani's private trips. |
| Adam Klag | 290 | Two customers accounted for over 90% of Klag's private trips. |
| Jamshed Choudhry | 285 | |
| Edgar Aucapina | 281 | One customer accounted for 24% of Aucapina's private trips. |
| Mohammad Siddiqui | 259 | |
| Anjum Ali | 228 | |

| NAME | PRIVATE TRIPS | NOTES |
|---|---|---|
| Kouri Baudwin | 215 | |
| Luis Aucapina | 212 | One customer accounted for one-third of Aucapina's private trips. |
| Inderjit Singh | 209 | One customer accounted for 65% of Singh's trips. |
| Harrikisoon Seejattan | 187 | Two customers accounted for 77% of Seejattan's private trips. |
| Ahmed Nisar | 164 | Three customers accounted for 76% of Nisar's private trips. |
| Mena Michael | 161 | One customer accounted for one-quarter of Michael's private trips. |
| Nestor Teran | 135 | |
| Kuldip Singh | 109 | One customer accounted for more than 70% of Singh's private trips. |
| Felix Caraballo | 103 | |
| Khushwant Singh | 102 | |
| Edisson Barros | 96 | |
| Saad Attia | 91 | |
| Jagjit Singh | 91 | |
| Bhavesh Shah | 86 | |
| Arcelia Barros | 84 | |
| Wilman Martinez | 80 | |
| Mazhar Saleem | 76 | |
| Gustavo Garcia | 69 | One customer accounted for more than half of Garcia's private trips. |
| Pedro Pazmino | 67 | |
| Wei Xiong Ni | 63 | |
| Aziz Urrehman | 62 | |
| Anwar Bhatti | 55 | |
| Mikhail Zemka | 48 | |
| Mohammed Mian | 47 | |
| Joginder Singh | 46 | |
| Daniel Alexis | 43 | |
| Jose Cabrera | 41 | |
| Nwala Gabriel | 41 | |
| Irfan Shafi | 37 | |
| Marlene Pinedo | 31 | |
| Harvinder Singh | 36 | |
| Avneet Koura | 28 | One customer accounted for 27 of the 28 trips. |
| Euclides Pena | 24 | |
| Jeff Gravesande | 20 | |

| NAME | PRIVATE TRIPS | NOTES |
|---|---:|---|
| Mikhail Gerber | 17 | |
| Norman Ho | 17 | |
| Luis M. Vasquez | 16 | |
| Ranjit Bhullar | 14 | |
| Gurmail Singh | 14 | |
| Miriam Solorzano | 14 | |
| Jairo Bautista | 13 | |
| Luis Sanchez | 12 | |
| Shahidullah Dulal | 11 | |
| Mohammed Gazi Ali | 10 | |
| Mustapha Rahmouni | 10 | |
| Imtiaz Quereshi | 7 | |
| Firozuddin Syed | 7 | |
| Man Cheng | 6 | |
| Ahmed Ismail | 5 | |
| David A. Sanhez | 5 | |
| Maninder Singh | 5 | |
| Mohammad Choudhry | 4 | |
| Liang Hua Ma | 4 | |
| Firoz Ahmed | 3 | |
| Socrates Gregoriadis | 3 | |
| Mario Guerrero-Bajana | 3 | |
| Ke Shi | 3 | |
| Mohammed M. Islam | 2 | |
| Ashwin Kumar | 2 | |
| Wenzhong Li | 2 | |
| Xiangbo Li | 2 | |
| Nobel A. Young | 2 | |
| Roxana Zetino-Beltran | 2 | |
| Xun Li Fan | 1 | |
| Shuhrat O. Khakberdiyev | 1 | |

Slinin Aff. ¶ 73.

187.   Plaintiffs were also able to – and did – advertise their driving services to the public at large.  For example, Miriam Solorzano and Jose Solorzano made business cards to

28

promote their driving services.  J. Solorzano Dep. p. 91:13-20; M. Solorzano Dep. p. 81:18-20; P 003880.[37]

188.   Additionally, Miriam Solorzano, Jairo Bautista, Jamshed Choudhary, Marlene Pinedo, and Mazhar Saleem deducted for advertising expenses on their tax returns. Specifically, in 2006, Mazhar Saleem deducted $450 for advertising expenses; in 2010, Marlene Pinedo deducted $490 for advertising expenses, in 2011, she deducted $250 for advertising expenses, and in 2012, she deducted $200 for advertising expenses; in 2006, Jairo Bautista deducted $60 for advertising expenses; in 2010, Jairo Bautista and Miriam Solorzano (filling one 1040-C under Bautista's name but containing both of their 1099 income) deducted $2,500 for advertising expenses, in 2011, they jointly deducted $2,800 for advertising expenses; and in 2007, Jamshed Choudhary deducted $672 for advertising expenses.  Pls.' Tax Returns.[38]

**DEFENDANTS DID NOT PROVIDE PLAINTIFFS WITH VEHICLES**

189.   None of the Defendants rented or sold vehicles to Plaintiffs.  Doetsch Dep. p. 77:15-25; Kumar Dep. p. 126:10-13.

190.   Sometimes Plaintiffs told Sanjeev Kumar, a driver relations worker at CTG, that they were looking to buy, sell, or lease a vehicle, and Kumar put people together who wanted to buy or rent vehicle.  Kumar Dep. pp. 227:19-228:17.

---

[37] This document, as well as another business card that was produced without a Bates number, are attached to the Thering Decl. as Exhibits 59 and 60.

[38] These documents are attached to the Thering Decl. as Exhibits 42, 45, 48 and 49.

191.   No one from Defendants benefitted financially when Kumar did this.  Slinin Aff. ¶ 95.

192.   If a Plaintiff wished to set up a payment plan to pay off money for supplies and maintenance owed to third parties, or for the purchase of a vehicle, CTG would agree to set up automatic deductions for that Plaintiff, so that money owed to that Plaintiff are instead paid directly to third parties.  Slinin Aff ¶ 37.

**PLAINTIFFS INVESTED IN AND MAINTAINED THEIR OWN VEHICLES**

193.   Plaintiffs made investments in their vehicles.  Slinin Dep. p. 51:16-17.

194.   Plaintiffs purchased or rented cars from other drivers and from unrelated third parties, not from defendants.   Choudhary Dep. p. 37:6-7; Pinedo Dep. p. 55:6-16; M. Solorzano Dep. pp. 37:9-10, 39:7-9, 15-19

195.   Plaintiffs decided whether they wanted to own the vehicle in which they provided services for Defendants.  Pls.' Response to RFA ¶ 128.

196.   Some Plaintiffs bought their cars, for various amounts, from unrelated third parties.  Choudhary Dep. p. 37:6-7; Pinedo Dep. p. 55:6-16; M. Solorzano Dep. p. 37:9-10.

197.   Others rented their cars, for various amounts, from unrelated third parties.  M. Solorzano Dep. p. 39:7-9, 15-19.

198.   Plaintiffs, and not any of the Defendants, were/are responsible for the maintenance of their own vehicles including regular oil change, brakes, tune-ups and car washes.  Pls.' Responses to RFA ¶¶ 136, 137; Choudhary Dep. p. 42:9-10; Civello Dep. p. 316:12-16; Koura Dep. pp. 55:22-56:5; Pinedo Dep. p. 32:8-11; M. Solorzano Dep. p. 65:3-5.

