**OUTTEN & GOLDEN LLP**
Adam T. Klein
Rachel Bien
Michael J. Scimone
Michael N. Litrownik
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000

**KAHN OPTON, LLP**
Stephen H. Kahn
One Parker Plaza
Fort Lee, New Jersey 07024
Telephone: (201) 947-9200

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

MAZHAR SALEEM and JAGJIT SINGH, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

CORPORATE TRANSPORTATION
GROUP, LTD., CORPORATE TRANSPORTATION
GROUP INTERNATIONAL, CORPORATE
TRANSPORTATION GROUP WORLDWIDE, INC., NYC
2 WAY INTERNATIONAL, LTD., CTG PRIVATE CAR &
LIMOUSINE, INC., ARISTACAR & LIMOUSINE, LTD.,
TWR CAR AND LIMO, LTD., EXCELSIOR CAR AND
LIMO, INC., HYBRID LIMO EXPRESS, INC., EDUARD
SLININ, and GALINA SLININ,

Defendants.

No. 12 Civ. 8450 (JMF)

---

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS
<u>UNDER LOCAL CIVIL RULE 56.1</u>**

## I.     CTG Operates a Black Car Business that Provides Ground Transportation.

1.     CTG provides black car service to its clients, which include law firms, music companies, banks, and insurance and brokerage firms.  Ex. A[1] (Civello Tr.) 27:3-11.

2.      The nine Defendant companies have operated as a single integrated enterprise and/or joint employer for purposes of the Fair Labor Standards Act throughout the past six years.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 3

3.     NYC 2 Way International, Ltd. owns a Taxi & Limousine Commission base license that enables it to operate a black car service within the tri-state area.  Ex. C (Slinin Tr.) 12:16-13:5.

4.     Allstate Private Car & Limousine, Inc. owns a Taxi & Limousine Commission base license that enables it to operate a black car service within the tri-state area.  Ex. C (Slinin Tr.) 12:16-13:5.

5.     Aristacar & Limousine, Ltd. owns a Taxi & Limousine Commission base license that enables it to operate a black car service within the tri-state area.  Ex. C (Slinin Tr.) 12:16-13:5.

6.     TWR Car and Limo, Ltd. owns a Taxi & Limousine Commission base license that enables it to operate a black car service within the tri-state area.  Ex. C (Slinin Tr.) 12:16-13:5.

7.     Excelsior Car and Limo, Inc., owns a Taxi & Limousine Commission base license that enables it to operate a black car service within the tri-state area.  Ex. C (Slinin Tr.) 12:16-13:5.

---

[1]     All exhibits are attached to the Declaration of Michael J. Scimone in Support of Plaintiffs' Motion for Partial Summary Judgment ("Scimone Decl.").

8.　　Hybrid Limo Express, Inc. owns a Taxi & Limousine Commission base license that enables it to operate a black car service within the tri-state area.  Ex. C (Slinin Tr.) 12:16-13:5.

9.　　CTG's franchisor companies are all black car companies that provide car service.  Ex. A (Civello Tr.) 39:23-42:15; Ex. C (Slinin Tr.) 12:16-13:5.

10.　　Corporate Transportation Group, Ltd. provides billing services that consist of receiving vouchers and credit card slips, billing customers, and processing payments to drivers affiliated with CTG franchisor companies.  Ex. A (Civello Tr.) 37:4-38:15.

11.　　Corporate Transportation Group, International provides billing services similar to those provided by Corporate Transportation Group, Ltd.  Ex. A (Civello Tr.) 38:19-39:1.

12.　　Corporate Transportation Group Worldwide, Inc. provides billing services similar to those provided by Corporate Transportation Group, Ltd., and also provides reservation services to clients.  Ex. C (Civello Tr.) 39:6-15; Ex. C (Slinin Tr.) 32:1-20.

13.　　CTG's headquarters is an approximately 20,000 square foot office space located at 335 Bond Street, in Brooklyn, New York.  Ex. D (Doetsch Tr.) 57:19-58:7.

14.　　CTG's business includes a dispatch operation, consisting of approximately 70 employees.  Ex. C (Slinin Tr.) 24:7-13.

15.　　CTG's business includes a billing operation, consisting of approximately 40 employees.  Ex. C (Slinin Tr.) 24:14-19; Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 49.

16.　　CTG's business includes a customer service operation, consisting of approximately 6 to 7 employees.  Ex. C (Slinin Tr.) 24:20-25.

17.　　CTG's business includes a driver relations operation, consisting of five employees.  Ex. C (Slinin Tr.) 25:1-6.

18.     CTG's business includes a sales operation, consisting of at least two employees. Ex. C (Slinin Tr.) 25:7-11; Ex. A (Civello Tr.) 67:22-68:14.

**A.     Black Car Drivers Must Be Dispatched from a Base and Cannot Make Street Pick-Ups.**

19.     Taxi & Limousine Commission regulations prohibit CTG drivers from soliciting passengers other than through a licensed base.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 32.

20.     The Taxi & Limousine Commission prohibits for-hire vehicles from picking up street hails.  Ex. A (Civello Tr.) 325:1-325:4; Ex. D (Doetsch Tr.) 234:7-13.

21.     CTG penalizes its drivers for picking up street hails.  Ex. D (Doetsch Tr.) 256:7-15; 266:7-20.

22.     Eduard Slinin has taken steps to prevent black car drivers from picking up street hails.  Ex. C (Slinin Tr.) 115:10-21.

**B.     CTG Requires Its Drivers to Adhere to Franchise Agreements.**

23.     In order to drive for one of the CTG franchisor companies, a driver must purchase or rent a franchise.  Ex. E (Kumar Tr.) 11:24-13:6; 14:11-15; 35:24-36:5.

24.     Drivers who rent a franchise from one of the CTG franchisor companies assume all the obligations contained in the franchise agreement.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 47; Ex. E (Kumar Tr.) 30:19-31:12.

25.     A driver who signs a franchise agreement must affiliate with a CTG franchisor company, and is not allowed to be dispatched by another base.  Ex. E (Kumar Tr.) 35:11-36:10.

26.     Until July 2012, franchise agreements for NYC 2 Way, International, Ltd., Aristacar & Limousine, Ltd., and TWR Car and Limo, Ltd. ran for three-year terms that could be renewed for $1.  Ex. F (NYC 2 Way Franchise Agreement, effective July 24, 2007), CTG15438-529 at CTG15481, ¶ 73; Ex. G (NYC 2 Way Franchise Agreement, effective December 11,

2008), CTG15358-437 at CTG15409, ¶ 73; Ex. H (NYC 2 Way Franchise Agreement, effective August 18, 2009), CTG15269-357 at CTG15320, ¶ 73; Ex. I (NYC 2 Way Franchise Agreement, effective July 6, 2010), CTG15166-268 at CTG15218, ¶ 73; Ex. J (NYC 2 Way Franchise Agreement, effective July 6, 2011), CTG14971-5069 at CTG15022-23, ¶ 73; Ex. K (Aristacar Franchise Agreement, effective July 23, 2007), CTG13654-738 at CTG13700, ¶ 73; Ex. L (Aristacar Franchise Agreement, effective January 13, 2009), CTG13568-653 at CTG13618, ¶ 73; Ex. M (Aristacar Franchise Agreement, effective August 13, 2009), CTG13476-567 at CTG13529, ¶ 73; Ex. N (Aristacar Franchise Agreement, effective July 7, 2010), CTG13382-475 at CTG13436, ¶ 73; Ex. O (Aristacar Franchise Agreement, effective July 6, 2011), CTG13290-381 at CTG13344, ¶ 73; Ex. P (TWR Franchise Agreement, effective July 23, 2007), CTG15981-6064 at CTG16027, ¶ 73; Ex. Q (TWR Franchise Agreement, effective January 19, 2009), CTG15891-980 at CTG15940, ¶ 73; Ex. R (TWR Franchise Agreement, effective August 13, 2009), CTG15800-890 at CTG15852, ¶ 73; Ex. S (TWR Franchise Agreement, effective July 7, 2010), CTG15708-799 at CTG15761, ¶ 73; Ex. T (TWR Franchise Agreement, effective August 10, 2011), CTG15617-707 at CTG15670, ¶ 72.

27.     Beginning in July 2012, franchise agreements for NYC 2 Way, International, Ltd., Aristacar & Limousine, Ltd., and TWR Car and Limo, Ltd. did not contain a fixed term of years, and ran for an unlimited period of time.  Ex. U (NYC 2 Way Franchise Agreement, effective July 2, 2012), CTG15070-165 at CTG15096; Ex. V (Aristacar Franchise Agreement, effective July 5, 2012), CTG13204-289 at CTG13228; Ex. W (TWR Franchise Agreement, effective July 5, 2012), CTG15530-616 at CTG15555.

28.     Eduard Slinin decides the price of franchises sold by CTG and its franchisor companies.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 16; Ex. C (Slinin Tr.) 72:7-10.

29.     When a driver purchases a franchise from someone other than a CTG-affiliated franchisor company, they pay a transfer fee directly to Eduard Slinin.  Ex. A (Civello Tr.) 228:1-11.

30.     Eduard Slinin decides the price of the transfer fee that drivers pay when one driver sells a franchise to another driver.  Ex. C (Slinin Tr.) 189:7-16.

