**OUTTEN & GOLDEN LLP**
Adam T. Klein
Rachel Bien
Michael J. Scimone
Michael N. Litrownik
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

**KAHN OPTON, LLP**
Stephen H. Kahn
One Parker Plaza
Fort Lee, New Jersey 07024
Telephone: (201) 947-9200

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAZHAR SALEEM and JAGJIT SINGH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CORPORATE TRANSPORTATION GROUP, LTD., CORPORATE TRANSPORTATION GROUP INTERNATIONAL, CORPORATE TRANSPORTATION GROUP WORLDWIDE, INC., NYC 2 WAY INTERNATIONAL, LTD., CTG PRIVATE CAR & LIMOUSINE, INC., ARISTACAR & LIMOUSINE, LTD., TWR CAR AND LIMO, LTD., EXCELSIOR CAR AND LIMO, INC., HYBRID LIMO EXPRESS, INC., EDUARD SLININ, and GALINA SLININ,<br><br>Defendants. | **No. 12 Civ. 8450 (JMF)** |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS: (i) FOR SUMMARY JUDGMENT DISMISSING PLAINTIFFS' FLSA AND NYLL CLAIMS; (ii) TO DECERTIFY THE COLLECTIVE ACTION PURSUANT TO SECTION 216(b) OF THE FLSA; (iii) TO STRIKE PLAINTIFFS JOSE PINTO, ISMAEL MEJIA, JOHN M. HIDALGO, AND NICK WIJESINGHE <u>OR POINT TO POINT CAR AND LIMO, INC.</u>

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND.................................................................................. 2

ARGUMENT ........................................................................................................ 4

I.     Defendants Rely on Inadmissible Evidence. ......................................... 4

     A.     The Court Should Disregard Much of Slinin's Affidavit Because It
         Fails to Satisfy Fed. R. Civ. P. 56(c)(4)...................................... 4

     B.     The Court Should Disregard the Daus and Dizengoff Affidavits
         Because the Witnesses Were Not Disclosed During Discovery and
         the Testimony Consists of Unqualified Opinion Testimony ..................... 6

     C.     The Court Should Not Allow Defendants to Support Their Motion
         with Evidence that They Failed to Produce During Discovery ................. 6

II.     Issues of Fact Preclude Summary Judgment on Plaintiffs' FLSA Claims ............ 7

     A.     CTG Exerts Significant Control Over Plaintiffs ........................................ 6

         1.     CTG Exercised Control in Ways that Are Relevant Under the
               FLSA Test ................................................................................ 9

               a.     Defendants Monitored Plaintiffs........................................ 9

               b.     Defendants Disciplined Plaintiffs. .................................... 10

                   i.     CTG Enforced the Dress Code and Car Code
                         Against Drivers. ........................................... 10

                   ii.     Plaintiffs Were Required to Follow CTG's Rules........ 12

               c.     Plaintiffs Did Not Control a Separate Economic Entity ... 15

                   i.     Plaintiffs Did Not Have Real Control Over the
                         Decision to Reject a Job. ............................... 15

                   ii.     Defendants Restricted Plaintiffs' Right to Sell
                         Their Franchises. ........................................... 16

                   iii.     Plaintiffs Did Not "Retain" Other Drivers. .................. 17

        iv.    Plaintiffs Were Not Able to Negotiate
              Their Compensation. ...................................... 17

    2.    Defendants Rely on Facts that Are not Material to the FLSA
       Standard or at Best, Warrant Little Weight ................................. 18

        a.    Plaintiffs Did Not Work at their Own Convenience. ........ 18

        b.    Whether Plaintiffs Incorporated Is Irrelevant. .................. 18

        c.    Whether Plaintiffs Worked for Other Employers Is
           Not Determinative............................................................ 19

        d.    Even Though Defendants' Training Was Minimal,
           It Is Further Evidence of Their Control ......................... 20

B.    Plaintiffs Had Little or No Opportunities for Profit or Loss and
    Made Relatively Minor Investments in CTG's Business ........................ 25

    1.    CTG's Dispatch System Eliminated Plaintiffs' Ability to
       Make Rational Economic Choices About Their Work ................ 20

    2.    Plaintiffs' Limited Investments Are Greatly Outweighted
       by CTG's Investments .................................................................. 25

    3    The Plaintiffs Who Rented Their Franchises Invested Far
       Less Than CTG and Did Not Have the Opportunity for
       Profit or Loss............................................................................... 25

C.    Defendants Prevent Plaintiffs from Exercising Entrepreneurial
    Initiative and Do Not Require Them to Have Specialized Skills ............ 25

D.    Defendants Admit that Plaintiffs Are Integral to CTG's Business........... 25

E.    Drivers' Extended Relationship With CTG Weighs in Plaintiffs'
    Favor. ...................................................................................................... 25

F.    The Submissions of *Amici* Do Not Provide Any Relevant Evidence
    Under the Economic Reality Test and Do Not Warrant Any Weight....... 25

    1.    The Franchisees' Brief Does Not Help Defendants..................... 25

        a.    The Franchisees' "Desire" to Be Independent
           Contractors Is Irrelevant. ................................................. 25

        b.    The Franchisees Support Plaintiffs' Showing that
           Drivers Had Little Opportunity for Profit or Loss............ 26

|  |  | c. | The Franchisees' Predictions Are Irrelevant..................... 26 |
|---|---|---|---|
|  | 2. | | The Court Should Give Little Weight to the BCAC's Brief......... 26 |
|  |  | a. | The Structure of the Black Car Industry Is Irrelevant....... 26 |
|  |  | b. | The Only Applicable Test Is the Test Under the FLSA.... 27 |
|  |  | c. | The BCAC's Policy Arguments Are Best Addressed to Congress.................................................................... 28 |

III.   Issues of Fact Preclude Summary Judgment on Saleem and Singh's NYLL Claims.................................................................................................. 28

    A.   The NYLL Applies the Common Law Control Test. ............................... 30

    B.   Material Issues of Fact Exist with Respect to the Degree of Controlthat Defendants Exercised Over Plaintiffs.................................... 30

        1.   Questions of Fact Exist With Respect to the *Bynog* Factors ........ 30

        2.   CTG Enforced Rules Against Saleem and Singh. ........................ 30

        3.   CTG Controlled Saleem's and Singh's Assignments. .................. 30

    C.   Plaintiffs' Tax Filings Are Not Controlling............................................. 36

IV.   The Taxicab Exemption Does Not Apply to Plaintiffs as a Matter of Law.......... 32

V.   The Court Should Not Decertify the Collective .................................................... 34

    A.   The Decertification Standard Is Less Stringent Than Rule 23 ................. 34

    B.   The Court Must Apply the FLSA's Economic Reality Test to Evaluate Defendants' Decertification Motion. .......................................... 35

    C.   Plaintiffs Are Similarly Situated............................................................. 36

        1.   Plaintiffs' Factual and Employment Settings Are Similar............ 36

        2.   Plaintiffs Are Not Subject to Individualized Defenses.................. 35

        3.   Procedural and Fairness Considerations Weigh in Favor of Maintaining the Collective............................................................. 36

      D.     In the Alternative, the Court May Consider Whether to Create Subclasses. ............................................................................... 36

VI.    The Court Should Not Dismiss Pinto, Mejia, or Hidalgo. .................................... 40

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. S. Shuttle Servs., Inc.*,
  301 F. App'x 856 (11th Cir. 2008) ...................................................................33, 34

*Airlines Transp. v. Tobin*,
  198 F.2d 249 (4th Cir. 1952) .................................................................................33

*Akgul v. Prime Time Transp., Inc.*,
  293 A.D.2d 631 (N.Y. App. Div. 2d Dep't 2002) .................................................11

*Ansoumana v. Gristede's Operating Corp.*,
  255 F. Supp. 2d 184 (S.D.N.Y. 2003)....................................................................24

*Anyan v. New York Life Ins. Co.*,
  192 F. Supp. 2d 228 (S.D.N.Y. 2002)....................................................................15

*Aristacar & Limousine Ltd.*, Case No. 29-RC-9410,
  (Decision and Direction of Election, July 19, 2000) .......................................11, 12

*Ayers v. SGS Control Servs., Inc.*,
  No. 03 Civ. 9078, 2007 WL 646326 (S.D.N.Y. Feb. 27, 2007) ......................36, 38

*Banful v. Skyline Credit Ride, Inc.*,
  222 A.D.2d 871 (N.Y. App. Div. 1995) .................................................................29

*Barfield v. N.Y.C. Health & Hosps. Corp.*,
  537 F.3d 132 (2d Cir. 2008)...................................................................................13

*Beliz v. W.H. McLeod & Sons Packing Co.*,
  765 F.2d 1317 (5th Cir. 1985) ...............................................................................23

*Berger Transfer & Storage v. Cent. States, Se. & Sw. Areas Pension Fund*,
  85 F.3d 1374 (8th Cir. 1996) .................................................................................15

*Brock v. Mr. W Fireworks, Inc.*,
  814 F.2d 1042 (5th Cir.1987) ...........................................................................15, 21

*Brock v. Superior Care, Inc.*,
  840 F.2d 1054 (2d Cir. 1988)...................................................................... *passim*

*Browning v. Ceva Freight, LLC*,
  885 F. Supp. 2d 590 (E.D.N.Y. 2012) ..............................................................15, 18

*Bynog v. Cipriani Grp., Inc.*,
  1 N.Y.3d 193 (2003) ................................................................................ *passim*

*Campos v. Zopounidis*,
  No. 09 Civ. 1138, 2011 WL 2971298 (D. Conn. July 20, 2011) ................................22, 24, 36

*Cariani v. D.L.C. Limousine Serv., Inc.*,
  363 F. Supp. 2d 637 (S.D.N.Y. 2005) ................................................................33

*Chaouni v. Ali*,
  105 A.D.3d 424 (N.Y. App. Div. 2013) ..............................................................14

*Devlin v. City of N.Y.*,
  254 A.D.2d 16 (N.Y. App. Div. 1998) ............................................................ *passim*

*Dole v. Amerilink Corp.*,
  729 F. Supp. 73 (E.D. Mo. 1990) ....................................................................14

*Dole v. Snell*,
  875 F.2d 802 (10th Cir. 1989) ..................................................................9, 18, 26

*Edwards v. Publishers Circulation Fulfillment, Inc.*,
  268 F.R.D. 181 (S.D.N.Y. 2010) ....................................................................14

*Feaster v. Comm'r of Internal Revenue*,
  100 T.C.M. 49 (2010) ................................................................................32

*In re FedEx Ground Package System, Inc.*,
  734 F. Supp. 2d 557 (N.D. Ind. 2010) ..............................................................14

*Frank v. Gold'n Plump Poultry, Inc.*,
  No. 04 Civ. 1018, 2007 WL 2780504 (D. Minn. Sept. 24, 2007) .........................................38

*Frankel v. Bally, Inc.*,
  987 F.2d 86 (2d Cir. 1993) ..........................................................................7

*Gate Guard Servs. L.P. v. Solis*,
  No. 10 Civ. 91, 2013 WL 593418 (S.D. Tex. Feb. 13, 2013) .............................................15

*Gayle v. Harry's Nurses Registry, Inc.*,
  No. 07 Civ. 4672, 2009 WL 605790 (E.D.N.Y. Mar. 9, 2009) .........................................10, 13

*Gayle v. Harry's Nurses Registry, Inc.*,
  No. 07 Civ. 4672, 2012 WL 686860 (E.D.N.Y. Mar. 2, 2012) .............................................39

*Godlewska v. HDA*,
  916 F. Supp. 2d 246 (E.D.N.Y. 2013) ................................................................13

*Gustafson v. Bell Atl. Corp.*,
171 F. Supp. 2d 311 (S.D.N.Y. 2001)........................................................................18, 20, 24