199.   The franchise agreements contain language stating: "Franchisee shall be solely responsible for all fees, taxes, charges, fines, inspections, repairs, summonses and all other aspects involving Franchisee and Franchisee's vehicle."  CTG 12622, CTG 13393, CTG 13749, CTG 13750, CTG 14437, CTG 14439, CTG 000351, CTG 15901.[39]

200.   The franchise agreements state: "Franchisee shall obtain, at his expense, all licenses required for the operation of [his] vehicle, and for the transportation of passengers, as may be required by all applicable regulatory agencies, including but not limited to, the New York State Department of Motor Vehicles and the New York City Taxi and Limousine Commission."  CTG 12647, 13420, 13778, 000351.[40]

201.   Defendants did not tell Plaintiffs where to get their vehicles maintained or repaired.  Pls.' Response to RFA ¶ 138; Choudhary Dep. p. 42:5-6, 8; Koura Dep. p. 56:14-16; Slinin Dep. p. 294:17-19.

202.   Plaintiffs paid to have their vehicles washed.  Pls.' Response to RFA ¶ 139.

203.   Defendants did not tell Plaintiffs where to get their vehicles washed.  Pls.' Response to RFA ¶ 140; Pinedo Dep. p. 31:20-22; M. Solorzano Dep. p. 59:20-23.

204.   Plaintiffs paid to have their vehicles cleaned/detailed.  Pls.' Response to RFA ¶ 141; Pinedo Dep. p. 32:8-9; M. Solorzano Dep. p. 65:3-5.

205.   Defendants did not tell Plaintiffs where to get their vehicles cleaned and detailed. Pls.' Response to RFA ¶ 142; Pinedo Dep. p. 31:20-22.

206.   Plaintiffs were responsible for and paid for the repair of their vehicles.  Pls.' Responses to RFA ¶¶ 143-144; M. Singh Dep. p. 48:20-21.

---

[39] These documents are attached to the Thering Decl. as Exhibits 24, 25, 26, and 28.

[40] These documents are attached to the Thering Decl. as Exhibits 24, 25, 26, and 28.

207.   Defendants did not tell Plaintiffs where to get their vehicles repaired or what mechanic to use.  Pls.' Response to RFA ¶ 145; Pinedo Dep. p. 32:5-7.

208.   Plaintiffs paid for gasoline for their vehicles.   Pls.' Response to RFA ¶ 146; Siddiqui Dep. p. 99:6-7.

209.   Defendants did not tell Plaintiffs where to get gasoline.  Pls.' Response to RFA ¶ 147; Bhatti Dep. p. 159:20-22.

210.   Some Plaintiffs only used their cars for business purposes. Siddiqui Dep. p. 84:5-7; Bhatti Dep. p. 86:22-24; M. Solorzano Dep. p. 93:10-11.

211.   Some plaintiffs used their cars for personal and family use such as to take their spouses or children shopping, to a restaurant, to a park, to Walmart, or to Great Adventure. Ali Dep. p. 50:6-8; Chowdhury Dep. p. 58; Saleem Dep. p. 50:7-17; J. Solorzano Dep. pp. 40:23-25-41:2-3.

212.   Defendants have no rules against Plaintiffs using their cars for personal purposes. Slinin Aff. ¶ 39; M. Solorzano Dep. p. 93:12-14.

213.   Defendants do not require any permanent signage on the Plaintiffs' cars.  Civello Dep. pp. 317:15-318:3; M. Solorzano Dep. pp. 92:24-25-93:2-14.

214.   Nothing prevents the Plaintiffs from putting signs for other black car companies on their cars.  Slinin Aff. ¶ 40.

### PLAINTIFFS PROCURE AND MAINTAIN THEIR OWN INSURANCE

215.  Through the franchisee agreements, the franchisees agree to "maintain at his own expense all insurances, including workman's compensation, unemployment, and/or disability for the Franchisee's employees, if any."  CTG 12652, 13425, 13783, 000351, 15930.[41]

216.  Per New York State legal requirement, Plaintiffs insure the cars they use to provide services for Defendants under business insurance policies.  Pls.' Response to RFA ¶ 149; Choudhary Dep. p. 44:19, 22; Chowdhury Dep. pp. 58:22-59:10; Pinedo Dep. p. 32:19-20.

217.  Defendants do not provide Plaintiffs with insurance or pay for Plaintiffs' insurance.  Pls.' Response to RFA ¶ 148; Malchikov Decl. ¶ 4, ECF No. 374; Ali Dep. p. 50:19-23; Bautista Dep. pp. 41:24-42:3; Civello Dep. p. 318:9-11.

218.  Bahgat Ahmed, an independent insurance broker, has an office at CTG's headquarters at 335 Bond Street, Brooklyn.  Civello Dep. pp. 18:13-23, 155:7-9, 14-15; Doetsch Dep. p. 126:12-13; Mastrangelo Dep. p. 20:16-17; Slinin Dep. p. 106:8-12; Toska Dep. p. 89:3-6.

219.  Bahgat is not an employee of nor does he have any position with any of the Defendants.  Civello Dep. pp. 18:21-19:3; Slinin Aff. ¶ 44.

220.  Plaintiffs can buy insurance from Bahgat, but they do not have to.  Civello Dep. pp. 18:13-14, 155:10-12; Slinin Dep. p. 106:8-24; Toska Dep. p. 89:3-10.

221.  The majority of plaintiffs did not purchase insurance from Bahgat.  Slinin Aff. ¶ 46.

---

[41] These documents are attached to the Thering Decl. as Exhibits 24, 25, 26, 28, and 29.

222.   Other than the rent Bahgat pays to lease office space at 335 Bond Street, none of the Defendants receive any sort of financial benefit from Bahgat's sale of insurance at 335 Bond Street.  Slinin Aff. ¶ 45.

223.   Two plaintiffs, Jose Pinto and Ismael Mejia, have never provided services for any of the Defendants or otherwise been affiliated with any of the Defendants.  Slinin Aff. ¶ 11.