31.     Eduard Slinin has discretion to negotiate the amount of the transfer fee.  Ex. A (Civello Tr.) 278:12-279:3; Ex. E (Kumar Tr.) 47:12-18.

32.     Mark Slinin, Eduard Slinin, and Gerhard Doetsch all have authority on behalf of NYC to approve a franchise transfer, Ex. E (Kumar Tr.) 47:22-49:12, but Eduard Slinin has to approve the transfer and is always informed of it.  Ex. E (Kumar Tr.) 58:4-59:13.

33.     All franchise agreements for NYC 2 Way, International, Ltd., Aristacar & Limousine, Ltd., and TWR Car and Limo, Ltd. that were in use between November 2009 and the present provide that drivers will be paid a percentage of each fare charged to a customer that they drive, after various voucher processing fees are deducted from the total amount shown on the voucher.  Ex. F (NYC 2 Way Franchise Agreement, effective July 24, 2007), CTG15438-529 at CTG15472-74, ¶ 37; Ex. G (NYC 2 Way Franchise Agreement, effective December 11, 2008), CTG15358-437 at CTG15399-401, ¶ 37; Ex. H (NYC 2 Way Franchise Agreement, effective August 18, 2009), CTG15269-357 at CTG15310-13, ¶ 37; Ex. I (NYC 2 Way Franchise Agreement, effective July 6, 2010), CTG15166-268 at CTG15207-10, ¶ 37; Ex. J (NYC 2 Way Franchise Agreement, effective July 6, 2011), CTG15971-5069 at CTG1502-15, ¶ 37; Ex. K (Aristacar Franchise Agreement, effective July 23, 2007), CTG13654-738 at CTG13690-92, ¶ 37; Ex. L (Aristacar Franchise Agreement, effective January 13, 2009), CTG13568-653 at CTG13608-10, ¶ 37; Ex. M (Aristacar Franchise Agreement, effective August 13, 2009),

CTG13476-567 at CTG13518-20, ¶ 37; Ex. N (Aristacar Franchise Agreement, effective July 7, 2010), CTG13382-475 at CTG13425-28, ¶ 37; Ex. O (Aristacar Franchise Agreement, effective July 6, 2011), CTG13290-381 at CTG13333-36, ¶ 36; Ex. P (TWR Franchise Agreement, effective July 23, 2007), CTG15981-6064 at CTG16017-20, ¶ 37; Ex. Q (TWR Franchise Agreement, effective January 19, 2009), CTG15891-980 at CTG15930-33, ¶ 37; Ex. R (TWR Franchise Agreement, effective August 13, 2009), CTG15800-890 at CTG15841-43, ¶ 37; Ex. S (TWR Franchise Agreement, effective July 7, 2010), CTG15708-799 at CTG15750-52, ¶ 37; Ex. T (TWR Franchise Agreement, effective August 10, 2011), CTG15617-707 at CTG15660-63, ¶ 36; Ex. U (NYC 2 Way Franchise Agreement, effective July 2, 2012), CTG15070-165 at CTG15111-14, ¶ 37; Ex. V (Aristacar Franchise Agreement, effective July 5, 2012), CTG13204-289 at CTG13243-46, ¶ 37; Ex. W (TWR Franchise Agreement, effective July 5, 2012), CTG15530-616 at CTG15571-74, ¶ 37.

34.     All franchise agreements for NYC 2 Way, International, Ltd., Aristacar & Limousine, Ltd., and TWR Car and Limo, Ltd. that were in use between November 2009 and the present provide that a driver may not serve a CTG customer without processing payment for such services through CTG.  Ex. A (Civello Tr.) 240:25-241:14; 271:18-272:2; Ex. E (Kumar Tr.) 35:24-36:10; 244-18-24; Ex. F (NYC 2 Way Franchise Agreement, effective July 24, 2007), CTG15438-529 at CTG15475, ¶ 42; Ex. G (NYC 2 Way Franchise Agreement, effective December 11, 2008), CTG15358-437 at CTG15402, ¶ 42; Ex. H (NYC 2 Way Franchise Agreement, effective August 18, 2009), CTG15269-357 at CTG15313-14, ¶ 42; Ex. I (NYC 2 Way Franchise Agreement, effective July 6, 2010), CTG15166-268 at CTG15210-11, ¶ 42; Ex. J (NYC 2 Way Franchise Agreement, effective July 6, 2011), CTG14971-5069 at CTG15015-16, ¶ 42; Ex. K (Aristacar Franchise Agreement, effective July 23, 2007), CTG13654-738 at

CTG13693, ¶ 42; Ex. L (Aristacar Franchise Agreement, effective January 13, 2009), CTG13568-653 at CTG13611, ¶ 42; Ex. M (Aristacar Franchise Agreement, effective August 13, 2009), CTG13476-567 at CTG13521, ¶ 42; Ex. N (Aristacar Franchise Agreement, effective July 7, 2010), CTG13382-475 at CTG13428, ¶ 42; Ex. O (Aristacar Franchise Agreement, effective July 6, 2011), CTG13290-381 at CTG13336, ¶ 41; Ex. P (TWR Franchise Agreement, effective July 23, 2007), CTG15981-6064 at CTG16020, ¶ 42; Ex. Q (TWR Franchise Agreement, effective January 19, 2009), CTG15891-980 at CTG15933, ¶ 42; Ex. R (TWR Franchise Agreement, effective August 13, 2009), CTG15800-890 at CTG15844, ¶ 42; Ex. S (TWR Franchise Agreement, effective July 7, 2010), CTG15708-799 at CTG15753, ¶ 42; Ex. T (TWR Franchise Agreement, effective August 10, 2011), CTG15617-707 at CTG15663, ¶ 41; Ex. U (NYC 2 Way Franchise Agreement, effective July 2, 2012), CTG15070-165 at CTG15114, ¶ 41; Ex. V (Aristacar Franchise Agreement, effective July 5, 2012), CTG13204-289 at CTG13246, ¶ 41; Ex. W (TWR Franchise Agreement, effective July 5, 2012), CTG15530-616 at CTG15574, ¶ 41.

35. CTG has filed two lawsuits to enforce provisions of franchise agreements between drivers and the CTG franchisor companies. Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 46; Ex. C (Slinin Tr.) 73:14-23; 75:18-76:5; Ex. X (complaint in *NYC 2 Way International, Ltd. v. Malook Singh*), CTG000234-39.

36. All franchise agreements for NYC 2 Way, International, Ltd., Aristacar & Limousine, Ltd., and TWR Car and Limo, Ltd. that were in use between November 2009 and the present provide that drivers must adhere to all rules contained in the Security Committee rulebook for the respective franchisor company. Ex. F (NYC 2 Way Franchise Agreement, effective July 24, 2007), CTG15438-529 at CTG15470, ¶ 23, CTG15475, ¶ 43, CTG15479, ¶ 59;

Ex. G (NYC 2 Way Franchise Agreement, effective December 11, 2008), CTG15358-437 at CTG15397, ¶ 23, CTG15402-03, ¶43, CTG15406, ¶ 59; Ex. H (NYC 2 Way Franchise Agreement, effective August 18, 2009), CTG15269-357 at CTG15308, ¶ 23, CTG15314, ¶ 43, CTG15315, ¶ 59; Ex. I (NYC 2 Way Franchise Agreement, effective July 6, 2010), CTG15166-268 at CTG15205, ¶ 23, CTG15211, ¶43, CTG15215, ¶ 59; Ex. J (NYC 2 Way Franchise Agreement, effective July 6, 2011), CTG14971-5069 at CTG15010, ¶ 23, CTG15016, ¶ 43, CTG15020, ¶59; Ex. K (Aristacar Franchise Agreement, effective July 23, 2007), CTG13654-738 at CTG13688, ¶ 23, CTG13693-94, ¶ 43, CTG13697, ¶ 59; Ex. L (Aristacar Franchise Agreement, effective January 13, 2009), CTG13568-653 at CTG13606, ¶ 23, CTG13611-12, ¶ 43, CTG13615, ¶59; Ex. M (Aristacar Franchise Agreement, effective August 13, 2009), CTG13476-567 at CTG13515, ¶ 23, CTG13521-22, ¶ 43, CTG13526, ¶ 59; Ex. N (Aristacar Franchise Agreement, effective July 7, 2010), CTG13382-475 at CTG13422, ¶ 23, CTG13429, ¶ 43, CTG13433, ¶ 59; Ex. O (Aristacar Franchise Agreement, effective July 6, 2011), CTG13290-381 at CTG13330-31, ¶ 23, CTG13337, ¶ 42, CTG13341, ¶ 58; Ex. P (TWR Franchise Agreement, effective July 23, 2007), CTG15981-6064 at CTG16015, ¶ 23, CTG16020-21, ¶43, CTG16024, ¶ 59; Ex. Q (TWR Franchise Agreement, effective January 19, 2009), CTG15891-980 at CTG15928, ¶ 23, CTG15933-34, ¶ 43, CTG15937, ¶ 59; Ex. R (TWR Franchise Agreement, effective August 13, 2009), CTG15800-890 at CTG15838, ¶ 23, CTG15844-45, ¶43, CTG15849, ¶ 59; Ex. S (TWR Franchise Agreement, effective July 7, 2010), CTG15708-799 at CTG15748, ¶ 24, CTG15753-54, ¶43, CTG15757-58, ¶59; Ex. T (TWR Franchise Agreement, effective August 10, 2011), CTG15617-707 at CTG15658, ¶ 23, CTG15663-64, ¶ 42, CTG15668, ¶58; Ex. U (NYC 2 Way Franchise Agreement, effective July 2, 2012), CTG15070-165 at CTG15110, ¶25, CTG15115, ¶ 42; Ex. V (Aristacar Franchise Agreement, effective July

5, 2012), CTG13204-289 at CTG13241, ¶ 25, CTG13246-47, ¶ 42; Ex. W (TWR Franchise

Agreement, effective July 5, 2012), CTG15530-616 at CTG15569, ¶ 25, CTG15574-75, ¶ 42.