*Halferty v. Pulse Drug Co., Inc.*,
821 F.2d 261 (5th Cir. 1987) .......................................................................................17, 22

*Hart v. Rick's Cabaret Int'l, Inc.*,
No. 09 Civ. 3043, 2013 WL 4822199 (S.D.N.Y. Sept. 10, 2013) ................................. *passim*

*Herman v. Brewah Cab, Inc.*,
992 F. Supp. 1054 (E.D. Wis. 1998).........................................................................................33

*Herman v. Express Sixty-Minutes Delivery Serv.*,
161 F.3d 299 (5th Cir. 1998) ...............................................................................................15, 19

*Herman v. Mid-Atlantic Installation Services, Inc.*,
164 F. Supp. 2d 667 (D. Md. 2000) ..............................................................................................14

*Hopkins v. Cornerstone Am.*,
545 F.3d 338 (5th Cir. 2008) .....................................................................................15, 17, 23

*Irizarry v. Catsimatidis*,
722 F.3d 99 (2d Cir. 2013)............................................................................................................8

*Jacobs v. N.Y. Foundling Hosp.*,
483 F. Supp. 2d 251 (E.D.N.Y. 2007) .............................................................................................36

*Jhoda v. Mauser Serv., Inc.*,
279 A.D.2d 853 (N.Y. App. Div. 2001) .........................................................................................29

*Kirsch v. Fleet St., Ltd.*,
148 F.3d 149 (2d Cir. 1998)............................................................................................................18

*Kurzyna v. Communicar Inc.*,
182 A.D.2d 924 (N.Y. App. Div. 1992) .....................................................................................29, 31

*LaFevre v. Tel-A-Car of N.Y., Inc.*,
198 A.D.2d 658 (N.Y. App. Div. 1993) ...............................................................................29, 30, 32

*Leach v. Kaykov*,
No. 07 Civ. 4060, 2011 WL 1240022 (E.D.N.Y. Mar. 30, 2011) ...........................................11

*Lewis v. ASAP Land Express, Inc.*,
554 F. Supp. 2d 1217 (D. Kan. 2008)............................................................................................24

*Lujan v. Cabana Mgmt., Inc.*,
284 F.R.D. 50 (E.D.N.Y. 2012) ...................................................................................................6, 7

*Matter of De Paiva*,
    270 A.D.2d 534 (N.Y. App. Div. 2000) ........................................................ *passim*

*Matter of Kidder*,
    255 A.D.2d 852 (N.Y. App. Div. 1998) ........................................................ *passim*

*Martin v. Selker Bros., Inc.*,
    949 F.2d 1286 (3d Cir. 1991) ...................................................................... 23

*Morgan v. Family Dollar Stores, Inc.*,
    551 F.3d 1233 (11th Cir. 2008) ................................................................... 38

*N.L.R.B. v. Associated Diamond Cabs, Inc.*,
    702 F.2d 912 (11th Cir. 1983) ............................................................... 14, 15

*Patterson v. Balsamico*,
    440 F.3d 104 (2d Cir. 2006) ........................................................................ 7

*Patterson v. Cnty. of Oneida*,
    375 F.3d 206 (2d Cir. 2004) ..................................................................... 4, 5

*Powell v. Carey Int'l, Inc.*,
    490 F. Supp. 2d 1202 (S.D. Fla. 2006) .................................................. 33, 34

*Ramos v. Baldor Specialty Foods, Inc.*,
    687 F.3d 554 (2d Cir. 2012) ...................................................................... 32

*Rivera v. Fenix Car Serv. Corp.*,
    903 N.Y.S.2d 690 (N.Y. Sup. Ct. 2010) ............................................... 29, 31

*Rivera v. Ndola Pharmacy Corp.*,
    497 F. Supp. 2d 381 (E.D.N.Y. 2007) ....................................................... 40

*Robicheaux v. Radcliff Material, Inc.*,
    697 F.2d 662 (5th Cir. 1983) ............................................................... 21, 32

*Rodolico v. Unisys Corp.*,
    199 F.R.D. 468 (E.D.N.Y. 2001) .............................................................. 34

*Rossi v. Assoc. Limo Servs., Inc.*,
    438 F. Supp. 2d 1354 (S.D. Fla. 2006) .................................................. 33, 34

*Sakacsi v. Quicksilver Delivery Sys., Inc.*,
    No. 06 Civ. 1297, 2007 WL 4218984 (M.D. Fla. Nov. 28, 2007) ................. 22

*Saleem v. Corporate Transp. Grp., Ltd.*,
    No. 12 Civ. 8450 (JMF), 2013 WL 6061340 (S.D.N.Y. Nov. 15, 2013) ......... 29, 35, 36

*Savino v. Utog 2-Way Radio Inc.*,
   215 A.D.2d 964 (N.Y. App. Div. 1995) ...................................................29

*Scantland v. Jeffry Knight, Inc.*,
   721 F.3d 1308 (11th Cir. 2013) ................................................. *passim*

*Schultz v. Capital Int'l Sec., Inc.*,
   466 F.3d 298 (4th Cir. 2006) ...................................................23

*Schultz v. Mistletoe Express Serv., Inc.*,
   434 F.2d 1267 (10th Cir. 1970) ...................................................22

*Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*,
   835 F.2d 1529 (7th Cir. 1987) ...................................................24, 26

*Thiessen v. Gen. Elec. Capital Corp.*,
   267 F.3d 1095 (10th Cir. 2001) ...................................................35

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
   471 U.S. 290 (1985) ...................................................25, 26

*Torres v. Gristede's Operating Corp.*,
   No. 04 Civ. 3316, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) ...................................................38

*United States v. Conlin*,
   551 F.2d 534 (2d Cir. 1977) ...................................................5, 6

*United States v. W. M. Webb, Inc.*,
   397 U.S. 179 (1970) ...................................................27

*Velu v. Velocity Express, Inc.*,
   666 F. Supp. 2d 300 (E.D.N.Y. 2009) ...................................................19, 24

*Vysovsky v. Glassman*,
   No. 01 Civ. 2531, 2007 WL 3130562 (S.D.N.Y. Oct. 23, 2007) ...................................................29

*Wavi v. Utog 2-Way Radio Inc.*,
   252 A.D.2d 719 (N.Y. App. Div. 1998) ...................................................29

*Weingarten v. XYZ Two Way Radio Serv. Inc.*,
   183 A.D.2d 964 (N.Y. App. Div. 1992) ................................................. *passim*

*Wirtz v. Cincinnati, Newport & Covington Transp. Co.*,
   375 F.2d 513 (6th Cir. 1967) ...................................................33, 34

*Yellow Taxi Co. of Minneapolis v. N.L.R.B.*,
   721 F.2d 366 (D.C. Cir. 1983) ...................................................14, 15

x

**Statutes**

29 U.S.C. § 213(b) ...........................................................................................................32

29 U.S.C. § 216(b) ........................................................................................................2, 35

**Other Authorities**

Fed. R. Civ. P. 56(c)(4) ..................................................................................................4, 5

Federal Rule of Evidence 702 ............................................................................................6

## <u>PRELIMINARY STATEMENT</u>

Defendants have failed to establish as a matter of law that no factual questions exist regarding Plaintiffs' and opt-in Plaintiffs' status as independent contractors, or that the purported factual differences among them warrant decertification.

As Plaintiffs demonstrated in their motion for partial summary judgment, *see* ECF No. 464, the Fair Labor Standards Act's ("FLSA's") economic reality factors weigh in Plaintiffs' favor. The factors that Defendants argue support their position are entitled to less weight, are not relevant at all to the FLSA, or raise factual disputes that are not appropriate for summary judgment. The Court should not weigh Defendant Eduard Slinin's declaration and the "summary" charts that it incorporates because they are inadmissible and rely on evidence that Plaintiffs requested but that Defendants did not produce during discovery. The Court should also disregard the opinion testimony of two witnesses whom Defendants never disclosed along with other evidence that was responsive to Plaintiffs' discovery requests but that Defendants failed to produce or disclose.

Factual disputes also preclude summary judgment on the New York Labor Law ("NYLL") claims of Plaintiffs Mazhar Saleem and Jagjit Singh because CTG exercised a degree of control consistent with the degree exercised by other black car companies in cases where courts held the drivers were employees under the NYLL, and because fact questions exist with respect to several factors of the test under *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193 (2003).[1]

---

[1] The Court should deny Defendants' motion as moot to the extent that it seeks summary judgment on the NYLL claims of the individuals who opted in to the lawsuit pursuant to the FLSA but who are not named Plaintiffs. These individuals have not asserted NYLL claims in this case. They have consented only to pursue their FLSA claims. *See, e.g.*, ECF No. 2 (consent to join form consenting to "seek redress for violations of the Fair Labor Standards Act, pursuant to 29 U.S.C. § 216(b)").

Common evidence unites the Plaintiffs and collective members with respect to the factors that are relevant under the FLSA's economic reality test and makes maintenance of the case as a collective the more efficient approach.  The Court's prior order denying class certification under Federal Rule of Procedure 23 is not dispositive of the issues here because the FLSA's similarly-situated standard is less stringent than Rule 23 and the economic reality factors are different than the NYLL's common-law control test.  Furthermore, Plaintiffs now rely on additional evidence common to the collective that Defendants produced after Plaintiffs moved for class certification, which the Court has not had an opportunity to consider.

## FACTUAL BACKGROUND

Plaintiffs and opt-in Plaintiffs (together "Plaintiffs") are current and former "black car" drivers for Defendant Corporate Transportation Group and its affiliated companies (collectively "CTG").  Pls.' Counter-Statement ¶¶ 25, 27.[2]  CTG contracts to provide for-hire transportation services to corporate customers and government agencies.  *Id*. ¶ 27; 166.  To work for CTG, Plaintiffs need a Taxi & Limousine Commission ("TLC") license and a car – no other knowledge or ability is required.  Pls.' Counter-Statement ¶¶ 193; 200; Pls.' ASF ¶ 34.  They must also purchase or rent "franchises" pursuant to uniform franchise agreements, either from CTG or from another driver.  Plaintiffs must pay a "transfer fee" to CTG that is determined by CTG's owner, Eduard Slinin, to purchase a franchise from another driver.  Pls.' Counter-Statement ¶¶ 23, 25; Pls.' ASF ¶¶ 31-33.  The franchise agreements prohibit Plaintiffs from servicing a CTG

---

[2]     References to "Pls.' Counter-Statement" are to Plaintiffs' Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1(b), submitted contemporaneously with this opposition. References to "Pls.' ASF" are to Plaintiffs' Additional Statement of Material Facts, contained in Plaintiffs' Counter-Statement.  References to "Defs.' SOF" are to Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, ECF No. 479.  References to "Defs.' Br." are to Defendants' Memorandum of Law, ECF No. 482.

customer through any other black car company for up to three years after leaving CTG.  Pls.'
Counter-Statement ¶ 55.

The franchise agreements designate a "Security Committee" and/or "Communications
Committee" to enforce rules against the drivers, and incorporate a detailed set of Rulebooks.
Pls.' ASF ¶ 15.  CTG prevents the Committees from changing the rules.  Pls.' Counter-Statement
¶¶ 304, 308.  CTG also influences the Committees by changing their composition and instructing
them to carry out CTG's wishes.  Pls.' Counter-Statement ¶ 227.  CTG also enforces the rules in
the Rulebooks itself, by inspecting drivers and fining them when they break the rules.  Pls.'
Counter-Statement ¶¶ 297-298; Pls.' ASF ¶¶ 7-9, 14, 20.  Although CTG claims that two
Committee Chairmen authorized it to do this, one of the Chairmen denies that he did, and the
other Chairman did not have the authority to make the request.  Pls.' ASF ¶ ¶¶ 21-22, 42.