## PLAINTIFFS DEDUCTED BUSINESS EXPENSES ON THEIR TAX RETURNS

224.   Plaintiffs paid for – and deducted – business expenses from their own independent businesses on their tax returns.  Specifically:

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| Avneet Koura | 2006 | $105,434 | $73,433 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), interest, legal & professional services, office expense, repairs and maintenance, supplies, taxes and licenses, tolls, radio dues, meal on the road, dues, voucher charges, gas, car wash & simonizing, parking, uniform and laundry, phone charges, towing charges, inspection fee |
| | 2007 | $96,975 | $64,743 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal & professional services, office expense, repairs and maintenance, supplies, taxes and licenses, tolls, radio dues, meal on the road, inspection fees, voucher charges, gas, car wash simonizing, parking, uniform and laundry, phone charges, towing charges |
| | 2008 | $36,353 | $36,652 | commissions and fees, insurance (other than health), legal and professional services, repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, tolls, dues, radio club, voucher fee, gas, car wash simonizing, uniforms/laundry |
| | 2009 | $18,829 | $11,104 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), utilities, tolls, DMV sticker, TLC sticker, gas |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | 2010 | $31,511 | $26,549 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), repairs and maintenance, tolls, radio club, misc, phone, sales tax, gas |
| | 2011 | $27,222 | $21,778 | depreciation and section 179 expense deduction, insurance (other than health), repairs and maintenance, discount, radio club, vouchers charge, sales tax, gas |
| | 2012 | $48.851 | $39,067 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, supplies, taxes and licenses, utilities, gas & oil, discount, vouchers charge, tolls & parking, uniform & laundry, car wash & simonizing, meals at work |
| *Jose Solorzano* | 2007 | $38,934 | $31,381 | insurance (other than health), repairs and maintenance, taxes and licenses, gas, dues, car wash, cellular phone |
| | 2008 | $20,093 | $7,809 | gas, dues, lease payment, horse payment, radio deposit, advance |
| | 2011 | $57,573 | $43,618 | car and truck expenses, commissions and fees, repair and maintenance, utilities, dues, car wash, cellular phone, uniform |
| | 2012 | $28,918 | $14,710 | car and truck expenses, gas |
| *Mohammad Siddiqui* | 2009 | $77,778 | $74,158 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, gas, tolls, dues, vr fees, phone, car wash, oil change, radio lease, uniform |
| | 2010 | $98,155 | $79,672 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, rent or lease (other business property), repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, gas, tolls, dues, vr fees, phone, car wash, oil change, radio lease, uniform |
| | 2011 | $87,748 | $76,368 | commissions and fees, deprecation and section 179 expense deduction, employee benefit programs, legal and professional services, rent or lease (other business property), repairs and maintenance, supplies, deductible meals and entertainment, gas, tolls, dues, vr fees, phone, car wash, oil |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | | | | change, radio lease, uniform |
| | 2012 | $91,914 | $80,139 | commissions and fees, deprecation and section 179 expense deduction, insurance (other than health), legal and professional services, interest (other), repairs and maintenance, supplies, deductible meals and entertainment, taxes and licenses, gas, tolls, dues, vr fees, phone, car wash, oil change, uniform |
| *Anwar Bhatti* | 2006 | $75,890 | $37,959 | insurance (other than health), taxes and licenses, discount paid, tolls, gas, cellular phone, voucher charges, oil & filter change, car wash & wax |
| | 2007 | $74,679 | $42,394 | commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses, car wash & wax, tolls, gas, cellular phone, voucher charges, oil & filter change |
| | 2008 | $70,947 | $42,995 | commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses, car wash & wax, tolls, gas, cellular phone, voucher charges, oil & filter change, discount paid |
| | 2009 | $63,615 | $39,021 | commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses, car wash & wax, tolls, gas, cellular phone, oil & filter change, discount paid, radio club |
| | 2010 | $64,671 | $37,729 | depreciation and section 179 expense deduction, insurance (other than health), repairs and maintenance, taxes and licenses, car wash & wax, tolls, gas, cellular phone, oil & filter change, discount paid, radio club |
| | 2011 | $63,662 | $38,511 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), repairs and maintenance, taxes and licenses, car wash & wax, tolls, gas, radio club |
| *Anjum Ali* | 2010 | $44,116 | $34,690 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), repairs and maintenance, taxes and licenses, tolls deducted by base, dues deducted by base, gasoline, telephone, car wash & wax, flat tires, oil change and breaks, other expense |
| | 2011 | $46,448 | $33,820 | depreciation and section 179 expense deduction, insurance (other than health, legal & professional services), repairs and maintenance, taxes and licenses, tolls |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | | | | deducted by base, gasoline, telephone, car wash & wax, discount deducted by base, sales tax deducted by base |
| | 2012 | $64,305 | $42,271 | depreciation and section 179 expense deduction, insurance (other than health), legal & professional services, repairs and maintenance, tolls deducted by base, gasoline, telephone, car wax & wash, discount deducted by base |
| Luis Perez | 2006 | $59,492 | $53,433 | car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal & professional services, repairs and maintenance, supplies, taxes and licenses, utilities, radio dues, tolls, voucher fees, sales tax, car wash, care & maintenance of uniform, prof publications |
| | 2007 | $70,021 | $63,425 | car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal & professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, taxes and licenses, utilities, radio dues, tolls, voucher fees, sales tax, car wash, care & maintenance of uniform, prof publications |
| | 2008 | $89,791 | $82,973 | car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal & professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, supplies, taxes and licenses, utilities, radio dues, tolls, voucher fees, sales tax, car wash, care & maintenance of uniform, prof publications, parking |
| | 2009 | $88,220 | $80,488 | car and truck expenses, commissions and fees, insurance (other than health), legal & professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, supplies, taxes and licenses, utilities |
| | 2010 | $83,456 | $64,987 | car and truck expenses, commissions and fees, legal & professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, supplies, taxes and licenses, utilities, radio dues, tolls, voucher fees, sales tax, car wash, care & maintenance of uniform, parking |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | 2011 | $72,256 | $59,509 | commissions and fees, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, taxes and licenses, tolls, radio dues, voucher fees, car wash, uniform purchase & upkeep, parking, gas |
| Marlene Pinedo | 2007 | $44,874 | $27,534 | car and truck expenses, legal and professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, taxes and licenses, tolls, business cellphone, base fee, car wash, uniforms |
| | 2008 | $65,511 | $45,593 | car and truck expenses, insurance (other than health), rent or lease (other business property), repairs and maintenance, taxes and licenses, tolls, business cellphone, base fee, car wash, uniforms and laundry |
| | 2009 | $55,931 | $40,356 | insurance (other than health), repairs and maintenance, taxes and licenses, tolls, business cellphone, base fee, car wash, uniforms and laundry, gas |