37.     The Rulebooks for NYC 2 Way, International, Ltd., Aristacar & Limousine, Ltd.,

and TWR Car and Limo, Ltd. contain rules governing dress code, standards for car cleanliness

and maintenance, use of the dispatch system, interaction with the base, and interaction with

customers.  Ex. Y (NYC 2 Way Rulebook), CTG34785-801; Ex. Z (Aristacar Rulebook), CTG

34751-67; Ex. AA (TWR Rulebook), CTG34802-18.

38.     The Rulebooks for NYC 2 Way, International, Ltd., Aristacar & Limousine, Ltd.,

and TWR Car and Limo, Ltd. prescribe fines for violating various rules contained in the

Rulebook.  Ex. Y (NYC 2 Way Rulebook), CTG34785-801; Ex. Z (Aristacar Rulebook), CTG

34751-67; Ex. AA (TWR Rulebook), CTG34802-18.

39.     To work for CTG, drivers are not required to have a particular level of driving

skill apart from being a licensed driver.  Ex. A (Civello Tr.) 45:14-46:19; Ex. BB (Civello Errata

Sheet) at 1.

40.     CTG does not train drivers how to navigate or find their way around the area

where they operate; CTG only trains drivers on the dispatching equipment, software, and what

the dispatch zones are and where they're located.  Ex. A (Civello Tr.) 45:20-46:2.

41.     CTG does not require drivers to have any knowledge about geography because

most drivers have access to GPS.  Ex. A (Civello Tr.) 46:3-13.

42.     CTG provides drivers approximately two hours of training at its base in Brooklyn

on the basics of the handheld dispatch devices.  Ex. A (Civello Tr.) 268:20-269:20.

**C.**     **CTG Controls the Marketing and Sales of Its Services.**

43.     Since 2008, CTG has prohibited drivers from advertising separately from CTG. Ex. G (NYC 2 Way Franchise Agreement, effective December 11, 2008), CTG15358-437 at CTG15378; Ex. H (NYC 2 Way Franchise Agreement, effective August 18, 2009), CTG15269-357 at CTG15289; Ex. I (NYC 2 Way Franchise Agreement, effective July 6, 2010), CTG15166-268 at CTG15186; Ex. J (NYC 2 Way Franchise Agreement, effective July 6, 2011), CTG14971-5069 at CTG14991; Ex. L (Aristacar Franchise Agreement, effective January 13, 2009), CTG13568-653 at CTG13588; Ex. M (Aristacar Franchise Agreement, effective August 13, 2009), CTG13476-567 at CTG13497-98; Ex. N (Aristacar Franchise Agreement, effective July 7, 2010), CTG13382-475 at CTG13404; Ex. O (Aristacar Franchise Agreement, effective July 6, 2011), CTG13290-381 at CTG13312; Ex. Q (TWR Franchise Agreement, effective January 19, 2009), CTG15891-980 at CTG15910; Ex. R (TWR Franchise Agreement, effective August 13, 2009), CTG15800-890 at CTG15820; Ex. S (TWR Franchise Agreement, effective July 7, 2010), CTG15708-799 at CTG15729; Ex. T (TWR Franchise Agreement, effective August 10, 2011), CTG15617-707 at CTG15639; Ex. U (NYC 2 Way Franchise Agreement, effective July 2, 2012), CTG15070-165 at CTG15091; Ex. V (Aristacar Franchise Agreement, effective July 5, 2012), CTG13204-289 at CTG13223; Ex. W (TWR Franchise Agreement, effective July 5, 2012), CTG15530-616 at CTG15550.

44.     CTG does a lot of advertising. Ex. CC (Kandov Tr.) 98:15.

45.     CTG advertises in newspapers and on local radio stations for drivers and customers. Ex. E (Kumar Tr.) 121:18-122:17.

46.     CTG also advertises through direct mail and has future plans to advertise on social media. Ex. C (Slinin Tr.) 27:15-28:17.

47.     Drivers are not permitted to negotiate a lower rate with a client than the one negotiated in advance by CTG.  Ex. A (Civello Tr.) 67:3-14.

48.     CTG's sales personnel negotiate pricing with clients on behalf of CTG.  Ex. A (Civello Tr.) 67:15-21.

49.     CTG, through its franchisor companies, negotiates the rates charged to customers for ground transportation services.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 26.

50.     Eduard Slinin has personally negotiated with customers over the rates charged for ground transportation services.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 27.

51.     When customers are given a refund, the refund affects drivers' compensation.  Ex. C (Slinin Tr.) 100:21-101:14.

52.     From time to time, CTG has made changes to the rates charged to customers.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 28.

53.     Eduard Slinin has from time to time determined whether to give a customer a refund, either in whole or in part.  Ex. C (Slinin Tr.) 97:7-9.

54.     Drivers do not have access to information about the rates that CTG charges except with respect to the particular jobs that they have accepted.  Ex. A (Civello Tr.) 63:2-64:1.

## II.     CTG's Significant Investments in Its Business Make It Competitive with Other Black Car Companies.

55.     CTG distinguishes itself from its competitors primarily through the size of its fleet and the quality of the vehicles.  Ex. A (Civello Tr.) 44:14-45:13.

56.     CTG's website, http://www.corporate-trans.com/about_ctg.html, states that CTG is a "ground transportation industry leader" and advertises the number and quality of the cars the company dispatches.  Ex. DD (CTG website page).

57.     CTG operates a computerized system that transmits work assignments from servers in CTG's dispatch room to handheld dispatch devices carried by drivers.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 36; Ex. A (Civello Tr.) 163:15-164:7.

58.     CTG's dispatch operations formerly used BlackBerries to transmit work to drivers, but now use an LG system.  Ex. C (Slinin Tr.) 83:17-84:3; Ex. EE (Toska Tr.) 17:10-19.

59.     CTG's dispatch platform was designed and built "in-house" by CTG's programmers with input from a range of CTG personnel, drivers, and clients.  Ex. A (Civello Tr.) 169:1-25.

60.     CTG's dispatch software has a list of pre-programmed "canned" messages that are repeated often, which can be sent by CTG to drivers or from drivers to CTG.  Ex. EE (Toska Tr.) 70:20-71:5.

61.     The home page of CTG's website, http://www.corporate-trans.com/index.asp, advertises CTG's advanced technology.  Ex. FF (CTG website page).

62.     Eduard Slinin has reviewed CTG's dispatch technology with clients in sales calls. Ex. C (Slinin Tr.) 80:8-81:3.

63.     CTG has an information technology infrastructure consisting of several computers, an internal computer network, a cellular network, and database management software.  Ex. EE (Toska Tr.) 15:6-18:12.

**B.      CTG Strictly Enforces Quality Control Measures.**

64.     When a driver accepts a job, he transmits an estimated time of arrival ("ETA") through his handheld device to an operator in the dispatch room.  Ex. C (Civello Tr.) 87:25-88:14.

65.     If a driver gives an ETA over the maximum allowed, he loses the job and it goes to another driver.  Ex. C (Civello Tr.) 189:6-12.

66.     Certain "canned" messages programmed into the CTG dispatch system permit dispatchers to instruct drivers to go to a certain address or zone.  Ex. EE (Toska Tr.) 74:9-75:9; 76:7-15; Ex. GG (List of canned messages), CTG16552-53.

67.     Certain canned messages programmed into the CTG dispatch system permit dispatchers to instruct drivers when customers have requested transportation services.  Ex. EE (Toska Tr.) 72:22-73:10; Ex. GG (List of canned messages), CTG16552-53.

68.     Certain "canned" messages programmed into the CTG dispatch system are used to warn drivers that they may be issued a 10/5 slip if they abuse the dispatch system.  Ex. EE (Toska Tr.) 79:20-81:3; Ex. GG (List of canned messages), CTG16552-53.

69.     In response to customer complaints, Greg Mastrangelo has used GPS to review the routes that CTG drivers take when transporting CTG clients and customers around the city, and at times has reduced the amount of money that drivers are paid as a result of his findings.  Ex. D (Doetsch Tr.) 13:7-16:7; Ex. HH (Mastrangelo Tr.) 29:17-22.

70.     Raisa Kandov has used GPS to monitor the route CTG drivers take as part of her responsibilities to respond to client and customer complaints.  Ex. CC (Kandov Tr.) 25:6-18; 26:10-17.

71.     It is CTG's policy that drivers should not call customers directly.  Ex. HH (Mastrangelo Tr.) 331:16-333:9.

72.     It is CTG's policy that drivers should greet customers by holding up a sign.  Ex. HH (Mastrangelo Tr.) 333:14-335:3.

73.     Greg Mastrangelo is CTG's front office manager and deals with drivers and driver issues.  Ex. D (Doetsch Tr.) 12:18-13:6.