Plaintiffs receive assignments from CTG in two ways.  First, CTG's electronic dispatch
system notifies Plaintiffs through a handheld device when CTG has a job available.  Pls.'
Counter-Statement ¶¶ 121-129, 136-137.  CTG does not give Plaintiffs any information about
assignments, including who the client is, the destination, or the rate.  Pls.' ASF ¶ 26.  Drivers
have 45 seconds to accept the assignment or lose their place in the queue for jobs.  *Id*. ¶ 40.  If a
driver accepts an assignment, he must do it or "bail out" and be taken off the dispatch system for
three hours.  *Id*. ¶ 27.  Second, drivers receive assignments through CTG's contract with the New
York City MTA.  To obtain MTA assignments, drivers call a hotline the day before and provide
the hours they are available to take assignments.  Pls.' Counter-Statement ¶¶ 171, 172.  CTG
then sends the driver a route of jobs to complete.  Pls.' Counter-Statement ¶¶ 168, 173.  Plaintiffs
are required to complete all of the jobs on the route or they are penalized.  Pls.' ASF ¶ 41.

CTG monitors Plaintiffs in several ways.  The handheld device Plaintiffs use is equipped with GPS, which CTG uses to monitor drivers' whereabouts and investigate customer complaints.  Pls.' ASF ¶¶ 1.  Plaintiffs must keep CTG's dispatchers constantly informed of their whereabouts and status using preprogrammed codes on the dispatch device.  Pls.' ASF ¶¶ 2-6.

CTG has an active fleet of approximately 700 drivers.  Pls.' Counter-Statement ¶ 41. This large fleet allows CTG to compete successfully for major corporate contracts.  Pls.' ASF ¶ 49.  To secure these contracts and manage its fleet, CTG has invested substantially in a large office space, extensive computer infrastructure, and proprietary dispatching software.  Pls.' ASF ¶¶ 43, 46-47.  In addition to drivers, CTG employs approximately 162 people in its dispatch, billing, sales, and other departments.  Pls.' ASF ¶ 45.

## ARGUMENT

### I.    Defendants Rely on Inadmissible Evidence.

Much of Defendants' "evidence" is inadmissible because Defendants have failed to lay a foundation for the witnesses' personal knowledge, rely on data and documents that were not identified or produced during discovery, and depend on unqualified opinion testimony.

#### A.    The Court Should Disregard Much of Slinin's Affidavit Because It Fails to Satisfy Fed. R. Civ. P. 56(c)(4).

The Court should not rely on much of Slinin's affidavit because it does not establish Slinin's personal knowledge about the subjects to which he testifies, and Defendants have not produced the data underlying the charts it contains.  *See* ECF No. 478 (Slinin Aff.) ¶¶ 59, 62, 73. Affidavits in support of summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see Patterson v. Cnty. of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004).  "[A]n affidavit's hearsay assertion that would not be admissible at

trial . . . is insufficient to create a genuine issue." *Patterson,* 375 F.3d at 219.  "[A] genuine

issue" cannot be "created merely by the presentation of assertions that are conclusory." *Id.*

Many statements in Slinin's affidavit are based on hearsay or speculation about the

motives or conduct of others, or are conclusory:

- "[T]he drivers who bought franchises decided to form Communications and
  Security Committees because they had established and run such committees when
  affiliated with previous franchisor companies, and they believed that the
  establishment of such committees would help protect their investments in their
  franchises."  Slinin Aff. ¶ 86.

- "Franchisee drivers choose which type of franchise they want to purchase based
  on which is the right fit for them."  Slinin Aff. ¶ 94.

- "Plaintiffs generally earned more money if they were strategic about accepting
  jobs."  Slinin Aff. ¶ 97.

The Court should not rely on these statements because they are not admissible under Rule

56(c)(4).  *See Patterson*, 375 F.3d at 219.

The Court should also disregard the charts in Slinin's affidavit that purport to contain

data compilations.  *See* Slinin Aff. ¶¶ 59, 62, 73.  Slinin does not identify the basis for his

knowledge about the data or the data's source and lays no foundation for the charts'

admissibility.  The charts do not qualify as summary exhibits under Fed. R. Civ. P. 1006.  Before

admitting such summaries, "the [C]ourt must ascertain with certainty that they are based upon

and fairly represent competent evidence," which the Court cannot do here.  *United States v.

Conlin*, 551 F.2d 534, 538 (2d Cir. 1977) (internal quotation marks and citation omitted).

Moreover, the data the charts purport to summarize – with respect to accounts drivers asked to be

taken off of, accounts CTG removed Plaintiffs from, and trips that customers arranged with

Plaintiffs – was never produced to Plaintiffs, despite being responsive to Plaintiffs' discovery

requests.  Scimone Decl. ¶ 12.  As a result, Plaintiffs have not had the opportunity to verify the

accuracy of the charts.  *See Conlin*, 551 F.2d at 538; *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D.

50, 71 (E.D.N.Y. 2012) (striking documents not produced or disclosed during discovery).

> **B.    The Court Should Disregard the Daus and Dizengoff Affidavits Because the Witnesses Were Not Disclosed During Discovery and the Testimony Consists of Unqualified Opinion Testimony.**

The Court should not rely on the affidavits of Matthew W. Daus and Victor Dizengoff

because Defendants failed to identify these individuals as potential witnesses until after the close

of discovery.  Scimone Decl. ¶¶ 4-7.[3]  Moreover, much of the testimony they provide is

inadmissible because it is not based on personal knowledge, Daus Aff. ¶¶ 17-18; Dizengoff ¶ 19,

and consists of opinion testimony.  *See* Dizengoff Aff. ¶¶ 16-17 (opining that Security

Committees benefit the TLC and drivers), ¶¶ 18-19 (opining that the IRS would consider

Plaintiffs independent contractors).  Defendants have not sought to show that the witnesses are

qualified experts pursuant to Federal Rule of Evidence 702, and did not disclose the witnesses to

Plaintiffs as potential experts.  *See* Scimone Decl. ¶ 9.

> **C.    The Court Should Not Allow Defendants to Support Their Motion with Evidence that They Failed to Produce During Discovery**.

The Court should not permit Defendants to rely on documents that were not produced to

Plaintiffs during discovery or disclosed as Rule 26(a) requires.  Scimone Decl. ¶ 15, 18; 21-22.

*See Lujan*, 284 F.R.D. at 70-71 (precluding documents produced after the close of discovery).

These documents include:

- Thering Decl. Exhibit 35 (no bates number).  This is a zone map with instructions for how drivers can receive certain jobs, how they should assemble at checkpoints, and how they should dress.  It is responsive to Plaintiffs' Document Request Nos. 14, 24, and 27. Scimone Decl. ¶ 15.

---

[3]       In fact, apart from Eduard Slinin and Galina Slinin, none of Defendants' affiants were disclosed to Plaintiffs until December 10, 2013.  Discovery closed on Oct. 14, 2013.  Scimone Decl. ¶¶ 4-7.

- Thering Decl. Ex. 62 (CTG38263). This is a letter from the Chairman of the NYC 2 Way, International, Ltd. Communications Committee regarding the enforcement of rules against drivers. It purports to request that CTG management assign a "consultant" to enforce rules against drivers. It is responsive to Plaintiffs' Document Request Nos. 32-35. Scimone Decl. ¶ 21.

- Thering Decl. Ex. 63 (CTG38264). This is purportedly a letter from the former NYC 2 Way, International, Ltd. Security Chairman, asking CTG management to assign a "consultant" to enforce rules against the drivers. Like Exhibit 62, it is responsive to Plaintiffs' Document Request Nos. 32-35. Scimone Decl. ¶ 18.[4]

Defendants offer no explanation for failing to disclose these documents, which Plaintiffs should have had the opportunity to review and use as deposition exhibits. See *Lujan*, 284 F.R.D. at 70-71. As a result, the Court should preclude Defendants from using them to support their motion. *See id*. (precluding evidence produced after the close of discovery where defendants did not explain failure to disclose, and evidence spoke to issues in the litigation and would prejudice plaintiffs); *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (preclusion of witness was appropriate where witness's identity was not disclosed during discovery; allowing testimony would be prejudicial and producing party did not explain failure to disclose the witnesses).

## II.    Issues of Fact Preclude Summary Judgment on Plaintiffs' FLSA Claims.

CTG cannot establish that a reasonable jury would be unable to conclude that Plaintiffs are covered "employees" under the FLSA. The FLSA's definition of "employee" is expansive and sweeps beyond the common-law control test for independent contractors to accomplish the FLSA's "remedial purpose." *Frankel v. Bally, Inc.*, 987 F.2d 86, 89 (2d Cir. 1993). Workers are "employees" under the FLSA if, "as a matter of economic reality, the[y] depend upon someone else's business for the opportunity to render service [as opposed to being] in business for

---

[4]     Plaintiffs dispute the facts surrounding the requests in Exhibits 62 and 63. First, the purported author of Exhibit 62 did not write the letter and had never seen it before December 2013, when Defendants produced it to Plaintiffs. Pls.' ASF ¶ 22. The purported author of Exhibit 63 did not have the authority to ask CTG consultants to fine drivers. *Id*. ¶ 42.

themselves." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988).  The economic

reality factors include:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Id.* at 1058-59 (internal citations omitted).  None of the factors is dispositive, and "the test is

based on a totality of the circumstances."  *Id.* at 1059.  Labels are not relevant.  If the economic

reality factors show that Plaintiffs were economically dependent on CTG, "putting on an

'independent contractor' label does not take [Plaintiffs] from the protection of the Act."  *Irizarry*

*v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013) (quoting *Rutherford Food Corp. v. McComb*,

331 U.S. 722, 729 (1947).

Defendants have not only failed to show that the economic reality factors weigh in their

favor, they have not even cited *Brock v. Superior Care*, the leading Second Circuit case on the

test that applies to independent contractors.  In fact, Defendants hardly cite any FLSA cases,

relying primarily on cases that apply the wrong standard.  Under the correct test, most of the

factors weigh decidedly in Plaintiffs' favor.  As to those that do not, Defendants rely on disputed

facts that preclude summary judgment in their favor.

**A.      CTG Exerts Significant Control Over Plaintiffs.**

Defendants fail to address the evidence in the record showing that they exercise the type

of control sufficient to meet the first economic reality factor, including by monitoring,

inspecting, and disciplining drivers.  Instead, Defendants try to avoid the FLSA's control test

altogether, focusing on factors that are not relevant under the FLSA, including whether Plaintiffs

"worked at their own convenience," or were able to work second or third jobs for other

employers.  See Defs.' Br. 17, 20.  While these are factors under the NYLL's common-law control test, *see, e.g.*, *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003), they are not dispositive or even significant under the FLSA's economic reality test.  *See Superior Care*, 840 F.2d at 1060 ("employees may work for more than one employer without losing their benefits under the FLSA"); *Dole v. Snell*, 875 F.2d 802, 806 (10th Cir. 1989) ("flexibility in work schedules is common to many businesses and is not significant in and of itself").

   **1.**    **CTG Exercised Control in Ways Relevant Under the FLSA Test**.

     **a.**    **Defendants Monitored Plaintiffs.**

  Defendants do not address their consistent monitoring of drivers through their dispatch system or inspections of drivers.  CTG uses GPS to ensure that drivers are where they are when they should be.  Pls.' ASF ¶ 1.  Drivers must notify CTG when they are "on scene" at a job and when they "unload" a passenger, and must provide CTG with their "ETA" to the next job.  *Id*. ¶¶ 2-4.  Until they are "released" from a job, drivers cannot take on new assignments.  *Id.* ¶ 5.  CTG also uses its dispatch system to direct drivers using fleet messages.  *Id.* ¶ 6.  Courts have held that monitoring to this extent is consistent with the "usual path" of an employee, not an independent contractor.  *See Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1315 (11th Cir. 2013) (technicians "were subject to meaningful supervision and monitoring" where they communicated with the dispatch room about their arrival on a job, completion of jobs, and ETA to the next job, and were subject to vehicle inspections).