| | 2010 | $58,758 | $37,008 | advertising, car and truck expenses, commissions and fees, legal and professional services, office expense, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, supplies, taxes and licenses, travel, deductible meals and entertainment, utilities, expenses for business use of home,  uniforms, laundry, dry cleaner |
| | 2011 | $38,034 | $26,604 | advertising, car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, supplies, taxes and licenses, utilities, expenses for business use of home |
| | 2012 | $26,579 | $14,121 | advertising, car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, utilities, expenses for business use of home |
| Jamshed Choudhary | 2007 | $119,160 | $104,585 | advertising, car and truck expenses, commissions and fees, legal and professional services, office expense, repairs and maintenance, supplies, deductible meals and entertainment, car wash, radio dues, car phone, uniform dry cleaning |
| | 2009 | $48,389 | $41,586 | commissions and fees, repairs and maintenance, deductible meals and entertainment, tolls, gas charges, insurance, car wash, cellphone, uniform/laundry, TLS, registration/taxstamp |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | 2010 | $76,314 | $67,618 | commissions and fees, depreciation and section 179 expense deduction, insurance, legal and professional services, office expense, rent or lease (vehicles, machinery, and equipment, repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, gasoline, tools, phone, car wash, oil change, uniform |
| | 2011 | $81,767 | $71,985 | commissions and fees, insurance (other than health), legal and professional services, repairs and maintenance, deductible meals and entertainment, gas expenses, tolls, radio club, extra tolls, uniform expenses, job related phone, diomond sticker, renewal registration fee, vehicle inspection fee |
| | 2012 | $89,690 | $74,628 | commissions and fees, insurance (other than health), legal and professional services, repairs and maintenance, deductible meals and entertainment, gas expenses, tolls, radio club, extra tolls, uniform expenses, job related phone, diomond sticker, vehicle inspection fee, dues |
| *Jagjit Singh* | 2009 | $177,170 | $147,908 | Commissions and fees, insurance (other than health), legal and professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, taxes and licenses, other expenses |
| | 2010 | $170,600 | $144,760 | commissions and fees, insurance (other than health), legal and professional services, rent or lease (vehicles, machinery, and equipment)m, repairs and maintenance, taxes and licenses, deductible meals and entertainment, gasoline, tolls, dues, car wash, parking, telephone, tyres, radio lease 150x52 |
| *Mazhar Saleem* | 2006 | $89,843 | $64,848 | advertising, car and truck expenses, repairs and maintenance, car wash, radio dues, car phone, uniform dry cleaning |
| | 2007 | $111,776 | $85,755 | car and truck expenses, repairs and maintenance, supplies, car wash, radio dues, car phone, uniform dry cleaning |
| | 2008 | $87,139 | $70,173 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, gasoline, tolls parking, dues, car wash, oil change, uniform |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | 2009 | $94,129 | $71,708 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, gasoline, tolls & EZ Pass, dues deducted by base, voucher fee, laundries and work clothes, telephone, car wash, flat tires, radio lease |
| | 2010 | $69,886 | $51,783 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, taxes and licenses, gasoline, tolls & EZ Pass, dues, voucher fee, laundries and work, telephone expenses, car wash, radio lease |
| | 2011 | $66,246 | $48,024 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, gasoline, tolls & EZ Pass, dues deducted by base, voucher fee, laundries and work, telephone expenses, car wash, flat tires, radio lease |
| | 2012 | $58,081 | $42,245 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, gasoline, tolls & EZ Pass, dues, voucher fee, laundries and work, telephone expenses, car wash, radio lease |
| *Malook Singh* | 2008 | $83,254 | $70,213 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), interest (mortgage), legal and professional services, rent or lease (other business property), repairs and maintenance, taxes and licenses, dues, gas, tolls & parking, radio lease, drug test, car wash, laundry and cleaning |
| | 2010 | $65,750 | $63,264 | commissions and fees, depreciation and section 179 expense deduction, rent or lease (vehicles, machinery, and equipment), trip fee, LTSP Plaintiff, dues, radio lease, drug test, car wash, gas |
| | 2011 | $16,353 | $12,027 | commissions and fees, depreciation and section 179 expense deduction, deductible meals and entertainment, postage, business telephone, gasoline, radio lease, dues, car wash |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | 2012 | $38,791 | $32,531 | commissions and fees, insurance (other than health), rent or lease (other buesinss property), repairs and maintenance, deductible meals and entertainment, utilities, gasoline, uniforms, oil change, business phone, car wash |
| *Carlota Briones* | 2007 | $105,949 | $73,562 | Employee benefit programs, insurance (other than health), repairs and maintenance, taxes and licenses, other expenses. |
| | 2009 | $44,549 | $30,339 | car and truck expenses, base fees, tolls, radio club, gas |
| | 2010 | $119,091 | $105,519 | rent or lease (vehicle, machinery, and equipment), repairs and maintenance, taxes and licenses, deductible meals and entertainment, other expenses |
| *Jairo Bautista* | 2006 | $110,630 | $76,737 | advertising, car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, legal and professional services, supplies, travel, utilities, phone, lab test, GPS navigator, dues |
| | 2007 | $110,244 | $102,840 | car and truck expenses, commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses, car wash, gas, cleaning, uniform, voucher, foods, BAS due, toll |
| | 2008 | $49,825 | $67,111 | car and truck expenses, commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses. |
| | 2009 | $136,135 | $64,701 | car and truck expenses, commissions and fees, interest (mortgage), taxes and licenses, car wash, gas, cleaning, uniform, voucher, foods, BAS due, toll |
| *Miriam C. Solorzano* | 2006 | $64,592 | $56,400 | car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, legal and professional services, travel, utilities, lab test, dues, GPS navigator |
| | 2007 | $67,782 | $55,401 | commissions and fees, insurance (other than health), rent or lease (vehicles, machinery, and equipment, repairs and maintenance, taxes and licenses, gas, car wash voucher fee, uniform, cleaning, cell phone, food, due base |
| | 2008 | $41,148 | $42,403 | commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses, gas, car wash voucher fee, uniform, car payment, due base |
| | 2009 | *Unreported* | $7,931 | Commissions and fees, rent or lease (other |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | | | | business property), repairs and maintenance |
| *Jairo Bautista & Miriam C. Solorzano* (joint returns) | 2010 | $176,929 | $155,859 | advertising, commissions and fees, car and truck expenses,  insurance (other than health) interest (mortgage), repairs and maintenance, taxes and licenses, utilities, gas, cleaning, uniform, voucher, foods, base due, tools, cell HP |
| | 2011 | $189,331 | $166,824 | advertising, car and truck expenses, commissions and fees, interest (mortgage), supplies, taxes and licenses, utilities, car payment, cleaning, uniform, voucher, foods, base due, tolls, cell HP |
| | 2012 | $213,524 | $187,614 | car and truck expenses, commissions and fees, interest (mortgage), legal and professional services, taxes and licenses, car payment, cleaning, uniform, voucher, gasoline, base due, tolls, cell HP |