74.     Greg Mastrangelo has from time to time spoken with drivers to review how to greet customers, i.e., by holding up a sign.  Ex. HH (Mastrangelo Tr.) 333:14-334:7.

75.     Greg Mastrangelo reviews the following with drivers: the condition of drivers' vehicles, how drivers should treat customers, how to be cordial, and how to service customers to the best of their ability.  Ex. HH (Mastrangelo Tr.) 242:17-243:5; Ex. II (Email, dated September 28, 2012), CTG30508-11; Ex. JJ (complaint spreadsheet), CTG27719, at cells J7, J9, J12, J13, J14, J16, J17, J32, J33, J37, K45, J49, J51, J63, J65, K71, K73, J75, K79, K80, J82, K95, K97, K101, K102, J110, K152, K189, J216, K217, K218, K219, K221, K268, K293.

76.     Greg Mastrangelo instructed a driver to stop calling a customer directly because it was against CTG policy.  Ex. HH (Mastrangelo Tr.) 62:7-24.

77.     From time to time, Greg Mastrangelo has requested that Joseph Maydwell inspect drivers' vehicles.  Ex. KK (Maydwell Tr.) 344:14-345:4; Ex. LL (Email, dated Dec. 15, 2012), CTG31335-36.

78.     From time to time, Greg Mastrangelo has requested that Stephen Aliberti inspect drivers' vehicles.  Ex. MM (Email, dated November 1, 2011), CTG28370-74.

79.      From time to time, CTG employee, Christine Navarette, has requested that Joseph Maydwell inspect drivers' vehicles.  Ex. NN (Email, dated October 12, 2012), CTG 30560-61.

80.     From time to time, CTG employee, Stephanie Prasker, has requested that Stephen Aliberti inspect drivers' vehicles.  Ex. OO (Email, dated March 7, 2011), CTG 27730-31.

81.    Drivers occasionally come to the base and request that driver relations personnel inspect their cars to verify that they are clean.  Ex. E (Kumar Tr.) 84:6-9.

82.    Greg Mastrangelo has conducted inspections of vehicles and has directed driver relations employees to inspect vehicles.  Ex. HH (Mastrangelo Tr.) 209:13-19; 210:4-6.

83.    CTG employee, Christine Navarrete, directed a driver relations employee to bring "driver 356 for a car inspections [sic]" in response to a customer complaint.  Ex. PP (Email, dated Feb. 3, 2012), CTG17077.

84.    Greg Mastrangelo from time to time reminds drivers what the dress code is "as a matter of keeping them aware that we're watching what's going on[.]"  Ex. HH (Mastrangelo Tr.) 183:15-184:11.

85.    Greg Mastrangelo from time to time removes drivers from accounts due to customer complaints, without consulting the Security Committees.  Ex. HH (Mastrangelo Tr.) 59:4-20; Ex. JJ (complaint spreadsheet), CTG27719, at cells K31, J40, J41, J47, and K 98.

86.    Greg Mastrangelo concurred with a decision to take a driver off all airport jobs for one week.  Ex. HH (Mastrangelo Tr.) 137:5-21; Ex. JJ (complaint spreadsheet), CTG27719, at cell K67.

87.    Greg Mastrangelo from time to time evaluates drivers' driving skills by getting in the car with the driver and being driven around.  Ex. HH (Mastrangelo Tr.) 232:8-13.

88.    Greg Mastrangelo determined that CTG personnel would from time to time conduct test drives with drivers.  Ex. HH (Mastrangelo Tr.) 335:4-336:5.

89.    Greg Mastrangelo informed a CTG client that, in response to a complaint, he would bring a driver in to review "CTGs [sic] customer service process" and would evaluate the driver's driving skills.  Ex. QQ (Email, dated Sept. 28, 2012), CTG 30508-11.

90.     From time to time, CTG shuts off drivers' handheld devices so that they can no longer receive jobs in order to force them to come to the base.  Ex. C (Slinin Tr.) 156:5-15; Ex. HH (Mastrangelo Tr.) 241:9-242:8; Ex. RR (Email, dated August 21, 2012), CTG30408-18.

91.     Greg Mastrangelo deals with customer incidents and manages contact with customers.  Ex. HH (Mastrangelo Tr.) 59:4-20.

92.     CTG decides whether to settle disputes with customers that complain about a driver.  Ex. C (Slinin Tr.) 192:15-193:10.

93.     Eduard Slinin hired Joseph Maydwell as a consultant for the Defendants on an independent contractor basis.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 13; Ex. C (Slinin Tr.) 30:19-22.

94.     Eduard Slinin hired Steven Aliberti as a consultant for the Defendants on an independent contractor basis.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 13; Ex. C (Slinin Tr.) 31:1-8.

95.     CTG's office staff have at times asked Joseph Maydwell to call drivers to let them know that CTG needs them at the base because of open complaints.  Ex. KK (Maydwell Tr.) 290:4-10; Ex. SS (Email, dated June 20, 2012), CTG29734-36; Ex. TT (Email, dated July 23, 2012), CTG30185-87; Ex. UU (Email, dated October 1, 2012), CTG30536-38; Ex. OO (Email, dated Mar. 7, 2011), CTG27730-31; Ex. VV (Email, dated Sept. 26, 2011), CTG33359; Ex. MM (Email, dated Nov. 1, 2011), CTG28370; Ex. WW (Email, dated Sept. 6, 2012), CTG17894-98; CTG17899-900; Ex. NN (Email, dated Oct. 12, 2012), CTG30560-61; Ex. LL (Email, dated Dec. 15, 2012), CTG31335-36; Ex. XX (Email, dated Dec. 24, 2012), CTG30810-16.

96.     Joseph Maydwell emailed CTG management on multiple occasions regarding inspections he conducted of drivers to determine whether they were in compliance with CTG's

rules and regulations. Ex. KK (Maydwell Tr.) 44:6-47:3; 67:18-79:10; 88:9-91:24; Ex. YY (Email, dated May 14, 2012), CTG 23191; Ex. TT (Email, dated Jul. 23, 2012), CTG 30185-86; Ex. ZZ (Email, dated Jul. 25, 2012), CTG23436.

97.     Joseph Maydwell informed Greg Mastrangelo, Eduard Slinin, Gerhard Doetsch, Joseph Civello, and Fadi Toska when he conducted inspections of drivers and imposed fines on them. Ex. KK (Maydwell Tr.) 237:25-239:9; Ex. AAA (Email, dated July 23, 2012), CTG 23432-33.

98.     Joseph Maydwell informed CTG management more than 37 times through emails of his enforcement of CTG's rules and regulations against drivers because he wanted them to know what he was up. Ex. KK (Maydwell Tr.) 238:10-239:9.

99.     Stephen Aliberti kept CTG management informed by email of inspections that he had conducted to ensure that drivers were in dress code. Ex. MM (Email, dated November 1, 2011), CTG28370-74;

100.    Joseph Maydwell emailed CTG management regarding his investigation into a CTG customer's allegation that a driver forcefully removed the cellphone from the pocket of the customer for payment of the fare. Ex. KK (Maydwell Tr.) 96:4-101:25; Ex. BBB (Email, dated July 31, 2012), CTG17752-55.

101.    Stephen Aliberti tracked customer complaints in a spreadsheet during the time he worked with CTG. Ex. D (Doetsch Tr.) 184:16-185:9; Ex. KK (Mastrangelo Tr.) 15:23-16:5; 163:12-15; Ex. CCC (Email, dated Feb. 16, 2011), CTG27718; Ex. JJ (complaint spreadsheet), CTG 27719.

**C.      CTG Uses "Security Committees" to Enforce Discipline.**

102.      Greg Mastrangelo works "hand in hand" with the Security Committees to handle customer service issues.  Ex. A (Civello Tr.) 81:12-23.

103.      CTG's driver relations operation, run by Greg Mastrangelo, deals with the Security Committees regarding drivers' issues and questions.  Ex. D (Doetsch Tr.) 60:23-62-19.

104.      CTG managers inform the Security Committees of violations of the rules by issuing forms known as "10/5" forms.  Ex. A (Civello Tr.) 99:19-100:5; 103:11-19; Ex. E (Kumar Tr.) 160:13-18; Ex. HH (Mastrangelo Tr.) 54:11-17; Ex. Y (NYC 2 Way Rulebook), CTG34785-801; Ex. Z (Aristacar Rulebook), CTG 34751-67; Ex. AA (TWR Rulebook), CTG34802-18.

105.      Greg Mastrangelo instructed a CTG customer relations employee, in response to her email concerning the number of complaints she was receiving from customers regarding drivers' late ETAs, that she should "[h]it the driver with 10/5 reason late eta and customer complaint.  Also send msg to all fleets that if they give an eta and the customer calls looking for the driver and the driver is late for the pick up they will get a 10/5."  Ex. DDD (Email, dated Sep. 29, 2010), CTG 27456-57.

106.      Stephen Aliberti informed Gerhard Doetsch, Greg Mastrangelo, and Eduard Slinin about a Security Committee meeting with management on August 9, 2010 via email at which the following issue was discussed: "All drivers will be held accountable to be on time for customer pickups; to wit, if a driver books into a specific zone, he must be Fully Prepared to properly service the customer. Failure to adhere to this policy will result in a monetary fine." Ex. HH (Mastrangelo Tr.) 70:16-72:15; Ex. EEE (Email, dated June 29, 2010), CTG32861; Ex. FFF (Email, dated Aug. 10, 2010), CTG 25496-97.