  CTG's managers, employees, and consultants also inspect drivers' cars routinely at CTG's direction.  Pls.' Counter-Statement ¶ 297, Pls.' ASF ¶¶ 7-8.  Drivers understand that they are monitored by CTG and that it can fine them if they are out of dress code or drive dirty cars. Pls.' Counter-Statement ¶¶ 232-235, Pls.' ASF ¶ 10.  *See Superior Care*, 840 F.2d at 1060

("Though visits to the job sites occurred only once or twice a month . . . the nurses were well aware that they were subject to such checks").  CTG's management reminds drivers that they are being monitored.  Pls.' ASF ¶ 11.  Greg Mastrangelo, CTG's head of driver relations, speaks with drivers to remind them that "we're watching what's going on" with respect to their cars and attire.  *Id*.  Such warnings are little more than "a euphemism for exercising control."  *Hart v. Rick's Cabaret Int'l, Inc.*, No. 09 Civ. 3043, 2013 WL 4822199, at *11 (S.D.N.Y. Sept. 10, 2013)  When CTG cannot contact a driver to summon him to the base for inspection, it shuts off the driver's handheld device so that he is unable to receive jobs and is forced to return to the base so CTG will restore his ability to work.  *Id*. ¶ 12.

### b.     Defendants Disciplined Plaintiffs.

Defendants controlled drivers by disciplining them for violating the company's rules. There is no dispute that Defendants required all drivers to agree to be bound by the Rulebook for their respective franchisor company because this was a term of every franchise agreement.  Pls.' Counter-Statement ¶ 235; Pls.' ASF ¶ 15.  Defendants claim that they did not write the rules. However, even if that were true, which Plaintiffs dispute, *see* Pls.' Counter-Statement ¶ 231, what is more significant is that Defendants enforced the rules.  *See Gayle v. Harry's Nurses Registry, Inc.*, No. 07 Civ. 4672, 2009 WL 605790, at *7 (E.D.N.Y. Mar. 9, 2009) (fact that defendant monitored nurses' notes to comply with Medicaid standards "does not change the result, which is [] that defendants do supervise field nurses' work").

### i.     CTG Enforced the Dress Code and Car Code Against Drivers.

There is no dispute that drivers were subject to a dress code and a car code that determined standards for car cleanliness.  Pls.' Counter-Statement ¶¶ 234, 297-298; Pls.' ASF ¶ 13.  The record shows that Defendants constantly took steps to enforce these codes, including by

10

fining drivers who were out of dress code, Pls.' Counter-Statement ¶ 298; Pls.' ASF ¶¶ 14, 20,

inspecting drivers to ensure that their cars and appearance conformed to the code, Pls.' ASF ¶ 7,

and directing consultants to inspect drivers, Pls.' Counter-Statement ¶ 297; Pls.' ASF ¶¶ 8-9.

Even if the Committees also conducted inspections and imposed fines, this does not erase

the fact that Defendants did these things too or mean Defendants did not also have the authority

to discipline drivers.  In fact, Defendants required drivers to submit to the Security Committees

as a condition of obtaining a franchise.  Pls.' ASF ¶ 15.  Thus, the Security Committees acted as

Defendants' agents, helping them to enforce rules against drivers.  *See Aristacar & Limousine

Ltd.*, Case No. 29-RC-9410, at 39-41 (Decision and Direction of Election, July 19, 2000); *N.Y.C.

2 Way Int'l*, Case No. 29-RC-9411, at 69-70 (Decision and Direction of Election, July 31, 2000).

Defendants rely on *Leach v. Kaykov*, No. 07 Civ. 4060, 2011 WL 1240022 (E.D.N.Y.

Mar. 30, 2011), for the proposition that security committees are common in the black car

industry.  *See* Defs.' Br. 22-23.  In *Leach*, however, the court found that issues of fact existed as

to whether the franchisee committee in that case was independent of the employer because, like

here, the employer incorporated the committee's rules into its franchise agreements and, like

here, the rules clearly served the employer's interests.  2011 WL 1240022, at *16-17.  The

NLRB went even further with respect to Defendants' Securities Committees, finding that there

was no dispute that NYC 2 Way's and Aristacar's Security Committees acted as Defendants'

agents by being designated to enforce the rules in Defendants' franchise agreements and by

enacting rules that furthered Defendants' interests.[5]  *Aristacar*, Case No. 29-RC-9410, at 39-41;

*N.Y.C. 2 Way Int'l*, Case No. 29-RC-9411, at 69-70.

---

[5]     The NLRB's factual findings are entitled to preclusive effect.  *Akgul v. Prime Time
Transp., Inc.*, 293 A.D.2d 631, 633 (N.Y. App. Div. 2d Dep't 2002).  Defendants are incorrect
that they did not have an opportunity to appeal the NLRB's decisions.  They had the right to file

### ii.       Plaintiffs Were Required to Follow CTG's Rules.

Defendants claim that the Security and Communications Committees are independent of CTG, but they fail to cite evidence in the record that supports this claim.  *See* Defs.' Br. 22.  The only evidence they cite is that drivers serve on the committees and that the committees hold hearings.  Defs.' SOF ¶¶ 227, 231, 233-234.  These facts do not establish that Defendants have no involvement.  In fact, the record provides numerous examples of Defendants influencing the committees.  Defendants report rule violations to the committees and follow up to ensure that they are addressed, recommend fines and other actions, and meet with the committees to discuss issues they would like them to handle.  Pls.' ASF ¶¶ 16-18.  Defendants have even changed the composition of the committees by adding or removing members.  Pls.' Counter-Statement, ¶ 227.

Defendants do not cite any facts to support their claim that they "neither wrote nor enforced rules drivers had to follow," *see* Defs.' Br. 23, and their claim is contradicted by many facts in the record.  First, even if Defendants did not write the rules, they prevented drivers from changing them.  *Id.* ¶¶ 227, 304.  Second, several of Defendants' own witnesses have admitted that Defendants enforce the rules.  *Id.* ¶ 234, 297, 304; Pls.' ASF ¶ 20.  Defendants attempt to evade these admissions by claiming that the Security Committees authorized them to issue fines, but Plaintiffs have pointed to evidence disputing this claim.  In particular, the Security Committee Chairman whom Defendants claim authorized them to fine drivers testified that he did no such thing.  Pls' ASF ¶¶ 21-23.

Defendants claim that the rules in the Rulebooks are designed only to meet government regulations, "quality assurance" standards, or customer expectations.  Defs.' Br. 23-24.  Courts

---

a request for review with the NLRB.  *See Aristacar*, Case No. 29-RC-9410, at 49 ("a request for review of this Decision may be filed with the National Labor Relations Board"); *N.Y.C. 2 Way Int'l*, Case No. 29-RC-9411, at 79 (same).

have rejected the argument that employer rules enforcing regulations or geared toward meeting the needs of customers do not show control under the economic reality test.  *See Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 147 (2d Cir. 2008) (holding that hospital was a joint employer because it was required to exercise control by federal and New York laws regarding patient care standards); *Gayle*, 2009 WL 605790, at *7 (Defendants' supervision of nurses' work showed control, even though required by Medicaid regulations); *Scantland*, 721 F.3d at 1316 ("The economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control . . . . If the nature of a business requires a company to exert control over workers to the extent that Knight has allegedly done, then that company must hire employees, not independent contractors.").

In any case, Defendants' Rulebooks go beyond TLC regulations, "quality control," or "customer expectations."  For example, the Rulebooks control how drivers interact with the public (Rule 102, "Unauthorized Statements;" Rule 118, "Customer Complaint"); and with CTG employees (Rule 107, "Unauthorized . . . Franchisee/Driver at [base];" Rule 114, "Obscene Language [used over dispatch system];" Rule 115, "Arguing or Misleading a Dispatcher").  Pls.' Counter-Statement ¶ 232.  The Rulebooks even contain rules aimed at policing the committees that supposedly created the rules.  (Rule 214, "Changing Rules & Fines;" Rule 215, "[Benefitting] Friends & Family.").  *Id.*

The cases on which CTG relies are distinguishable because the rules at issue here go beyond the minimum quality control standards in those cases.  In *Godlewska v. HDA*, 916 F. Supp. 2d 246 (E.D.N.Y. 2013), the court distinguished between rules showing "control over the employee's day-to-day conditions of employment," which it held supported employee status, and merely setting minimum standards to ensure compliance with regulations.  *See id.* 260 (internal

quotation marks and citation omitted).  Likewise, in *Dole v. Amerilink Corp.*, 729 F. Supp. 73 (E.D. Mo. 1990), the court found that the employer's "quality controls" were distinguishable from rules reflecting day-to-day control.  *See id.* 76.  In *Herman v. Mid-Atlantic Installation Services, Inc.*, 164 F. Supp. 2d 667 (D. Md. 2000), the court held that an employer's contract specifications did not show it controlled the workers, but that its requirement that workers regularly report on their progress using a dispatch system *did* show control.  *Id.* at 674.

The other cases Defendants cite are also distinguishable.  In *Edwards v. Publishers Circulation Fulfillment, Inc.*, 268 F.R.D. 181, 186 (S.D.N.Y. 2010), and in *In re FedEx Ground Package System, Inc.*, 734 F. Supp. 2d 557, 588 (N.D. Ind. 2010), the courts distinguished between the employer's control over the results of work (which is consistent with independent contractor status) and its control over the means used to achieve those results (which is characteristic of employee status).  In this case, Defendants controlled how drivers did their jobs (the means) on a day-to-day basis: by directing drivers through their dispatch system, much like the employer in *Mid-Atlantic Installation Services*, 164 F. Supp. 2d at 674, and *Scantland*, 721 F.3d at 1315, and by instructing drivers on how to interact with customers.  Pls.' ASF ¶ 24. Moreover, the evidence in the record establishes that Defendants made consistent efforts to enforce the rules in order to ensure that the work was done as they wanted it done.  *Id.* ¶ 20.  *See Hart*, 2013 WL 4822199, at *9 (rules aimed at meeting customer preference for an "upscale" feel helped employer "achieve its business ends," and showed control over employees).[6]

---

[6]     Other cases Defendants rely on are not applicable because they do not apply the FLSA test.  In *Chaouni v. Ali*, 105 A.D.3d 424 (N.Y. App. Div. 2013), the court applied the test under the NYLL and held that an employer's weekly inspection of cars was not sufficient to support employee status.  *Id.* at 425.  This is inconsistent with the FLSA test.  For example, in *Superior Care*, the Second Circuit held that twice-monthly site visits were sufficient to support a finding of control.  840 F.2d at 1060.  Similarly, *Yellow Taxi Co. of Minneapolis v. N.L.R.B.*, 721 F.2d 366 (D.C. Cir. 1983) and *N.L.R.B. v. Associated Diamond Cabs, Inc.*, 702 F.2d 912 (11th Cir.

**c.**      **Plaintiffs Did Not Control a Separate Economic Entity.**

Defendants argue that drivers controlled their work, but the few examples they cite fail to show that Plaintiffs acted as a separate economic entity.  Under the economic reality test, a worker's control of her work is "only significant" when it shows the worker "stands as a separate economic entity."  *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) (quoting *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1049 (5th Cir.1987).  The examples that Defendants cite are illusory, insignificant, or nonexistent.