Pls.' Tax Returns.[42]

225.   On their tax returns, Plaintiffs declared, under penalty of perjury that they examined the return and accompanying schedules and statements, and to the best of their knowledge and belief they were true, correct, and complete.  Pls.' Tax Returns.[43]

## DRIVER SECURITY AND COMMUNICATIONS COMMITTEES

226.   There are two types of committees at Allstate, Aristacar, Excelsior, NYC2Way, and TWR — a Communications Committee and a Security Committee.  Pls.' Response to RFA ¶ 97; Civello Dep. p. 96:16-22; Doetsch Dep. 90:13-15; Mastrangelo Dep. pp. 116:9-14, 146:9-147:19; Slinin Dep. p. 69:14-16.

-----

[42] These documents are attached to the Thering Decl. as Exhibits 41-53.  Exhibit 54 is a graphic created by a professional graphic design company based on information culled from tax return documents produced by Plaintiffs entitled "Plaintiffs Deducted Business Expenses on Their Tax Returns."

[43] These documents are attached to the Thering Decl. as Exhibits 41-53.

227.   All of these Committees were formed by and have been and are run by drivers and are composed entirely of drivers.  Pls.' Response to RFA ¶ 98; Pls.' Response to RFA ¶¶ 100, 105, 107; Doetsch Dep. p. 91:8-11; Mastrangelo Dep. p. 312:7-9.

228.   In the early 1960s, two-way radios were put in cabs in New York City.  This was a pilot program by the TLC.  Independent owner-operators of individual cabs got together and formed co-ops in the five boroughs because they thought it would be better for business if someone could call multiple cabs at one time rather than an individual cab.  The TLC did not regulate these co-ops but the driver/owner-operators of the co-ops believed they would function better if they had rules to protect their investments in their businesses. Accordingly, the driver-owner/operators formed security and communication committees within the co-ops.; Dizengoff Aff. ¶ 20; Chowdhury Dep. pp. 78:4-6; M. Singh Dep. pp. 52:23-25; 53:3-4.

229.   When the Franchisors were formed, the drivers who bought franchises decided to form Communications and Security Committees because they had established and run such committees when affiliated with previous franchisor companies and they believed that the establishment of such committees would help protect their investments in their franchises. Slinin Dep. 71:12-72:6; Slinin Aff. ¶ 86.

230.   Plaintiffs devote time to working on the Security and Communications Committees in order to protect their investments in their franchises.  Avagyan Aff. ¶ 12; Borden Aff. ¶ 18.

231.   The Rule Books were written by the franchisee drivers to protect their investments in their franchises.  Vishin Aff. ¶ 10.

232.   All of the rules in the Committee Rule Books are either rules aimed at ensuring customer satisfaction or rules that the TLC has put in place (i.e., are iterations of New York City law).  Mastrangelo Dep. p. 185:5-10.

233.   The Security Committees are comprised of the drivers' peers who hold hearings on complaints.  Civello Dep. p. 91:17-23; Valery Aff., Rider A ¶¶ 8-10; Reyderman Aff., Rider A ¶¶ 5-11; Gluzman Aff., Handwritten Pages ¶ 12; Mughal Aff., Rider A ¶¶ 5-10; Avagyan Aff., Rider A ¶¶ 5-10; Nusenbaum Aff., Rider A ¶¶ 6-10.

234.   If a driver breaks a rule, the Security Committee may impose a monetary penalty on the driver.  Maydwell Dep. pp. 114:14-115:5; Slinin Dep. pp. 167:2-168:20, 306:22-24, 319:13-18.

235.   The franchise agreements state that the franchisees agree to abide by the rules developed, implemented, and enforced by the franchisee Security and Communications Committees, which are designed to protect the collective interest of all franchisees and Plaintiffs of franchisees.   The franchise agreements also inform Plaintiffs that these Committees operate independently of and without interference by the Franchisors.  CTG 34785-34801, 13781, 000351, 15928.[44]

236.   Plaintiffs are not required to wear clothing bearing any CTG or Franchisor logos.  Plfs.' Response to RFA ¶ 84; Slinin Aff. ¶ 96.

237.   Marlene Pinedo drives Sundays through Fridays "because those are the days when there is the most work."  Pinedo Dep. 40:11-23.

---

[44] These documents are attached to the Thering Decl. as Exhibits 26, 27, and 29.

## PLAINTIFFS' OWN SUNSHINE FUNDS

238.   NYC2Way, TWR, Excelsior, and Aristacar have Sunshine Funds.  Kandov Dep. p. 45:4-7; Nusenbaum Aff., Rider A ¶ 25-26; Valery Aff., Rider A ¶ 22.

239.   The Sunshine Funds are pools of money that drivers, including Plaintiffs, who choose to contribute to the Sunshine Fund, can access if they need a loan.  Civello Dep. p. 125:6-12; Kandov Dep. p. 79:18-24; Kumar Dep. p. 85:9-17.

240.   Drivers who need a loan can call the fund chairman, who will give them the loan. Slinin Dep. pp. 211:22-212:13.

241.   Money in the Sunshine Funds can be used if a Plaintiff is facing hardship (e.g., suffers a death in a family or is going through a divorce), or when a Plaintiff is in need of money after getting a ticket or having his or her car towed.  Kumar Dep. p. 225:15-23; Nusenbaum Aff., Rider A ¶ 15; Valery Aff., Rider A ¶ 13.

242.   The Chairmen of Sunshine Funds write checks to Plaintiffs who participate in the Sunshine Funds when a Plaintiff needs money, and these checks are signed by the respective Sunshine Fund chairmen — Oleg Gluzman for NYC2Way; Mirek Fil for Excelsior; Jerry Cutler for TWR; and Joseph Nusenbaum for Aristacar.  Nusenbaum Aff., Rider A ¶ 25-26; Valery Aff., Rider A ¶ 22.

243.   The Sunshine Funds are funded by dues driver members elect to pay in the amount of $6 per week.  Civello Dep. p. 125:9-10; Kandov Dep. p. 107:17-19; Kumar Dep. pp. 85:10-86:18; Slinin Dep. p. 211:16-19; Nusenbaum Aff., Rider A ¶¶14, 21.

244.   Drivers do not have to participate in the Sunshine Funds.  Kandov Dep. p. 107:20-25.

245.   The Sunshine Funds are also funded by fines the drivers' Security Committees impose on the drivers.  Nusenbaum Aff., Rider A ¶ 16; Valery Aff., Rider A ¶ 14.

246.   All fines assessed by the Security Committees and then deducted from drivers voucher payments go into the respective Sunshine Funds.  Koura Dep. p. 81:22-25; M. Solorzano Dep. p. 83:7-9; Reyderman Aff., Rider A ¶ 12; Gluzman Aff., Handwritten Pages ¶ 17.

247.   The Sunshine Funds were started by and have been maintained by drivers for the benefit of the drivers.  Reyderman Aff., Rider A ¶ 13; Guzman Aff., Handwritten Pages ¶ 18; Nusenbaum Aff., Rider A ¶ 12.

## PLAINTIFFS EARN VASTLY DIFFERENT AMOUNTS OF MONEY

248.   Plaintiffs generally earned more money if they were strategic about accepting jobs.  Additionally, if Plaintiffs retained people to work for them and purchased or rented more than one franchise, they generally earned more money.  Slinin Aff. ¶ 97.

249.   Additionally, if Plaintiffs retained people to work for them or if they purchased or rented more than one franchise, they generally earned more money.   Slinin Aff. ¶ 97.

250.   Plaintiffs earned vastly different amounts from the work they performed for the Franchisors.  Pls.' Response to RFA ¶ 120.