107.     Greg Mastrangelo from time to time contacts Security Committees to request that they fine drivers in response to customer complaints.  Ex. C (Slinin Tr.) 143:18-144:6.

108.     Eduard Slinin requested that a driver be fined $1,000 for demanding cash from a passenger for a job that was supposed to be paid by credit card.  Ex. C (Slinin Tr.) 165:24-166:11.

109.     Eduard Slinin has from time to time told the Security Committees when he thinks a customer complaint against a driver is not valid and the driver should not be fined.  Ex. C (Slinin Tr.) 187:16-188:9.

110.     Greg Mastrangelo suggested to CTG management that it should request that communications and security committee chairmen assess fines when customers complain about late pickups.  Ex. GGG (Email, dated Sep. 29, 2010), CTG 32873-74.

111.     Greg Mastrangelo from time to time disciplines drivers for violating rules contained in the Rulebooks without consulting the Security Committees.  Ex. D (Doetsch Tr.) 238:15-239:11.

112.     Pursuant to the rules in the Rulebooks, CTG from time to time fines drivers without Security Committee hearings.  Ex. HH (Mastrangelo Tr.) 325:6-22.

**III.     CTG's Proprietary Dispatch Software Determines the Terms and Conditions of Drivers' Work.**

113.     CTG drivers get the majority of their work through their dispatch device.  Ex. A (Civello Tr.) 163:8-14; Ex. HHH (Saleem Tr., Confidential portion) 87:9-17; Ex. III (J. Singh Tr., Confidential portion) 57:8-16; Ex. JJJ (Ali Tr.) 24:3-21; Ex. KKK (Bautista Tr.) 79:9-21; Ex. LLL (Bhatti Tr., Day 1) 72:2-18; Ex. MMM (J. Choudhary Tr.) 54:12-22; Ex. NNN (A. Chowdhury Tr.) 51:6-17; Ex. OOO (Koura Tr.) 33:9-16; Ex. PPP (Siddiqui Tr., Day 1) 179:3-6;

Ex. QQQ (Pinedo Tr.) 23:2-11; Ex. RRR (M. Singh Tr.) 52:14-16; Ex. SSS (J. Solorzano Tr.) 57:8-17; Ex. TTT (M. Solorzano Tr.) 40:11-41:16.

114.    CTG's dispatch system is based on geographic subdivisions of the New York City area referred to as "zones."  Ex. A (Civello Tr.) 174:14-25; Ex. UUU (CTG Dispatch Manual), CTG09239-53.

115.    Drivers must "book in" to a zone to become eligible to receive work through their dispatch devices.  Ex. A (Civello Tr.) 178:9-15.

116.    When drivers book in to a zone, they see their positions in a "queue," that is, their position in the zone relative to other drivers in the same zone.  Ex. A (Civello Tr.) 178:16-21.

117.    Other than their position in the "queue," drivers do not see any other information when they book in to a zone from the book-in screen.  Ex. A (Civello Tr.) 178:22-179:1.

118.    The first driver in a particular zone's queue is eligible to receive the next available job.  Ex. A (Civello Tr.) 206:13-19.

119.    On average, it can take anywhere from 30 minutes to two hours to reach the top of the queue.  Ex. III (J. Singh Tr., Confidential portion) 137:6-10.

120.    On a screen on drivers' dispatch devices, drivers can see the number of jobs available in a zone, the number of cars booked into a particular zone, the number of reservations in a zone within the next hour, and the number of passengers who have called and requested to be picked up without a reservation (a "live call").  Ex. A (Civello Tr.) 179:8-182:8.

121.    Drivers are not able to see any information about individual jobs other than the number of jobs available in the zone.  Ex. A (Civello Tr.) 178:12-182:8.

122.    Drivers choose to book into or travel to zones where the most jobs exist.  Ex. HHH (Saleem Tr., Confidential portion) 90:4-8; Ex. III (J. Singh Tr., Confidential portion) 64:6-

20; Ex. JJJ (Ali Tr.) 82:12-21; Ex. KKK (Bautista Tr.) 80:6-22; Ex. LLL (Bhatti Tr. Day 1) 90:15-91:14; Ex. MMM (J. Choudhary Tr.) 58:12-17; Ex. NNN (A. Chowdhury Tr.) 83:4-12; Ex. OOO (Koura Tr.) 33:20-34:10; Ex. PPP (Siddiqui Tr. Day 1) 166:6-24; Ex. QQQ (Pinedo Tr.) 39:17-22; Ex. RRR (M. Singh Tr.) 34:14-22; Ex. SSS (J. Solorzano Tr.) 54:15-55:5; Ex. TTT (M. Solorzano Tr.) 49:2-7.

123.    When a driver receives a job offer over the dispatch device, his options are to accept, reject, or do nothing.  Ex. A (Civello Tr.) 184:4-19.

124.    If a driver is number one in the "queue" and is offered a job, the driver is not informed about the pickup address, passenger name, account number, destination, or rate of the fare.  Ex. A (Civello Tr.) 184:4-13.

125.    Once a driver accepts a job, he is informed about the pickup address, passenger's name, account number, destination, and rate of the fare.  Ex. A (Civello Tr.) 186:24-187:5.

126.    If a job is offered to a driver, and the driver doesn't accept or reject it within 45 seconds, the driver is booked off the zone by the dispatch system and must wait five minutes before booking in again, at which point the driver goes to the bottom of the queue.  Ex. A (Civello Tr.) 184:4-185:7; 186:20-23; Ex. UUU (CTG Dispatch Manual), CTG09239-53, at CTG09241.

127.    If a driver rejects a job offer, the driver is booked off the zone by the dispatch system and must wait five minutes before booking in again, at which point the driver goes to the bottom of the queue.  Ex. A (Civello Tr.) 185:8-17.

128.    When a driver arrives at a pick-up point, if the customer doesn't appear within 15 minutes, the driver must alert dispatch through a code on his mobile device that the customer has not shown up.  Ex. A (Civello Tr.) 58:1-12.

129.     If the driver does not transmit the "no show" code to the base, he must wait for the base to "release" him and in the meantime cannot book back into his zone or take any other jobs.  Ex. A (Civello Tr.) 59:17-60:21.

130.     If a driver accepts a job, but then does not want to take the job, the driver can request a "bailout" and the dispatcher will bail him.  Ex. A (Civello Tr.) 199:13-9.

131.     If a driver takes a bailout, it means the driver cannot work on the dispatch system for three hours, i.e., cannot book into a zone for three hours, and must begin at the bottom of the queue when he does.  Ex. A (Civello Tr.) 200:10-16.

132.     If a driver requests a bailout with a passenger in the car, the driver is only taken off the dispatch system for one hour instead of three.  Ex. A (Civello Tr.) 200:17-201:5.

133.     CTG kept track of driver bailouts in order to determine whether they were negatively affecting customer service.  Ex. HH (Mastrangelo Tr.) 53:-8-54:10; Ex. VVV (Email, dated Oct. 22, 2010), CTG19537-38.

**IV.     Slinin Is Closely Involved in CTG's Day-to-Day Operations.**

134.     Eduard Slinin has been the President of all of the Defendant companies from November 19, 2006 through the present.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 2.

135.     Eduard Slinin is the sole owner of Corporate Transportation Group, Ltd.  Ex. C (Slinin Tr.) 8:6-8.

136.     Eduard Slinin is one of two shareholders in Corporate Transportation Group, Worldwide.  Ex. C (Slinin Tr.) 8:9-21.

137.      Eduard Slinin holds a 50% ownership interest in NYC 2 Way International, Ltd. Ex. C (Slinin Tr.) 8:22-9:3.

138.     Eduard Slinin's brother, Mark Slinin, holds a 50% ownership interest in NYC 2 Way International, Ltd.  Ex. C (Slinin Tr.) 8:25-9:3.

139.     Mark Slinin did not play an active role in managing the business of NYC 2 Way International, Ltd. for at least five years prior to October 11, 2013.  Ex. C (Slinin Tr.) 9:4-6.

140.     Eduard Slinin is a part owner of Aristacar & Limousine, Ltd.  Ex. C (Slinin Tr.) 9:15-10:9.

141.     Eduard Slinin holds a 50% ownership interest in Allstate Private Car & Limousine, Inc.  Ex. C (Slinin Tr.) 10:10-14.

142.     Eduard Slinin's brother, Mark Slinin, holds a 50% ownership interest in Allstate Private Car & Limousine, Inc.  Ex. C (Slinin Tr.) 10:10-14.

143.     Eduard Slinin is a part owner of TWR Car and Limo, Ltd.  Ex. C (Slinin Tr.) 10:15-25.

144.     Eduard Slinin's wife, Galina Slinin, is the only other shareholder of TWR Car and Limo, Ltd. besides Eduard Slinin.  Ex. C (Slinin Tr.) 10:19-25.

145.     Eduard Slinin is a part owner of Excelsior Car and Limo, Inc.  Ex. C (Slinin Tr.) 11:1-13.

146.      Eduard Slinin's wife, Galina Slinin, is the only other shareholder of Excelsior Car and Limo, Inc. besides Eduard Slinin.  Ex. C (Slinin Tr.) 11:1-13.

147.     Eduard Slinin is a part owner of Hybrid Limo Express, Inc.  Ex. C (Slinin Tr.) 11:14-19.

148.     Eduard Slinin's wife, Galina Slinin, is the only other shareholder of Hybrid Limo Express, Inc. besides Eduard Slinin.  Ex. C (Slinin Tr.) 11:20-23.