**i.**      **Plaintiffs Did Not Have Real Control Over the Decision to Reject a Job.**

While Plaintiffs had the formal right to reject a job, in reality, the right was illusory. Rejecting a job because it was not economically advantageous came with a penalty.  Pls.' Counter-Statement ¶¶ 145-146, 157; Pls.' ASF ¶ 25.  This fact distinguishes this case from the cases on which Defendants rely, *see* Defs.' Br. 18, because the employers in those cases did not penalize the workers for rejecting assignments.  *See Gate Guard Servs. L.P. v. Solis*, No. 10 Civ. 91, 2013 WL 593418, at *4 (S.D. Tex. Feb. 13, 2013); *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 600-01 (E.D.N.Y. 2012); *Anyan v. New York Life Ins. Co.*, 192 F. Supp. 2d 228, 239 (S.D.N.Y. 2002) *aff'd sub nom. Anyan v. Nelson*, 68 F. App'x 260 (2d Cir. 2003); *Herman v. Express Sixty-Minutes Delivery Serv.*, 161 F.3d 299, 303 (5th Cir. 1998); *Berger Transfer & Storage v. Cent. States, Se. & Sw. Areas Pension Fund*, 85 F.3d 1374, 1378 (8th Cir. 1996).  In contrast, Defendants' dispatch system forces drivers who reject jobs to the bottom of the queue

---

1983) were decided under the common-law control test.  *See Yellow Taxi Co.*, 721 F.2d at 373; *Assoc. Diamond Cabs*, 702 F.2d at 918.  Moreover, in both cases, the courts held that requiring drivers to comply with government regulations is insufficient to demonstrate control, which is contrary to what courts applying the FLSA standard have held.  *See Gayle*, 2009 WL 605790, at *7 (citing *Barfield*, 537 F.3d at 147 (2d Cir. 2008)).  In any case, as discussed above, Defendants' rules exceed the TLC's regulations.

15

and also bars them from working for three hours if they "bail out" (refuse a job) after first accepting it.  Pls.' Counter-Statement ¶¶ 152, 303; Pls.' ASF ¶ 25, 27-30.

Moreover, drivers lack any real freedom to assess whether to reject a job because Defendants do not provide them with the information they require to make a rational economic decision, such as client identity, destination, or price.  Pls.' ASF ¶ 26.  In fact, Defendants punish drivers for making rational decisions by subjecting them to the harshest penalties when they bail out of a job after learning that it will not benefit them financially.  *Id*. ¶ 27.

Defendants' claim that "it was solely Plaintiffs' decision whether it made more economic sense to bail out" of a job is contradicted by evidence showing that at least one CTG employee requested an "investigation" of a driver who consistently bailed out of certain jobs and asked that the driver be taken off the air because "she just looks at where the job is going then bails out." *Id*. ¶ 28.  Greg Mastrangelo admitted that such bail outs would result in customer service issues, referred to the driver in question as a "problem child," and said he would refer her to the Security Committee to "correct . . . the conduct[.]"  *Id*. ¶ 29.

### ii.      Defendants Restricted Plaintiffs' Right to Sell their Franchises.

Plaintiffs' right to sell their franchises was subject to Slinin's approval.  *Id*. ¶ 31.  In addition, Slinin imposed "transfer fees" – in some cases, as much as $5,000 – which had to be paid to CTG before a driver could sell his franchise.  *Id*. ¶¶ 32-33.  Moreover, the right to sell a franchise meant very little in reality because the Plaintiffs who tried to sell their franchises found that they were either unable to sell their franchises because no one wanted them or had to sell them for far less than they had paid.  Pls.' Counter-Statement ¶¶ 90-91.

### iii.     Plaintiffs Did Not "Retain" Other Drivers.

Plaintiffs did not "retain" other drivers to work for them.  Those that rented their franchises to other drivers simply charged them rent for the right to use the franchise.  *Id*. ¶ 109.  Even in cases in which workers have hired helpers, courts evaluating their status as independent contractors have found this fact minimally probative, particularly where the workers did not actually manage the helpers.  *See Scantland*, 721 F.3d at 1317 (authority to hire helpers "was illusory" because employees exercised no "real managerial skill over such helpers"); *see also Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 266 (5th Cir. 1987), *opinion modified on reh'g*, 826 F.2d 2 (5th Cir. 1987) ("even if [plaintiff] had employed other[] [workers] . . . [defendant] would still have been able to control the way that any other workers [performed]").  Here, the Plaintiffs who rented their franchises did not manage the drivers who rented from them and the drivers were subject to the same CTG rules that governed Plaintiffs' work.  Pls.' ASF ¶ 36.

### iv.     Plaintiffs Were Not Able to Negotiate Their Compensation.

Defendants admit that they controlled the prices that they charged their clients, *see* Defs.' Br. 26, which directly impacted the wages that Plaintiffs earned.  An employer's control over the "meaningful economic aspects of the business" that determine a worker's income weighs against independent contractor status.  *Hopkins*, 545 F.3d at 343 (internal citation omitted); *see Brock*, 840 F.2d at 1060 (fact that employer set compensation weighed in favor of employee status).

Plaintiffs dispute Defendants' claim that they could negotiate the terms of their franchise. In fact, the evidence Defendants rely on shows that CTG offers franchises on fixed terms, and that the only "negotiation" over terms is whether the driver will pay in installments.  Pls.' Counter-Statement ¶¶ 70-71.

2.      **Defendants Rely on Facts that Are Not Material to the FLSA Standard or at Best, Warrant Little Weight.**

a.      **Plaintiffs Did Not Work at their Own Convenience.**

Whether Plaintiffs "worked at their own convenience" is a factor under the NYLL's test, not the FLSA's economic reality test.  *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 171 (2d Cir. 1998); *Browning*, 885 F. Supp. 2d at 602.  Under the FLSA test, "flexibility in work schedules is common to many businesses and is not significant in and of itself."  *Snell*, 875 F.2d at 806.  Where "the demands of the business control[] the [workers]," the fact that workers may have formal control over their hours is not determinative of the economic reality.  *Id.*

In this case, the economic reality is that Plaintiffs were dependent on CTG for work and worked when and where CTG made the work available.  Pls.' ASF ¶ 37.  As discussed above, Defendants' control over the dispatch system prevents drivers from making economic decisions about the jobs they take, forcing drivers to increase their earnings the only way they can: by working more hours.  This circumstance "is analogous to an employee's ability to take on overtime work or an efficient piece-rate worker's ability to produce more pieces."  *Scantland*, 721 F.3d at 1316-17.

b.      **Whether Plaintiffs Incorporated Is Irrelevant.**

The fact that Plaintiffs had the right to incorporate is not determinative of the economic reality of their relationship with CTG.  Defendants still must show that Plaintiffs were not economically dependent on CTG for their livelihood, which they have failed to do.  *See Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 325-26 (S.D.N.Y. 2001) (driver who incorporated was an employee because he "did not have the opportunity to make an ill-advised, independent business decision that would result in a significant loss of profit" and remained "economically dependent on the Company").  Defendants have also not demonstrated that the

five opt-ins (out of approximately 211) who did incorporate were any less dependent on CTG than the drivers who did not incorporate.

<blockquote>

**c.      Whether Plaintiffs Worked for Other Employers Is Not Determinative.**
</blockquote>

The fact that some Plaintiffs performed work for other black car companies warrants little weight under the FLSA's economic reality test. *See Superior Care*, 840 F.2d at 1060 ("employees may work for more than one employer without losing their benefits under the FLSA"). Many employees can and do work second or even third jobs to earn a living. *See McLaughlin v. Seafood, Inc.*, 861 F.2d 450, 452-53 (5th Cir. 1988), *modified by* 867 F.2d 875 (5th Cir. 1989) ("Laborers who work for two different employers on alternate days are no less economically dependent than laborers who work for a single employer. . . . [U]nless a worker possesses specialized and widely-demanded skills, th[e] freedom [to work for multiple employers] is hardly the same as true economic independence.").

CTG's drivers are distinguishable from the drivers in *Herman v. Express Sixty-Minutes Delivery Service, Inc.*, because those drivers worked pursuant to an agreement that "[did] not contain a covenant-not-to-compete." *Id*. at 303. CTG's franchises do have a non-compete covenant that prevents drivers from transporting CTG's customers for another company. Pls.' Counter-statement, ¶ 55. CTG has sued drivers who breached its non-compete covenant, undermining its argument that drivers have the "freedom" to drive for whomever they wish. *Id*.

Defendants rely on *Velu v. Velocity Express, Inc.*, 666 F. Supp. 2d 300 (E.D.N.Y. 2009), in which the court held that the plaintiff was an independent contractor because, if he left the defendant, he "could go out the next day with the same van, clothes, equipment, computer, printer, and other supplies, and immediately work for another shipping company." *Id*. at 307. This rationale is not persuasive because there is no reason why it could not be applied to any

19

employee.  Moreover, it is inconsistent with *Superior Care*, which held that nurses were still

employees even though they did work for multiple employers at once.  *See* 840 F.2d at 1060.

> **d.    Even Though Defendants' Training Was Minimal, It Is Further Evidence of Their Control.**

The fact that CTG provided minimal training shows that Plaintiffs performed a job that

did not require specialized skills, which is a factor weighing in Plaintiffs' favor under the

FLSA's economic reality test.  *See infra* Part II.C.  Defendants did provide "remedial" training in

the form of instructions to drivers on how to provide customer service.  Pls.' ASF ¶ 39.  These

facts further demonstrate Defendants' control over their drivers.  *See Scantland*, 721 F.3d at

1314 (employer's program of "remedial training" supported finding of control).

> **B.    Plaintiffs Had Little or No Opportunities for Profit or Loss and Made Relatively Minor Investments in CTG's Business.**

> **1.    CTG's Dispatch System Eliminated Plaintiffs' Ability to Make Rational Economic Choices About Their Work.**

CTG's limits on Plaintiffs' access to jobs and information concerning those jobs removed

any "entrepreneurial profit and loss" from Plaintiffs' work as drivers.  *Gustafson*, 171 F. Supp.

2d at 326.  The dispatch system withholds information – such as destination, account, and price –

that would allow drivers to seek out the best jobs.  Pls.' ASF ¶ 26.  Drivers can only obtain this

information after accepting a job, at which point they are penalized if they "bail out."  *Id.* ¶ 27.

Drivers must therefore accept jobs without knowing whether they will be lucrative and are

discouraged from turning down jobs that are not.[7]  The only way drivers can earn more money is

---

[7]    The only scenario in which a three-hour penalty, followed by a waiting period after booking back in, would be preferable would be if a job forced a driver to be engaged for more than three hours, with little compensation to show for it.  Since jobs are generally based on distance, Pls.' ASF ¶ 58, most "bad" jobs are local trips that would ordinarily take less than three hours.  The reason for this design is obvious: Defendants want to service customers making local trips, and cannot afford to let drivers avoid these trips altogether.

to accept more jobs.  This volume-based form of pay makes them similar to hourly or piece-rate workers.  *Scantland*, 721 F.3d at 1316-17.

Drivers' access to jobs is dependent on their position on the queue.  As a result, they must constantly monitor the dispatch system and respond quickly to jobs or lose the opportunity to work until they reach the top of the queue again.  Pls.' ASF ¶ 40.  This ensures that drivers are ready when CTG needs them – regardless of whether the job is a profitable one.  *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666-67 (5th Cir. 1983) (workers' "opportunity for profit was determined solely by [employer's] need for their work" as opposed to "initiative and planning of the individual [worker]").[8]

MTA account assignments also deny drivers the ability to turn unwanted jobs down.  Pls' Counter-statement ¶¶ 166-171.  To receive an MTA job, drivers call a telephone number the day before and provide the times when and borough where they will be working.  *Id.* ¶¶ 171-172.  CTG then creates a route of pre-assigned jobs that the drivers must complete.  *Id.* ¶ 173.  Drivers cannot turn the jobs down or fail to complete them.  Pls.' ASF ¶ 41.  Like the dispatch system, the MTA system of assigning jobs provides little or no opportunity for profit or loss because drivers also receive no information about the jobs beforehand, and cannot reject them.