251.   Specifically, 1099s produced during discovery show that the following plaintiffs earned the following amounts from the provision of driving services through one of the Franchisors:

| NAME | YEAR | AMOUNT |
|---|---|---|
| *Anjum Ali* | 2010 | $42,445.68 |
| | 2011 | $41,672.60 |
| | 2012 | $38,928.22 |
| *Jairo Bautista* | 2006 | $110,630.00 |
| | 2007 | $110,244.14 |

| | 2008 | $49,825.04 |
|---|---|---|
| | 2009 | $28,826.19 |
| | 2010 | $108,619.66 |
| | 2011 | $114,708.76 |
| | 2012 | $100,785.68 |
| *Anwar Bhatti* | 2006 | $75,889.61 |
| | 2007 | $74,678.52 |
| | 2008 | $70,947.46 |
| | 2009 | $63,614.93 |
| | 2010 | $64,670.67 |
| | 2011 | $63,661.59 |
| | 2012 | $64,538.90 |
| *Carlota Briones* | 2006 | $91,075.46 |
| | 2007 | $105,949.23 |
| | 2008 | $46,689.21 |
| | 2009 | $44,549.19 |
| | 2010 | $119,464.58 |
| | 2011 | $95,839.53 |
| | 2012 | $2,478.75 |
| *Jose Cabrera* | 2006 | $49,501.69 |
| | 2007 | $58,069.33 |
| | 2008 | $42,592.30 |
| | 2009 | $32,097.39 |
| | 2010 | $21,103.65 |
| | 2012 | $8,822.37 |
| *Jamshed Choudhary* | 2006 | $59.945.61 |
| | 2007 | $116,592.07 |
| | 2008 | $93,952.77 |
| | 2009 | $48,389.54 |
| | 2010 | $76,314.49 |
| | 2011 | $81,766.88 |
| | 2012 | $89,690.22 |
| *Ibrahim Desooki* | 2006 | $76,238.40 |
| | 2007 | $78,133.64 |
| | 2008 | $50,610.89 |
| | 2009 | $27,486.86 |
| | 2010 | $26,229.13 |
| | 2011 | $11,159.52 |
| *Rajan Kapoor* | 2006 | $20,053.02 |
| | 2007 | $39,257.23 |
| | 2008 | $5,099.55 |
| *Avneet Koura* | 2006 | $105,433.77 |
| | 2008 | $36,352.64 |
| | 2009 | $18,828.95 |
| | 2010 | $31,511.02 |

| | 2011 | $27,221.96 |
|---|---|---|
| | 2012 | $29,095.36 |
| *Wilman Martinez* | 2006 | $87,786.59 |
| | 2007 | $109,616.62 |
| | 2008 | $102,154.61 |
| | 2009 | $60,509.31 |
| | 2010 | $54,628.95 |
| | 2011 | $66,158.18 |
| *Mohammed Mian* | 2012 | $17,673.60 |
| *Maher Mohammad* | 2006 | $13,049.04 |
| | 2008 | $32,449.63 |
| | 2009 | $42,448.13 |
| | 2010 | $42,081.34 |
| | 2011 | $28,847.37 |
| *Luis Perez* | 2006 | $59,491.75 |
| | 2007 | $70,021.00 |
| | 2008 | $89,790.63 |
| | 2009 | $88,427.51 |
| | 2010 | $83,754.83 |
| | 2011 | $72,525.81 |
| | 2012 | $9,324.77 |
| *Marlene Pinedo* | 2007 | $45,599.10 |
| | 2008 | $65,510.59 |
| | 2009 | $55,931.54 |
| | 2011 | $16,121.08 |
| | 2012 | $16,529.30 |
| *Atif Razaq* | 2006 | $86,737.49 |
| | 2007 | $83,919.22 |
| | 2008 | $74,709.29 |
| | 2009 | $73,518.05 |
| | 2011 | $52,660.38 |
| *Mazhar Saleem* | 2006 | $89,843.37 |
| | 2007 | $103,573.08 |
| | 2008 | $63,332.33 |
| | 2009 | $89,228.51 |
| | 2010 | $64,098.78 |
| | 2011 | $52,805.35 |
| | 2012 | $46,481.92 |
| *Luis Sanchez* | 2012 | $94,829.70 |
| *Pedro Segundo* | 2010 | $72,909.23 |
| | 2011 | $104,797.24 |
| *Bhavesh Shah* | 2008 | $47,590.41 |
| | 2010 | $76,367.96 |
| | 2011 | $82,236.83 |
| | 2012 | $87,588.03 |

| | | |
|---|---|---|
| *Mohammad Siddiqui* | 2009 | $36,345.52 |
| | 2010 | $44,549.71 |
| | 2011 | $38,979.46 |
| | 2012 | $46,627.01 |
| *Jagjit Singh* | 2008 | $70,608.94 |
| | 2009 | $177,170.35 |
| | 2010 | $167,165.99 |
| | 2011 | $172,217.18 |
| | 2012 | $105,422.29 |
| *Khushwant Singh* | 2009 | $35,113.11 |
| | 2010 | $87,558.58 |
| | 2011 | $104,273.91 |
| | 2012 | $77,506.09 |
| *Malook Singh* | 2009 | $36,234.59 |
| | 2010 | $65,070.25 |
| *Jose Solorzano* | 2006 | $40,870.95 |
| | 2007 | $38,933.86 |
| | 2009 | $1,517.67 |
| | 2010 | $1,860.55 |
| | 2011 | $53,943.60 |
| *Miriam Solorzano* | 2006 | $64,592.22 |
| | 2007 | $67,782.07 |
| | 2008 | $41,147.69 |
| | 2009 | $58,043.59 |
| | 2010 | $66,718.89 |
| | 2011 | $71,639.74 |
| | 2012 | $67,419.74 |
| *Dongseog Yoo* | 2006 | $59,429.85 |
| | 2007 | $49,981.14 |
| | 2008 | $41,879.06 |
| | 2009 | $40,764.96 |
| | 2010 | $4,169.45 |

CTG 00006- CTG 00008, CTG 00016-CTG 00022, CTG 00031 - CTG 00037, CTG 00043-

CTG 00048, CTG 00053- CTG 00054, CTG 00060- CTG 00062, CTG 00075- CTG 00080, CTG

00087- CTG 00090, CTG 00097- CTG 00102, CTG 00112- CTG 00116, CTG 00140- CTG

00145, CTG 00187- CTG 00191, CTG 00283- CTG 00289.[45]

**DEFENDANTS DO NOT PROVIDE THE PLAINTIFFS WITH BENEFITS**

252.   Defendants do not provide Plaintiffs with any benefits.  Pls.' Responses to RFAs

¶¶ 191-192.

253.   Defendants do not provide Plaintiffs with health insurance.  Pls.' Response to

RFA ¶ 191.

254.   Defendants do not provide Plaintiffs with a 401(k), retirement, or other pension

plan benefits.  Pls.' Response to RFA ¶ 192.

255.   The Plaintiffs are issued 1099s, not W-2s.  Kandov Dep. p. 139:10-15; Slinin

Dep. p. 51:1-11.

256.   In contrast to the Plaintiffs, CTG currently has approximately 162 employees who

are paid on W-2 forms and operate the dispatch service, billing department, customer

service department, driver relations department, and sales department.  Slinin Aff. ¶ 34;

Slinin Dep. p. 24:7-25.