149.     Eduard Slinin, Galina Slinin, and Mark Slinin are the only individuals with any ownership interest in Corporate Transportation Group, Ltd., Corporate Transportation Group, Worldwide, NYC 2 Way International, Aristacar & Limousine, Ltd., Allstate Private Car & Limousine, Ltd., TWR Car and Limo, Ltd., Excelsior Car and Limo, Inc., and Hybrid Limo Express, Inc.  Ex. C (Slinin Tr.) 11:24-12:2.

150.     Eduard Slinin works approximately 18 hours per day for the Defendant companies, at least six days per week.  Ex. C (Slinin Tr.) 89:18-21.

151.     Eduard Slinin considers himself "fully responsible" for the operations of the Defendant companies.  Ex. C (Slinin Tr.) 105:5-9.

152.     Eduard Slinin considers himself a "hands-on" manager.  Ex. C (Slinin Tr.) 105:15-17.

153.     Eduard Slinin is personally involved in many operations of the Defendant companies.  Ex. C (Slinin Tr.) 87:16-21.

154.     Eduard Slinin approves expenditures for marketing for the Defendant companies.  Ex. C (Slinin Tr.) 85:3-14.

155.     Eduard Slinin approves expenditures for office expenses such as furniture.  Ex. C (Slinin Tr.) 85:3-19.

156.     Eduard Slinin approves expenditures for legal bills.  Ex. C (Slinin Tr.) 90:24-91:5.

157.     Eduard Slinin decided to structure a portion of the compensation for employees in Defendants' driver relations department as self-employment income, to be reported to the IRS on a 1099 form.  Ex. C (Slinin Tr.) 284:16-22.

158.    Eduard Slinin decided to structure a portion of the compensation for employees in Defendants' dispatch operation as self-employment income, to be reported to the IRS on a 1099 form.  Ex. C (Slinin Tr.) 284:23-285:5.

159.    Eduard Slinin decided to hire Joseph Maydwell as a consultant for the Defendant companies, and to report his compensation to the IRS on a 1099 form.  Ex. C (Slinin Tr.) 285:6-22.

160.    Eduard Slinin's day-to-day responsibilities for the Defendant companies include maintaining customer relationships.  Ex. C (Slinin Tr.) 27:5-14; 80:10-81:10.

161.    Eduard Slinin's day-to-day responsibilities for the Defendant companies include developing new clients.  Ex. C (Slinin Tr.) 27:15-17.

162.    Eduard Slinin is responsible for client and customer relations.  Ex. C (Slinin Tr.) 80:8-81:10.

163.    Eduard Slinin's customer and client relations work includes sitting down with clients and showing them CTG's new dispatch operations technology.  Ex. C (Slinin Tr.) 80:8-81:3.

164.    Eduard Slinin's day-to-day responsibilities for the Defendant companies include developing strategy for direct mail and social media marketing.  Ex. C (Slinin Tr.) 28:7-17.

165.    Eduard Slinin's day-to-day responsibilities for the Defendant companies include negotiating prices for ground transportation services with customers.  Ex. B (Defs.' Resp. to Pls. RFAs), RFA No. 27; Ex. C (Slinin Tr.) 200:25-201:5; 80:10-81:10.

166.    Eduard Slinin's day-to-day responsibilities for the Defendant companies include overseeing the Defendant companies' dispatch operation.  Ex. C (Slinin Tr.) 28:18-29:3.

167.    Eduard Slinin has meetings regarding the operation of Defendants' dispatch operation with Joseph Civello, the head of dispatch operations, approximately once every two weeks.  Ex. C (Slinin Tr.) 82:15-21.

168.    Eduard Slinin's day-to-day responsibilities for the Defendant companies include overseeing the Defendant companies' billing operation.  Ex. C (Slinin Tr.) 28:18-22.

169.    Eduard Slinin reviews reports on the Defendant companies' billing operations that show how many trips Defendants' customers book with the Defendant companies.  Ex. C (Slinin Tr.) 86:20-87:4.

170.    Eduard Slinin frequently refers customer service issues to Greg Mastrangelo or to other employees of the Defendant companies.  Ex. C (Slinin Tr.) 81:20-82:2.

171.    Eduard Slinin periodically follows up on customer service issues that he refers to other employees of the Defendant companies.  Ex. C (Slinin Tr.) 81:20-82:2.

**A.    Slinin Makes Key Decisions About Drivers' Terms of Employment.**

172.    Eduard Slinin made the decision to operate CTG as a dispatch service that would dispatch jobs through a radio or a handheld device.  Ex. C (Slinin Tr.) 63:1-6.

173.    Eduard Slinin decided how to structure CTG drivers' compensation.  Ex. C (Slinin Tr.) 59:8-21; Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 22.

174.    Eduard Slinin decided to classify drivers as independent contractors.  Ex. C (Slinin Tr.) 49:23-50:9; 54:20-55:6; 56:22-57:18.

175.    The Rulebooks of the Security Committees and/or Communications Committees for the Defendant companies are incorporated into the franchise agreements that apply to drivers. Ex. F (NYC 2 Way Franchise Agreement, effective July 24, 2007), CTG15438-529 at CTG15470, ¶ 23; Ex. G (NYC 2 Way Franchise Agreement, effective December 11, 2008),

CTG15358-437 at CTG15397, ¶ 23; Ex. H (NYC 2 Way Franchise Agreement, effective August 18, 2009), CTG15269-357 at CTG15308, ¶ 23; Ex. I (NYC 2 Way Franchise Agreement, effective July 6, 2010), CTG15166-268 at CTG15205, ¶ 23; Ex. J (NYC 2 Way Franchise Agreement, effective July 6, 2011), CTG14971-5069 at CTG15010, ¶ 23; Ex. K (Aristacar Franchise Agreement, effective July 23, 2007), CTG13654-738 at CTG13688, ¶ 23; Ex. L (Aristacar Franchise Agreement, effective January 13, 2009), CTG13568-653 at CTG13606, ¶ 23; Ex. M (Aristacar Franchise Agreement, effective August 13, 2009), CTG13476-567 at CTG13515, ¶ 23; Ex. N (Aristacar Franchise Agreement, effective July 7, 2010), CTG13382-475 at CTG13422, ¶ 23; Ex. O (Aristacar Franchise Agreement, effective July 6, 2011), CTG13290-381 at CTG13330-31, ¶ 23; Ex. P (TWR Franchise Agreement, effective July 23, 2007), CTG15981-6064 at CTG16015, ¶ 23; Ex. Q (TWR Franchise Agreement, effective January 19, 2009), CTG15891-980 at CTG15928, ¶ 23; Ex. R (TWR Franchise Agreement, effective August 13, 2009), CTG15800-890 at CTG15838, ¶ 23; Ex. S (TWR Franchise Agreement, effective July 7, 2010), CTG15708-799 at CTG15748, ¶ 24; Ex. T (TWR Franchise Agreement, effective August 10, 2011), CTG15617-707 at CTG15658, ¶ 23; Ex. U (NYC 2 Way Franchise Agreement, effective July 2, 2012), CTG15070-165 at CTG15110, ¶25; Ex. V (Aristacar Franchise Agreement, effective July 5, 2012), CTG13204-289 at CTG13241, ¶ 25; Ex. W (TWR Franchise Agreement, effective July 5, 2012), CTG15530-616 at CTG15569, ¶ 25.

176.    The franchise agreements that apply to drivers give Defendants the unilateral right to terminate drivers' franchises if they violate the rules. Ex. C (Slinin Tr.) 164:21-25; Ex. F (NYC 2 Way Franchise Agreement, effective July 24, 2007), CTG15438-529 at CTG15476-77, ¶ 46; Ex. G (NYC 2 Way Franchise Agreement, effective December 11, 2008), CTG15358-437 at CTG15403-04, ¶ 46; Ex. H (NYC 2 Way Franchise Agreement, effective August 18, 2009),

CTG15269-357 at CTG15314-16, ¶ 46; Ex. I (NYC 2 Way Franchise Agreement, effective July 6, 2010), CTG15166-268 at CTG15211-13, ¶ 46; Ex. J (NYC 2 Way Franchise Agreement, effective July 6, 2011), CTG14971-5069 at CTG15016-18, ¶ 46; Ex. K (Aristacar Franchise Agreement, effective July 23, 2007), CTG13654-738 at CTG13694-95, ¶ 46; Ex. L (Aristacar Franchise Agreement, effective January 13, 2009), CTG13568-653 at CTG13612-13, ¶ 46; Ex. M (Aristacar Franchise Agreement, effective August 13, 2009), CTG13476-567 at CTG13522-24, ¶ 46; Ex. N (Aristacar Franchise Agreement, effective July 7, 2010), CTG13382-475 at CTG13429-31, ¶ 46; Ex. O (Aristacar Franchise Agreement, effective July 6, 2011), CTG13290-381 at CTG13337-39, ¶ 45; Ex. P (TWR Franchise Agreement, effective July 23, 2007), CTG15981-6064 at CTG16021-23, ¶ 46; Ex. Q (TWR Franchise Agreement, effective January 19, 2009), CTG15891-980 at CTG15934-36, ¶ 46; Ex. R (TWR Franchise Agreement, effective August 13, 2009), CTG15800-890 at CTG15845-47, ¶ 46; Ex. S (TWR Franchise Agreement, effective July 7, 2010), CTG15708-799 at CTG15754-56, ¶ 46; Ex. T (TWR Franchise Agreement, effective August 10, 2011), CTG15617-707 at CTG15664-66, ¶ 45; Ex. U (NYC 2 Way Franchise Agreement, effective July 2, 2012), CTG15070-165 at CTG15115-17, ¶45; Ex. V (Aristacar Franchise Agreement, effective July 5, 2012), CTG13204-289 at CTG13247-48, ¶ 45; Ex. W (TWR Franchise Agreement, effective July 5, 2012), CTG15530-616 at CTG15575-76, ¶ 45.