Defendants argue that Plaintiffs could profit more if they cultivated "goodwill" and developed repeat business from private clients.  Defs.' Br. 28.  Courts have rejected this "basis" for independent contractor status.  *See Mr. W Fireworks*, 814 F.2d at 1050 ("although experience and courtesy to customers may to some degree enhance an operator's commission, this is equally true of all commissioned employees and of employees earning gratuities"); *Halferty*, 821 F.2d  at

---

[8]      Although Defendants assert that drivers can profit from being "strategic" about accepting jobs, Defs.' Br. 27, they provide no explanation about what this means or how it can be accomplished.  The assertion rests solely on the conclusory affidavit of Eduard Slinin, which the Court should disregard.  *See* Section I.A. *supra*.

266-67 ("Under [defendant's] interpretation, a worker with any sort of incentive plan or volume-based pay ceases to be an employee . . . a grocery store clerk who increases the volume of business by being pleasant would thereby become an independent contractor by participating in a profit-sharing plan.").

> ### 2.     Plaintiffs' Limited Investments Are Greatly Outweighed by CTG's Investments.

Plaintiffs' investment in their cars is dwarfed by CTG's investments in its business.  Even large expenditures on equipment, such as a vehicle, must be weighed against the investments of the employer.  *Campos v. Zopounidis*, No. 09 Civ. 1138, 2011 WL 2971298, at *6-7 (D. Conn. July 20, 2011) (driver was an employee even though he supplied his own vehicle where employer invested in premises, supplies, payroll service, utilities, and other operating expenses); *see also Hart*, 2013 WL 4822199, at *12-13 (comparing dancers' investment in costumes to club's investment in premises); *Schultz v. Mistletoe Express Serv., Inc.*, 434 F.2d 1267, 1270-71 (10th Cir. 1970) (workers were employees even though they furnished their own trucks because employer owned and supplied the shipping terminals); *Sakacsi v. Quicksilver Delivery Sys., Inc.*, No. 06 Civ. 1297, 2007 WL 4218984, at *6-7 (M.D. Fla. Nov. 28, 2007) (employer's investments in the office, computer system, devices, and account managers' pay outweighed drivers' investment in cars, gas, and maintenance).

CTG invests heavily in capital expenditures that give it control over the key determinants of how much money drivers make.  These include investing in: (a) a 20,000 square foot office space; (b) six TLC base licenses; (c) 162 employees divided between sales, dispatch, billing, and other departments; (d) information technology infrastructure, including an internal computer network and cellular network; (e) a computerized dispatch system; and (f) proprietary software that CTG invested substantial time and effort to develop.  Pls.' ASF ¶¶ 43-48.  All of these

resources produce the competitive advantage – "overwhelming fleet resources" – that allows CTG to compete for large corporate accounts. *Id.* ¶¶ 49, 53. Drivers depend on access to those accounts for their income.

### 3. The Plaintiffs Who Rented Their Franchises Invested Far Less Than CTG and Did Not Have the Opportunity for Profit or Loss.

Defendants' investment significantly outweighs the investment of the six Plaintiffs who rented franchises to other drivers. Pls.' Counter-Statement, ¶¶ 109-110. Even if these Plaintiffs collected rent, they did not have the opportunity to profit or lose from the relationship because Defendants controlled the terms and conditions under which the drivers who rented from them drove. Pls.' ASF ¶¶ 35-36. *See Hopkins*, 545 F.3d at 344 (although sales leaders could hire subordinates, their income was derived from sources other than managing them, which was not relevant to their opportunity for profit or loss), *see Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 308 (4th Cir. 2006) (security agents' pay was not dependent on their "managerial skill").

Moreover, collecting rent at a fixed rate is different than using managerial skill to realize a profit by running a business – the kind of entrepreneurial activity that the economic reality test targets. *See Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1328 (5th Cir. 1985) (labor contractor did not have opportunity for profit where his income "was not based on . . . his entrepreneurial skill[,]" but instead consisted of taking a cut from compensation paid to workers he supplied).

The fact that some drivers rented franchises to other drivers does not mean that they were not economically dependent on CTG. Even if rentals provided these drivers with some income, CTG does not point to any evidence showing that this income made them less dependent on CTG for work than drivers who did not rent out franchises *See Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1294-95 (3d Cir. 1991) (Gas station operators' "side activities, which were merely

incidental to the sale of gasoline, were irrelevant to the FLSA employment relationship arising from the predominant underlying business activity of selling gasoline.").

C.     **Defendants Prevent Plaintiffs from Exercising Entrepreneurial Initiative and Do Not Require Them to Have Specialized Skills.**

Defendants argue that Plaintiffs exercise "independent initiative" because they maintain licenses, balance their schedules, and have endurance. Defs.' Br. 29. However, these "skills" are "routine life skills" that are not specialized or indicative of economic independence. *Campos*, 2011 WL 2971298, *7 (having a driver's license and driving a car are routine life skills akin to knowing how to balance a checkbook); *Gustafson*, 171 F. Supp. 2d at 326 (driving requires little or no skill or initiative); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 191 (S.D.N.Y. 2003) (navigating New York City does not require specialized skill).

Even if it is true that Defendants "rely on" drivers to maintain licenses, balance their schedules, and endure long hours, Defs.' Br. 29, this does not mean that specialized skills are required to do the job. Rather, it shows that Plaintiffs are integral to Defendants' business. *See Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987) (migrants' "endurance in the hot sun do[es] not change the nature of their employment relationship").

D.     **Defendants Admit that Plaintiffs Are Integral to CTG's Business.**

Defendants admit that Plaintiffs' work is integral to their business. *See* Defs.' Br. 32. *See Lewis v. ASAP Land Express, Inc.*, 554 F. Supp. 2d 1217, 1225 (D. Kan. 2008) ("[a]s a delivery service, [defendant] cannot function without delivery drivers"). This fact weighs "heavily" in favor of employee status. *See Superior Care*, 840 F.2d at 1059.

The court in *Velu*, on which Defendants rely, misapplied this factor. It found that the drivers' work was integral to the business, but held that because it was "interchangeable with the work of other drivers," this factor was not met. *Velu*, 666 F. Supp. 2d at 307. The standard is

24

not whether particular workers are integral, however, but whether the work itself is integral. *See Superior Care*, 840 F.2d at 1061 (nurses' "*services* are the most integral part of Superior Care's operation") (emphasis added). In fact, a worker who is "interchangeable" because his work does not require specialized skills is more likely to be an employee.

### E.   Drivers' Extended Relationship With CTG Weighs in Plaintiffs' Favor.

Defendants cannot dispute that Plaintiffs worked for Defendants for extended periods of time, often in excess of 16 years. Pls.' ASF ¶ 50. CTG's franchise agreements formerly ran for three years and could be renewed, and currently run for unlimited terms. *Id*. ¶¶ 51-52. This fact weighs in Plaintiffs' favor. *See Scantland*, 721 F.3d at 1318-19 (contracts for one-year terms showed the "substantial permanence" of the relationship).

### F.   The Submissions of *Amici* Do Not Provide Any Relevant Evidence Under the Economic Reality Test and Do Not Warrant Any Weight.

#### 1.   The Franchisees' Brief Does Not Help Defendants.

##### a.   The Franchisees' "Desire" to Be Independent Contractors Is Irrelevant.

It is irrelevant to the FLSA's economic reality test that certain franchisees may want to maintain their independent contractor label. The purposes of the FLSA "require that it be applied even to those who would decline its protections." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985). In *Tony & Susan Alamo Foundation*, the U.S. Supreme Court held that a religious foundation's workers were employees, not "volunteers," under the FLSA even though they "vehemently" objected to being classified as such. *Id*. The Court reasoned that, "[i]f an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions." *Id*. The Court concluded that the workers'

subjective beliefs were irrelevant to the economic reality of their relationship with their employer.  *Id*.  Here, the fact that some franchisees object to being employees is irrelevant. Their "protestations, however sincere, cannot be dispositive.  The test of employment under the Act is one of 'economic reality[.]'"  *Id*. at 301.

> **b.**   **The Franchisees Support Plaintiffs' Showing that Drivers Had Little Opportunity for Profit or Loss.**

The Franchisees' affidavits show that the only control drivers have over their income is the ability to work more hours, which is consistent with Plaintiffs' evidence.  *See* Borisov Decl. ¶¶ 6-7 ("I am free to maximize my income by working more often, by working more days and/or longer shifts[.]")  "[T]oiling for money on a piecework basis is more like wages than an opportunity for 'profit.'"  *Snell*, 875 F.2d at 809.

> **c.**   **The Franchisees' Predictions Are Irrelevant.**

The Franchisees assert that they will be harmed if black car drivers "are deemed to be employees," but their speculation about what could happen is not relevant to the economic reality analysis.  If exceptions to the FLSA beyond those established by Congress were made because certain workers wish to opt out of its protections, the exceptions "would affect many more people than th[e] workers directly at issue in th[e] case and would . . . likely . . . exert a general downward pressure on wages in competing businesses."  *See Tony & Susan Alamo Found.*, 471 U.S. at 302.  The Court should not be swayed by the Franchisees' "gloomy prediction that application of the Act will have a devastating economic impact," because it does not "relieve [CTG] from complying with the Act's provisions."  *Lauritzen*, 835 F.2d at 1538.

> **2.**   **The Court Should Give Little Weight to the BCAC's Brief.**

> **a.**   **The Structure of the Black Car Industry Is Irrelevant.**

26

The BCAC's account of how the black car industry developed does not provide evidence of how CTG functions today.  Even if the Court takes notice that the industry emerged from voluntary associations of drivers, this does not account for the step in that evolution that CTG represents: its growth into "a multi-company service provider, . . . able to service large market relationships with overwhelming fleet resources, extended by a single management entity, enjoying the benefits of consolidat[ion]."  Pls.' ASF ¶ 49.  This consolidation allows CTG to capture profitable corporate contracts on which CTG's drivers depend, and requires CTG to exercise control over its drivers to maintain those relationships.  *Id*. ¶ 53.

**b.      The Only Applicable Test Is the Test Under the FLSA.**

The BCAC cites decisions from courts and regulatory bodies that use different tests than the one that applies under the FLSA to argue that drivers are independent contractors.  The Court should not consider these determinations because they are not consistent with the FLSA.

The IRS does not apply the FLSA's economic reality test.  *See United States v. W. M. Webb, Inc.*, 397 U.S. 179, 186-87 (1970) (discussing Congressional reaction to the Supreme Court's application of the economic reality test to the Social Security Act).  As the BCAC Brief explains, the IRS test reduces its analysis to two factors (investment and opportunity for profit or loss), which create a presumption that can be rebutted by a showing of control consistent with the common-law test.  BCAC Br. 7.  This is different from the "totality of the circumstances" approach under the FLSA.  *Superior Care*, 840 F.2d at 1059.  It also shows that the IRS considers some drivers employees, if the employer controls the means by which they operate.

The black car operator workers' compensation fund the BCAC describes, BCAC Br. 8-9, came into existence because the Unemployment Insurance Board and New York State Insurance Fund had at one point determined that black car drivers should be treated as employees.  Daus

Aff. 4-5.  This shows that black car drivers' status as independent contractors is far from a foregone conclusion.

The BCAC points out that the New York Attorney General deems black car bases to be "franchise" operations, BCAC Br. 9, and supplies the definition of "franchise."  *Id*. at 6.  In pertinent part, that definition states that a franchisee works "under a marketing plan or system prescribed in substantial part by a franchisor," is "required to pay, directly or indirectly, a franchise fee," and may offer "services substantially associated with the franchisor's . . . trade name."  This is consistent with the FLSA's definition of "employee": the employer controls the marketing of the services, the worker's sunk costs tend to create a long-term relationship with the employer, and the worker's services are integral to the employer's business.

The BCAC discusses the allocation of sales and use tax under New York tax law to show that the Tax Department views black car bases as providing a service to their drivers.  BCAC Br. 9-11.  Whatever the Tax Department's view may be, it does not reflect the economic reality that drivers are dependent on CTG to supply them with customers.