**PLAINTIFFS CAN AND DO PERFORM DRIVING SERVICES
FOR OTHER UNRELATED BLACK CAR COMPANIES**

257.   Plaintiffs are not required to drive exclusively for one of the Franchisors.  Rather,

they can, do, and did drive for other unrelated, competitor black car companies, including,

but not necessarily limited to, New York Limo Pros, Basking Ridge Express Car and Limo,

Platinum Class Limo, Cartier Limo, Communicar, Newport Car & Limo, Unilimo, CTK,

---

[45] These documents are attached to the Thering Decl. as Exhibit 55.  A graphical rendition of this data created by a professional graphic design company culled from this information and entitled "Plaintiffs Earned Vastly Different Amounts of Money" is attached as Exhibit 56.

East Coast Limo, Executive Transportation Group, Uni, Allo, Utog, Charge and Ride and Concord Limo.  Pls.' Response to RFA ¶ 66; Ali Dep. p. 36:5-22; Civello Dep. pp. 272:11-14 337:13-339:12; Doetsch Dep. p. 233:15-20, 22-23; Kumar Dep. pp. 222:22-223:2; Saleem Dep. p. 20:14-20; Siddiqui Dep. pp. 93:21-94:3; P 001152, P 001147, P 001153, P 001158, P 001154, CTG 12577-CTG 12578, CTG 12522-CTG 12524, CTG 16820-CTG 16823, CTG 12560, P 002043, P 002031, P 002456, P 002464,  P 002454, P 002460, CTG 16489, P 002457, P 002455, P 002458, P 002463, P 002465, CTG 16524, CTG 16525, P 000940, P 000949, P 001007, CTG 16150, P 000945, P 000948, P 001009,  CTG 16175-CTG 16176, CTG 12588-CTG 12591, P 001623, P 001624.[46]

258.   Plaintiffs (including 71% of plaintiffs who were deposed) earned compensation from driving for other unrelated and competing black car companies. .  Specifically:

| Plaintiff | Black Car Company | Time Frame | Amount Earned |
|---|---|---|---|
| Anjum Ali | NY Limo Pros | 2010-2012 | $16,752.21 |
| Anjum Ali | Platinum Class | 2012 | $796.15 |
| Anjum Ali | Basking Ridge | 2011 | $812.86 |
| Jairo Bautista | Elite | 2008-2009 | $55,505.26 |
| Jairo Bautista | MJ Flight Line | 2008 | $230.00 |
| Jairo Bautista | Star 16 LLC | 2008 | $20,020.00 |
| Miriam Solorzano | UTOG 2-Way | 2008 | $19,386.00 |
| Marlene Pinedo | Unicar | 2011 | $11,612.89 |
| Marlene Pinedo | Immediate Luxury | 2012 | $10,500.00 |
| Mazhar Saleem | NY Limo Pros | 2010-2012 | $11,052 |
| Mazhar Saleem | Cartier Limo | 2011-2012 | $6,404.67 |
| Mazhar Saleem | Basking Ridge | 2011-2012 | $6,444.97 |
| Mazhar Saleem | Platinum Class Limo | 2012 | $539.10 |
| Mazhar Saleem | East Coast Limo | 2009-2010 | $7,284.38 |
| Malook Singh | Elite | 2006-2009 | $206,568.71 |
| Malook Singh | Charge & Ride | 2011-2012 | $67,058.88 |
| Maher Maqsood | Exec. Charge | 2012 | $18,403.66 |

---

[46] These documents are attached to the Thering Decl. as Exhibit  57.

| Ranjit Bhullar | Exec. Charge | 2006-2008 | $395,081.90 |
|---|---|---|---|
| Mohammed Siddiqui | NY Limo Pros | 2009-2012 | $145,850.45 |
| Mohammed Siddiqui | Communicar | 2009 | $77,778.00 |
| Mohammed Siddiqui | CTK Limousine Worldwide | 2010-2012 | $9,280.10 |
| Anowar Chowdhury | Elite | 2006, 2008-2010 | $96,064.33 |
| Irfan Shafi | East Coast | 2009-2010 | $1,771.29 |
| Mohammad Siddiqui | UNI | 2012 | $5,579.00 |
| Jose Solorzano | Bakry | 2012 | $2,719.00 |
| Jose Solorzano | Allo Transportation | 2012 | $1,392.21 |

P 001152, P 001147, P 001153, P 001158, P 001154, CTG 12577-CTG 12578, CTG 12522-CTG 12524, CTG 16820-CTG 16823, CTG 12560, P 002043, P 002031, P 002456, P 002464,  P 002454, P 002460, CTG 16489, P 002457, P 002455, P 002458, P 002463, P 002465, CTG 16524, CTG 16525, P 000940, P 000949, P 001007, CTG 16150, P 000945, P 000948, P 001009,  CTG 16175-CTG 16176, CTG 12588-CTG 12591, P 001623, P 001624.[47]

259.   Plaintiffs did work for other black car companies using the same cars that they owned or rented and used to work for CTG.  Pls.' Response to RFA ¶ 68.

260.   Some Plaintiffs attempted to get work from other black car companies while driving into Manhattan.  J. Choudhary Dep. pp. 49:19-25, 50:6-13.

261.   Plaintiffs have their own customers (i.e., for whom they do not go through any of the Franchisor Defendants), some of whom they service more than once a week.  Choudhary Dep. p. 41:14-17; Koura Dep. pp. 52:13-53:6; J. Solorzano Dep. pp. 36:25-37:2-4.

---

[47] These documents are attached to the Thering Decl. as Exhibit 57.  A graphical representation created by a professional graphic design company based on information culled from this data, as well as data culled from Exhibits 36-40 of the Thering Decl. and entitled "Plaintiffs Performed Services and Earned Revenues from Other Black Car Companies" is attached as Exhibit 57 to the Thering Decl.

262.   Plaintiffs provided rides to personal customers in the same cars they used to perform driving services for the Franchisors.  Pls.' Response to RFA ¶ 76.

263.   Plaintiffs have customers who pay them through Plaintiffs' own established credit card merchant accounts (such as Intuit, Global and I-Payment) instead of using CTG to process the payments).   Ali Dep. pp. 108:8-11, 14; 109:24-110:2, 8-10; Saleem Dep. p. 122:19-23; Siddiqui Dep. p. 112:22-24; J. Solorzano Dep. pp. 38:4-10, 13-14, 24-25; 39:2-5.

264.   For example, Plaintiffs established their own merchant accounts as follows:

| Plaintiff | Credit Card Merchant Account Company | Amount Processed | Time Period |
|---|---|---|---|
| Mazhar Saleem | Intuit | $5,065.96 | January-May 2013 |
| Mazhar Saleem | Intuit | $3,114.14 | April-December 2012 |
| Aziz Urrehman | Intuit | $997.00 | February and March 2013 |
| Anjum Ali | Intuit | $1,665.60 | January-July 2013 |
| Anjum Ali | Intuit | $7,751.29 | March-December 2012 |
| Jose Solorzano | Global Payments Inc. | $2,659.78 | June-August 2008 |
| Marlene Pinedo | iPayment | $55,092.26 | February-December 2012 |
| Marlene Pinedo | iPayment | $16,851.76 | January-July 2013 |

CTG 38174-38228, CTG 38526, CTG 34294-34242,  P 003896-003934, CTG 38522-38550, CTG 38146-38151, CTG 38168-38173 .