177.    Eduard Slinin made the decision to incorporate the rules into drivers' franchise agreements. Ex. C (Slinin Tr.) 62:15-21.

178.    Eduard Slinin made the decision to include a provision in drivers' franchise agreements that prohibits drivers from picking up CTG customers without billing those customers through CTG. Ex. C (Slinin Tr.) 63:18-64:18.

179.     Eduard Slinin made the decision to initiate a lawsuit against Malook Singh in New York State Supreme Court, titled *NYC 2 Way International, Ltd. v. Malook Singh*. Ex. C (Slinin Tr.) 73:14-23; 75:18-76:5; Ex. X (complaint in *NYC 2 Way International, Ltd. v. Malook Singh*), CTG000234-39.

180.     Eduard Slinin made the decision to structure drivers' compensation as a percentage of each job. Ex. B (Defs.' Resp. to Pls. RFAs) RFA Nos. 21, 22; Ex. C (Slinin Tr.) 59:8-21; 62:22-25.

181.     When drivers affiliate with a Defendant franchisor company, they pay a deposit of between $1,000 and $2,000, which may be returned to them when they leave. Ex. A (Civello Tr.) 211:16-25.

182.     Eduard Slinin made the decision to institute the system of drivers paying deposits. Ex. C (Slinin Tr.) 86:9-19.

183.     After the first week of a driver's affiliation with a franchisor company, in each subsequent week, he or she is required to pay weekly dues of $56. Defs.' Resp. to Pls.' RFA Nos. 18, 20; Ex. A (Civello Tr.) 101:20-102:1.

184.     Drivers who serve on a Security Committee or Communications Committee are exempt from paying weekly dues. Defs.' RFA No. 18; Ex. C (Civello Tr.) 101:16-18.

185.     Eduard Slinin made the decision to charge drivers $56 per week in dues. Ex. B (Defs.' Resp. to Pls.' RFAs) RFA No. 19.

186.     Eduard Slinin made the decision to waive payment of deposits and weekly dues in the first week of a driver's affiliation with Defendants, in order to reduce turnover rates. Ex. B (Defs.' Resp. to Pls.' RFAs) RFA No. 19; Ex. C (Slinin Tr.) 123:4-15.

187.    Defendants' dispatch system currently transmits work to drivers over a handheld LG smartphone; prior to the implementation of the LG devices, the system transmitted work to drivers over a handheld Blackberry device.  Ex. C (Slinin Tr.) 83:17-24.

188.    Eduard Slinin, Joseph Civello, Fadi Toska, Greg Mastrangelo, and Gerhard Doetsch collectively made the decision to switch from using Blackberry devices to using LG smartphones.  Ex. C (Slinin Tr.) 83:25-84:17.

**B.    Slinin Makes Hiring Decisions.**

189.    Eduard Slinin hired Joseph Civello.  Ex. B (Defs.' Resp. to Pls.' RFAs) RFA No. 9; Ex. C (Slinin Tr.) 29:4-5.

190.    Joseph Civello has been the manager of the dispatch department for the Defendant franchisor companies from November 19, 2006 to the present.  Ex. B (Defs.' Resp. to Pls.' RFAs) RFA No. 9; Ex. C (Slinin Tr.) 29:1-3.

191.    Joseph Civello reports directly to Eduard Slinin.  Ex. C (Slinin Tr.) 28:23-29:3.

192.    Joseph Civello currently does all of the hiring for Defendants' dispatch department. Ex. C (Slinin Tr.) 29:6-11.

193.    Eduard Slinin hired Gerhard Doetsch.  Ex. B (Defs.' Resp. to Pls.' RFAs) RFA No. 12.

194.    Gerhard Doetsch has served as the Chief Operating Officer of Corporate Transportation Group, Ltd. from the beginning of 2010 to the present.  Ex. B (Defs.' Resp. to Pls.' RFAs) RFA No. 12.

195.    Gerhard Doetsch reports directly to Eduard Slinin.  Ex. C (Slinin Tr.) 29:12-14.

196.    Gerhard Doetsch currently does all of the hiring for Defendants' billing department. Ex. C (Slinin Tr.) 29:18-20.

197. Eduard Slinin hired Greg Mastrangelo. Ex. B (Defs.' Resp. to Pls.' RFAs) RFA No. 10; Ex. C (Slinin Tr.) 30:10-11.

198. Greg Mastrangelo served as the Vice President of Operations for Corporate Transportation Group, Ltd. from November 19, 2006 to the present. Ex. B (Defs.' Resp. to Pls.' RFAs) RFA No. 10.

199. Eduard Slinin appointed Greg Mastrangelo to the position of head of customer service and head of driver relations after Mastrangelo was hired by Corporate Transportation Group, Ltd. Ex. B (Defs.' Resp. to Pls.' RFAs) RFA No. 11.

200. Greg Mastrangelo and Gerhard Doetsch are responsible for all of the hiring for Defendants' customer service department. Ex. C (Slinin Tr.) 30:2-6.

201. Greg Mastrangelo currently does all of the hiring for Defendants' driver relations department. Ex. C (Slinin Tr.) 30:7-9.

202. Eduard Slinin hired Sanjeev Kumar to work in Defendants' driver relations department. Ex. C (Slinin Tr.) 30:12-15.

203. Eduard Slinin hired Raisa Kandov. Ex. CC (Kandov Tr.) 14:11-12.

204. Raisa Kandov deals with clients' billing questions and issues. Ex. CC (Kandov Tr.) 24:9-21.

205. Raisa Kandov is responsible for entering information into Defendants' billing system about which deductions will be made from drivers' checks. Ex. CC (Kandov Tr.) 23:10-16; 39:6-40:7; 41:8-10.

206. Eduard Slinin does all hiring for Defendants' sales department. Ex. C (Slinin Tr.) 29:24-30:1.

### C. Slinin Is Personally Involved in Daily Operations Affecting Drivers.

207. Eduard Slinin approves the return of drivers' deposits when they leave the Defendant companies.  Ex. C (Slinin Tr.) 85:20-86:8.

208. Eduard Slinin at times approves refunds or discounts to Defendants' customers. Ex. C (Slinin Tr.) 97:7-9.

209. Refunds or discounts to Defendants' customers directly affect the compensation that drivers receive because drivers receive a percentage of each fare.  Ex. C (Slinin Tr.) 100:21-101:14.

210. Eduard Slinin has at times intervened when a customer complaint has the potential to reduce a driver's compensation.  Ex. C (Slinin Tr.) 102:11-17.

211. Eduard Slinin has from time to time recommended fines to the Security Committees for drivers.  Ex. C (Slinin Tr.) 166:5-15.

212. Eduard Slinin has at times recommended that the Security Committees not fine drivers for violating the rules.  Ex. C (Slinin Tr.) 187:8-188:9.

213. From time to time, drivers approach Eduard Slinin about their grievances because they want to talk to a specific person.  Ex. C (Slinin Tr.) 184:4-25 ("Drivers have to be treated like babies, you have to pamper them.  Sometimes the driver would like to speak to a specific person."

## V. Plaintiffs

### A. Mazhar Saleem

214. Mahzar Saleem signed a franchise agreement on November 17, 2010 and affiliated with NYC 2 Way.  Ex. VVV (Saleem Franchise Agreement), P002547-654.

215. Mahzar Saleem drove for CTG from 1998–2000 and 2006–2012. Ex. XXX (Saleem Tr., Non-confidential portion) 16:15-17:14.

216. Mazhar Saleem was fined by CTG on multiple occasions, for infractions, including arguing with the Security Chairman, arguing with a dispatcher, not reporting to a checkpoint, and accepting a street hail. Ex. HHH (Saleem Tr., Confidential portion) 151:11-152:5; 154:6-8; Ex. YYY (Security Deduction Report), CTG16065-72.

217. Mazhar Saleem has received fleet messages from CTG telling drivers about jobs that are available. Ex. HHH (Saleem Tr., Confidential portion) 87:19-88:2

218. Mazhar Saleem has received messages from CTG on his dispatch device asking how long it will take him to arrive at a passenger's pickup location. Ex. HHH (Saleem Tr., confidential portion) 88:2-9.

**B.    Jagjit Singh**

219. Jagjit Singh drove for CTG from 2008 through approximately February 2013, and was affiliated with NYC 2 Way. Ex. III (J. Singh. Tr., Confidential portion) 69:4-21.

220. Jagjit Singh was "bailed out" by CTG on at least ten occasions when he accepted a job that he was unable to complete. Ex. III (J. Singh Tr., Confidential portion) 85:16-88:6.

221. Jagjit Singh was assigned jobs from an account even after he requested to be taken off the account, and was told that if he did not do the job he would be bailed out. Ex. III (J. Singh Tr., Confidential portion) 143:6-11.