> c.    **The BCAC's Policy Arguments Are Best Addressed to Congress.**

The BCAC argues that black car bases would be harmed if the Court or a jury finds that Plaintiffs are employees.  Like the Franchisees, the BCAC's predictions are just as speculative and irrelevant.  If the BCAC believes that an exemption from the FLSA should be created for black car drivers, it should address its arguments to Congress, not the Court.

## III.    Issues of Fact Preclude Summary Judgment on Saleem and Singh's NYLL Claims.

Material questions of fact preclude summary judgment against the NYLL claims of named Plaintiffs Saleem and Singh.  Defendants' principal argument that summary judgment should be granted is that "many New York courts have opined on the level of control inherent in

[the black car industry's] business model." Defs.' Br. 31.  However, many of these courts have found that the drivers were employees.  *See, e.g., Rivera v. Fenix Car Serv. Corp.*, 903 N.Y.S.2d 690, 694-95 (N.Y. Sup. Ct. 2010); *Jhoda v. Mauser Serv., Inc.*, 279 A.D.2d 853, 854 (N.Y. App. Div. 2001); *Matter of De Paiva*, 270 A.D.2d 534, 535 (N.Y. App. Div. 2000); *Matter of Kidder*, 255 A.D.2d 852, 853 (N.Y. App. Div. 1998); *Jarzabek*, 235 A.D.2d 878 (N.Y. App. Div. 1997); *Devlin v. City of N.Y.*, 254 A.D.2d 16, 17 (N.Y. App. Div. 1998); *Wavi v. Utog 2-Way Radio Inc.*, 252 A.D.2d 719 (N.Y. App. Div. 1998); *Banful v. Skyline Credit Ride, Inc.*, 222 A.D.2d 871, 872 (N.Y. App. Div. 1995); *Savino v. Utog 2-Way Radio Inc.*, 215 A.D.2d 964 (N.Y. App. Div. 1995); *LaFevre v. Tel-A-Car of N.Y., Inc.*, 198 A.D.2d 658 (N.Y. App. Div. 1993); *Weingarten v. XYZ Two Way Radio Serv. Inc.*, 183 A.D.2d 964, 965-66 (N.Y. App. Div. 1992); *Kurzyna v. Communicar Inc.*, 182 A.D.2d 924, 924-25 (N.Y. App. Div. 1992).

### A.      The NYLL Applies the Common Law Control Test.

As this Court has recognized, the NYLL applies the common law control test, not the economic reality test, to determine whether a worker is an independent contractor.  *See Saleem v. Corporate Transp. Grp., Ltd.*, No. 12 Civ. 8450 (JMF), 2013 WL 6061340, at *4 n.2 (S.D.N.Y. Nov. 15, 2013).  Under the NYLL, "the critical inquiry [is] the degree of control exercised by the purported employer[.]"  *Bynog*, 1 N.Y.3d at 198.  The relevant factors include whether the worker: (1) worked at his own convenience; (2) could engage in other employment; (3) received fringe benefits; (4) was on the employer's payroll; and (5) was on a fixed schedule.  *Id.*  In addition to these factors, courts also consider whether the employer enforced rules, for example, through fines or other penalties, *see Hart*, 2013 WL 4822199, at *19, or controlled the timing and distribution of assignments.  *Vysovsky v. Glassman*, No. 01 Civ. 2531, 2007 WL 3130562, at *14 (S.D.N.Y. Oct. 23, 2007).

**B.      Material Issues of Fact Exist with Respect to the Degree of Control that Defendants Exercised Over Plaintiffs.**

**1.      Questions of Fact Exist With Respect to the *Bynog* Factors.**

With respect to the first, second, and fourth *Bynog* factors, fact questions exist because Saleem and Singh worked largely at CTG's convenience due to the nature of the dispatch system, were limited in their ability to engage in other employment, and were on CTG's payroll.

Saleem and Singh worked largely at CTG's convenience because they had no choice about the jobs they were offered and lacked the information they required to choose among jobs and select the ones that benefited them the most.  Pls.' Counter-Statement ¶ 125, 136-137.  *See LeFevre*, 198 A.D.2d at 659 (fares were set by company); *Weingarten*, 183 A.D.2d at 965 (company controlled solicitation and scheduling of fares); *De Paiva*, 270 A.D.2d at 534 (company dispatched drivers and established rates); *Kidder*, 255 A.D.2d at 853 (company set fees for jobs); *Jarzabek*, 235 A.D.2d at 879 (company assigned jobs through 2-way radio); *Devlin*, 254 A.D.2d at 16 (company controlled customer accounts).  They were also prohibited by the TLC from working for other black car bases.  *See LeFevre*, 198 A.D.2d at 659 (drivers could only answer calls dispatched by base).

CTG limited Saleem and Singh's ability to engage in other employment by prohibiting them from transporting its clients for other black car companies.  Pls.' Counter-Statement ¶ 55.  Even though CTG did not enforce the non-compete provision against Saleem and Singh personally, it did enforce it against other drivers, which sent a message to all drivers.  *See Hart*, 2013 WL 4822199, at *19 (analyzing NYLL, and holding that employer "exerted substantial control . . . through the written threat of disciplinary action").

On a regular basis, CTG's computerized billing system produced a list of drivers who were owed payments, calculated the compensation owed to each of them, including Saleem and

Singh, and cut checks bearing CTG's name.  Pls.' Counter-Statement ¶ 54.  Courts have held that

for-hire drivers were employees where they worked for employers under similar payroll regimes.

*Weingarten*, 183 A.D.2d at 965-66; *Kurzyna*, 182 A.D.2d at 924-25; *Jarzabek*, 235 A.D.2d at

878; *Devlin*, 254 A.D.2d at 16.

### 2.    CTG Enforced Rules Against Saleem and Singh.

Even where all of the *Bynog* factors were met, courts have denied summary judgment in

driver cases based on the ways in which Defendants exerted control over their drivers, including

Saleem and Singh, such as by subjecting them to rules, monitoring them, inspecting them, and

penalizing them.  *See Rivera*, 903 N.Y.S.2d at 694-95 (finding fact questions where company

rule book specified dress code and car condition; company inspected vehicles and dictated use of

the dispatch service and treatment of customers; required drivers to keep items in vehicles, and

reserved the right to impose penalties).

Here, CTG imposed penalties on Saleem and Singh, including leveling fines and forcing

them off its dispatch system when they bailed out of jobs.  *See* Pls.' ASF ¶¶ 55-56. Saleem and

Singh each agreed to be bound by the Rulebooks as a condition of obtaining a franchise from

CTG, which subjected them to the threat of fines for dress or car code violations among others.

*Id*. ¶ 15.  Courts have denied summary judgment where the workers were subject to a

comparable degree of control.  *See Weingarten*, 183 A.D.2d at 965-66 (fines for rejecting

voucher fares); *Kurzyna*, 182 A.D.2d at 924 (fines); *De Paiva*, 270 A.D.2d at 534 (uniforms);

*Kidder*, 255 A.D.2d at 853 (uniform requirement); *Jarzabek*, 235 A.D.2d at 878 (violations of

rulebook were subject to fines or suspensions); *Rivera*, 903 N.Y.S.2d at 694-95 (employer

maintained rulebook, inspected drivers, and had rules regarding radio use, required equipment);

*Devlin*, 254 A.D.2d at 16 (company maintained rulebook and dress code).

### 3.    CTG Controlled Saleem's and Singh's Assignments.

CTG controls the timing, distribution, and pricing of Saleem and Singh's assignments. Pls.' Counter-statement, ¶¶ 128-130, 136-138.  These facts weigh in favor of employee status. *See LeFevre*, 198 A.D.2d at 658-59; *Weingarten*, 183 A.D.2d at 965-66; *De Paiva*, 270 A.D.2d at 535; *Kidder*, 255 A.D.2d at 853; *Jarzabek*, 235 A.D.2d at 878; *Devlin*, 254 A.D.2d at 16.

### C.    Plaintiffs' Tax Filings Are Not Controlling.

The fact that Plaintiffs claimed deductions for work-related expenses does not estop them from asserting that they are employees.[9]  It is a misconception that only independent contractors can claim deductions for work-related expenses.  Employees also "may deduct expenses incurred in the performance of services as an employee." *Feaster v. Comm'r of Internal Revenue*, 100 T.C.M. 49 (2010).

## IV.    The Taxicab Exemption Does Not Apply to Plaintiffs as a Matter of Law.

CTG has failed to establish its affirmative defense that Plaintiffs are exempt under the taxicab exemption.  Exemptions to the FLSA are narrowly construed in favor of the workers in question.  *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (citing *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)).  The employer bears the burden of showing that its employees fall "plainly and unmistakably" within an exemption.  *Id.*  The taxicab exemption applies to workers "employed by an employer engaged in the business of operating taxicabs."  29 U.S.C. § 213(b)(17).  "Pick-up and delivery service[s]" are not exempt.  *See* U.S. Dept. of Labor, Field Operations Handbook, 24h01-03 (1999 ed.) ("Examples of nonexempt work . . . are: . . . driving, in connection with . . . a pick-up and delivery service.").

---

[9]    Plaintiffs read Defendants' argument as being addressed to the NYLL claims, given the NYLL cases that they cite.  Tax status is irrelevant under the FLSA.  *See Robicheaux*, 697 F.2d at 667 ("that [plaintiffs] . . . listed themselves as self-employed on their tax returns . . . does not tip the balance in favor of independent contractor status").

CTG drivers work by obtaining jobs from a dispatcher, rather than by picking up passengers on the street through "street hails."  Courts have held this fact weighs against a finding that the business operates taxicabs.  *Abel v. S. Shuttle Servs., Inc.*, 301 F. App'x 856, 858 (11th Cir. 2008); *Wirtz v. Cincinnati, Newport & Covington Transp. Co.*, 375 F.2d 513, 514 (6th Cir. 1967); *Rossi v. Assoc. Limo Servs., Inc.*, 438 F. Supp. 2d 1354, 1363 (S.D. Fla. 2006); *Powell v. Carey Int'l, Inc.*, 490 F. Supp. 2d 1202, 1212 (S.D. Fla. 2006); *Herman v. Brewah Cab, Inc.*, 992 F. Supp. 1054, 1059-60 (E.D. Wis. 1998).

CTG holds itself out to the public under the trade names of its various Franchisor companies as a "limo service" or "private car and limo service."  Pls.' ASF ¶ 57.  Courts have held that businesses that advertise as "limousine" services or as "chauffeured transportation" do not operate taxicabs.  *See e.g., Abel*, 301 F. App'x at 858; *Wirtz*, 375 F.2d at 514.

CTG charges its customers based on travel between zones, not using taximeters.  Pls.' ASF ¶¶ 58.  Companies that charge fares based on distance between zones, as opposed to mileage measured by a taximeter, do not fall under the exemption.  *See, e.g., Abel*, 301 F. App'x at 858; *Wirtz*, 375 F.2d at 514.

Finally, CTG does not serve the general public, but rather serves primarily corporate customers and disabled persons through a contract with the MTA.  Pls.' Counter-Statement ¶¶ 27, 166.  Carriers that operate primarily by contracting with businesses or public agencies for "recurrent transportation," U.S. Dep't of Labor, Field Operations Handbook, 24h01 (1999 ed.), as opposed to serving the general public, are not taxicabs.  *See Wirtz*, 375 F.2d at 515; *Airlines Transp. v. Tobin*, 198 F.2d 249, 252 (4th Cir. 1952); *Powell*, 490 F. Supp. 2d at 1213; *Brewah Cab*, 992 F. Supp. at 1057 (service contracted with City of Milwaukee to transport disabled residents); *Cf. Cariani v. D.L.C. Limousine Serv., Inc.*, 363 F. Supp. 2d 637, 645 (S.D.N.Y.

2005) (absence of contracts, which was dispositive factor in *Airlines Transportation*, *Wirtz*, and *Brewah Cab*, weighed in favor of employer).