265.   Some plaintiffs have picked up private street hails without going through any dispatch system of the Franchisor Defendants (despite the fact that this is against TLC regulations).  Pls.' Response to RFA ¶ 71; Ali Dep. p. 92:3-4; Bhatti Dep. p. 80:6-7; Perez Dep. p. 70:3-5; Saleem Dep. p. 79:12-18; Siddiqui Dep. p. 111:10-15, 19-21.

266.   Plaintiffs picked up street hails in the same cars they used to provide services for the Franchisors.  Pls.' Response to RFA ¶ 72.

## PLAINTIFFS CHOOSE TO DO WHAT THEY WANT WHEN THEY WANT

267.  Plaintiffs can engage in any activity (personal or otherwise) while booked in and waiting for job offers from CTG.  Slinin Aff. ¶ 53.

268.  Some plaintiffs go to the lines while booked into CTG's dispatch system.  M. Solorzano Dep. p. 56:10-12, 20-22.

269.  Some plaintiffs pick up street hails during this time while booked into CTG's dispatch system.  Anjun Ali stated succinctly: "If I am, for example, booked in a certain zone, and I am number 24 or 26 and down the list, and I am sitting on the side of the street someplace, if somebody asks me, can you give me a ride?  I just would quickly drop them off and come back and wait again."  Ali Dep. p. 118:19-24; Siddiqui Dep. p. 269:9-13.

270.  Some plaintiffs eat while booked into CTG's dispatch system.  Bautista Dep. pp. 66:21-25-67:2-4.

271.  Some plaintiffs sleep while booked into CTG's dispatch system. Bautista Dep. p. 97:6-7.

272.  Some plaintiffs talk on the phone for personal reasons while booked into CTG's dispatch system.  Bautista Dep. p. 97:13-16.

## CUSTOMER COMPLAINTS

273.  CTG receives customer complaints.  Mastrangelo Dep. pp. 28:15-29:10, 56:3-10.

274.  When a customer asks what happens to a complaint, management tells the customer it was written up and promptly passed along to an appropriate Security Committee and explains the outcome.  In most cases management writes an apology letter, and provides the customer with complimentary vouchers and tries to satisfy the customer.  Civello Dep. p. 91:2-16; Mastrangelo Dep. pp. 30:7-8, 59:11-14; Slinin Dep. pp. 175:20-176:6.

275.   There is no electronic tracking of customer complaints through the IDS software system.  Kumar Dep. p. 138:2-14; Slinin Dep. p. 268:12-23; Toska Dep. p. 107:16-21.

276.   There is no audit trail of each individual who handles each part of a customer complaint.  Toska Dep. p. 109:19-22.

277.   There is currently no spreadsheet that tracks customer complaints.  Civello Dep. pp. 79:23-80:2; Mastrangelo Dep. pp. 28:9-14, 149:5-8.

278.   Plaintiffs are not drug tested in response to a customer complaint.  Mastrangelo Dep. p. 206:2-5.

279.   CTG does not keep personnel files on Plaintiffs.  Civello Dep. p. 111:3-11; Mastrangelo Dep. pp. 115:20-25, 210:18-20.

280.   Joseph Maydwell does not have the authority to terminate the services of Plaintiffs.  Maydwell Dep. p. 161:4-6.

281.   Stephen Aliberti did not have the authority to terminate the services of Plaintiffs.  Slinin Aff. ¶ 90.

282.   If a Plaintiff commits an act that potentially violates the rules established by the Security Committees and Communications Committees, a "10/5" is written up.  Borden Aff. ¶ 9-10.

283.   A 10/5 is a slip of paper that notifies the appropriate Security Committee that a Plaintiff may have broken a Security Committee rule.  Slinin Dep. p. 143:13-17.

284.   Writing up a 10/5 does not by itself impose any kind of penalty—it merely brings attention to the Security Committee that a Plaintiff may have violated a rule and that the Security Committee should review the situation.  Slinin Dep. p. 296:17-23.

285.   A 10/5 is submitted to the Security Committee by being dropped in a box located at 335 Bond Street.  Doetsch Dep. pp. 242:12-15, 270:23-271:3.

286.   The Security Committee put the box at this location for this purpose.  Doetsch Dep. pp. 270:23-271:6.

287.   The Security Committee reviews 10/5 forms and determines if the listed infractions require more serious attention.  Doetsch Dep. p. 243:6-25.

### LACK OF DRIVER TRAINING

288.   Yossef Elshorbagy conducts training with new drivers.  This one-time two or three hour training session covers how the smartphone device operates, which zones to book into, and other basic information for a driver to use the CTG dispatch system, as well as the fundamentals of the Security Committee Rules and Regulations.  Civello Dep. p. 14:18-25, 45:14-24, 268:8-15; Mastrangelo Dep. p. 223:22-24; Maydwell Dep. p. 332:3-6; Slinin Dep. p. 35:2-17.

289.   Defendants do not train any drivers on how, when, or where to perform their driving services.  Civello Dep. 45:20-46:2; M. Saleem Dep. 69:21-70:2.

290.   Defendants do not train Plaintiffs on how to get around the New York City area or regarding customer service issues.  Civello Dep. pp. 45-46; Mastrangelo Dep. p. 224:9-10.

## PLAINTIFF JOHN M. HIDALGO

291.   On April 30, 2013, Hidalgo filed for voluntary bankruptcy pursuant to Chapter 13 of the Bankruptcy Code.  Hidalgo Voluntary Petition for Bankruptcy April 30, 2013.[48]

292.   He remains under the jurisdiction of the Bankruptcy Court pursuant to an order entered on October 24, 2013 confirming his Chapter 13 Plan.   Order of the Bankruptcy Court October 24, 2013.[49]

293.   Neither Hidalgo nor his attorneys advised Defendants that such a petition had been filed.  Thering Decl. 79.

294.   In his petition, Hidalgo indicated in the Schedule B Declaration of Personal Property that he had no outstanding legal claims.   Hidalgo Voluntary Petition for Bankruptcy April 30, 2013.[50]

295.   Hidalgo declared under penalty of perjury that the information contained in the petition was true and correct.  Hidalgo Voluntary Petition for Bankruptcy April 30, 2013.[51]

---

[48] This document is attached to the Thering Decl. as Exhibit 75.

[49] This document is attached to the Thering Decl. as Exhibit 76.

[50] This document is attached to the Thering Decl. as Exhibit 75.

[51] This document is attached to the Thering Decl. as Exhibit 75.

Dated: New York, New York
      January 14, 2014

                                   EPSTEIN BECKER & GREEN, P.C.

                                        /s Margaret Thering
                                   Evan J. Spelfogel
                                   Margaret C. Thering
                                   250 Park Avenue
                                   New York, NY 10177
                                   (212) 351-4500
                                   Attorneys for Defendants

TO:

Michael Scimone, Esq.
Rachel Megan Bien, Esq.
Michael Litrownik, Esq.
Adam T. Klein, Esq.
Lewis M. Steel, Esq.
Justin Swartz, Esq.
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, New York 10016

Stephen H. Kahn, Esq.
KAHN OPTON LLP
228 E 45th Street
New York, New York 10017