222. Jagjit Singh has received fleet messages from CTG telling drivers to come into New York City because CTG needed cars. Ex. III (J. Singh Tr., Confidential portion) 59:20-60:3.

223. Jagjit Singh received telephone calls at home from dispatchers telling him that CTG needed cars to come to the city. Ex. III (J. Singh Tr., Confidential portion) 59:20-60:3.

### C. Anjum Ali

224. Anjum Ali signed a franchise agreement in or about October 2010, and affiliated with NYC 2 Way. Ex. JJJ (Ali Tr.) 20:9-25; Ex. ZZZ (Ali Franchise Agreement), P001159-266.

225. Anjum Ali has performed driving work for CTG from October 2010 to the present. Ex. JJJ (Ali Tr.) 19:23-20:18.

226. Anjum Ali paid a $5,000 transfer fee in cash to Eduard Slinin when he purchased his franchise. Ex. JJJ (Ali Tr.) 21:20-23.

227. Anjum Ali was bailed out by CTG on occasions when he was offered a job that was too far from his current location to be reached within 30 minutes. Ex. JJJ (Ali Tr.) 83:19-84:15.

228. Anjum Ali was required to do jobs for accounts that he had asked to be removed from, and was told that if he did not do those jobs he would be bailed out. Ex. JJJ (Ali Tr.) 144:2-10; 161:13-17; 172:8-19

### D. Jairo Bautista

229. Jairo Bautista signed a franchise agreement approximately 16 years ago and affiliated with TWR. Ex. KKK (Bautista Tr.) 24:14-25:8.

230. Jairo Bautista drove for CTG from 1997 through June 2013. Ex. KKK (Bautista Tr.) 8:17-9:14; 24:14-15.

### E. Anwar Bhatti

231.     Anwar Bhatti signed a franchise agreement franchise agreement on July 21, 2003 and affiliated with NYC 2 Way.  Ex. LLL (Bhatti Tr. Day 1) 64:18-24; 65:21-22; Ex. AAAA (Bhatti Franchise Agreement).

232.     Anwar Bhatti drove for CTG from 1998 through November 2012.  Ex. LLL (Bhatti Tr. Day 1) 29:8-23.

233.     Anwar Bhatti complained to CTG management about the bailout penalty while he was chairman of NYC's Security Committee.  Ex. LLL (Bhatti Tr. Day 1) 198:10-24.

234.     Anwar Bhatti was taken off the air at one time and required to go to the base to speak with Eduard Slinin.  Ex. LLL (Bhatti Tr. Day 1) 126:12-127:20.

### F. Jamshed Choudhary

235.     Jamshed Choudhary signed a franchise agreement in or about 1997 and affiliated with NYC 2 Way.  Ex. MMM (J. Choudhary Tr.) 17:19-24.

236.     Jamshed Choudhary drove for CTG from 1997 through the present.  Ex. MMM (J. Choudhary Tr.) 31:24-32:3.

237.     Jamshed Choudhary was told on multiple occasions by CTG dispatchers that he would have to bail out if he did not want to complete a low-paying job.  Ex. MMM (J. Choudhary Tr.) 34:4-35:3.

238.      Jamshed Choudhary was required to do jobs for accounts that he had asked to be removed from, and was told that if he did not do those jobs he would be bailed out.  Ex. MMM (J. Choudhary Tr.) 69:20-70:2.

239.    While he was Communications Chairman, Jamshed Choudhary requested that the Security Committee fines be reduced, but was told by Greg Mastrangelo that the existing fines should remain in place.  Ex. MMM (J. Choudhary Tr.) 25:18-26:12.

**G.    Anowar Chowdhury**

240.    Anowar Chowdhury signed a franchise agreement and affiliated with NYC 2 Way.  Ex. NNN (A. Chowdhury Tr.) 76:18-77:4.

241.    Anowar Chowdhury paid a $3,500 transfer fee to Eduard Slinin when he purchased his franchise.  Ex. NNN (A. Chowdhury Tr.) 39:13-40:8.

242.    Anowar Chowdhury drove for CTG for two-and-a-half years prior to 2011.  Ex. NNN (A. Chowdhury Tr.) 12:9-17.

243.    Anowar Chowdhury was told by a CTG dispatcher that he should not bail out of jobs.  Ex. NNN (A. Chowdhury Tr.) 50:7-25.

244.    Anowar Chowdhury received telephone calls and electronic messages from dispatchers telling him when CTG needed him in a particular zone.  Ex. NNN (A. Chowdhury Tr.) 68:4-13.

245.    Anowar Chowdhury's car was inspected on multiple occasions by Stephen Aliberti.  Ex. NNN (A. Chowdhury Tr.) 109:10-111:25; 125:21-126:8.

246.    Anowar Chowdhury was instructed to follow Security Committee rules by Stephen Aliberti.  Ex. NNN (A. Chowdhury Tr.) 112:5-11

247.    Anowar Chowdhury was told on multiple occasions to come to the base at 335 Bond Street to speak with Stephen Aliberti.  Ex. NNN (A. Chowdhury Tr.) 112:12-14; 125:21-126:8.

248.     Anowar Chowdhury's dispatch device was shut off on one occasion so that he would come to the base to speak with Stephen Aliberti, Sanjeev Kumar, Joseph Civello, Eduard Slinin, and Anwar Bhatti regarding a customer complaint.  Ex. NNN (A. Chowdhury Tr.) 112:20-116:8.

249.     After discussing a customer complaint with Anowar Chowdhury, Eduard Slinin fined Anowar Chowdhury $5,000.  Ex. NNN (A. Chowdhury Tr.) 116:9-118:25; Ex. YYY (Security Deduction Report), CTG16065-72.

**H.     Avneet Koura**

250.     Avneet Koura signed a franchise agreement in or about 1994 and affiliated with NYC 2 Way.  Ex. OOO (Koura Tr.) 19:23-20:9.

251.     Avneet Koura drove for CTG from 2009 through 2012.  Ex. OOO (Koura Tr.) 21:21-22:2.

252.     Avneet Koura has received CTG fleet messages requesting that drivers move to different zones.  Ex. OOO (Koura Tr.) 74:6-12

253.     Avneet Koura has received notices with his check from CTG management reminding drivers to follow the rules in the Rulebook.  Ex. OOO (Koura Tr.) 50:5-51:11.

**I.     Mohammad Siddiqui**

254.     Mohammad Siddiqui signed a franchise agreement on December 16, 2010 and affiliated with NYC 2 Way.  Ex. PPP (Siddiqui Tr. Day 1) 129:8-12; Ex. BBBB (Siddiqui Franchise Agreement).

255.     Mohammad Siddiqui drove for CTG from approximately 2009 through the present.  Ex. PPP (Siddiqui Tr. Day 1) 158:5-8; 122:16-123:5.

256. Mohammad Siddiqui paid a $5,000 transfer fee in cash to Eduard Slinin when he purchased his franchise. Ex. PPP (Siddiqui Tr. Day 1) 132:5-17; 133:14-134:11.

257. Mohammad Siddiqui was taken off the air at one time and required to go to the base for a hearing about an incident in which the customer complained about a route that he had taken. Ex. HHHH (Siddiqui Tr. Day 2) 268:17-269:7.

**J.    Marlene Pinedo**

258. Marlene Pinedo signed a franchise agreement in or about 2006 and affiliated with Aristacar. Ex. QQQ (Pinedo Tr.) 8:9-9:14.

259. Marlene Pinedo drove for CTG from 2006 through the present. Ex. QQQ (Pinedo Tr.) 8:2-11.

**K.    Malook Singh**

260. Malook Singh signed a franchise agreement on March 6, 2009 and affiliated with NYC 2 Way. Ex. DDDD (M. Singh Franchise Agreement).

261. Malook Singh drove for CTG from approximately 2010 through May 2012. Ex. RRR (M. Singh Tr.) 13:18-23; 9:18-23.

262. Malook Singh has received fleet messages from CTG requesting that drivers move to different zones. Ex. RRR (M. Singh Tr.) 86:16-20; 91:5-9.

**L.    Jose Solorzano**

263. Jose Solorzano signed a franchise approximately 18 years ago and affiliated with TWR. Ex. SSS (J. Solorzano Tr.) 28:11-29:9.

264. Jose Solorzano drove for CTG from 1995 through approximately February 2013. Ex. SSS (J. Solorzano Tr.) 26:4-11.

### M.     Miriam Solorzano

265.    Miriam Solorzano signed a franchise agreement in or about 2006 and affiliated with TWR.  Ex. TTT (M. Solorzano Tr.) 25:14-25.

266.    Miriam Solorzano drove for CTG from 1995 through the present.  Ex. TTT (M. Solorzano Tr.) 8:16-9:8.

Dated: New York, New York
        January 14, 2014

Respectfully submitted,

/s/ Adam T. Klein

Adam T. Klein
Rachel Bien
Michael J. Scimone
Michael N. Litrownik
**OUTTEN & GOLDEN, LLP**
3 Park Avenue, 29th Floor
New York, NY  10016
Telephone:  (212) 245-1000
Facsimile:  (212) 977-4005

**KAHN OPTON, LLP**
Stephen H. Kahn
One Parker Plaza
Fort Lee, New Jersey 07024
Telephone: (201) 947-9200

*Attorneys for Plaintiffs*