CTG shares key features with the businesses in *Abel*, *Airlines Transportation*, *Rossi*, *Powell*, and *Brewah Cab*.  CTG contracts with businesses and government agencies for recurrent transportation needs.  Pls.' Counter-Statement ¶¶ 27, 166.  CTG operates as a "ground transportation" or "limo" company.  Pls.' ASF ¶ 57.  CTG charges based on distance, not using taximeters.  *Id*. ¶¶ 58.

**V.      The Court Should Not Decertify the Collective.**

The Court should not decertify the collective because Defendants have failed to show that the standard that applies to decertification motions has been met.  The Court's denial of class certification is not dispositive because the decertification standard under the FLSA is not as high as the standard under Rule 23, and because, as the Court recognized, a different independent contractor test applies under the FLSA than under the NYLL.  As discussed above, the FLSA's test relies on different factors than the NYLL's test and focuses on the right to control.

**A.      The Decertification Standard Is Less Stringent Than Rule 23.**

Although the standard at the decertification stage is higher than at the first stage, it is still less stringent than the standard plaintiffs must meet to satisfy Rule 23.  Unlike Rule 23, collective actions under the FLSA do not adjudicate absent class members' rights.  *See Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 481-82 (E.D.N.Y. 2001) ("similarly situated" standard is "considerably less stringent than the requirement under [Rule 23(b)(3)] that common questions predominate" and holding that this is consistent with the differences in the applicable procedures and the FLSA's remedial goals) (citations and internal quotation marks omitted).   Under the FLSA, "the protections afforded [to absent class members] by the predominance requirement are

largely served by the opt-in feature of section 216(b)." *Id.* at 481. The opt-in feature also substitutes for Rule 23(b)(3)'s superiority requirement because "by affirmatively opting-in to the collective action, section 216(b) plaintiffs have already decided that the benefits of proceeding as a class member outweigh any benefits of proceeding individually." *Id.* at 482 (citation omitted); s*ee also Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102, 1105 (10th Cir. 2001) (use of the Rule 23 standard in determining whether plaintiffs were "similarly situated" for purposes of 29 U.S.C. § 216(b) would "effectively ignore Congress' directive" because "Congress clearly chose not to have Rule 23 standards apply" to the FLSA).

**B.      The Court Must Apply the FLSA's Economic Reality Test to Evaluate Defendants' Decertification Motion.**

The Court's prior denial of class certification is not dispositive because, as this Court has noted, the FLSA's independent contractor test is different than the NYLL's test. *Saleem*, 2013 WL 6061340, at *4 n.2. The FLSA's economic reality test can be met through evidence of Defendants' authority to control. *See Superior Care*, 840 F.2d at 1060 ("Though visits to the job sites occurred only once or twice a month, Superior Care unequivocally expressed the *right* to supervise the nurses' work, and the nurses were well aware that they were subject to such checks.") (emphasis added); *Hart*, 2013 WL 4822199, at *6-11 ("[t]he mere threat of . . . a fine . . . operate[s] as a sword of Damocles over the [employees], helping ensure [their] compliance").

The Court's denial of class certification is also not dispositive because there is substantial evidence, which Plaintiffs discuss below, that was produced after the Court's ruling on class certification that shows that Defendants not only had the authority to control drivers, they exercised their right consistently in ways that are common to the collective.

With respect to factors other than control that the Court held could "be outcome determinative—*given the nature of the inquiry under New York law*[,]" including whether drivers

owned vehicles, had private clients, or worked for competitors, *see Saleem*, 2013 WL 6061340, at *5 (emphasis added), they are less significant under the FLSA's economic reality test.  *See Campos*, 2011 WL 2971298, at *6 (under economic reality test, drivers' investment must be considered relative to employer's investment); *Superior Care*, 840 F.2d at 1060 (under economic reality test, "employees may work for more than one employer without losing their benefits under the FLSA").

### C.    Plaintiffs Are Similarly Situated.

Defendants have failed to show that the standard for decertification has been met.  At the second stage, courts consider:

> (1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations.

*Jacobs v. N.Y. Foundling Hosp.*, 483 F. Supp. 2d 251, 265 (E.D.N.Y. 2007).  Even at the second stage, Plaintiffs are only required to show that they are "similar, not identical" to other collective members.  *Ayers v. SGS Control Servs., Inc.*, No. 03 Civ. 9078, 2007 WL 646326, at *4 (S.D.N.Y. Feb. 27, 2007) (citation and internal quotation marks omitted).

### 1.    Plaintiffs' Factual and Employment Settings Are Similar.

Plaintiffs worked under similar factual and employment settings with respect to the factors that are relevant under the FLSA's economic reality test.

With respect to the first factor, control, common facts support Plaintiffs' claim that Defendants had the right to control their terms and conditions of work.  All Plaintiffs agreed to nearly-identical franchise agreements that incorporated nearly-identical Rulebooks.[10]  Pls.'

---

[10]    Defendants did not produce a Rulebook for one Franchisor company, Hybrid Limo, or identify the members of Hybrid's Security Committee.  Defs.' SOF ¶ 226.  Two drivers who worked for Hybrid Limo have opted in to the case.  *Id*. ¶ 25.

Counter-Statement ¶ 232; Pls.' ASF ¶ 15.  The existence and function of the Security

Committees were also consistent across the collective.  Pls.' Counter-Statement ¶ 226.  .

Defendants' exercise of control was consistent across the collective as well.  A spreadsheet

produced by Defendants that tracked customer complaints shows Defendants' consultants and

managers enforced the rules against drivers regularly.  Pls.' ASF ¶ 20.  CTG also controlled the

distribution of work in the same way for all drivers and controlled the transfer of franchises for

all drivers by determining how much it would cost.  *Id.* ¶¶ 37, 31-33.

    With respect to the second factor, profit or loss, all Plaintiffs were subject to the same

dispatch system, which limited their ability to make economic decisions to improve their pay and

provided them with one way to make more money: working more hours.  *Id.* ¶¶ 25-27.

Although the precise amount of Plaintiffs' investment in their cars varied somewhat, they all

made the same kinds of investments and, for all Plaintiffs, their investments were much less

significant relative to Defendants' investment in their business.  *Id*. ¶¶ 43-48.  The MTA

assignment system also did not provide opportunities for profit because drivers were assigned

jobs and could not reject them.  *Id*. ¶ 41; Pls.' Counter-Statement ¶¶ 170-173.

    With respect to the third factor, the level of skill required for the job, Plaintiffs all did the

same job, requiring the same skills, and did not require specialized skills.  *Id.* ¶¶ 27; 288-290.

    With respect to the fourth factor, Plaintiffs typically worked for Defendants for extended

periods of time and agreed to franchise terms of one year or more.  Pls.' ASF ¶¶ 50-52.

    With respect to the fifth factor, whether Plaintiffs were integral to CTG's business,

Plaintiffs all performed the same function that was integral to Defendants' business –

transporting CTG's customers.  *Id*., ¶¶ 27, 30.

## 2. Plaintiffs Are Not Subject to Individualized Defenses.

Defendants do not identify any defenses that are unique to certain Plaintiffs and claim that all Plaintiffs are subject to the same two defenses: that Plaintiffs are independent contractors and that they are exempt under the taxicab exemption.  Defendants have failed to show that the application of these defenses will vary from Plaintiff to Plaintiff.  The nature of the economic reality test is also not a bar to maintaining the collective.  Courts have held that "[j]ust because [an] inquiry is fact-intensive does not preclude a collective action where plaintiffs share common job traits."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11th Cir. 2008).  As discussed above, the facts relevant to the economic reality test are sufficiently common to all Plaintiffs to show that collective resolution is appropriate.  Similarity, not identity, is what the FLSA requires.  *See Ayers*, 2007 WL 646326, at *4.

Furthermore, differences such as whether Plaintiffs worked for other companies or whether Plaintiffs incorporated are of little relevance to the FLSA and do not warrant decertification.  These differences do not alter the underlying economic reality that drivers were dependent on CTG for access to work.  After all, "[i]f one zooms in close enough on anything, differences will abound . . . . But [in a 216(b) collective action] plaintiffs' claims need to be considered at a higher level of abstraction."  *Frank v. Gold'n Plump Poultry, Inc.*, No. 04 Civ. 1018, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007).

## 3. Procedural and Fairness Considerations Weigh in Favor of Maintaining the Collective.

It would be much more efficient to permit this case to proceed as a collective than for each Plaintiff to file a separate case.  *See Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316, 2006 WL 2819730, at *11 (S.D.N.Y. Sept. 29, 2006) ("[O]n balance, the policy objectives of reducing cost and increasing efficiency are best furthered by granting collective action without

undue prejudice to any party."). Courts must evaluate "whether a collective action [will] lower costs to the plaintiffs through the pooling of resources, efficiently resolve[] common issues of law and fact, and coherently manage the class in a manner that will not prejudice any party." *Ayers*, 2007 WL 646326, at *6.

Litigation of Plaintiffs' claims on a collective basis would be fair and much more efficient. Separately litigating over 200 wage claims would increase costs for both parties and would be inefficient, given the many common facts that Plaintiffs share. *See Gayle*, 2012 WL 686860, at *6 (declining to decertify collective of independent contractors because they were subject to "the same hiring, working, supervision, compensation, and termination procedures" and allowing them to pool resources would allow them to assert claims in a cost-effective manner).

**D.      In the Alternative, the Court May Consider Whether to Create Subclasses.**

Alternatively, if the Court determines that material differences among some Plaintiffs could make litigation on a collective basis inefficient, it may allow Plaintiffs to proceed in subclasses. *Rodolico*, 199 F.R.D. at 484 ("If . . . a collective action cannot accommodate the proposed individual defenses, the Court has the discretion to create subclasses"). For example, if the Court concludes that there are material differences among Plaintiffs depending on the franchisor company with which they affiliated, it could subclass the collective based on the franchisor company for which they worked. Similarly, if the Court agrees with Defendants that the Plaintiffs who rented their franchises to other drivers are differently situated, it could create a subclass for these Plaintiffs. Using subclasses would be more efficient and fair than dismissing the claims of certain Plaintiffs altogether who otherwise share many common facts.

39

**VI.    The Court Should Not Dismiss Pinto, Mejia, or Hidalgo.**

Finally, the Court should not dismiss the claims of Jose Pinto, Ismael Mejia, and John M.

Hidalgo.[11]  Defendants' only evidence that Pinto and Mejia should be dismissed is Eduard

Slinin's inadmissible affidavit.  As for Hidalgo, his allegation that he was misclassified by CTG

is not rooted in his pre-bankruptcy past, and therefore his claim is not part of his bankruptcy

estate.  *See Rivera v. Ndola Pharmacy Corp.*, 497 F. Supp. 2d 381, 396-97 (E.D.N.Y. 2007)

(even though the plaintiff "will need to refer to some pre-petition events in order to prove her

wages … these events are not for these purposes related to plaintiff's allegations that she was not

compensated for overtime work").

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

motion for summary judgment, motion to decertify the collective action, and motion to dismiss

the claims of Pinto, Mejia, and Hidalgo.

Dated:  New York, New York
          February 4, 2014

                                        Respectfully submitted,

                                        /s/ Adam T. Klein
                                        Adam T. Klein

                                        **OUTTEN & GOLDEN LLP**
                                        Adam T. Klein
                                        Rachel Bien
                                        Michael J. Scimone
                                        Michael N. Litrownik
                                        3 Park Avenue, 29th Floor
                                        New York, New York 10016
                                        Telephone:  (212) 245-1000

---

[11]    Plaintiffs do not oppose the motion to strike Point-to-Point Car and Limo, Inc.

**KAHN OPTON, LLP**
Stephen H. Kahn
One Parker Plaza
Fort Lee, New Jersey 07024
Telephone: (201) 947-9200

*Attorneys for Plaintiffs*