**OUTTEN & GOLDEN LLP**
Adam T. Klein
Rachel Bien
Michael J. Scimone
Michael N. Litrownik
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

**KAHN OPTON, LLP**
Stephen H. Kahn
One Parker Plaza
Fort Lee, New Jersey 07024
Telephone: (201) 947-9200

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAZHAR SALEEM and JAGJIT SINGH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CORPORATE TRANSPORTATION GROUP, LTD., CORPORATE TRANSPORTATION GROUP INTERNATIONAL, CORPORATE TRANSPORTATION GROUP WORLDWIDE, INC., NYC 2 WAY INTERNATIONAL, LTD., ALLSTATE PRIVATE CAR & LIMOUSINE, INC., ARISTACAR & LIMOUSINE, LTD., TWR CAR AND LIMO, LTD., EXCELSIOR CAR AND LIMO, INC., HYBRID LIMO EXPRESS, INC., EDUARD SLININ, and GALINA SLININ,<br><br>Defendants. | No. 12 Civ. 8450 (JMF) |

## PLAINTIFFS' COUNTER-STATEMENT OF MATERIAL FACTS
## PURSUANT TO LOCAL RULE 56.1(b)

Plaintiffs, by and through their attorneys, hereby submit this Counter-Statement of

Material Facts Pursuant to Local Civil Rule 56.1(b).

## PROCEDURAL HISTORY[1]

1.      Plaintiffs have brought a wage and hour collective and class action under federal and New York State law.  Complaint ¶ 5.[2]

Response: **Admit.**

2.      Plaintiffs allege that Defendants misclassified them and other "black car" drivers as independent contractors.  Complaint ¶ 3.

Response: **Admit.**

3.      Plaintiffs assert they should be retroactively re-classified as "employees" and have named as defendants nine corporations: Corporate Transportation Group, Ltd. ("CTG"); Corporate Transportation Group International; Corporate Transportation Group Worldwide, Inc.; NYC 2 Way International, Ltd. ("NYC2Way"); AllState Private Car & Limousine, Inc. ("AllState"); Aristacar & Limousine, Ltd. ("Aristacar"); TWR Car and Limo, Ltd. ("TWR"); Excelsior Car and Limo, Inc. ("Excelsior"); and Hybrid Limo Express, Inc. ("Hybrid").[3] Plaintiffs have also named Eduard Slinin and his wife Galina Slinin as individual defendants. Complaint ¶ 21.

---

[1]      Plaintiffs have retained Defendants' subject headings for ease of reference.  Exhibits cited in Defendants' Rule 56.1 Statement are generally attached to the Declaration of Margaret C. Thering in Support of Defendants' Motion for Summary Judgment Dismissing Plaintiffs' FLSA and NYLL claims (ii) to Decertify the Collective Action Pursuant to Section 216(b) of the FLSA; (iii) to Strike Plaintiffs Jose Pinto, Ismael Majia, John M. Hidalgo, and Nick Wijesinghe ("Defs.' Mot."), ECF No. 477 ("Thering Decl.").  Unless otherwise noted, citations to lettered exhibits in Plaintiffs' responses refer to exhibits attached to the Declarations of Michael J. Scimone submitted in support of Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Mot."), ECF Nos. 491, 492.  Citations to numbered exhibits refer to exhibits attached to the Declaration of Michael J. Scimone submitted in opposition to Defendants' Motion ("Scimone Opp. Decl..").

[2]      Complaint, ECF No. 1.

[3]      Collectively, NYC2Way, AllState, Aristacar, TWR, Excelsior, and Hybrid will be referred to as the "Franchisors."

<u>Response</u>: **Admit** that Plaintiffs have named the referenced entities and individuals as Defendants, but **deny** the characterization of the relief sought as a request to be "retroactively re-classified."  Plaintiffs seek back pay and other monetary damages as a result of their misclassification, and an injunction against future violations of the FLSA and NYLL.  Complaint at 20-21.

4.　　On June 17, 2013, Judge Furman conditionally certified a FLSA collective action. ECF No. 67.

<u>Response</u>: **Admit.**

5.　　On July 31, 2013, Plaintiffs moved to certify a Rule 23 class in connection with their state law claims.  ECF No. 160.

<u>Response</u>: **Admit.**

6.　　On September 13, 2013, Defendants opposed this motion.  ECF No. 368.

<u>Response</u>: **Admit.**

7.　　On November 15, 2013, Judge Furman ruled that there were too many dissimilarities among the Plaintiffs to allow a Rule 23 class to be certified, explaining: "In short, the Court concludes that the common question - whether CTG drivers were misclassified as independent contractors - will not yield a common answer.  Instead, answering that question as to each driver will require a fact-specific and driver-specific examination of the degree of control that CTG exercised in fact."  ECF No. 430, pp. 12-13.

<u>Response</u>: **Admit.**

8.　　Additionally, on November 15, 2013, Judge Furman ruled: "Some drivers owned their own vehicles, maintained their own vehicles, had private customers, and drove for competitor car companies.  Some drivers, however, did not have private customers, did not own

3

their vehicles, did not perform their own maintenance, and did not drive for competitor companies.  These differences among drivers are likely to be significant - and could even be outcome determinative."  ECF No. 430, pp.10-11.

> Response: **Admit.**

9.     On September 16, 2013, 23 franchise owners/drivers moved to file an *amici curiae* brief, arguing that they and all other franchise owners are independent contractors and not employees of defendants.  ECF Nos. 371-374.

> Response: **Admit.**

10.     In the text of their proposed brief, the *amici* specify that they sought to file the brief in order to protect their investments in their franchises. ECF Nos. 371-374.

> Response: **Admit.**

## CORPORATE TRANSPORTATION GROUP, LTD.

11.     CTG is a data processing company that performs billing and payment, bookkeeping, brokerage and accounting services, and processes vouchers and credit card slips for franchisees of the Franchisors, as well as for drivers of 126 unrelated black car and/or livery companies.  Civello Dep. p. 37:7-12; Kumar Dep. p. 12:21-22; Slinin Dep. p. 118:17-25; Slinin Aff. ¶ 5.

> Response: **Admit.**

12.     CTG also provides dispatching services for Franchisors and unrelated black car and/or livery companies.  Slinin Aff. ¶ 6.

> Response: **Admit.**

13.     Through its dispatching services, CTG matches up people who want rides (prospective customers) with people who wish to provide rides (for-hire drivers).  Slinin Aff. ¶ 7.

<u>Response</u>: **Admit** that CTG uses its dispatching services to provide drivers to prospective customers, but **deny** Defendants' characterization of drivers as "people who wish to provide rides" and Defendants' assignment of clients to drivers as "match[ing] up."  CTG receives requests for transportation from its customers, and assigns those fares to its drivers, typically through CTG's computerized dispatch system, and penalizes drivers who refuse to complete those assignments.  Ex. A (Civello Tr.) 27:3-11, 87:7-88:4, 184:4-185:17, 199:13-200:16.

14.     Corporate Transportation Group International and Corporate Transportation Group Worldwide, Inc. facilitate the provision of transportation services abroad and in the western United States.  Slinin Aff. ¶ 9.

<u>Response</u>: **Admit.**

15.     None of the plaintiffs in this lawsuit have provided services for Corporate Transportation Group International or Corporate Transportation Group Worldwide, Inc.  Slinin Aff. ¶ 10.

<u>Response</u>: **Deny**.  Corporate Transportation Group International and Corporate Transportation Group Worldwide, Inc. are part of a single integrated enterprise with the other Defendant companies, and Plaintiffs' services were provided to that enterprise.  Ex. B (Defs.' Resp. to Pls. RFAs), RFA No. 3.

16.     From 2006 through the present, Galina Slinin had no involvement with running the business of the Franchisor Defendants.  G. Slinin Aff. ¶¶ 2 - 11; Slinin Aff. ¶ 3.

<u>Response</u>: **Admit.**

17.     Although Galina Slinin is listed as the Chief Executive Officer and Principal Executive Officer of CTG Worldwide, Inc. in the New York State Department of State records,

she has had no involvement with the business operations or business decisions of the company at any point from 2006 to the present.  G. Slinin Aff. ¶ 6; Slinin Aff. ¶ 3.

> Response: **Admit.**

18.    Although Galina Slinin is named as the Chief Executive Officer of Excelsior Car & Limo and Hybrid Limo Express in New York State Department of State records, she has had no involvement with the business operations or business decisions of the company at any point from 2006 to the present.  G. Slinin Aff. ¶ 7; Slinin Aff. ¶ 3.

> Response: **Admit.**

19.    Galina Slinin is not an executive, officer, supervisor, or agent of any of the Franchisor Defendants in this lawsuit.  G. Slinin Aff. ¶¶ 2-11.

> Response: **Deny.**  Defendants admit that Galina Slinin is the Chief Executive Officer of Excelsior Car & Limo and Hybrid Limo Express.  *See supra* ¶ 18.

20.    Galina Slinin does not set schedules of any employees of CTG or of the Franchisor Defendants.  G. Slinin Aff. ¶¶ 2, 5, 11.

> Response: **Admit.**

21.    Galina Slinin does not have authority to hire, fire, promote, reassign, or discipline CTG's employees or employees of the Defendant Franchisors, nor does anyone seek her input on such decisions.  G. Slinin Aff. ¶¶ 2, 5, 11.

> Response: **Admit.**

22.    Plaintiffs' counsel never sought to take the deposition of Galina Slinin.  Slinin Aff. ¶ 3.

> Response: **Admit.**

23.     The Franchisors sell or lease franchises to individuals and corporations in the black car industry who wish to use CTG's services.  Slinin TRO Aff. ¶ 4, ECF No. 139.

<u>Response</u>: **Admit**.

24.     Eduard Slinin is the president of the Defendant corporate entities.  Slinin Aff. ¶ 2.

<u>Response</u>: **Admit.**

25.     Plaintiffs own or operate franchises with NYC2Way, AllState, Aristacar, TWR, Hybrid Limousine, and Excelsior.  Of the Plaintiffs in this case, 115 are affiliated with NYC2Way; 53 are affiliated with AllState; 19 are affiliated with Aristacar; 17 are affiliated with TWR; seven are affiliated with Excelsior; and two are affiliated with Hybrid.  Some plaintiffs are affiliated with more than one company.  Slinin Aff., Ex. A.

<u>Response</u>: **Admit.**

26.     CTG does not have clients.  The clients are from NYC2Way, Aristacar, and all the other affiliated companies.  Civello Dep. p. 38:13-15.

<u>Response</u>: **Deny.**  CTG is part of a single integrated enterprise with the other Defendant companies, and Plaintiffs performed work for the clients of that enterprise.  Ex. B (Defs.' Resp. to Pls. RFAs), RFA No. 3.

## **WHAT THE PLAINTIFFS DO**

27.     Plaintiffs are engaged in common carrier transportation, which is private automobile transportation service.  Slinin Dep. pp. 302:18-21, 316:11-25; Slinin Aff. ¶ 13.

<u>Response</u>: **Admit** that Plaintiffs provide private automobile transportation service, but **deny** the characterization of that service as "common carrier transportation."  Plaintiffs primarily provide services to CTG's corporate client base, not to the general public.  Ex. A (Civello Tr.) 27:3-11.

28.     Plaintiffs typically operate small motor vehicles.  Slinin Dep. pp. 302:22-303:1, 317:16-23.

Response: **Admit.**

29.     In these small motor vehicles, Plaintiffs transport persons and such property as they may carry with them to any requested destination in the community.  Slinin Dep. p. 303:2-10.

Response: **Admit.**

30.     Plaintiffs provide transportation services on demand to a variety of customers. Slinin Dep. p. 303:11-24, Slinin Aff. ¶ 14.

Response: **Admit.**

31.     Plaintiffs do not drive fixed routes.  Slinin Dep. p. 303:16-18.

Response: **Admit**.

32.     Defendants do not dictate the routes Plaintiffs take to transport customers.  Plfs.' Response to Defendants' RFA ¶ 82.[4]

Response:  **Admit**.

33.     Plaintiffs drive predominantly in the tri-state area (New York, New Jersey, and Connecticut).  Slinin Dep. p. 303:13-15.

Response: **Admit.**

34.     The customer determines the time of the trip.  Slinin Dep. p. 303:19-21.

Response: **Admit.**

---

[4]     Plaintiffs' Responses to Defendants' Requests For Admission are attached to the Thering Decl. as Exhibit 1.

35.     The customer determines the destination of the trip.  Slinin Dep. p. 303:22-24.

<u>Response</u>: **Admit.**

36.     Plaintiffs typically only carry one fare at a time.  Slinin Dep. p. 304:9-11.

<u>Response</u>: **Admit** as to most clients, but deny with respect to work performed for the MTA account.  In many cases drivers working on the MTA account will transport multiple passengers at one time.  Ex. 1 (Transcript of Hrg. dated Aug. 4, 2013) 34:9-23.

## <u>DEFENDANTS ARE REGULATED BY THE TLC</u>

37.     The Franchisors each have a base license which entitles them to operate a taxi service within the tri-state area in New York City.  Slinin Dep. pp. 12:19-13:2; Civello Dep. pp. 39:23-42:20.

<u>Response</u>: **Admit**.

38.     The Franchisors are regulated by the TLC.  Slinin Aff. ¶ 80.

<u>Response</u>: **Admit**.

39.     Per TLC regulations, each black car must be affiliated with a base, but can lawfully be affiliated with only with one base at a time.  Civello Dep. p. 16:16-20; Kumar Dep. pp. 34:17-35:7; Slinin Dep. p. 26:15-17.

<u>Response</u>: **Admit**.

40.     Per TLC regulations, Plaintiffs must have TLC licenses and abide by the TLC rules and regulations.  Pls.' Responses to RFA ¶¶ 85-86, 95.

<u>Response</u>: **Admit**.

41.     Approximately 700 black cars are currently affiliated with the Franchisors.  Slinin Dep. p. 26:18-21.

<u>Response</u>: **Admit**.

42.     Because they facilitate and serve the transportation needs of the public, customer safety and public safety are constant and important concerns in CTG's and the Franchisors' businesses.  Slinin Dep. pp. 131:19-132:3.

Response: **Admit** that CTG and Franchisors are concerned with safety, but **deny** that this is because they "facilitate and serve the transportation needs of the public."  Defendants primarily serve the transportation needs of their private clients.  Ex. A (Civello Tr.) 27:3-11.

43.     Plaintiff Miriam Solorzano was disciplined by the TLC for refusing to allow a blind passenger to bring his "seeing eye dog" into her vehicle.  P 000021, 000022, 000180.[5]

Response: **Admit** that the TLC disciplined Miriam Solorzano based on the stated allegation, but **deny** the truth of the allegation.  Ex. TTT (M. Solorzano Tr.) 61:8-24.

### HOW DOES ONE PROVIDE SERVICES FOR ONE OF THE FRANCHISORS?

44.     One can buy a franchise directly from one of the Franchisors.  Kumar Dep. pp. 15:23-16:17.

Response: **Admit**.

45.     If purchased directly from a Franchisor, Allstate franchises cost $20,000; Aristacar and TWR franchises cost $32,000; NYC franchises cost $40,000; and Excelsior franchises cost $60,000.  CTG 12644, 13417, 13739, 14428, 000351 p.1, 15923.[6]

Response: **Admit**.

46.     One can also buy a franchise directly from a franchisee in the secondary market. Ali Dep. p. 22:20-23; Malchikov Declaration ¶ 3, ECF No. 374; Kumar Dep. p. 198:9-11.

---

[5] These documents are attached to the Thering Decl. as Exhibit 61.

[6] These documents are attached to the Thering Decl. as Exhibits 24-30.

Response: **Admit**.

47.     Plaintiffs bought and sold franchises on the secondary market (i.e., not from any of the defendants).  Slinin Aff. ¶ 25.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.  *See* Slinin Aff. ¶ 25.

48.     For example, Anjum Ali and Mazhar Saleem bought their franchises from Helmy Hussein for $1,000.  P 001144, 002052.[7]

Response: **Admit**.

49.     Some Plaintiffs rented their franchises from Franchisors or on the secondary market.  M. Singh Dep. p. 36:17-19; M. Solorzano Dep. p. 27:10-15.

Response: **Admit**.

50.      Plaintiffs decide whether to rent or buy a franchise and with which company to be associated.  Kumar TRO Aff. ¶ 11, ECF No. 143; *see also* Kumar Dep. p. 24:13-25.

Response: **Admit**.

51.     Franchisee drivers choose which type of franchise they want to purchase based on which is the right fit for them.  Slinin Aff. ¶ 94.

Response: **Admit** that drivers choose which company's franchise to purchase, but **deny** that they choose based on the "right fit" between them and the type of franchise.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The

---

[7] These documents are attached to the Thering Decl. as Exhibit 30.

witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.. *See* Slinin Aff. ¶ 94.

52.     Drivers may decide that purchasing a franchise is not the right fit for them and decide that renting a franchise is a better choice for them.  Slinin Aff. ¶ 94.

Response: **Admit** that drivers decide whether to rent or purchase franchises, but **deny** that the evidence supports Defendants' assertion that they make this decision based on what the "right fit" is for them.  *See supra* Response to ¶ 51.

53.     If a driver does not purchase a franchise outright, the driver can pay a $2000 deposit and pay a weekly rent, which can range from $130 to $150.  Slinin Aff. ¶ 94; CTG 12644, CTG 13417, CTG 13393, CTG 000351 p.1.[8]

Response: **Admit.**

**HOW PLAINTIFFS ARE PAID**

54.     When a Plaintiff picks up a customer of one of the Franchisors, per the terms of the franchise agreement, the Plaintiff processes the billing through CTG.  *See, e.g.,* CTG 13750, 14437.[9]

Response: **Admit.**

55.     When a Plaintiff picks up his or her own client (i.e., one that is not obtained by through one of the Franchisor Defendants), the Plaintiff may process it through whatever method he or she chooses, including his or her own bank account or credit card merchant service account.  Siddiqui Dep. p. 111:24-112:3; Slinin Dep. p. 64:1-8.

---

[8]     These documents are attached to the Thering Decl. as Exhibits 24-30.
[9]     These documents are attached to the Thering Decl. as Exhibits 26 and 27.

<u>Response</u>: **Admit** that when Plaintiffs transport customers who are not CTG clients, they can process the payment themselves.  **Deny** that Plaintiffs have any control over how payments are processed if the customer is a CTG client because CTG requires them to process the billing through CTG pursuant to the franchise agreements.  Ex. F (NYC 2 Way Franchise Agreement, effective July 24, 2007), CTG15438-529 at CTG15475, ¶ 42; Ex. G (NYC 2 Way Franchise Agreement, effective December 11, 2008), CTG15358-437 at CTG15402, ¶ 42; Ex. H (NYC 2 Way Franchise Agreement, effective August 18, 2009), CTG15269-357 at CTG15313-14, ¶ 42; Ex. I (NYC 2 Way Franchise Agreement, effective July 6, 2010), CTG15166-268 at CTG15210-11, ¶ 42; Ex. J (NYC 2 Way Franchise Agreement, effective July 6, 2011), CTG14971-5069 at CTG15015-16, ¶ 42; Ex. K (Aristacar Franchise Agreement, effective July 23, 2007), CTG13654-738 at CTG13693, ¶ 42; Ex. L (Aristacar Franchise Agreement, effective January 13, 2009), CTG13568-653 at CTG13611, ¶ 42; Ex. M (Aristacar Franchise Agreement, effective August 13, 2009), CTG13476-567 at CTG13521, ¶ 42; Ex. N (Aristacar Franchise Agreement, effective July 7, 2010), CTG13382-475 at CTG13428, ¶ 42; Ex. O (Aristacar Franchise Agreement, effective July 6, 2011), CTG13290-381 at CTG13336, ¶ 41; Ex. P (TWR Franchise Agreement, effective July 23, 2007), CTG15981-6064 at CTG16020, ¶ 42; Ex. Q (TWR Franchise Agreement, effective January 19, 2009), CTG15891-980 at CTG15933, ¶ 42; Ex. R (TWR Franchise Agreement, effective August 13, 2009), CTG15800-890 at CTG15844, ¶ 42; Ex. S (TWR Franchise Agreement, effective July 7, 2010), CTG15708-799 at CTG15753, ¶ 42; Ex. T (TWR Franchise Agreement, effective August 10, 2011), CTG15617-707 at CTG15663, ¶ 41; Ex. U (NYC 2 Way Franchise Agreement, effective July 2, 2012), CTG15070-165 at CTG15114, ¶ 41; Ex. V (Aristacar Franchise Agreement, effective July 5, 2012), CTG13204-289 at CTG13246, ¶ 41; Ex. W (TWR Franchise Agreement, effective July 5, 2012), CTG15530-616

at CTG15574, ¶ 41; Ex. 2 (Hybrid Limo Express, Inc. ("Hybrid") Franchise Agreement, effective Jan. 16, 2008), CTG14544-640 at CTG14607, ¶ 42; Ex. 4 (Hybrid Franchise Agreement, effective Jan. 5, 2011), CTG14428-543 at CTG14499, ¶ 42; Ex. 5 (Hybrid Franchise Agreement, effective Aug. 19, 2011), CTG14641-757 at CTG14712, ¶ 41; Ex. 6 (Hybrid Franchise Agreement, effective July 5, 2012), CTG14758-865 at CTG14823, ¶ 41; Ex. 7 (Excelsior Car & Limo, Inc. ("Excelsior") Franchise Agreement, effective July 24, 2007), CTG14316-427 at CTG14374-75, ¶ 42; Ex. 8 (Excelsior Franchise Agreement, effective Jan. 12, 2009), CTG14201-315 at CTG14269, ¶ 42; Ex. 9 (Excelsior Franchise Agreement, effective Aug. 18, 2009), CTG14086-200 at CTG14134, ¶ 42; Ex. 10 (Excelsior Franchise Agreement, effective July 7, 2010), CTG13851-4085 at CTG14015, ¶ 42; Ex. 11 (Excelsior Franchise Agreement, effective July 5, 2012), CTG13739-850 at CTG13805, ¶ 41; Ex. 12 (Allstate Private Car & Limousine, Inc. ("Allstate") Franchise Agreement, effective July 23, 2007), CTG13130-203 at CTG13155, ¶ 47; Ex. 13 (Allstate Franchise Agreement, effective Jan. 13, 2009), CTG13055-129 at CTG13091, ¶ 47; Ex. 14 (Allstate Franchise Agreement, effective Aug. 18, 2009), CTG12968-3054 at CTG13006, ¶ 47; Ex. 15 (Allstate Franchise Agreement, effective July 7, 2010), CTG12882-967 at CTG12921, ¶ 47; Ex. 16 (Allstate Franchise Agreement, effective Jan. 11, 2011), CTG12801-81 at CTG12844, ¶ 53; Ex. 17 (Allstate Franchise Agreement, effective Aug. 10, 2011), CTG12710-800 at CTG12752, ¶ 50; Ex. 18 (Allstate Franchise Agreement, effective July 5, 2012), CTG12613-709 at CTG12655, ¶ 41.

For example, Defendants sued Malook Singh for processing a payment for a customer because the customer worked for a corporate client of Defendants.  Ex. RRR (M. Singh Tr.) 11:12-19, 12:15-13:8, 22:13-20.  Because black car companies do not have exclusive contracts with clients, Ex. A (Civello Tr.) 43:20-44:13, any client could potentially become a customer of

CTG, thereby subjecting a driver to the noncompete provisions of the franchise agreements.
Furthermore, TLC regulations prohibit black car drivers from servicing customers other than
through prearrangement with a licensed base with which they are affiliated.  New York City,
N.Y., Rules, Tit. 35, § 55-19(a), New York City, N.Y., Rules, Tit. 35, § 59A-11(e).

56.     After completing a job for one of the Franchisors' customers, the Plaintiff asks the
customer to sign a voucher.  Kandov Dep. p. 31:12-16; Kumar Dep. pp. 38:15-39:13, 213:8-15.

Response: **Admit.**

57.     Plaintiffs submit these vouchers to CTG for payment.  Pls.' Response to RFA ¶
116.

Response: **Admit.**

58.     Each voucher represents one trip.  Kandov Dep. pp. 36:22-37:4.

Response: **Admit.**

59.     Plaintiffs are paid the full fare for the rides that they provide, less commissions,
voucher processing fees, and authorized deductions.  Slinin Aff. ¶ 28.

Response: **Admit** that Plaintiffs are paid as described except **deny** that the only
deductions made from drivers' pay are "authorized."  CTG also made deductions from drivers'
pay for fines stemming from alleged rule infractions.  Ex. CC (Kandov Tr.) 77:18-78:7; Ex. C
(Slinin Tr.) 318:5-17; Ex. HH (Mastrangelo Tr.) 325:6-22.

60.     CTG charges a $1 processing fee per voucher regardless of voucher amount.
Kumar Dep. pp. 42:13-43:4.

Response: **Admit.**

61.     To get paid, Plaintiffs bring their vouchers to CTG's office at 335 Bond Street. Choudhary Dep. p. 53:5-7; Kandov Dep. p. 31:12-16; Kumar Dep. p. 213:12-23; Pinedo Dep. p. 50:17-19.

Response: **Admit.**

62.     Plaintiffs decide when and how often to drop off their vouchers and pick up their voucher payments.  Pls.' Response to RFA ¶ 121; Civello Dep. pp. 158:11-20, 309:15-311:18; Kandov Dep. p. 31:17-19; M. Singh Dep. p. 59:17-19, 21.

Response: **Admit.**

63.     Whenever a driver submits a voucher, CTG's billing system processes the vouchers and pays the driver.  Kandov Dep. p. 31:14-16; Kumar Dep. pp. 38:22-39:3.

Response: **Admit.**

64.     Plaintiffs choose when to get paid.  Pls.' Response to RFA ¶ 121.

Response: **Admit.**

65.     Plaintiffs pay a commission to the Franchisor Defendants.  CTG 12622, CTG 13393, CTG 13749, CTG 13750, CTG 14437, CTG 14439, CTG 000351, CTG 15901.[10]

Response: **Admit** that a portion of each fare is retained by CTG, but **deny** the characterization of this payment as a "commission" paid to the Franchisor Defendants.

66.     Plaintiffs choose the amount of commission to pay.  CTG 12622, 13393, 13749-13750, 000351 p.8, 15901.[11]

Response: **Deny**.  Plaintiffs are limited to the options that CTG dictates.  Ex. A (Civello Tr.) 308:25-309:20.

---

[10]     These documents are attached to the Thering Declaration as Exhibits. 24- 29.
[11]     These documents are attached to the Thering Decl. as Exhibits 24, 26, 28, and 29.

67.     Plaintiffs are not paid by direct deposit.  Civello Dep. p. 326:7-9.

Response: **Admit.**

## PURCHASING A FRANCHISE

68.     There are no restrictions regarding who may purchase a franchise.  Slinin Aff. ¶ 16.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.  *See* Slinin Aff. ¶ 16.  CTG requires that a franchisee be affiliated with the base of one of CTG's franchisor companies, and that the franchisee have a valid TLC license, documents for their car, registration, insurance, a TLC permit, and a W-9 form.  Ex. E (Kumar Tr.) 34:15-36:18; 37:7-16.

69.     The only requirement to purchasing a franchise is the procurement of a valid TLC license. Kumar TRO Aff. ¶¶ 22-23, ECF No. 143.

Response: **Deny**.  In addition to obtaining a TLC license, CTG requires that a franchisee be affiliated with the base of one of CTG's franchisor companies, and that the franchisee have documents for their car, registration, insurance, a TLC permit, and a W-9 form.  Ex. E (Kumar Tr.) 34:15-36:18; 37:7-16.

70.     If a person decides to purchase a franchise, he or she must execute a franchise agreement, which may be reviewed with an attorney and negotiated prior to executing.  Kumar Dep. pp. 31:19-32:9; CTG 12660-12661, 13792, 000351, 15939.[12]

---

[12] These documents are attached to the Thering Decl. as Exhibits 24, 26, 28, and 29.

Response: **Admit** that a person must execute a franchise agreement when purchasing a franchise and **admit** that he or she may review it with an attorney. **Deny** that drivers may negotiate the terms of their franchise agreements with CTG. The cited testimony and documents do not support this assertion. *See* Kumar Dep. pp. 31:19-32:9; CTG 12660-12661, 13792, 000351, 15939.

71.     Negotiations between Plaintiffs and the Franchisors take place over the terms of the franchise agreements and often focus on items such as the purchase or rental price the Plaintiff and Franchisors will agree upon for the franchise, or whether the franchise will be a "rent-to-buy" arrangement. Kumar Dep. pp. 197:12-201:8.

Response: **Deny**. The cited testimony does not support this assertion. Kumar Dep. pp. 197:12-201:8. The testimony shows that CTG offers franchises on fixed terms, that drivers may purchase them from third parties, and that Defendants sometimes permit drivers to pay under payment plans by making monthly payments. Kumar Dep. pp. 197:12-201:8.

72.     The different Franchisors have different franchise agreements. CTG 12622, 12644, 12647, 12649, 12652, 12658, 12660-12661, 13382-13475, 13393, 13417, 13420, 13425, 13432. 13739, 13749, 13750, 13764, 13781, 13783, 13789, 13792, 14437, 14439, 14453, 14470, 14473, 14481, 00351, 15901, 15913, 15923, 15927, 15928, 15930, 15939, 000351;[13] Slinin Aff. 21.

Response: **Admit** that the franchise agreements are not identical word for word, but **deny** that the material terms of the franchise agreements differ other than with respect to the purchase

---

[13]     Excerpts from the franchise agreements are attached to the Thering Decl. as Exhibits 24-30.

price of a franchise.  Ex. U (NYC 2 Way Franchise Agreement, effective July 2, 2012),

CTG15070-165; Ex. V (Aristacar Franchise Agreement, effective July 5, 2012), CTG13204-289;

Ex. W (TWR Franchise Agreement, effective July 5, 2012), CTG15530-616; Ex. 6 (Hybrid

Franchise Agreement, effective July 5, 2012), CTG14758-865; Ex. 11 (Excelsior Franchise

Agreement, effective July 5, 2012), CTG13739-850; Ex. 18 (Allstate Franchise Agreement,

effective July 5, 2012), CTG12613-709.

73.    While there are differences among all of the franchise agreements, there are also

similarities.  For example, all franchise agreements contain the provision: "Franchisee shall at all

times be free from the control or direction of Franchisor in the operation of Franchisee's Vehicle,

and Franchisor shall not supervise or direct the services to be performed by Franchisee."  CTG

12613-12709, 13382-13475, 13739-13850, 000351, 15891-15980.[14]

Response: **Admit**.

74.    The franchise agreements all state that those who perform driving services for one

of the Franchisors are independent contractors.  CTG 12658, 13432, 13789, 000351 p.14,

15936.[15]

Response: **Admit**.

75.    The franchise agreements also all provide: "Franchisee is not an employee or

agent of Franchisor, but merely a subscriber to the services which Franchisor provides."  CTG

12658, 13432, 13789, 000351 p.14, 15936.[16]

Response: **Admit**.

---

[14]    These documents are attached to the Thering Decl. as Exhibits 24-30.
[15]    These documents are attached to the Thering Decl. as Exhibits 24-30.
[16]    These documents are attached to the Thering Decl. as Exhibits 24-30.

<u>**BECOMING AFFILIATED WITH ONE OF THE FRANCHISORS**</u>

76.     After a driver decides which company to be associated with, the driver fills out an application with the Franchisor as a base so that a "base transfer" may take place if the driver is already affiliated with a base, or so that a driver may become affiliated with a base if not yet affiliated.  Slinin Aff. ¶18.

<u>Response</u>: **Deny.**  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.

77.      The "base transfer" process is required by TLC rules.  Kumar TRO Aff. ¶ 12; *see also* Kumar Dep. pp. 34:21-35:7.

<u>Response</u>: **Admit**.

78.     TLC rules provide that a Plaintiff can only be associated with one base at a time. Kumar Dep. pp. 34:21-35:7.

<u>Response</u>: **Admit**.

79.     CTG keeps the application on file with its drivers' relations department for those who perform driving services for one of the Franchisors.  Kumar Dep. p. 37:2-16.

<u>Response</u>: **Admit**.

80.     The application includes basic information about the driver and the driver's vehicle and a "deduction agreement" sheet listing the agreed upon deductions to be deducted from payments to that driver.  Kumar Dep. 37:7-16.

<u>Response</u>: **Admit** that the application includes basic information about the driver and the driver's vehicle, as well as deductions that will be made from the driver's pay, but **deny** that drivers sign any kind of "deduction agreement."  The cited testimony does not support this assertion. Ex. E (Kumar Tr.) 37:7-16.

81.     These deductions are not made without driver authorization.  Kumar Dep. 37:17-38:17.

<u>Response</u>: **Deny** that all deductions that CTG makes from driver pay are authorized by drivers.  The cited testimony says that deductions for the purchase or rent of a franchise are authorized by drivers.  Ex. E (Kumar Tr.) 37:17-38:17.  Other deductions from drivers' pay are made without the drivers' authorization, such as fines deducted by CTG for alleged rule infractions.  Ex. HHH (Saleem Tr., Confidential portion) 151:11-152:5, 154:6-8; Ex. NNN (A. Chowdhury Tr.) 116:9-118:25.

82.     These deductions codes are entered into CTG's billing/payment system, and the process is carried out through automated calculations and deductions from each check issued to a specific driver.  Kandov Dep. pp. 39:13-15, 40:15-22, 92:4-10.

<u>Response</u>: **Admit**.

83.     Plaintiffs are not required to disclose to Defendants other black car companies for which they drive.  Slinin Aff. ¶ 17.

<u>Response</u>: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.

84.     None of the Defendants perform a background check for criminal history or outstanding TLC violations.  Civello Dep. p. 331:9-23; Kumar Dep. pp. 60:19-61:7.

Response: **Admit**.

85.     The TLC does this before issuing its license.  Civello Dep. p. 331:18-23.

Response: **Admit** that the TLC reviews TLC violations before issuing its license, but **deny** the remainder of the statement.  The cited testimony does not support the assertion that the TLC conducts a background check for criminal history.  *See* Ex. A, Civello Tr. 331:18-23.

86.     If a driver is going to wait in "lines" in front of specific clients, the clients require the drivers to have a scannable bar code (which the clients provide) available in their vehicle to verify they are actually affiliated with the black car company with which the client has an agreement.  Slinin Aff. ¶ 68.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.

### FRANCHISES ARE TRANSFERABLE AT FRANCHISEES' WILL

87.     All of the franchise agreements for the Franchisors provide that the franchise may be leased or rented to a third party with the prior written consent of the Franchisor, which consent *shall not be unreasonably withheld*.  CTG 12649, 13422, 13780-13781, 000351 p.5, 15927-8.[17]

---

[17]     These documents are attached to the Thering Decl. as Exhibits 24-30.

<u>Response</u>: **Admit**.

88.     One can purchase as many franchises as one wants, and some Plaintiffs own or have owned franchises with more than one company.  For example, Plaintiff Keith Daniel owns an Allstate franchise and rents a NYC2Way franchise.  Plaintiff Xun Li Fan owns an Allstate franchise and has rented NYC2Way and Aristacar franchises.  Plaintiff Samson Liao owns a NYC2Way franchise and rents an Allstate franchise.  Plaintiff Luis Perez owns NYC2Way and Allstate franchises.  Plaintiff Hafjur Rahman owns an Allstate franchise and rents a NYC2Way franchise.  Plaintiff Wilson Antonio Santos owns Aristacar and Allstate franchises.  Slinin Aff., Ex. A.

<u>Response</u>: **Deny**.  The cited exhibit is not in admissible form pursuant to Fed. R. Evid. 1006.  The summary chart it contains lacks foundation sufficient to verify its accuracy and does not disclose the underlying documents, if any, that it summarizes.  *See* Slinin Aff., Ex. A.  In addition, the underlying documents were not produced to Plaintiffs during the course of discovery, even though they were responsive to Plaintiffs' discovery demands, and were not listed on Defendants' disclosures pursuant to Fed. R. Civ. P. 26(a)(1).  Scimone Opp. Decl. ¶ 12.

89.     Mark Malchikov, a former driver and current franchise owner, purchased more than two dozen franchises.  Malchikov Decl. ¶ 1, ECF No. 374.

<u>Response</u>: **Admit**.

90.     Franchisees view their purchase of franchises as an investment.  Slinin Dep. 66:12-16; Malchikov Decl. ¶ 1, ECF No. 374; Dizengoff Aff. ¶ 15; Avagyan Aff. ¶ 10; Mughal Aff. ¶ 10; Vishin Aff. ¶ 10.

<u>Response</u>: **Deny.**  The cited testimony by Eduard Slinin consists of speculation and/or hearsay.  The cited declarations and affidavits speak only to the motivations of the particular

speakers.  With respect to the motivations of other franchisees, the cited testimony fails to

comply with Fed. R. Civ. P. 56(c)(4) because the witnesses provide no basis for having

knowledge of how other franchisees view their purchases.

Plaintiffs do not view their franchises as an investment.  Ex. SSS (J. Solorzano Tr.)

39:18-40:8 (testifying that he was unable to sell or rent his franchise because there was no work

available from CTG); Ex. QQQ (Pinedo Tr.) 26:25-27:8; Ex. OOO (Koura Tr.) 19:23-20

(incurred $15,000 loss by selling franchise); Ex. NNN (A. Chowdhury Tr.) 53:12-54:10 (unable

to sell franchise because no work available at CTG); Ex. KKK (Bautista Tr. 25:25-27:5) (unable

to sell or rent franchise because nobody wants it); Ex. JJJ (Ali Tr.) 48:20-49:4 (never tried to sell

franchise and unaware of whether any other drivers have tried to sell their franchises).

91.    Some Plaintiffs in this lawsuit are currently trying to sell their franchise(s).

Bautista Dep. p. 26:2; Chowdhury Dep. p. 53:14-16; J. Solorzano Dep. p. 39:18-19; M.

Solorzano Dep. p. 26:13-15.

Response: **Deny** as to Jairo Bautista, Jose Solorzano, and Miriam Solorzano.  Bautista is

not currently trying to sell his franchise because it has no value.  Ex. KKK (Bautista Tr.) 25:25-

27:2.  Jose Solorzano is not actively trying to sell his franchise.  Ex. SSS (J. Solorzano Tr.)

39:22-24.  Miriam Solorzano is not currently trying to sell her franchise.  Ex. TTT (M. Solorzano

Tr. 26:10-23).  **Admit** as to Anowar Chowdhury.  Ex. NNN (A. Chowdhury Tr.) 53:20-54:2.

92.    Some Plaintiffs have rented out or are currently renting out their franchises to

other third-party individuals or entities that have no direct affiliation with (and are not controlled

by) the Franchisor Defendants.  Bhatti Dep. pp. 67:3-7, 10, 16-18, 21-25-68:2-3; Choudhary

Dep. pp. 18:18-25-19:2-8.

Response: **Admit** as to Anwar Bhatti and Jamshed Choudhary.

24

93.     Additionally, drivers, including Plaintiff Atif Razaq, have placed ads in Black Car News regarding the rental of franchises.  Black Car News issues April-July 2010, and March-December 2013.[18]

Response: **Admit** that ads appear in the cited document advertising the sale of CTG-affiliated franchises, but **deny** that Atif Razaq has placed any ads because the cited document does not support this assertion.  *See* Thering Decl. Ex. 64.

94.     Approximately 60% of Plaintiffs own (or have owned) franchises and 40% rent (or have rented) franchises.  Slinin Aff. ¶ 23.

Response: **Deny**.  The summary chart referenced as support for this assertion is inadmissible pursuant to Fed. R. Evid. 1006.  It lacks foundation sufficient to verify its accuracy and does not disclose the underlying documents, if any, that it summarizes.  *See* Slinin Aff., Ex. A.  In addition, the underlying documents were not produced to Plaintiffs during the course of discovery, even though they were responsive to Plaintiffs' discovery demands, and were not listed on Defendants' disclosures pursuant to Fed. R. Civ. P. 26(a)(1).  Scimone Opp. Decl. ¶ 12.

95.     Among the Plaintiffs who own franchises, approximately 20% to 25% purchased them from private individuals and not from any of the Defendants.  Slinin Aff. ¶ 25.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.  *See* Slinin Aff. ¶ 25.

---

[18]     These documents are attached to the Thering Decl. as Exhibit 64.

96.     One can cease to be a franchise owner, yet still provide services through the CTG network by renting a franchise.  Koura Dep. p. 22:5-8.

Response: **Admit**.

## THE PROVISION OF GROUND TRANSPORTATION SERVICES

97.     Each Plaintiff operates and runs his or her own business.  Slinin Dep. p. 53:17-19; Pls.' Tax Returns.[19]

Response: **Deny**.  The cited testimony does not support this assertion.  Plaintiffs do not operate or run their own businesses to drive for Defendants.  Ex. JJJ (Ali Tr.)  50:19-51:17; 67:6-8; Ex. LLL (Bhatti Tr.) 82:11-15; Ex. NNN (A. Chowdhury Tr.) 57:23-58:11; Ex. OOO (Koura Tr.) 44:5-45:5; Ex. III (J. Singh Tr.) 103:12-25; Ex. HHH (Saleem Tr.) 15:24-16:-6; 105:20-106:15; Ex. TTT (M. Solorzano Tr.) 63:2-12; Ex. SSS (J. Solorzano Tr.) 76:17-24.  **Deny** that Plaintiffs' tax returns support the assertion that they owned or operated businesses; Plaintiffs received 1099s from CTG and provided these documents to their accountants, who determined how to file their tax returns. Ex. JJJ (Ali Tr.) 67:17-19; Ex. III (J. Singh Tr. Confidential Portion) 100:19-101: Ex. LLL (Bhatti Tr. Day 1) 166:16-167:13; Ex. MMM (J. Choudhary Tr) 73:5-74:2; Ex. RRR (Malook Singh Tr.) 74:8-22.

98.     Plaintiffs are free to incorporate their businesses.  Slinin Aff. ¶ 85.

Response: **Deny** to the extent this statement suggests that Plaintiffs own or operate businesses, but **admit** to the extent that a person is free to form a corporation in the State of New York for any lawful purpose.  *See* N.Y. Bus. Corp. Law § 201.

99.     Some Plaintiffs incorporated their businesses.  Pls.' Response to RFA ¶ 4.

---

[19]     These documents are attached to the Thering Decl. as Exhibits 41 – 54.

<u>Response</u>: **Deny** to the extent this statement suggests that Plaintiffs own or operate businesses, but **admit** that some Plaintiffs formed corporations.

100.     Nick Wijesinghe bought a franchise from Excelsior and incorporated his business as Point to Point Car & Limo.  Slinin Aff., Ex. A; New York Secretary of State Business Entity Report for Point to Point Car & Limo.[20]

<u>Response</u>: **Deny**.  The cited exhibit to the Slinin affidavit does not support this assertion. Exhibit 74 to the Thering Decl. does not support this assertion, was not produced during the course of discovery, has not been authenticated, and the Thering Decl. does not lay a foundation for its admissibility.  *See* Scimone Opp. Decl.. ¶ 23.

101.     Sukhdev Singh rented a franchise from NYC2Way and incorporated it as Paplu Cab Corp.  Slinin Aff., Ex. A; New York Secretary of State Business Entity Report for Paplu Cab Corp.[21]

<u>Response</u>: **Deny**.  The cited exhibit to the Slinin affidavit does not support this assertion. Exhibits 68-69 to the Thering Decl. does not support this assertion, was not produced during the course of discovery, has not been authenticated, and the Thering Decl. does not lay a foundation for its admissibility.  *See* Scimone Opp. Decl.. ¶ 23.

102.     In 2013, Sukhdev Singh's business made $98,000.  New York Secretary of State Business Entity Report for Paplu Cab Corp.[22]

---

[20]     The latter document is attached to the Thering Decl. as Exhibit74.
[21]     The latter document is attached to the Thering Decl. as Exhibits 68-89.
[22]     This document is attached to the Thering Decl. as Exhibit 69.

<u>Response</u>: **Deny**.  Exhibit 69 to the Thering Decl. does not support this assertion, was not produced during the course of discovery, has not been authenticated, and the Thering Decl. does not lay a foundation for its admissibility.  *See* Scimone Opp. Decl.. ¶ 23.

103.    Odishi Inc., through Joseb Rusia, CEO, bought an Allstate franchise.  Slinin Aff., Ex. A; New York Secretary of State Business Entity Report on Odishi, Inc.[23]

<u>Response</u>: **Deny**.  The cited exhibit to the Slinin affidavit does not support this assertion. Exhibit 67 to the Thering Decl. does not support this assertion, was not produced during the course of discovery, has not been authenticated, and the Thering Decl. does not lay a foundation for its admissibility.  *See* Scimone Opp. Decl.. ¶ 23.

104.    Arcelia Barros, the person who will accept service on behalf of Unicar Luxury, Inc., a business owned by Marlene Pinedo, bought a franchise from Aristacar.  Slinin Aff., Ex. A; New York Secretary of State Report on Unicar Luxury, Inc.[24]

<u>Response</u>: **Deny**.  The cited exhibit to the Slinin affidavit does not support this assertion. Exhibit 71 to the Thering Decl. does not support this assertion, was not produced during the course of discovery, has not been authenticated, and the Thering Decl. does not lay a foundation for its admissibility.  *See* Scimone Opp. Decl.. ¶ 23.  None of the cited documents describe any relationship between Marlene Pinedo and Unicar Luxury, Inc.

105.    In 2011, Unicar Luxury, Inc. earned $99,000.  Dunn & Bradstreet report on Unicar Luxury Inc.[25]

---

[23]    The latter document is attached to the Thering Decl. as Exhibit 67.
[24]    The latter document is attached to the Thering Decl. as Exhibit 71.
[25]    This document is attached to the Thering Decl. as Exhibit 70.

<u>Response</u>: **Deny**.  Exhibit 70 to the Thering Decl. does not support this assertion, was not produced during the course of discovery, has not been authenticated, and the Thering Decl. does not lay a foundation for its admissibility.

106.    Garnell Wrighten bought a franchise from Allstate and incorporated his business as The Rite Car Service, Inc., which earned $257,000 in 2013.  Slinin Aff., Ex. A; Experian report on The Rite Car Service, Inc.[26]

<u>Response</u>: **Deny**.  The cited exhibit to the Slinin affidavit does not support this assertion.  Exhibit 72 to the Thering Decl. does not support this assertion, was not produced during the course of discovery, has not been authenticated, and the Thering Decl. does not lay a foundation for its admissibility.  *See* Scimone Opp. Decl.. ¶ 23

107.    Wrighten advertises his business on LinkedIn where he lists himself as the owner of The Rite Car Service, Inc., states that he studied business administration, and states that he is a member of the National Limousine Association and a group pertaining to Airport Transfers & Ground Transportation.  LinkedIn Page of Garnell Wrighten.[27]

<u>Response</u>: **Deny**.  Exhibit 65 to the Thering Decl. was not produced during the course of discovery, has not been authenticated, and the Thering Decl. does not lay a foundation for its admissibility.  *See* Scimone Opp. Decl.. ¶ 23

## FRANCHISEES DO NOT HAVE TO PROVIDE DRIVING SERVICES PERSONALLY

108.    Franchisees do not have to provide driving services personally.  Civello Dep. p. 305:22-24.

---

[26]    The latter document is attached to the Thering Decl. as Exhibit 72.
[27]    This document is attached to the Thering Decl. as Exhibit 65.

Response: **Admit**.

109.     Plaintiffs could and did rent out their franchises and retain others to provide

ground transportation services on their behalf.  Pls.' Response to RFA ¶ 78; Bhatti Dep. p. 67:3-

4; Choudhary Dep. pp. 18:18-25-19:2-8.

Response: **Admit** that Plaintiffs could rent out their franchises and that the cited evidence

shows that Anwar Bhatti and Jamshed Choudhary did so.  **Deny** that the evidence shows that

Plaintiffs "retain[ed]" others to "provide ground transportation services on their behalf."  *See*

Pls.' Response to RFA ¶ 78; Bhatti Dep. p. 67:3-4; Choudhary Dep. pp. 18:18-25-19:2-8.

110.     Drivers told the base if they were using another driver to ensure that the other

driver had the requisite insurance and TLC license.  Slinin Aff. ¶ 26.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as

required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has

personal knowledge of the facts alleged or that he is competent to testify about the facts based on

any other source of competent evidence

## PLAINTIFFS DECIDE WHEN TO PROVIDE DRIVING SERVICES

111.     The franchise agreements entered into between Defendants and Plaintiffs do not

guarantee a certain amount of work to Plaintiffs.  Pls.' Response to RFA ¶ 11.

Response: **Admit**.

112.     Plaintiffs had no fixed schedule and decided for themselves when to provide

ground transportation services.  Pls.' Response to RFA ¶ 9; Pls.' Response to RFA ¶ 21; Pls.'

Response to RFA ¶ 22; Pls.' Response to RFA ¶ 23; Pls.' Response to RFA ¶ 24; CTG 12658,

13432, 13789, 000351 p.14, 15936; Civello Dep. p. 298:2-24; Pinedo Dep. pp. 40:24-41:5;[28] J.

Singh Dep. pp. 58:24-59:2; Slinin Dep. p. 303:16-18; J. Solorzano Dep. p. 81:14-17; Toska Dep.

pp. 182:21-22, 24;183:9-10, 12.

> Response: **Admit**.

113.    Some Plaintiffs elected to drive when their friends were driving.  Ali Dep. p.

96:2-14.

> Response: **Admit**.

114.    Some Plaintiffs elected to drive when they thought they could get the most jobs.

Bautista Dep. p. 106:18-23.

> Response: **Admit**.

115.    Plaintiffs could cease providing driving services whenever they wanted.  Civello

Dep. p. 305:22-24; Toska Dep. p. 186:8-13.

> Response: **Admit**.

116.    Some Plaintiffs elected to abstain from providing driving services for extended

periods of time.  Pls.' Response to RFA ¶ 81.

> Response: **Admit**.

117.    Plaintiffs are not required to tell Defendants if they are going to refrain from

providing driving services for a period of time.  Pls.' Responses to RFA ¶¶ 79-80; Civello Dep.

pp. 305:25-306:1-23.

> Response: **Admit**

---

[28]    These documents are attached to the Thering Decl. as Exhibit 16.

118.    Plaintiffs who ceased providing driving services could resume providing driving services whenever they wanted without penalty of any kind.  Toska Dep. p. 186:14-20.

Response: **Admit**.

119.    Some Plaintiffs took months off from driving and then returned to driving.  Ali Dep. p. 121:7-10; Civello Dep. pp. 305:25-306:1-23; Choudhary Dep. p. 61:12-14; Saleem Dep. pp. 40:15-17, 42:23-24; CTG 16651.[29]

Response: **Admit**.

**SIGNALING ONE'S AVAILABILITY AND WILLINGNESS TO WORK**

120.    To obtain black car services, customers can request a black car via telephone, website, or smartphone app.  Slinin Aff. ¶ 49.

Response: **Admit**.

121.    To signal their willingness and ability to work, Plaintiffs "log in" (otherwise known as "booking in") to CTG's dispatch system.  Pls.' Responses to RFA ¶¶ 12-13.

Response: **Admit**.

122.    Logging in to CTG's dispatch system involves turning on a smart phone app, opening the phone, signing on, and then booking in.  Toska Dep. p. 181:16-20.

Response: **Admit**.

123.    Plaintiffs are never required to book into CTG's dispatch system.  Slinin Aff. ¶ 15.

Response: **Admit**.

---

[29]    This document is attached to the Thering Decl. as Exhibit 31.

124.    Plaintiffs booked into CTG's dispatch system a widely disparate number of times. Pls.' Response to RFA ¶ 19; Civello Dep. p. 318:21-22; CTG 16651.[30]

Response: **Admit**.

125.    By turning on the CTG app, a Plaintiff is able to see what jobs are available in what "zones," *i.e.* geographic locations of the city.  Civello Dep. p. 174.

Response: **Deny**.  Plaintiffs were only able to see how many jobs were available in each zone and how many cars were booked into each zone – not what the jobs consisted of.  Ex. A (Civello Tr.) 178:12-181:7; Ex. UUU (Dispatch Manual), CTG9239-53, CTG09243.

126.    After logging in to the dispatch system, Plaintiffs "book in" to a zone by entering the zone number they chose and pressing send.  Toska Dep. pp. 180:22-181:24.

Response: **Admit**.

127.    The city is geographically broken up into zones.  Thering Decl Exh. 35.

Response: **Admit**.

128.    Plaintiffs book into a zone and wait for a job to be offered to them when they become the first car in line in that zone.  Chowdhury Dep. pp. 65-66.

Response: **Admit**.

129.    On a real time basis, the dispatch computer system automatically scans a data field containing a listing of Plaintiffs who are booked in and queued up to accept rides in a specific zone.  Toska Dep. p. 41:7-12, 17-18, 23.

Response: **Admit**.

---

[30]    This document is attached to the Thering Decl. as Exhibit 31.

130.    If there are no drivers booked in to a zone where a customer needs to be picked up, the dispatch computer system can scan a neighboring designated "backup" zone.  Toska Dep. p. 45:11-19.

Response: **Admit**.

131.    All non-airport zones have theoretical-only limits of approximately 9,999 book-ins, which is realistically unreachable.  Toska Dep. p. 185:16-20.

Response: **Admit**.

132.    The only zones with realistically reachable limits are the three airport zones: LaGuardia, JFK and Newark, which are zones 50, 59 and 70, respectfully.  Civello Dep. pp. 206:24-207:1-5.

Response: **Admit**.

133.    The airport zone limits were imposed by Security Committees, not by anyone in CTG management.  Toska Dep. pp. 185:23-25-186:3-4.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Fadi Toska, did not purport to have personal knowledge of the work of the Security Committees or knowledge from any other source.  See Ex. EE (Toska Tr.) 185:23-25-186:3-4.

134.    Plaintiffs can book into whatever zone they want.  Pls.' Response to RFA ¶ 28; Choudhary Dep. p. 58:10-11; J. Singh Dep. p. 64:17-18; M. Solorzano Dep. p. 109:22-25.

Response: **Admit**.

135.    Different plaintiffs favored and disfavored different zones.  Pls.' Response to

RFA ¶ 30; Bautista Dep. p. 80:7-8; J. Singh Dep. p. 65:23-25; CTG 16650, 16551, and 16554.[31]

Response: **Admit**.

136.    Once booked in to a particular zone, Plaintiffs receive job offers from CTG's

dispatch system.  Civello Dep. p. 87:7-22; Slinin Dep. p. 112:13-21; Toska Dep. pp. 180:15-21,

182:9-16.

Response: **Admit**.

137.    Typically the job offers are given out in a "first come first serve" fashion.  Slinin

Dep. p. 115:1-4; Toska Dep. p. 169:20-24.

Response: **Admit**.

138.    If a Plaintiff rejects a job offer, the job offer is given to the next Plaintiff booked

in on the queue.  Pls.' Response to RFA ¶ 43.

Response: **Admit**.

139.    There were instances where a job was pushed to a particular driver at the request

of a customer.  Slinin Aff. ¶ 61.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as

required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has

personal knowledge of the facts alleged or that he is competent to testify about the facts based on

any other source of competent evidence.

---

[31]    Thering Decl. Exhibit 31.  Thering Exhibit 32 contains graphics produced by a
professional graphic design company visually representing data culled from CTG's dispatch
data.

140.    Sometimes a job is not given to the driver who is at the top of the queue because the client has asked that certain drivers not provide services for the client's account. From 2009-2012, the following Plaintiffs were removed from the following accounts at client request:

| PLAINTIFF | CLIENT |
|---|---|
| Tamer Rashdan | Administration for Children's Services |
| Mazhar Saleem | Ernst & Young |
| Rangdev Multani | New York Life Insurance Co. |
| Ashwin Kumar | Horizon Blue Cross Blue Shield |
| Daniel Alexis | Ernst & Young |
| Anjum Ali | Ernst & Young |
| Francois FanFan | Merrill Lynch |

Slinin Aff. ¶ 62.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.  The summary chart referenced as support for this assertion is inadmissible pursuant to Fed. R. Evid. 1006.  It lacks foundation sufficient to verify its accuracy and does not disclose the underlying documents, if any, that it summarizes.  In addition, the underlying documents were not produced to Plaintiffs during the course of discovery, even though they were responsive to Plaintiffs' discovery demands, and were not listed on Defendants' disclosures pursuant to Fed. R. Civ. P. 26(a)(1).  Scimone Opp. Decl. ¶ 12.

141.    Sometimes a job is not given to the driver at the top of the queue due to a customer's specific vehicle request.  Civello Dep. p. 206:1-19; Slinin Dep. p. 113:1-10.

Response: **Admit**.

142.    Drivers who receive a job offer choose whether to accept or reject the job. Malchikov Decl. ¶ 8, ECF No. 374; Choudhary Dep. p. 68:15-17.

Response: **Admit**.

143.    Plaintiffs are free to – and do - choose how many rides to accept from Defendants each day, week, month, and year.  Pls.' Responses to RFA ¶¶ 47-56.

Response: **Admit**.

144.    Different Plaintiffs accepted different numbers of rides, and different Plaintiffs accepted different percentages of rides offered to them.  Pls.' Responses to RFA ¶¶ 59-60.

Response: **Admit**.

145.    Plaintiffs have the right to reject jobs.  Toska Dep. p. 170:9-10, 12.

Response: **Admit** that Plaintiffs have the right to reject jobs, but **deny** that they could do so without penalty.  Plaintiffs who rejected a job were booked off the air for at least five minutes and placed at the bottom of the list for jobs.  Ex. JJJ (Ali Tr.) 25:22-26:23; Ex. LLL (Bhatti Tr. Day 1) 210:3-6; Ex. MMM (J. Choudhary Tr.) 80:16-81:7; Ex. NNN (A. Chowdhury Tr.) 52:6-13;

146.    Plaintiffs exercised their right to reject job offers.  Pls.' Response to RFA ¶ 32.

Response: **Admit** that Plaintiffs did so and were penalized accordingly.  *See supra* Response to ¶ 15.

147.    Different plaintiffs rejected different numbers of rides and different percentages of rides offered to them.  Pls.' Responses to RFA ¶¶ 41-42.

Response: **Admit**.

148.    For example, from May 2010 to May 2013, Wilman Martinez never rejected a CTG job offer, but Ranjit Bhullar rejected 949; in March 2011, Bhavesh Shah accepted 83 job offers and rejected nine; Jamshed Choudhry accepted 148 job offers and rejected 12; Jose

Solorzano accepted only 15 while Jose Cabrera was in the midst of taking the entire year of 2011 off.  (He drove again in 2012.)  CTG 16554; CTG 16550; CTG 16551.[32]

> Response: **Admit**.

149.    A driver who does not want to drive for a certain client can tell dispatch that he wants to be taken off of that account.  Kumar Dep. p. 134:18-23; Toska Dep. pp. 183:25-184:2-3.

> Response: **Admit** that drivers could make the request, but **deny** that CTG respected the requests.  Ex. III (J. Singh Tr.) 134:6-135:5; 137:11-140:4; Ex. OOO (Koura Tr.) 111:19-112:16; Ex. JJJ (Ali Tr.) 29:6-34:11; 144:2-10; 161:13-17; 172:8-19.

150.    Plaintiffs have asked to be taken off of accounts.  Pls.' Responses to RFA ¶¶ 44 and 46; Ali Dep. pp. 29:17-25–30:2-4; Koura Dep. p. 63:8-13.

> Response: **Admit**, but **deny** that CTG respected those requests.  *See supra* Response to ¶ 149.

151.    Approximately 16% of Plaintiffs have requested to be taken off of accounts, and some have asked to be taken off of more than one account.  Specifically, the following plaintiffs requested to be taken off the following numbers of accounts:

| Plaintiff | Number of accounts plaintiff requested to be off |
|---|---|
| Mark Shinder | 9 |
| Mohammad Siddiqui | 8 |
| Kuldip Singh | 8 |
| Mikhail Gerber | 6 |
| Edgar Acuapina | 5 |
| Babar Hafeez | 5 |
| Avneet Koura | 5 |
| Issa Feras | 4 |
| Inderjit Singh | 4 |

---

[32]    Thering Decl. Exhibit 31.

| Khushwant Singh | 4 |
|---|---|
| Dongseog Yoo | 4 |
| Anjum Ali | 3 |
| Abdelilah El Karhat | 3 |
| Marlene Pinedo | 3 |
| Mustapha Rahmouni | 3 |
| Aziz Urrehman | 3 |
| Luis Aucapina | 2 |
| Walid Hamcho | 2 |
| Ibrahim M. Desooki | 2 |
| Jose Mogrovejo | 2 |
| Ranjit Bhullar | 2 |
| Juan Soto | 2 |
| Mei Yao | 2 |
| Jose Cabrera | 1 |
| Norman Ho | 1 |
| Jeewan Singh | 1 |
| Mena Michael | 1 |
| Gurmail Singh | 1 |
| Joginder Singh | 1 |
| Leo Stewart | 1 |
| Harnek Whar | 1 |
| Sheng Zhong Xu | 1 |

Slinin Aff. 59.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.  The summary chart referenced as support for this assertion is inadmissible pursuant to Fed. R. Evid. 1006.  It lacks foundation sufficient to verify its accuracy and does not disclose the underlying documents, if any, that it summarizes.  In addition, the underlying documents were not produced to Plaintiffs during the course of discovery, even though they were responsive to Plaintiffs' discovery demands, and were not listed on Defendants' disclosures pursuant to Fed. R. Civ. P. 26(a)(1).  Scimone Opp. Decl. ¶ 12.

39

152.     If a Plaintiff accepts a job, but does not like the job due to its location, pay, or any other reason, the Plaintiff can "bail out" of the job.  Mastrangelo Dep. pp. 45:19-21, 53:13-15; Maydwell Dep. p. 288:7-19; Slinin Dep. p. 310:10-15.

Response: **Admit**, but **deny** that Plaintiffs can do so without penalty.  Ex. A (Civello Tr.) 200:10-16; Ex. III (J. Singh Tr., Confidential portion) 85:16-88:6; Ex. NNN (A. Chowdhury Tr.) 50:7-25.

153.     Some Plaintiffs frequently bail out of jobs.  CTG 38248.[33]

Response: **Admit**.

154.     Some Plaintiffs rarely bail out of jobs.  CTG 38248.[34]

Response: **Admit**.

155.     Some Plaintiffs bail out of jobs because they believe the job is a "bad job" or a "lousy job" and is not worth the money, and they can earn more money elsewhere.  Choudhary Dep. p. 34:9-13.

Response: **Deny**.  The cited testimony does not support this assertion.  Choudhary testified that sometimes CTG gave him bad jobs and if he told them to give him a good job instead, they would tell him to take a day off.  Ex. MMM (J. Choudhary Tr.) 34:9-13.

156.     A driver who is number one in a zone queue and rejects a job as opposed to bailing out of a job previously accepted, simply moves to the bottom of the queue and then receives another job offer when back up at the top of the queue.  Slinin Aff ¶ 54.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has

---

[33]     This document is attached to the Thering Decl. as Exhibit 33.
[34]     This document is attached to the Thering Decl. as Exhibit 33.

personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.

157.    Some Plaintiffs frequently reject jobs.  Ali Dep. pp. 96:22-97:4; CTG 16554.[35]

Response: **Admit**, but **deny** that Plaintiffs did so without penalty.  Ex. JJJ (Ali Tr.) 25:22-26:23; Ex. LLL (Bhatti Tr. Day 1) 210:3-6; Ex. MMM (J. Choudhary Tr.) 80:16-81:7; Ex. NNN (A. Chowdhury Tr.) 52:6-13.

158.    Sometimes Defendants are unable to fulfill a customer's request for a car because no Plaintiff wants to accept the job because it does not pay enough.  Mastrangelo Dep. p. 33:15-18; Slinin Aff. ¶ 60.

Response: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The cited testimony by Greg Mastrangelo refers to a statement contained in an email relating a second statement by a dispatcher that relayed a third statement by a driver.  *See* Ex. HH (Mastrangelo Tr. 33:15-18.  Mastrangelo further testified that the dispatcher's statement that a job was "not worth" the driver's time was improper and that he would recommend she be fired for making it.  Ex. HH (Mastrangelo Tr) 33:15-35:8.  The citation to the Slinin Affidavit is also inadmissible because Slinin has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.

159.    "Booking in" to the system is not the only way a Plaintiff can get a job.  A Plaintiff can also get a job by going to a "line."  Mastrangelo Dep. p. 61:15-23; Slinin Dep. pp. 157:25-159:2.

---

[35]    Thering Decl. Exh. 31.

<u>Response</u>: **Admit**.

160.    A "line" is a queue of cars that wait outside certain businesses, such as Goldman Sachs, Bank of America, and Citibank.  Civello Dep. pp. 196:19-197:3; Mastrangelo Dep. p. 61:20-23; Slinin Dep. pp. 157:25-159:2.

<u>Response</u>: **Admit**.

161.    CTG operates 10 lines.  Slinin Aff. ¶ 63.

<u>Response</u>: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.

162.    The lines only allow certain car services to service their lines.  Accordingly, drivers not affiliated with a Franchisor cannot go to a line.  Slinin Aff. ¶ 67.

<u>Response</u>: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.  *See* Slinin Aff. ¶ 67.

163.    Some Plaintiffs frequently get jobs through the lines.  Slinin Aff. ¶ 65.

<u>Response</u>: **Deny**.  Defendants fail to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(4).  The witness, Eduard Slinin, has not established that he has personal knowledge of the facts alleged or that he is competent to testify about the facts based on any other source of competent evidence.  *See* Slinin Aff. ¶ 65.

164.    Plaintiffs are free to join or leave a line at any time they wish. Slinin Aff. ¶ 64.

Response: **Deny**. The cited testimony is not in admissible form as required by Fed. R.

Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of whether

plaintiffs are free to join or leave a line at any time nor that he is competent to testify to the same.

Slinin Aff. ¶ 64.

165.    Another way Plaintiffs can get jobs is through the MTA client.  Civello Dep. p.

15:12-17:5; Mastrangelo Dep. pp. 12:24-13:4; Slinin Dep. pp. 37:22-38:11, 135:20-136:2.

Response: **Admit**.

166.    CTG has a contractual relationship with the New York City Metropolitan Transit

Authority ("MTA") that involves picking up passengers who are too sick to travel via public

transportation.  Civello Dep. p. 73:15-22.

Response: **Admit**.

167.    Plaintiffs who want to work MTA jobs must go through City of New York and

Access-A-Ride training pursuant to MTA guidelines.  Slinin Dep. pp. 136:19-137:11.

Response: **Admit**.

168.    MTA jobs are pre-routed the day before the jobs are to be filled.  Slinin Dep. pp.

287:17-288:5; Toska Dep. pp. 43:16-18, 47:25-48:6.

Response: **Admit**.

169.    Every evening between 6:00 p.m. and 10:00 p.m., CTG receives a "manifest"

from the MTA command center, listing jobs/passenger pick-ups that need to be serviced the

following day.  Civello Dep. p. 15; Slinin Dep. pp. 287:21-288:7; Toska Dep. p. 173:9-10.

Response: **Admit**.

170.    In accordance with the requirements of its contract with the MTA, once CTG

receives the MTA "manifest," CTG works with the data from the manifest to develop pre-

planned routes via a computer-assisted process to figure out the most efficient routes for picking

up sick passengers who require the assistance of the MTA's paratransit division.  Civello Dep.

pp. 15:12-23, 73:15-22; Slinin Dep. p. 288:5-15; Toska Dep. p. 173:5-7, 9-20.

> Response: **Admit**.

171.    Plaintiffs who wish to be assigned MTA jobs call a special hotline to request

MTA ride assignments.  Slinin Dep. pp. 287:24-288:1; Toska Dep. p. 173:14-20.

> Response: **Admit**.

172.    Plaintiffs relay information over the hotline regarding what dates, times, starting

locations, and finishing locations they would like MTA jobs.  Slinin Dep. pp. 288:21-289:4;

Toska Dep. pp. 171:23-172:11.

> Response: **Deny**.  The cited testimony does not support the assertion.  The cited
>
> testimony establishes that Plaintiffs relay information over the hotline regarding a block of time
>
> they are available to work during the following day, and which borough they wish to start work
>
> in.  Ex. C (Slinin Tr.) 288:16-289:4; Ex. EE (Toska Tr.) 171:23-172:11.

173.    CTG electronically, through its computer systems, matches the requests from the

Plaintiffs to jobs on the MTA manifest.  Slinin Dep. pp. 288:21-289:11; Toska Dep. p. 173:15-

20.

> Response: **Deny**.  The cited testimony does not support the assertion.  Plaintiffs
>
> communicate information regarding their availability via the hotline as described in Plaintiffs'
>
> response to paragraph 172, *supra*.  CTG's computer system assigns jobs to the Plaintiffs
>
> consistent with this information.  Ex. C (Slinin Tr.) 288:21-289:11; Ex. EE (Toska Tr.) 173:15-
>
> 20.

174.     Some Plaintiffs have elected never to drive for the MTA account.  Slinin Dep. pp. 135:20-136:2.

Response: **Deny**.  The cited testimony does not support this assertion.  The cited testimony speaks generally to the percentage of drivers who perform MTA work, not to whether some Plaintiffs have never performed MTA work.  Ex. C (Slinin Tr.) 135:20-136:2.

175.     Some Plaintiffs frequently drive for the MTA account.  Slinin Dep. pp. 135:20-136:2.

Response: **Deny**.  The cited testimony does not support this assertion.  The cited testimony speaks generally to the percentage of drivers who perform MTA work, not to the frequency with which they do so.  Ex. C (Slinin Tr.) 135:20-136:2.

176.     From 2009 to 2012, Jose Solorzano drove almost exclusively for the MTA account.  P 000030-000097.[36]

Response: **Deny**, as the cited documents do not support the assertion, but **admit** that Jose Solorzano drove almost exclusively for the MTA account from March 2011 to October 2012.  Thering Decl. Ex. 34 (Paystubs), P000030-97.

177.     Approximately 60% of Plaintiffs have chosen to drive for the MTA account at some point.  Slinin Aff. ¶ 69.

Response: **Deny**.  The cited testimony is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of the percentage of drivers who have driven for the MTA account, nor that he is competent to testify to the same.

---

[36] This document is attached to the Thering Decl. as Exhibit 34.

178.     Some plaintiffs who elected to drive for the MTA account later have decided to stop driving for the MTA account primarily because they did not believe they were earning enough money on the MTA jobs.  Koura Dep. pp. 63:20-643.

<u>Response</u>: **Admit**, but **deny** that CTG respected Plaintiffs' requests to be taken off the MTA account or other accounts.  Ex. OOO (Koura Tr.) 111:19-112:16; 115:9-20; Ex. JJJ (Ali Tr.) 25:6-12; Ex. HHHH (Siddiqui Tr. Day 2) 322:15-24, 325:7-11; Ex. III (J. Singh Tr. Confidential Portion) 137:17-19

179.     Because the MTA account pays less than many other accounts, CTG is not always able to fill MTA jobs with Plaintiffs or other Franchisor-drivers.  Civello Dep. p. 288:5-15; Slinin Dep. pp. 286:24-287:5.

<u>Response</u>: **Admit.**

180.     Accordingly, CTG reaches out to unrelated livery cab companies to fill these jobs. Civello Dep. pp. 72:15-73:1, 75:4-8, 288:5-15; Slinin Dep. pp. 37:22-38:14, 286:24-287:5.

<u>Response</u>: **Admit** that CTG reaches out to unrelated livery cab companies to fill MTA jobs, but **deny** that this is the only way that CTG fills MTA jobs.  CTG also attempts to fill MTA jobs by offering to give other, higher-paying jobs to drivers who agree to fill an MTA job, Ex. 1 (Transcript of Hrg. dated Aug. 4, 2013), 36:17-37:10; Ex. HHHH (Siddiqui Tr. Day 2) 320:17-16, or will try to fill an MTA job by assigning it to a driver booked into the dispatch system who has not indicated a preference for completing MTA jobs.  Ex. OOO (Koura Tr.) 111:19-112:16; Ex. III (J. Singh Tr. Confidential Portion) 142:13-143:11.  Drivers have protested both practices. Ex. HHHH (Siddiqui Tr. Day 2) 320:17-16; Ex. 19 (list of drivers' demands), P003448.

181.     These livery cab companies are not owned or operated by any of the Defendants. Civello Dep. p. 288:13-15; Maydwell Dep. p. 373:17-24; Slinin Dep. pp. 17:17-22, 19:3-6.

Response: **Admit.**

182.    CTG enters into affiliate agreements with some of these companies.  Slinin Aff. ¶
70.

Response: **Admit.**

183.    CTG does not have an exclusive contract with the MTA, and MTA work does not
comprise the majority of Defendants' business.  Civello Dep. p. 73:6-8; Slinin Aff. ¶¶ 71-72.

Response: **Admit.**

184.    Getting jobs through CTG's dispatch system, through lines, or through the MTA
account are not the only ways plaintiffs can get jobs.  They can also get jobs directly from their
own personal customers.  Pls.' Response to RFA ¶ 75; Choudhary Dep. p. 41:14, 17, Koura Dep.
p. 52:13-15; J. Solorzano Dep. pp. 36:25-37:2.

Response: **Admit** that some Plaintiffs have private customers, but **deny** the implication
that drivers are free to do this, as TLC regulations prohibit black car drivers from picking up
customers except through prearrangement with a licensed base with which they are affiliated.
New York City, N.Y., Rules, Tit. 35, § 55-19(a), New York City, N.Y., Rules, Tit. 35, § 59A-
11(e).

185.    Per the terms of the franchise agreements, Plaintiffs who get calls directly from
Franchisor customers service the Franchisor customer without the use of CTG's dispatch system,
but they still process the vouchers through CTG's voucher processing services.  Slinin Aff. ¶ 73.

Response: **Admit.**  From time to time, drivers have serviced Franchisor customers
without processing vouchers through CTG's voucher processing system, in violation of their
franchise agreements, and CTG has sued them for this breach.  Ex. X (complaint in *NYC 2 Way
International, Ltd. v. Malook Singh*), CTG000234-39.

186.    Approximately 40% of Plaintiffs performed trips for personal customers that were processed through CTG's voucher processing service.  Specifically from April 2012 until December 2013 the following Plaintiffs performed trips for personal customers and processed them through CTG's data processing service:

| NAME | PRIVATE TRIPS | NOTES |
|---|---|---|
| Harvinder S. Bhamra | 475 | One customer accounted for 218 of Bhamra's trips. |
| Harnek Whar | 413 | One customer accounted for 111 of Whar's private trips. |
| Prakash Badlani | 304 | |
| Rangdev Multani | 300 | One customer accounted for one-third of Multani's private trips. |
| Adam Klag | 290 | Two customers accounted for over 90% of Klag's private trips. |
| Jamshed Choudhry | 285 | |
| Edgar Aucapina | 281 | One customer accounted for 24% of Aucapina's private trips. |
| Mohammad Siddiqui | 259 | |
| Anjum Ali | 228 | |
| Kouri Baudwin | 215 | |
| Luis Aucapina | 212 | One customer accounted for one-third of Aucapina's private trips. |
| Inderjit Singh | 209 | One customer accounted for 65% of Singh's trips. |
| Harrikisoon Seejattan | 187 | Two customers accounted for 77% of Seejattan's private trips. |
| Ahmed Nisar | 164 | Three customers accounted for 76% of Nisar's private trips. |
| Mena Michael | 161 | One customer accounted for one-quarter of Michael's private trips. |
| Nestor Teran | 135 | |
| Kuldip Singh | 109 | One customer accounted for more than 70% of Singh's private trips. |
| Felix Caraballo | 103 | |
| Khushwant Singh | 102 | |
| Edisson Barros | 96 | |
| Saad Attia | 91 | |
| Jagjit Singh | 91 | |

48

| NAME | PRIVATE TRIPS | NOTES |
|---|---|---|
| Bhavesh Shah | 86 | |
| Arcelia Barros | 84 | |
| Wilman Martinez | 80 | |
| Mazhar Saleem | 76 | |
| Gustavo Garcia | 69 | One customer accounted for more than half of Garcia's private trips. |
| Pedro Pazmino | 67 | |
| Wei Xiong Ni | 63 | |
| Aziz Urrehman | 62 | |
| Anwar Bhatti | 55 | |
| Mikhail Zemka | 48 | |
| Mohammed Mian | 47 | |
| Joginder Singh | 46 | |
| Daniel Alexis | 43 | |
| Jose Cabrera | 41 | |
| Nwala Gabriel | 41 | |
| Irfan Shafi | 37 | |
| Marlene Pinedo | 31 | |
| Harvinder Singh | 36 | |
| Avneet Koura | 28 | One customer accounted for 27 of the 28 trips. |
| Euclides Pena | 24 | |
| Jeff Gravesande | 20 | |
| Mikhail Gerber | 17 | |
| Norman Ho | 17 | |
| Luis M. Vasquez | 16 | |
| Ranjit Bhullar | 14 | |
| Gurmail Singh | 14 | |
| Miriam Solorzano | 14 | |
| Jairo Bautista | 13 | |
| Luis Sanchez | 12 | |
| Shahidullah Dulal | 11 | |
| Mohammed Gazi Ali | 10 | |
| Mustapha Rahmouni | 10 | |
| Imtiaz Quereshi | 7 | |
| Firozuddin Syed | 7 | |
| Man Cheng | 6 | |
| Ahmed Ismail | 5 | |
| David A. Sanhez | 5 | |

| NAME | PRIVATE TRIPS | NOTES |
|---|---|---|
| Maninder Singh | 5 | |
| Mohammad Choudhry | 4 | |
| Liang Hua Ma | 4 | |
| Firoz Ahmed | 3 | |
| Socrates Gregoriadis | 3 | |
| Mario Guerrero-Bajana | 3 | |
| Ke Shi | 3 | |
| Mohammed M. Islam | 2 | |
| Ashwin Kumar | 2 | |
| Wenzhong Li | 2 | |
| Xiangbo Li | 2 | |
| Nobel A. Young | 2 | |
| Roxana Zetino-Beltran | 2 | |
| Xun Li Fan | 1 | |
| Shuhrat O. Khakberdiyev | 1 | |

Slinin Aff. ¶ 73.

<u>Response</u>: **Deny**.  The cited testimony is inadmissible because Slinin fails to establish

that he has personal knowledge of trips for customers that contacted drivers directly, or is

competent to testify as to the same.  Slinin Aff. ¶ 73.  Furthermore, the cited evidence is

inadmissible pursuant to Fed. R. Evid. 1006.  It lacks foundation sufficient to verify its accuracy

and does not disclose the underlying documents, if any, that it summarizes.  No such documents

were made available to Plaintiffs for inspection during the course of discovery.  *See* Scimone

Opp. Decl.. ¶ 12.

187.    Plaintiffs were also able to – and did – advertise their driving services to the

public at large.  For example, Miriam Solorzano and Jose Solorzano made business cards to

promote their driving services.  J. Solorzano Dep. p. 91:13-20; M. Solorzano Dep. p. 81:18-20; P

003880.[37]

     <u>Response</u>: **Admit** that Miriam and Jose Solorzano made business cards, but **deny** the rest

of the assertion.  Both witnesses testified that they gave their cards, if at all, to existing

passengers, not that they used them to solicit or otherwise generate business from "the public at

large."  Ex. SSS (J. Solorzano Tr.) 92:5-12; Ex. TTT (M. Solorzano Tr.) 81:18-3.  Furthermore,

Miriam Solorzano's business card prominently displays "TWR Express Car Service Limousine"

and is therefore on its face an advertisement or promotion of CTG's services, to the extent that it

was used in the manner of an advertisement or promotion at all.  Thering Decl. Ex. 59 (business

card), P003880.

     188.    Additionally, Miriam Solorzano, Jairo Bautista, Jamshed Choudhary, Marlene

Pinedo, and Mazhar Saleem deducted for advertising expenses on their tax returns.  Specifically,

in 2006, Mazhar Saleem deducted $450 for advertising expenses; in 2010, Marlene Pinedo

deducted $490 for advertising expenses, in 2011, she deducted $250 for advertising expenses,

and in 2012, she deducted $200 for advertising expenses; in 2006, Jairo Bautista deducted $60

for advertising expenses; in 2010, Jairo Bautista and Miriam Solorzano (filling one 1040-C under

Bautista's name but containing both of their 1099 income) deducted $2,500 for advertising

expenses, in 2011, they jointly deducted $2,800 for advertising expenses; and in 2007, Jamshed

Choudhary deducted $672 for advertising expenses.  Pls.' Tax Returns.[38]

     <u>Response</u>: **Admit**.

---

[37]    This document, as well as another business card that was produced without a Bates
number, are attached to the Thering Decl. as Exhibits 59 and 60.

[38]    These documents are attached to the Thering Decl. as Exhibits 42, 45, 48 and 49.

## DEFENDANTS DID NOT PROVIDE PLAINTIFFS WITH VEHICLES

189.    None of the Defendants rented or sold vehicles to Plaintiffs.  Doetsch Dep. p. 77:15-25; Kumar Dep. p. 126:10-13.

Response: **Admit**.

190.    Sometimes Plaintiffs told Sanjeev Kumar, a driver relations worker at CTG, that they were looking to buy, sell, or lease a vehicle, and Kumar put people together who wanted to buy or rent vehicle.  Kumar Dep. pp. 227:19-228:17.

Response: **Admit.**

191.    No one from Defendants benefitted financially when Kumar did this.  Slinin Aff. ¶ 95.

Response: **Admit**.

192.    If a Plaintiff wished to set up a payment plan to pay off money for supplies and maintenance owed to third parties, or for the purchase of a vehicle, CTG would agree to set up automatic deductions for that Plaintiff, so that money owed to that Plaintiff are instead paid directly to third parties.  Slinin Aff ¶ 37.

Response: **Deny.**  The cited testimony is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of CTG's involvement in payments between Plaintiffs and third parties, nor that he is competent to testify to the same.  Slinin Aff. ¶ 37.

## PLAINTIFFS INVESTED IN AND MAINTAINED THEIR OWN VEHICLES

193.    Plaintiffs made investments in their vehicles.  Slinin Dep. p. 51:16-17.

Response: **Admit** that Plaintiffs spent money to procure and maintain vehicles, but **deny** Defendants' characterization of these expenditures as an "investment."

194.    Plaintiffs purchased or rented cars from other drivers and from unrelated third parties, not from defendants.  Choudhary Dep. p. 37:6-7; Pinedo Dep. p. 55:6-16; M. Solorzano Dep. pp. 37:9-10, 39:7-9, 15-19.

Response: **Admit**.

195.    Plaintiffs decided whether they wanted to own the vehicle in which they provided services for Defendants.  Pls.' Response to RFA ¶ 128.

Response: **Admit**.

196.    Some Plaintiffs bought their cars, for various amounts, from unrelated third parties.  Choudhary Dep. p. 37:6-7; Pinedo Dep. p. 55:6-16; M. Solorzano Dep. p. 37:9-10.

Response: **Admit**.

197.    Others rented their cars, for various amounts, from unrelated third parties.  M. Solorzano Dep. p. 39:7-9, 15-19.

Response: **Admit**.

198.    Plaintiffs, and not any of the Defendants, were/are responsible for the maintenance of their own vehicles including regular oil change, brakes, tune-ups and car washes. Pls.' Responses to RFA ¶¶ 136, 137; Choudhary Dep. p. 42:9-10; Civello Dep. p. 316:12-16; Koura Dep. pp. 55:22-56:5; Pinedo Dep. p. 32:8-11; M. Solorzano Dep. p. 65:3-5.

Response: **Admit**.

199.    The franchise agreements contain language stating: "Franchisee shall be solely responsible for all fees, taxes, charges, fines, inspections, repairs, summonses and all other

aspects involving Franchisee and Franchisee's vehicle." CTG 12622, CTG 13393, CTG 13749, CTG 13750, CTG 14437, CTG 14439, CTG 000351, CTG 15901.[39]

Response: **Admit**.

200.    The franchise agreements state: "Franchisee shall obtain, at his expense, all licenses required for the operation of [his] vehicle, and for the transportation of passengers, as may be required by all applicable regulatory agencies, including but not limited to, the New York State Department of Motor Vehicles and the New York City Taxi and Limousine Commission." CTG 12647, 13420, 13778, 000351.[40]

Response: **Admit**.

201.    Defendants did not tell Plaintiffs where to get their vehicles maintained or repaired. Pls.' Response to RFA ¶ 138; Choudhary Dep. p. 42:5-6, 8; Koura Dep. p. 56:14-16; Slinin Dep. p. 294:17-19.

Response: **Admit**.

202.    Plaintiffs paid to have their vehicles washed. Pls.' Response to RFA ¶ 139.

Response: **Admit**.

203.    Defendants did not tell Plaintiffs where to get their vehicles washed. Pls.' Response to RFA ¶ 140; Pinedo Dep. p. 31:20-22; M. Solorzano Dep. p. 59:20-23.

Response: **Admit**.

204.    Plaintiffs paid to have their vehicles cleaned/detailed. Pls.' Response to RFA ¶ 141; Pinedo Dep. p. 32:8-9; M. Solorzano Dep. p. 65:3-5.

---

[39] These documents are attached to the Thering Decl. as Exhibits 24, 25, 26, and 28.
[40] These documents are attached to the Thering Decl. as Exhibits 24, 25, 26, and 28.

Response: **Admit**.

205.    Defendants did not tell Plaintiffs where to get their vehicles cleaned and detailed. Pls.' Response to RFA ¶ 142; Pinedo Dep. p. 31:20-22.

Response: **Admit**.

206.    Plaintiffs were responsible for and paid for the repair of their vehicles.  Pls.' Responses to RFA ¶¶ 143-144; M. Singh Dep. p. 48:20-21.

Response: **Admit**.

207.    Defendants did not tell Plaintiffs where to get their vehicles repaired or what mechanic to use.  Pls.' Response to RFA ¶ 145; Pinedo Dep. p. 32:5-7.

Response: **Admit**.

208.    Plaintiffs paid for gasoline for their vehicles.  Pls.' Response to RFA ¶ 146; Siddiqui Dep. p. 99:6-7.

Response: **Admit**.

209.    Defendants did not tell Plaintiffs where to get gasoline.  Pls.' Response to RFA ¶ 147; Bhatti Dep. p. 159:20-22.

Response: **Admit**.

210.    Some Plaintiffs only used their cars for business purposes. Siddiqui Dep. p. 84:5-7; Bhatti Dep. p. 86:22-24; M. Solorzano Dep. p. 93:10-11.

Response: **Admit**.

211.    Some plaintiffs used their cars for personal and family use such as to take their spouses or children shopping, to a restaurant, to a park, to Walmart, or to Great Adventure.  Ali Dep. p. 50:6-8; Chowdhury Dep. p. 58; Saleem Dep. p. 50:7-17; J. Solorzano Dep. pp. 40:23-25-41:2-3.

Response: **Admit**.

212.    Defendants have no rules against Plaintiffs using their cars for personal purposes. Slinin Aff. ¶ 39; M. Solorzano Dep. p. 93:12-14.

Response: **Admit**.

213.    Defendants do not require any permanent signage on the Plaintiffs' cars.  Civello Dep. pp. 317:15-318:3; M. Solorzano Dep. pp. 92:24-25-93:2-14.

Response: **Admit**.

214.    Nothing prevents the Plaintiffs from putting signs for other black car companies on their cars.  Slinin Aff. ¶ 40.

Response: **Deny**.  The cited testimony is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of Plaintiffs' ability to put signs from other black car companies on their cars, nor that he is competent to testify to the same.  The assertion is conclusory.  Slinin Aff. ¶ 40.  Furthermore, **deny** insofar as Taxi and Limousine Commission regulations prohibit Plaintiffs from affiliating with more than one base, Kumar Tr. 35:8-36:10, and applying signage from another black car company to a black car could subject a driver to fines for such conduct.  Ex. E (Kumar Tr.) 244:8-245:6.  Furthermore, **deny** insofar as Defendants penalized drivers whom they suspected were affiliated with another base, Ex. JJ (Complaint Spreadsheet), CTG27719, at cell G23, and applying signage from another black car company to a black car could alert Defendants that a driver was affiliated with a different base.  Ex. E (Kumar Tr.) 244:8-245:6.

## **PLAINTIFFS PROCURE AND MAINTAIN THEIR OWN INSURANCE**

215.     Through the franchisee agreements, the franchisees agree to "maintain at his own expense all insurances, including workman's compensation, unemployment, and/or disability for the Franchisee's employees, if any."  CTG 12652, 13425, 13783, 000351, 15930.[41]

Response: **Admit**.

216.     Per New York State legal requirement, Plaintiffs insure the cars they use to provide services for Defendants under business insurance policies.  Pls.' Response to RFA ¶ 149; Choudhary Dep. p. 44:19, 22; Chowdhury Dep. pp. 58:22-59:10; Pinedo Dep. p. 32:19-20.

Response: **Admit**.

217.     Defendants do not provide Plaintiffs with insurance or pay for Plaintiffs' insurance.  Pls.' Response to RFA ¶ 148; Malchikov Decl. ¶ 4, ECF No. 374; Ali Dep. p. 50:19-23; Bautista Dep. pp. 41:24-42:3; Civello Dep. p. 318:9-11.

Response: **Admit**.

218.     Bahgat Ahmed, an independent insurance broker, has an office at CTG's headquarters at 335 Bond Street, Brooklyn.  Civello Dep. pp. 18:13-23, 155:7-9, 14-15; Doetsch Dep. p. 126:12-13; Mastrangelo Dep. p. 20:16-17; Slinin Dep. p. 106:8-12; Toska Dep. p. 89:3-6.

Response: **Admit**.

219.     Bahgat is not an employee of nor does he have any position with any of the Defendants.  Civello Dep. pp. 18:21-19:3; Slinin Aff. ¶ 44.

---

[41] These documents are attached to the Thering Decl. as Exhibits 24, 25, 26, 28, and 29.

220.  Plaintiffs can buy insurance from Bahgat, but they do not have to.  Civello Dep. pp. 18:13-14, 155:10-12; Slinin Dep. p. 106:8-24; Toska Dep. p. 89:3-10.

Response: **Admit**.

221.  The majority of plaintiffs did not purchase insurance from Bahgat.  Slinin Aff. ¶ 46.

Response: **Deny**.  The cited testimony is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of Plaintiffs' procurement of insurance, Bahgat's sale thereof, or the percentage of Plaintiffs who purchase insurance from Bahgat, nor that he is competent to testify to the same.  Slinin Aff. ¶ 46.

222.  Other than the rent Bahgat pays to lease office space at 335 Bond Street, none of the Defendants receive any sort of financial benefit from Bahgat's sale of insurance at 335 Bond Street.  Slinin Aff. ¶ 45.

Response: **Deny**.  The cited testimony is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of Bahgat's financial relationship with Defendants, nor that he is competent to testify to the same. Slinin Aff. ¶ 45.

223.  Two plaintiffs, Jose Pinto and Ismael Mejia, have never provided services for any of the Defendants or otherwise been affiliated with any of the Defendants.  Slinin Aff. ¶ 11.

Response: **Deny**.  The cited testimony is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of Jose Pinto or Ismael Mejia's relationship to Defendants, nor that he is competent to testify to the same.  Slinin Aff. ¶ 11.

## PLAINTIFFS DEDUCTED BUSINESS EXPENSES ON THEIR TAX RETURNS

224.   Plaintiffs paid for – and deducted – business expenses from their own independent

businesses on their tax returns.  Specifically:

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|-----------|------|--------------|-----------------|-------------------------------------------------|
| *Avneet Koura* | 2006 | $105,434 | $73,433 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), interest, legal & professional services, office expense, repairs and maintenance, supplies, taxes and licenses, tolls, radio dues, meal on the road, dues, voucher charges, gas, car wash & simonizing, parking, uniform and laundry, phone charges, towing charges, inspection fee |
| | 2007 | $96,975 | $64,743 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal & professional services, office expense, repairs and maintenance, supplies, taxes and licenses, tolls, radio dues, meal on the road, inspection fees, voucher charges, gas, car wash simonizing, parking, uniform and laundry, phone charges, towing charges |
| | 2008 | $36,353 | $36,652 | commissions and fees, insurance (other than health), legal and professional services, repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, tolls, dues, radio club, voucher fee, gas, car wash simonizing, uniforms/laundry |
| | 2009 | $18,829 | $11,104 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), utilities, tolls, DMV sticker, TLC sticker, gas |
| | 2010 | $31,511 | $26,549 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), repairs and maintenance, tolls, radio club, misc, phone, sales tax, gas |
| | 2011 | $27,222 | $21,778 | depreciation and section 179 expense deduction, insurance (other than health), repairs and maintenance, discount, radio club, vouchers charge, sales tax, gas |
| | 2012 | $48.851 | $39,067 | commissions and fees, depreciation and section 179 expense deduction, insurance |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | | | | (other than health), legal and professional services, repairs and maintenance, supplies, taxes and licenses, utilities, gas & oil, discount, vouchers charge, tolls & parking, uniform & laundry, car wash & simonizing, meals at work |
| Jose Solorzano | 2007 | $38,934 | $31,381 | insurance (other than health), repairs and maintenance, taxes and licenses, gas, dues, car wash, cellular phone |
| | 2008 | $20,093 | $7,809 | gas, dues, lease payment, horse payment, radio deposit, advance |
| | 2011 | $57,573 | $43,618 | car and truck expenses, commissions and fees, repair and maintenance, utilities, dues, car wash, cellular phone, uniform |
| | 2012 | $28,918 | $14,710 | car and truck expenses, gas |
| Mohammad Siddiqui | 2009 | $77,778 | $74,158 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, gas, tolls, dues, vr fees, phone, car wash, oil change, radio lease, uniform |
| | 2010 | $98,155 | $79,672 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, rent or lease (other business property), repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, gas, tolls, dues, vr fees, phone, car wash, oil change, radio lease, uniform |
| | 2011 | $87,748 | $76,368 | commissions and fees, deprecation and section 179 expense deduction, employee benefit programs, legal and professional services, rent or lease (other business property), repairs and maintenance, supplies, deductible meals and entertainment, gas, tolls, dues, vr fees, phone, car wash, oil change, radio lease, uniform |
| | 2012 | $91,914 | $80,139 | commissions and fees, deprecation and section 179 expense deduction, insurance (other than health), legal and professional services, interest (other), repairs and maintenance, supplies, deductible meals and entertainment, taxes and licenses, gas, tolls, dues, vr fees, phone, car wash, oil change, |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | | | | uniform |
| *Anwar Bhatti* | 2006 | $75,890 | $37,959 | insurance (other than health), taxes and licenses, discount paid, tolls, gas, cellular phone, voucher charges, oil & filter change, car wash & wax |
| | 2007 | $74,679 | $42,394 | commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses, car wash & wax, tolls, gas, cellular phone, voucher charges, oil & filter change |
| | 2008 | $70,947 | $42,995 | commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses, car wash & wax, tolls, gas, cellular phone, voucher charges, oil & filter change, discount paid |
| | 2009 | $63,615 | $39,021 | commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses, car wash & wax, tolls, gas, cellular phone, oil & filter change, discount paid, radio club |
| | 2010 | $64,671 | $37,729 | depreciation and section 179 expense deduction, insurance (other than health), repairs and maintenance, taxes and licenses, car wash & wax, tolls, gas, cellular phone, oil & filter change, discount paid, radio club |
| | 2011 | $63,662 | $38,511 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), repairs and maintenance, taxes and licenses, car wash & wax, tolls, gas, radio club |
| *Anjum Ali* | 2010 | $44,116 | $34,690 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), repairs and maintenance, taxes and licenses, tolls deducted by base, dues deducted by base, gasoline, telephone, car wash & wax, flat tires, oil change and breaks, other expense |
| | 2011 | $46,448 | $33,820 | depreciation and section 179 expense deduction, insurance (other than health, legal & professional services), repairs and maintenance, taxes and licenses, tolls deducted by base, gasoline, telephone, car wash & wax, discount deducted by base, sales tax deducted by base |
| | 2012 | $64,305 | $42,271 | depreciation and section 179 expense deduction, insurance (other than health), legal & professional services, repairs and |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | | | | maintenance, tolls deducted by base, gasoline, telephone, car wax & wash, discount deducted by base |
| *Luis Perez* | 2006 | $59,492 | $53,433 | car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal & professional services, repairs and maintenance, supplies, taxes and licenses, utilities, radio dues, tolls, voucher fees, sales tax, car wash, care & maintenance of uniform, prof publications |
| | 2007 | $70,021 | $63,425 | car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal & professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, taxes and licenses, utilities, radio dues, tolls, voucher fees, sales tax, car wash, care & maintenance of uniform, prof publications |
| | 2008 | $89,791 | $82,973 | car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal & professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, supplies, taxes and licenses, utilities, radio dues, tolls, voucher fees, sales tax, car wash, care & maintenance of uniform, prof publications, parking |
| | 2009 | $88,220 | $80,488 | car and truck expenses, commissions and fees, insurance (other than health), legal & professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, supplies, taxes and licenses, utilities |
| | 2010 | $83,456 | $64,987 | car and truck expenses, commissions and fees, legal & professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, supplies, taxes and licenses, utilities, radio dues, tolls, voucher fees, sales tax, car wash, care & maintenance of uniform, parking |
| | 2011 | $72,256 | $59,509 | commissions and fees, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, taxes and licenses, tolls, radio dues, voucher fees, car wash, uniform purchase & upkeep, parking, gas |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| *Marlene Pinedo* | 2007 | $44,874 | $27,534 | car and truck expenses, legal and professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, taxes and licenses, tolls, business cellphone, base fee, car wash, uniforms |
| | 2008 | $65,511 | $45,593 | car and truck expenses, insurance (other than health), rent or lease (other business property), repairs and maintenance, taxes and licenses, tolls, business cellphone, base fee, car wash, uniforms and laundry |
| | 2009 | $55,931 | $40,356 | insurance (other than health), repairs and maintenance, taxes and licenses, tolls, business cellphone, base fee, car wash, uniforms and laundry, gas |
| | 2010 | $58,758 | $37,008 | advertising, car and truck expenses, commissions and fees, legal and professional services, office expense, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, supplies, taxes and licenses, travel, deductible meals and entertainment, utilities, expenses for business use of home,  uniforms, laundry, dry cleaner |
| | 2011 | $38,034 | $26,604 | advertising, car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, supplies, taxes and licenses, utilities, expenses for business use of home |
| | 2012 | $26,579 | $14,121 | advertising, car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, utilities, expenses for business use of home |
| *Jamshed Choudhary* | 2007 | $119,160 | $104,585 | advertising, car and truck expenses, commissions and fees, legal and professional services, office expense, repairs and maintenance, supplies, deductible meals and entertainment, car wash, radio dues, car phone, uniform dry cleaning |
| | 2009 | $48,389 | $41,586 | commissions and fees, repairs and maintenance, deductible meals and entertainment, tolls, gas charges, insurance, car wash, cellphone, uniform/laundry, TLS, registration/taxstamp |
| | 2010 | $76,314 | $67,618 | commissions and fees, depreciation and section 179 expense deduction, insurance, legal and professional services, office |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | | | | expense, rent or lease (vehicles, machinery, and equipment, repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, gasoline, tools, phone, car wash, oil change, uniform |
| | 2011 | $81,767 | $71,985 | commissions and fees, insurance (other than health), legal and professional services, repairs and maintenance, deductible meals and entertainment, gas expenses, tolls, radio club, extra tolls, uniform expenses, job related phone, diomond sticker, renewal registration fee, vehicle inspection fee |
| | 2012 | $89,690 | $74,628 | commissions and fees, insurance (other than health), legal and professional services, repairs and maintenance, deductible meals and entertainment, gas expenses, tolls, radio club, extra tolls, uniform expenses, job related phone, diomond sticker, vehicle inspection fee, dues |
| *Jagjit Singh* | 2009 | $177,170 | $147,908 | Commissions and fees, insurance (other than health), legal and professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, taxes and licenses, other expenses |
| | 2010 | $170,600 | $144,760 | commissions and fees, insurance (other than health), legal and professional services, rent or lease (vehicles, machinery, and equipment)m, repairs and maintenance, taxes and licenses, deductible meals and entertainment, gasoline, tolls, dues, car wash, parking, telephone, tyres, radio lease 150x52 |
| *Mazhar Saleem* | 2006 | $89,843 | $64,848 | advertising, car and truck expenses, repairs and maintenance, car wash, radio dues, car phone, uniform dry cleaning |
| | 2007 | $111,776 | $85,755 | car and truck expenses, repairs and maintenance, supplies, car wash, radio dues, car phone, uniform dry cleaning |
| | 2008 | $87,139 | $70,173 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, rent or lease (vehicles, machinery, and equipment), repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, gasoline, tolls parking, dues, car wash, oil change, uniform |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | 2009 | $94,129 | $71,708 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, supplies, taxes and licenses, deductible meals and entertainment, gasoline, tolls & EZ Pass, dues deducted by base, voucher fee, laundries and work clothes, telephone, car wash, flat tires, radio lease |
| | 2010 | $69,886 | $51,783 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, taxes and licenses, gasoline, tolls & EZ Pass, dues, voucher fee, laundries and work, telephone expenses, car wash, radio lease |
| | 2011 | $66,246 | $48,024 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, gasoline, tolls & EZ Pass, dues deducted by base, voucher fee, laundries and work, telephone expenses, car wash, flat tires, radio lease |
| | 2012 | $58,081 | $42,245 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), legal and professional services, repairs and maintenance, gasoline, tolls & EZ Pass, dues, voucher fee, laundries and work, telephone expenses, car wash, radio lease |
| *Malook Singh* | 2008 | $83,254 | $70,213 | commissions and fees, depreciation and section 179 expense deduction, insurance (other than health), interest (mortgage), legal and professional services, rent or lease (other business property), repairs and maintenance, taxes and licenses, dues, gas, tolls & parking, radio lease, drug test, car wash, laundry and cleaning |
| | 2010 | $65,750 | $63,264 | commissions and fees, depreciation and section 179 expense deduction,  rent or lease (vehicles, machinery, and equipment), trip fee, LTSP Plaintiff, dues, radio lease, drug test, car wash, gas |
| | 2011 | $16,353 | $12,027 | commissions and fees, depreciation and section 179 expense deduction, deductible meals and entertainment, postage, business telephone, gasoline, radio lease, dues, car |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | | | | wash |
| | 2012 | $38,791 | $32,531 | commissions and fees, insurance (other than health), rent or lease (other buesinss property), repairs and maintenance, deductible meals and entertainment, utilities, gasoline, uniforms, oil change, business phone, car wash |
| Carlota Briones | 2007 | $105,949 | $73,562 | Employee benefit programs, insurance (other than health), repairs and maintenance, taxes and licenses, other expenses. |
| | 2009 | $44,549 | $30,339 | car and truck expenses, base fees, tolls, radio club, gas |
| | 2010 | $119,091 | $105,519 | rent or lease (vehicle, machinery, and equipment), repairs and maintenance, taxes and licenses, deductible meals and entertainment, other expenses |
| Jairo Bautista | 2006 | $110,630 | $76,737 | advertising, car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, legal and professional services, supplies, travel, utilities, phone, lab test, GPS navigator, dues |
| | 2007 | $110,244 | $102,840 | car and truck expenses, commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses, car wash, gas, cleaning, uniform, voucher, foods, BAS due, toll |
| | 2008 | $49,825 | $67,111 | car and truck expenses, commissions and fees, insurance (other than health), repairs and maintenance, taxes and licenses. |
| | 2009 | $136,135 | $64,701 | car and truck expenses, commissions and fees, interest (mortgage), taxes and licenses, car wash, gas, cleaning, uniform, voucher, foods, BAS due, toll |
| Miriam C. Solorzano | 2006 | $64,592 | $56,400 | car and truck expenses, commissions and fees, depreciation and section 179 expense deduction, legal and professional services, travel, utilities, lab test, dues, GPS navigator |
| | 2007 | $67,782 | $55,401 | commissions and fees, insurance (other than health), rent or lease (vehicles, machinery, and equipment, repairs and maintenance, taxes and licenses, gas, car wash voucher fee, uniform, cleaning, cell phone, food, due base |
| | 2008 | $41,148 | $42,403 | commissions and fees, insurance (other than health), repairs and maintenance, taxes and |

| PLAINTIFF | YEAR | GROSS INCOME | AMOUNT DEDUCTED | ITEMS DEDUCTED ON 1040-C OF FEDERAL TAX RETURNS |
|---|---|---|---|---|
| | | | | licenses, gas, car wash voucher fee, uniform, car payment, due base |
| | 2009 | *Unreported* | $7,931 | Commissions and fees, rent or lease (other business property), repairs and maintenance |
| *Jairo Bautista & Miriam C. Solorzano* (joint returns) | 2010 | $176,929 | $155,859 | advertising, commissions and fees, car and truck expenses,  insurance (other than health) interest (mortgage), repairs and maintenance, taxes and licenses, utilities, gas, cleaning, uniform, voucher, foods, base due, tools, cell HP |
| | 2011 | $189,331 | $166,824 | advertising, car and truck expenses, commissions and fees, interest (mortgage), supplies, taxes and licenses, utilities, car payment, cleaning, uniform, voucher, foods, base due, tolls, cell HP |
| | 2012 | $213,524 | $187,614 | car and truck expenses, commissions and fees, interest (mortgage), legal and professional services, taxes and licenses, car payment, cleaning, uniform, voucher, gasoline, base due, tolls, cell HP |

Pls.' Tax Returns.[42]

Response: **Deny**.  The cited evidence is not in admissible form as the above summary chart and the graphic described in footnote 42 lack foundation sufficient to verify their accuracy.

225.    On their tax returns, Plaintiffs declared, under penalty of perjury that they examined the return and accompanying schedules and statements, and to the best of their knowledge and belief they were true, correct, and complete.  Pls.' Tax Returns.[43]

---

[42] These documents are attached to the Thering Decl. as Exhibits 41-53.  Exhibit 54 is a graphic created by a professional graphic design company based on information culled from tax return documents produced by Plaintiffs entitled "Plaintiffs Deducted Business Expenses on Their Tax Returns."

[43] These documents are attached to the Thering Decl. as Exhibits 41-53.

<u>Response</u>: **Admit**.

## DRIVER SECURITY AND COMMUNICATIONS COMMITTEES

226.    There are two types of committees at Allstate, Aristacar, Excelsior, NYC2Way, and TWR — a Communications Committee and a Security Committee.  Pls.' Response to RFA ¶ 97; Civello Dep. p. 96:16-22; Doetsch Dep. 90:13-15; Mastrangelo Dep. pp. 116:9-14, 146:9-147:19; Slinin Dep. p. 69:14-16.

<u>Response</u>: **Admit**.

227.    All of these Committees were formed by and have been and are run by drivers and are composed entirely of drivers.  Pls.' Response to RFA ¶ 98; Pls.' Response to RFA ¶¶ 100, 105, 107; Doetsch Dep. p. 91:8-11; Mastrangelo Dep. p. 312:7-9.

<u>Response</u>: **Admit** that the Committees are composed of drivers, but **deny** that the committees were formed by drivers as the testimony cited does not support this assertion.  Also **deny** that the Committees are "run" by the drivers.  *See* Ex. XXX (Saleem Tr., Nonconfidential Portion) 74:11-78:8, 85:3-22 (CTG compelled witness to surrender chairmanship of Communications Committee, and replaced him with drivers who had opposed him in the previous election); Ex. PPP (Siddiqui Tr. Day 1) 162:19-163:9 (current Security Chairman, testifying that Eduard Slinin must approve Committee's proposed changes to the Rulebook); Ex. HHHH (Siddiqui Tr. Day 2) 277:16-24 (Eduard Slinin has placed two members on the current Security Committee); 282:10-283:5 (Eduard Slinin sometimes overrules Security Committee's rulings on fines); 341:17-24 (discussing vote fraud during previous Committee election); Ex. LLL (Bhatti Tr. Day 1) 200:14-201:9 (former Security Chairman, testifying that Eduard Slinin told him to place a driver on the Security Committee); 231:14-232:7 (Eduard Slinin told witness to remove a member from the Security Committee); 206:7-20 (if Committee wanted to change

68

the Rulebook, it had to ask management); Ex. 25 (Bhatti Decl) ¶¶ 5-12 (CTG employees

instructed Security Chairman on how to conduct hearings and handled all paperwork; Ex.

MMM. (J. Choudhary Tr.) 24:24-26:25 (former Communications Chairman, testifying that CTG

managers ignored his requests to reduce fines).

228.    In the early 1960s, two-way radios were put in cabs in New York City.  This was

a pilot program by the TLC.  Independent owner-operators of individual cabs got together and

formed co-ops in the five boroughs because they thought it would be better for business if

someone could call multiple cabs at one time rather than an individual cab.  The TLC did not

regulate these co-ops but the driver/owner-operators of the co-ops believed they would function

better if they had rules to protect their investments in their businesses.  Accordingly, the driver-

owner/operators formed security and communication committees within the co-ops.; Dizengoff

Aff. ¶ 20; Chowdhury Dep. pp. 78:4-6; M. Singh Dep. pp. 52:23-25; 53:3-4.

Response: **Admit**, except **deny** that the cited testimony by Anowar Chowdhury and

Malook Singh supports this assertion.

229.    When the Franchisors were formed, the drivers who bought franchises decided to

form Communications and Security Committees because they had established and run such

committees when affiliated with previous franchisor companies and they believed that the

establishment of such committees would help protect their investments in their franchises.  Slinin

Dep. 71:12-72:6; Slinin Aff. ¶ 86.

Response: **Admit** that NYC 2 Way drivers formed the Communications and Security

Committees for NYC 2 Way shortly after NYC 2 Way was started, but **deny** that the same is true

of the other Franchisors, as the cited testimony from the deposition of Eduard Slinin does not

refer to any company besides NYC 2 Way.  Also **deny** the asserted reasons for the formation of

NYC 2 Way's Communications and Security Committees as the cited testimony from the deposition of Eduard Slinin does not speak to drivers' motivation in forming the Committees, and the cited testimony from the Slinin affidavit is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of drivers' motivation in forming the Committees, nor that he is competent to testify to the same.  Slinin Aff. ¶ 86.

230.    Plaintiffs devote time to working on the Security and Communications Committees in order to protect their investments in their franchises.  Avagyan Aff. ¶ 12; Borden Aff. ¶ 18.

Response: **Deny**.  The cited testimony is inadmissible because it consists of conclusory opinion statements.  Also **deny** to the extent to which the cited testimony purports to speak to the motivations of other members of the Security or Communications Committees, as the two affiants cited are not competent to testify to the motivations of others and lack knowledge of such matters.  Avagyan Aff. ¶ 12; Borden Aff. ¶ 18.

231.    The Rule Books were written by the franchisee drivers to protect their investments in their franchises.  Vishin Aff. ¶ 10.

Response: **Deny**.  The cited testimony does not support the assertion that franchisee drivers wrote the Rule Books, and consists of conclusory statements that are inadmissible as the testimony lacks foundation sufficient to establish that Vishin has knowledge of the reasons for the Rule Book's existence or is competent to testify as to the same.  Vishin Aff. ¶ 10.

232.    All of the rules in the Committee Rule Books are either rules aimed at ensuring customer satisfaction or rules that the TLC has put in place (i.e., are iterations of New York City law).  Mastrangelo Dep. p. 185:5-10.

<u>Response</u>: **Deny**.  The cited testimony does not support the assertion.  Several rules in the Rulebooks for the Franchisor companies are calculated to enforce labor discipline or protect CTG's business in ways unrelated to customer service or TLC regulations, Ex. Y (NYC 2 Way Rulebook), CTG34785-801, CTG34792-94, Rules 102, 104-107, 109-110, 113-115, 118; Ex. Z (Aristacar Rulebook), CTG34751-67, CTG34758-60, Rules 102, 104-107, 109-110, 113-115, 118; Ex. AA (TWR Rulebook), CTG34802-18, CTG34809-11, Rules 102, 104-107, 109-110, 113-115, 118; Ex. 20 (Excelsior Rulebook), CTG34768-84, CTG34775-77, Rules 102, 104-107, 109-110, 113-115, 118; Ex. 21 (Allstate Rulebook), CTG34734-50, CTG34741-43, Rules 102, 104-107, 109-110, 113-115, 118, or are calculated to enforce discipline among the Security Committee.  Ex. Y (NYC 2 Way Rulebook), CTG34785-801, CTG34801, Rules 214-215; Ex. Z (Aristacar Rulebook), CTG34751-67, CTG34767, Rules 214-215; Ex. AA (TWR Rulebook), CTG34802-18, CTG34817, Rules 214-215; Ex. 20 (Excelsior Rulebook), CTG34768-84, CTG34784, Rules 214-215; Ex. 21 (Allstate Rulebook), CTG34734-50, CTG34749-50, Rules 214-215; Mastrangelo Tr. 92:23-94:6.

233.     The Security Committees are comprised of the drivers' peers who hold hearings on complaints.  Civello Dep. p. 91:17-23; Valery Aff., Rider A ¶¶ 8-10; Reyderman Aff., Rider A ¶¶ 5-11; Gluzman Aff., Handwritten Pages ¶ 12; Mughal Aff., Rider A ¶¶ 5-10; Avagyan Aff., Rider A ¶¶ 5-10; Nusenbaum Aff., Rider A ¶¶ 6-10.

<u>Response</u>: **Admit** with respect to NYC 2 Way, but **deny** with respect to other companies, as the cited testimony does not support this assertion.

234.     If a driver breaks a rule, the Security Committee may impose a monetary penalty on the driver.  Maydwell Dep. pp. 114:14-115:5; Slinin Dep. pp. 167:2-168:20, 306:22-24, 319:13-18.

Response: **Admit** but **deny** that such fines are imposed without CTG's direction or recommendation.  Ex. C (Slinin Tr.) 166:9-168:20.  CTG also takes the final steps to implement any fine imposed by the Security Committee or any other party.  Ex. CC (Kandov Tr.) 77:18-78:2; Ex. 25 (Bhatti Decl.) ¶ 12.  CTG imposes automatic fines on drivers whose car or dress do not comply with CTG's standards of "professional appearance."  Thering Decl. Ex. 35 (Unproduced document), p. 22.

235.    The franchise agreements state that the franchisees agree to abide by the rules developed, implemented, and enforced by the franchisee Security and Communications Committees, which are designed to protect the collective interest of all franchisees and Plaintiffs of franchisees.  The franchise agreements also inform Plaintiffs that these Committees operate independently of and without interference by the Franchisors.  CTG 34785-34801, 13781, 000351, 15928.[44]

Response: **Admit.**

236.    Plaintiffs are not required to wear clothing bearing any CTG or Franchisor logos.  Plfs.' Response to RFA ¶ 84; Slinin Aff. ¶ 96.

Response: **Admit.**

237.    Marlene Pinedo drives Sundays through Fridays "because those are the days when there is the most work."  Pinedo Dep. 40:11-23.

Response: **Admit.**

---

[44] These documents are attached to the Thering Decl. as Exhibits 26, 27, and 29.

**PLAINTIFFS' OWN SUNSHINE FUNDS**

238.    NYC2Way, TWR, Excelsior, and Aristacar have Sunshine Funds.  Kandov Dep.

p. 45:4-7; Nusenbaum Aff., Rider A ¶ 25-26; Valery Aff., Rider A ¶ 22.

Response: **Admit**

239.    The Sunshine Funds are pools of money that drivers, including Plaintiffs, who

choose to contribute to the Sunshine Fund, can access if they need a loan.  Civello Dep. p. 125:6-

12; Kandov Dep. p. 79:18-24; Kumar Dep. p. 85:9-17.

Response: **Deny**.  Drivers were not allowed in all instances to access the Sunshine Funds

for a loan, as the determination about whether to allow a loan and how much interest to charge

was subject to the discretion of the Sunshine Chairman.  Ex. HHH (Saleem Tr., Confidential

portion) 141:5-20; Ex. MMM (J. Choudhary Tr.) 30:6-17.  The chairman of the Sunshine Fund

for Aristacar is Jerry Cutler, who is not a driver.  Ex. 22 (Defs' Resp. to Pls.' Interrogs.),

Interrog. No. 3; Ex. C (Slinin Tr.) 305:8-306:14.  The current Sunshine Fund chairmen have all

held their positions for at least the past six years, and in some cases for as long as 15 years.  Ex.

22 (Defs' Resp. to Pls.' Interrogs.), Interrog. No. 3; Gluzman Aff. ¶ 11.  In or about October

2010, NYC 2 Way drivers went on strike and demanded, among other things, that control of the

Sunshine Funds be returned to the drivers.  Ex. HHH (Saleem Tr., Confidential Portion) 141:5-

20; Ex. 19 (list of drivers' demands), P003448.

240.    Drivers who need a loan can call the fund chairman, who will give them the loan.

Slinin Dep. pp. 211:22-212:13.

Response: **Deny**.  See response to paragraph 240 above.

241.    Money in the Sunshine Funds can be used if a Plaintiff is facing hardship (e.g.,

suffers a death in a family or is going through a divorce), or when a Plaintiff is in need of money

after getting a ticket or having his or her car towed.  Kumar Dep. p. 225:15-23; Nusenbaum Aff.,

Rider A ¶ 15; Valery Aff., Rider A ¶ 13.

Response:  **Deny**.  See response to paragraph 240 above.

242.    The Chairmen of Sunshine Funds write checks to Plaintiffs who participate in the

Sunshine Funds when a Plaintiff needs money, and these checks are signed by the respective

Sunshine Fund chairmen — Oleg Gluzman for NYC2Way; Mirek Fil for Excelsior; Jerry Cutler

for TWR; and Joseph Nusenbaum for Aristacar.  Nusenbaum Aff., Rider A ¶ 25-26; Valery Aff.,

Rider A ¶ 22.

Response:  **Deny**.  See response to paragraph 240 above.

243.    The Sunshine Funds are funded by dues driver members elect to pay in the

amount of $6 per week.  Civello Dep. p. 125:9-10; Kandov Dep. p. 107:17-19; Kumar Dep. pp.

85:10-86:18; Slinin Dep. p. 211:16-19; Nusenbaum Aff., Rider A ¶¶14, 21.

Response:  **Admit** that the Sunshine Funds are partially funded by dues paid by drivers, as

well as by fines charged to drivers and interest paid by drivers on Sunshine Fund loans.  Ex. C

(Slinin Tr.) 211:24-212:19.

244.    Drivers do not have to participate in the Sunshine Funds.  Kandov Dep. p. 107:20-

25.

Response:  **Admit.**

245.    The Sunshine Funds are also funded by fines the drivers' Security Committees

impose on the drivers.  Nusenbaum Aff., Rider A ¶ 16; Valery Aff., Rider A ¶ 14.

Response:  **Admit.**

246.     All fines assessed by the Security Committees and then deducted from drivers voucher payments go into the respective Sunshine Funds.  Koura Dep. p. 81:22-25; M. Solorzano Dep. p. 83:7-9; Reyderman Aff., Rider A ¶ 12; Gluzman Aff., Handwritten Pages ¶ 17.

Response: **Admit.**

247.     The Sunshine Funds were started by and have been maintained by drivers for the benefit of the drivers.  Reyderman Aff., Rider A ¶ 13; Guzman Aff., Handwritten Pages ¶ 18; Nusenbaum Aff., Rider A ¶ 12.

Response: **Deny**.  The cited testimony is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because the affiants have neither established that they have personal knowledge of the creation or purpose of the Sunshine Funds nor that they are competent to testify to the same.  Reyderman Aff., Rider A ¶ 13; Guzman Aff., Handwritten Pages ¶ 18; Nusenbaum Aff., Rider A ¶ 12.

## PLAINTIFFS EARN VASTLY DIFFERENT AMOUNTS OF MONEY

248.     Plaintiffs generally earned more money if they were strategic about accepting jobs.  Additionally, if Plaintiffs retained people to work for them and purchased or rented more than one franchise, they generally earned more money.  Slinin Aff. ¶ 97.

Response: **Deny**.  The cited testimony is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of how Plaintiffs earned more money or how renting franchises to others affected their income, nor that he is competent to testify to the same.  The cited testimony is conclusory and fails to explain what is meant by the terms "strategic" or "retained."  Plaintiffs generally earned more money by working additional hours in order to increase the number of jobs that they could perform.  Ex.

LLL (Bhatti Tr. Day 1) 102:9-12; Ex. TTT (M. Solorzano Tr.) 100:16-23; Ex. KKK (Bautista Tr.) 15:2-13.

249.    Additionally, if Plaintiffs retained people to work for them or if they purchased or rented more than one franchise, they generally earned more money.   Slinin Aff. ¶ 97.

Response: **Deny**.  See response to paragraph 249 above.

250.   Plaintiffs earned vastly different amounts from the work they performed for the Franchisors.  Pls.' Response to RFA ¶ 120.

Response: **Admit**.

251.    Specifically, 1099s produced during discovery show that the following plaintiffs earned the following amounts from the provision of driving services through one of the Franchisors:

| NAME | YEAR | AMOUNT |
|---|---|---|
| *Anjum Ali* | 2010 | $42,445.68 |
| | 2011 | $41,672.60 |
| | 2012 | $38,928.22 |
| *Jairo Bautista* | 2006 | $110,630.00 |
| | 2007 | $110,244.14 |
| | 2008 | $49,825.04 |
| | 2009 | $28,826.19 |
| | 2010 | $108,619.66 |
| | 2011 | $114,708.76 |
| | 2012 | $100,785.68 |
| *Anwar Bhatti* | 2006 | $75,889.61 |
| | 2007 | $74,678.52 |
| | 2008 | $70,947.46 |
| | 2009 | $63,614.93 |
| | 2010 | $64,670.67 |
| | 2011 | $63,661.59 |
| | 2012 | $64,538.90 |
| *Carlota Briones* | 2006 | $91,075.46 |
| | 2007 | $105,949.23 |
| | 2008 | $46,689.21 |
| | 2009 | $44,549.19 |

| | | |
|---|---|---|
| | 2010 | $119,464.58 |
| | 2011 | $95,839.53 |
| | 2012 | $2,478.75 |
| Jose Cabrera | 2006 | $49,501.69 |
| | 2007 | $58,069.33 |
| | 2008 | $42,592.30 |
| | 2009 | $32,097.39 |
| | 2010 | $21,103.65 |
| | 2012 | $8,822.37 |
| Jamshed Choudhary | 2006 | $59.945.61 |
| | 2007 | $116,592.07 |
| | 2008 | $93,952.77 |
| | 2009 | $48,389.54 |
| | 2010 | $76,314.49 |
| | 2011 | $81,766.88 |
| | 2012 | $89,690.22 |
| Ibrahim Desooki | 2006 | $76,238.40 |
| | 2007 | $78,133.64 |
| | 2008 | $50,610.89 |
| | 2009 | $27,486.86 |
| | 2010 | $26,229.13 |
| | 2011 | $11,159.52 |
| Rajan Kapoor | 2006 | $20,053.02 |
| | 2007 | $39,257.23 |
| | 2008 | $5,099.55 |
| Avneet Koura | 2006 | $105,433.77 |
| | 2008 | $36,352.64 |
| | 2009 | $18,828.95 |
| | 2010 | $31,511.02 |
| | 2011 | $27,221.96 |
| | 2012 | $29,095.36 |
| Wilman Martinez | 2006 | $87,786.59 |
| | 2007 | $109,616.62 |
| | 2008 | $102,154.61 |
| | 2009 | $60,509.31 |
| | 2010 | $54,628.95 |
| | 2011 | $66,158.18 |
| Mohammed Mian | 2012 | $17,673.60 |
| Maher Mohammad | 2006 | $13,049.04 |
| | 2008 | $32,449.63 |
| | 2009 | $42,448.13 |
| | 2010 | $42,081.34 |
| | 2011 | $28,847.37 |

| | | |
|---|---|---|
| Luis Perez | 2006 | $59,491.75 |
| | 2007 | $70,021.00 |
| | 2008 | $89,790.63 |
| | 2009 | $88,427.51 |
| | 2010 | $83,754.83 |
| | 2011 | $72,525.81 |
| | 2012 | $9,324.77 |
| Marlene Pinedo | 2007 | $45,599.10 |
| | 2008 | $65,510.59 |
| | 2009 | $55,931.54 |
| | 2011 | $16,121.08 |
| | 2012 | $16,529.30 |
| Atif Razaq | 2006 | $86,737.49 |
| | 2007 | $83,919.22 |
| | 2008 | $74,709.29 |
| | 2009 | $73,518.05 |
| | 2011 | $52,660.38 |
| Mazhar Saleem | 2006 | $89,843.37 |
| | 2007 | $103,573.08 |
| | 2008 | $63,332.33 |
| | 2009 | $89,228.51 |
| | 2010 | $64,098.78 |
| | 2011 | $52,805.35 |
| | 2012 | $46,481.92 |
| Luis Sanchez | 2012 | $94,829.70 |
| Pedro Segundo | 2010 | $72,909.23 |
| | 2011 | $104,797.24 |
| Bhavesh Shah | 2008 | $47,590.41 |
| | 2010 | $76,367.96 |
| | 2011 | $82,236.83 |
| | 2012 | $87,588.03 |
| Mohammad Siddiqui | 2009 | $36,345.52 |
| | 2010 | $44,549.71 |
| | 2011 | $38,979.46 |
| | 2012 | $46,627.01 |
| Jagjit Singh | 2008 | $70,608.94 |
| | 2009 | $177,170.35 |
| | 2010 | $167,165.99 |
| | 2011 | $172,217.18 |
| | 2012 | $105,422.29 |
| Khushwant Singh | 2009 | $35,113.11 |
| | 2010 | $87,558.58 |
| | 2011 | $104,273.91 |

| | 2012 | $77,506.09 |
|---|---|---|
| Malook Singh | 2009 | $36,234.59 |
| | 2010 | $65,070.25 |
| Jose Solorzano | 2006 | $40,870.95 |
| | 2007 | $38,933.86 |
| | 2009 | $1,517.67 |
| | 2010 | $1,860.55 |
| | 2011 | $53,943.60 |
| Miriam Solorzano | 2006 | $64,592.22 |
| | 2007 | $67,782.07 |
| | 2008 | $41,147.69 |
| | 2009 | $58,043.59 |
| | 2010 | $66,718.89 |
| | 2011 | $71,639.74 |
| | 2012 | $67,419.74 |
| Dongseog Yoo | 2006 | $59,429.85 |
| | 2007 | $49,981.14 |
| | 2008 | $41,879.06 |
| | 2009 | $40,764.96 |
| | 2010 | $4,169.45 |

CTG 00006- CTG 00008, CTG 00016-CTG 00022, CTG 00031 - CTG 00037, CTG 00043-

CTG 00048, CTG 00053- CTG 00054, CTG 00060- CTG 00062, CTG 00075- CTG 00080, CTG

00087- CTG 00090, CTG 00097- CTG 00102, CTG 00112- CTG 00116, CTG 00140- CTG

00145, CTG 00187- CTG 00191, CTG 00283- CTG 00289.[45]

Response: **Deny**. The cited evidence is not in admissible form as the above summary

chart lacks foundation sufficient to verify its accuracy. The 1099 forms issued by CTG show the

total of gross payments from customers, including the amount of the fare that is collected by the

base; therefore, to the extent that the above chart indicates amounts reflected in 1099 forms, the

amounts given overstate drivers' actual earnings. Ex. JJJ (Ali Tr.) 69:4-15. Because the

---

[45] These documents are attached to the Thering Decl. as Exhibit 55. A graphical rendition of this
data created by a professional graphic design company culled from this information and entitled
"Plaintiffs Earned Vastly Different Amounts of Money" is attached as Exhibit 56.

percentage collected by CTG varies based on the timing of the payment, it is impossible to conclude from the information presented above how much money each driver actually earned in a given year.  *Id*. 70:13-71:3.

## DEFENDANTS DO NOT PROVIDE THE PLAINTIFFS WITH BENEFITS

252.    Defendants do not provide Plaintiffs with any benefits.  Pls.' Responses to RFAs ¶¶ 191-192.

Response:  **Admit**.

253.    Defendants do not provide Plaintiffs with health insurance.  Pls.' Response to RFA ¶ 191.

Response:  **Admit**.

254.    Defendants do not provide Plaintiffs with a 401(k), retirement, or other pension plan benefits.  Pls.' Response to RFA ¶ 192.

Response:  **Admit**.

255.    The Plaintiffs are issued 1099s, not W-2s.  Kandov Dep. p. 139:10-15; Slinin Dep. p. 51:1-11.

Response:  **Admit**.

256.    In contrast to the Plaintiffs, CTG currently has approximately 162 employees who are paid on W-2 forms and operate the dispatch service, billing department, customer service department, driver relations department, and sales department.  Slinin Aff. ¶ 34; Slinin Dep. p. 24:7-25.

Response:  **Admit**.

## PLAINTIFFS CAN AND DO PERFORM DRIVING SERVICES
## FOR OTHER UNRELATED BLACK CAR COMPANIES

257.    Plaintiffs are not required to drive exclusively for one of the Franchisors.  Rather, they can, do, and did drive for other unrelated, competitor black car companies, including, but not necessarily limited to, New York Limo Pros, Basking Ridge Express Car and Limo, Platinum Class Limo, Cartier Limo, Communicar, Newport Car & Limo, Unilimo, CTK, East Coast Limo, Executive Transportation Group, Uni, Allo, Utog, Charge and Ride and Concord Limo.  Pls.' Response to RFA ¶ 66; Ali Dep. p. 36:5-22; Civello Dep. pp. 272:11-14 337:13-339:12; Doetsch Dep. p. 233:15-20, 22-23; Kumar Dep. pp. 222:22-223:2; Saleem Dep. p. 20:14-20; Siddiqui Dep. pp. 93:21-94:3; P 001152, P 001147, P 001153, P 001158, P 001154, CTG 12577-CTG 12578, CTG 12522-CTG 12524, CTG 16820-CTG 16823, CTG 12560, P 002043, P 002031, P 002456, P 002464,  P 002454, P 002460, CTG 16489, P 002457, P 002455, P 002458, P 002463, P 002465, CTG 16524, CTG 16525, P 000940, P 000949, P 001007, CTG 16150, P 000945, P 000948, P 001009,  CTG 16175-CTG 16176, CTG 12588-CTG 12591, P 001623, P 001624.[46]

Response:  **Admit** that Defendants do not prohibit drivers from driving for other black car companies, but **deny** that drivers are permitted to drive for such companies, as they are prohibited from doing so by the TLC.  See New York City, N.Y., Rules, Tit. 35, § 59A-11(e).

258.    Plaintiffs (including 71% of plaintiffs who were deposed) earned compensation from driving for other unrelated and competing black car companies. Specifically:

| Plaintiff | Black Car Company | Time Frame | Amount Earned |
|-----------|-------------------|------------|---------------|
| Anjum Ali | NY Limo Pros | 2010-2012 | $16,752.21 |
| Anjum Ali | Platinum Class | 2012 | $796.15 |

---

[46] These documents are attached to the Thering Decl. as Exhibit  57.

| Anjum Ali | Basking Ridge | 2011 | $812.86 |
|---|---|---|---|
| Jairo Bautista | Elite | 2008-2009 | $55,505.26 |
| Jairo Bautista | MJ Flight Line | 2008 | $230.00 |
| Jairo Bautista | Star 16 LLC | 2008 | $20,020.00 |
| Miriam Solorzano | UTOG 2-Way | 2008 | $19,386.00 |
| Marlene Pinedo | Unicar | 2011 | $11,612.89 |
| Marlene Pinedo | Immediate Luxury | 2012 | $10,500.00 |
| Mazhar Saleem | NY Limo Pros | 2010-2012 | $11,052 |
| Mazhar Saleem | Cartier Limo | 2011-2012 | $6,404.67 |
| Mazhar Saleem | Basking Ridge | 2011-2012 | $6,444.97 |
| Mazhar Saleem | Platinum Class Limo | 2012 | $539.10 |
| Mazhar Saleem | East Coast Limo | 2009-2010 | $7,284.38 |
| Malook Singh | Elite | 2006-2009 | $206,568.71 |
| Malook Singh | Charge & Ride | 2011-2012 | $67,058.88 |
| Maher Maqsood | Exec. Charge | 2012 | $18,403.66 |
| Ranjit Bhullar | Exec. Charge | 2006-2008 | $395,081.90 |
| Mohammed Siddiqui | NY Limo Pros | 2009-2012 | $145,850.45 |
| Mohammed Siddiqui | Communicar | 2009 | $77,778.00 |
| Mohammed Siddiqui | CTK Limousine Worldwide | 2010-2012 | $9,280.10 |
| Anowar Chowdhury | Elite | 2006, 2008-2010 | $96,064.33 |
| Irfan Shafi | East Coast | 2009-2010 | $1,771.29 |
| Mohammad Siddiqui | UNI | 2012 | $5,579.00 |
| Jose Solorzano | Bakry | 2012 | $2,719.00 |
| Jose Solorzano | Allo Transportation | 2012 | $1,392.21 |

P 001152, P 001147, P 001153, P 001158, P 001154, CTG 12577-CTG 12578, CTG 12522-CTG 12524, CTG 16820-CTG 16823, CTG 12560, P 002043, P 002031, P 002456, P 002464,  P 002454, P 002460, CTG 16489, P 002457, P 002455, P 002458, P 002463, P 002465, CTG 16524, CTG 16525, P 000940, P 000949, P 001007, CTG 16150, P 000945, P 000948, P 001009,  CTG 16175-CTG 16176, CTG 12588-CTG 12591, P 001623, P 001624.[47]

---

[47] These documents are attached to the Thering Decl. as Exhibit 57.  A graphical representation created by a professional graphic design company based on information culled from this data, as well as data culled from Exhibits 36-40 of the Thering Decl. and entitled "Plaintiffs Performed

Response: **Admit**.

259.    Plaintiffs did work for other black car companies using the same cars that they owned or rented and used to work for CTG.  Pls.' Response to RFA ¶ 68.

Response: **Admit**.

260.    Some Plaintiffs attempted to get work from other black car companies while driving into Manhattan.  J. Choudhary Dep. pp. 49:19-25, 50:6-13.

Response: **Admit**.

261.    Plaintiffs have their own customers (i.e., for whom they do not go through any of the Franchisor Defendants), some of whom they service more than once a week.  Choudhary Dep. p. 41:14-17; Koura Dep. pp. 52:13-53:6; J. Solorzano Dep. pp. 36:25-37:2-4.

Response: **Admit**.

262.    Plaintiffs provided rides to personal customers in the same cars they used to perform driving services for the Franchisors.  Pls.' Response to RFA ¶ 76.

Response: **Admit**.

263.    Plaintiffs have customers who pay them through Plaintiffs' own established credit card merchant accounts (such as Intuit, Global and I-Payment) instead of using CTG to process the payments).  Ali Dep. pp. 108:8-11, 14; 109:24-110:2, 8-10; Saleem Dep. p. 122:19-23; Siddiqui Dep. p. 112:22-24; J. Solorzano Dep. pp. 38:4-10, 13-14, 24-25; 39:2-5.

Response: **Admit**.

264.    For example, Plaintiffs established their own merchant accounts as follows:

---

Services and Earned Revenues from Other Black Car Companies" is attached as Exhibit 57 to the Thering Decl.

| Plaintiff | Credit Card Merchant Account Company | Amount Processed | Time Period |
|---|---|---|---|
| Mazhar Saleem | Intuit | $5,065.96 | January-May 2013 |
| Mazhar Saleem | Intuit | $3,114.14 | April-December 2012 |
| Aziz Urrehman | Intuit | $997.00 | February and March 2013 |
| Anjum Ali | Intuit | $1,665.60 | January-July 2013 |
| Anjum Ali | Intuit | $7,751.29 | March-December 2012 |
| Jose Solorzano | Global Payments Inc. | $2,659.78 | June-August 2008 |
| Marlene Pinedo | iPayment | $55,092.26 | February-December 2012 |
| Marlene Pinedo | iPayment | $16,851.76 | January-July 2013 |

CTG 38174-38228, CTG 38526, CTG 34294-34242,  P 003896-003934, CTG 38522-38550, CTG 38146-38151, CTG 38168-38173.

Response:  **Admit**.

265.   Some plaintiffs have picked up private street hails without going through any dispatch system of the Franchisor Defendants (despite the fact that this is against TLC regulations).  Pls.' Response to RFA ¶ 71; Ali Dep. p. 92:3-4; Bhatti Dep. p. 80:6-7; Perez Dep. p. 70:3-5; Saleem Dep. p. 79:12-18; Siddiqui Dep. p. 111:10-15, 19-21.

Response:  **Admit**.

266.   Plaintiffs picked up street hails in the same cars they used to provide services for the Franchisors.  Pls.' Response to RFA ¶ 72.

Response:  **Admit**.

**PLAINTIFFS CHOOSE TO DO WHAT THEY WANT WHEN THEY WANT**

267.   Plaintiffs can engage in any activity (personal or otherwise) while booked in and waiting for job offers from CTG.  Slinin Aff. ¶ 53.

84

<u>Response</u>: **Deny**. The cited testimony is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of how Plaintiffs spend their time while waiting for work from CTG, nor that he is competent to testify to the same. Slinin Aff. ¶ 53. In fact, Plaintiffs were limited in their practical ability to engage in personal activities by the fact that they would lose their position in the dispatch queue if they missed a job offer. Ex. JJJ (Ali Tr.) 119:4-25; Ex. KKK (Bautista Tr.) 17:6-16, 95:25-96:3.

268. Some plaintiffs go to the lines while booked into CTG's dispatch system. M. Solorzano Dep. p. 56:10-12, 20-22.

<u>Response:</u> **Admit**.

269. Some plaintiffs pick up street hails during this time while booked into CTG's dispatch system. Anjun Ali stated succinctly: "If I am, for example, booked in a certain zone, and I am number 24 or 26 and down the list, and I am sitting on the side of the street someplace, if somebody asks me, can you give me a ride? I just would quickly drop them off and come back and wait again." Ali Dep. p. 118:19-24; Siddiqui Dep. p. 269:9-13.

<u>Response:</u> **Admit**.

270. Some plaintiffs eat while booked into CTG's dispatch system. Bautista Dep. pp. 66:21-25-67:2-4.

<u>Response:</u> **Admit**. The cited testimony specifies that Bautista generally ate when there was little work, and that he ate quickly in order to be ready to work if he received a job. Ex. KKK (Bautista Tr.) 66:21-67:4

271. Some plaintiffs sleep while booked into CTG's dispatch system. Bautista Dep. p. 97:6-7.

<u>Response:</u> **Admit**.

85

272.     Some plaintiffs talk on the phone for personal reasons while booked into CTG's dispatch system.  Bautista Dep. p. 97:13-16.

Response:  **Admit**.

**CUSTOMER COMPLAINTS**

273.     CTG receives customer complaints.  Mastrangelo Dep. pp. 28:15-29:10, 56:3-10.

Response:  **Admit**.

274.     When a customer asks what happens to a complaint, management tells the customer it was written up and promptly passed along to an appropriate Security Committee and explains the outcome.  In most cases management writes an apology letter, and provides the customer with complimentary vouchers and tries to satisfy the customer.  Civello Dep. p. 91:2-16; Mastrangelo Dep. pp. 30:7-8, 59:11-14; Slinin Dep. pp. 175:20-176:6.

Response: **Deny**.  The cited testimony does not support the assertion that CTG management informs customers of Security Committee proceedings as a standard practice, nor does it support the assertion that management sends customers letters, vouchers, or takes other steps.  In fact, in many instances, CTG management took action personally against a driver with no reference to the Security Committees, and told customers that they had done so.  Ex. NNN (A. Chowdhury Tr.) 112:15-118:20 (describing incident in which Eduard Slinin personally fined him $5,000 because of a customer complaint); Ex. HHH (Saleem Tr., Confidential Portion) 142:10-20; 151:11-152:5; Ex. HHHH (Siddiqui Tr. Day 2) 282:18-283:5; Ex. JJJ (Ali Tr.) 43:20-44:8; 186:15-187:19; Ex. LLL (Bhatti Tr. Day 1) 109:15-21; 214:7-216:14; Ex. HH (Mastrangelo Tr.) 207:7-19, 210:21-25; Ex. XX (Email, dated Dec. 24, 2012), CTG30810-16; Ex. SS (Email, dated Jun. 20, 2012), CTG29734-36; Ex. 23 (Email, dated Oct. 23, 2012), CTG31695-96.

275.    There is no electronic tracking of customer complaints through the IDS software system.  Kumar Dep. p. 138:2-14; Slinin Dep. p. 268:12-23; Toska Dep. p. 107:16-21.

Response: **Admit** that complaints are not currently tracked through the IDS software, but **deny** that such a system does not exist or was never used.  For a period of approximately two to three months, CTG employee Melissa Rodriguez tracked customer complaints using the IDS system, but stopped doing so because the process of using the IDS system was too unwieldy.  Some time afterwards, Stephen Aliberti began tracking customer complaints using a spreadsheet.  Ex. HH (Mastrangelo Tr.) 163:12-164:12.

276.    There is no audit trail of each individual who handles each part of a customer complaint.  Toska Dep. p. 109:19-22.

Response: **Deny.**  The cited testimony is not admissible as the witness admitted that he has no knowledge of the data contained in the IDS complaint tracking system.  Ex. EE (Toska Tr.) 109:23-111:9.

277.    There is currently no spreadsheet that tracks customer complaints.  Civello Dep. pp. 79:23-80:2; Mastrangelo Dep. pp. 28:9-14, 149:5-8.

Response: **Admit.**

278.    Plaintiffs are not drug tested in response to a customer complaint.  Mastrangelo Dep. p. 206:2-5.

Response: **Admit.**

279.    CTG does not keep personnel files on Plaintiffs.  Civello Dep. p. 111:3-11; Mastrangelo Dep. pp. 115:20-25, 210:18-20.

Response: **Deny**.  CTG maintains files that contain a driver's application information; computerized records showing how a driver's payment should be set up, what accounts the

driver has requested to be taken off of, and licensing information; and billing records that include information on dollar amounts that should be deducted from each driver's compensation on a regular basis.  Ex. HH (Mastrangelo Tr.) 168:22-169:24; Ex. EE (Toska Tr.) 93:22-94:4, 97:21-100:5; Ex. CC (Kandov Tr.) 40:17-42:15

280.    Joseph Maydwell does not have the authority to terminate the services of Plaintiffs.  Maydwell Dep. p. 161:4-6.

Response: **Deny**.  Joseph Maydwell purported to exercise the authority to terminate drivers on multiple occasions.  Ex. 24 (Email dated Sep. 7, 2012), CTG17906; Ex. BBB (Email dated July 31, 2012), CTG17752-55 at CTG17753.

281.    Stephen Aliberti did not have the authority to terminate the services of Plaintiffs. Slinin Aff. ¶ 90.

Response: **Deny**.  The cited testimony does not support this fact based on evidence in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of Aliberti's authority, nor that Slinin is competent to testify to the same.  Slinin Aff. ¶ 90.

282.    If a Plaintiff commits an act that potentially violates the rules established by the Security Committees and Communications Committees, a "10/5" is written up.  Borden Aff. ¶ 9-10.

Response: **Admit.**

283.    A 10/5 is a slip of paper that notifies the appropriate Security Committee that a Plaintiff may have broken a Security Committee rule.  Slinin Dep. p. 143:13-17.

Response: **Admit.**

284.     Writing up a 10/5 does not by itself impose any kind of penalty—it merely brings attention to the Security Committee that a Plaintiff may have violated a rule and that the Security Committee should review the situation.  Slinin Dep. p. 296:17-23.

Response: **Admit.**

285.     A 10/5 is submitted to the Security Committee by being dropped in a box located at 335 Bond Street.  Doetsch Dep. pp. 242:12-15, 270:23-271:3.

Response: **Deny.**  CTG management currently collects 10/5 slips and submits them to the security committees.  Although a box has recently been placed in the dispatch room as of December 2013, Joseph Civello holds the only known key to that box, and must open it when security committee members wish to collect 10/5 slips.  Ex. 29 (Siddiqui Decl.) ¶¶ 12-16; Ex. 25 (Bhatti Decl) ¶ 24.

286.     The Security Committee put the box at this location for this purpose.  Doetsch Dep. pp. 270:23-271:6.

Response: **Deny.**  CTG placed this box in the dispatch room for the first time in December 2013.  Ex. 29 (Siddiqui Decl.) ¶¶ 12-16.

287.     The Security Committee reviews 10/5 forms and determines if the listed infractions require more serious attention.  Doetsch Dep. p. 243:6-25.

Response: **Admit.**

**LACK OF DRIVER TRAINING**

288.     Yossef Elshorbagy conducts training with new drivers.  This one-time two or three hour training session covers how the smartphone device operates, which zones to book into, and other basic information for a driver to use the CTG dispatch system, as well as the fundamentals of the Security Committee Rules and Regulations.  Civello Dep. p. 14:18-25,

45:14-24, 268:8-15; Mastrangelo Dep. p. 223:22-24; Maydwell Dep. p. 332:3-6; Slinin Dep. p. 35:2-17.

    <u>Response</u>: **Admit.**

289.    Defendants do not train any drivers on how, when, or where to perform their driving services.  Civello Dep. 45:20-46:2; M. Saleem Dep. 69:21-70:2.

    <u>Response</u>: **Admit.**

290.    Defendants do not train Plaintiffs on how to get around the New York City area or regarding customer service issues.  Civello Dep. pp. 45-46; Mastrangelo Dep. p. 224:9-10.

    <u>Response</u>: **Admit.**

## PLAINTIFF JOHN M. HIDALGO

291.    On April 30, 2013, Hidalgo filed for voluntary bankruptcy pursuant to Chapter 13 of the Bankruptcy Code.  Hidalgo Voluntary Petition for Bankruptcy April 30, 2013.[48]

    <u>Response</u>: **Admit.**

292.    He remains under the jurisdiction of the Bankruptcy Court pursuant to an order entered on October 24, 2013 confirming his Chapter 13 Plan.  Order of the Bankruptcy Court October 24, 2013.[49]

    <u>Response</u>: **Admit.**

293.    Neither Hidalgo nor his attorneys advised Defendants that such a petition had been filed.  Thering Decl. 79.

    <u>Response</u>: **Admit.**

---

[48] This document is attached to the Thering Decl. as Exhibit 75.
[49] This document is attached to the Thering Decl. as Exhibit 76.

294.     In his petition, Hidalgo indicated in the Schedule B Declaration of Personal

Property that he had no outstanding legal claims.  Hidalgo Voluntary Petition for Bankruptcy

April 30, 2013.[50]

Response: **Admit.**

295.     Hidalgo declared under penalty of perjury that the information contained in the

petition was true and correct.  Hidalgo Voluntary Petition for Bankruptcy April 30, 2013.[51]

Response: **Admit.**

**FACTS NOT INCLUDED IN DEFENDANTS' RULE 56.1 STATEMENT BUT
RELIED UPON BY DEFENDANTS IN THEIR MEMORANDUM OF LAW**

296.     "In March 2010, the Security Committee for NYC 2 Way asked Mastrangelo if

they could use Stephen Aliberti, who had been retained by Slinin on behalf of CTG to act as a

consultant for the MTA account, to help them inspect cars.  Slinin agreed to do this and by doing

so benefitted the Security Committee by providing an additional person to help them enforce the

committee rules.  Aliberti ceased being a contractor for CTG in late 2011.  CTG 38264; Slinin

Aff. ¶ 90-91."  Defs.' MOL at 13.

Response: **Deny**.  The cited testimony is not in admissible form as required by Fed. R.

Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of drivers

who allegedly approached Greg Mastrangelo nor that he is competent to testify to the same.  This

statement in the Slinin affidavit is hearsay.  The document submitted in support of this assertion

is contradicted by the testimony of Anwar Bhatti, who is the alleged drafter of the document.

---

[50] This document is attached to the Thering Decl. as Exhibit 75.
[51] This document is attached to the Thering Decl. as Exhibit 75.

Ex. 25 (Bhatti Decl.) ¶¶ 22-23.  The cited document was produced after the close of discovery and was never authenticated.  *See* Scimone Opp. Decl.. in Opp. to Defs.' Mot., ¶ 18.

297.    "In March 2012, the Communications Committee for NYC 2 Way asked Mastrangelo if they could use Maydwell to help them inspect cars because while they wanted to enforce Security Committee rules, they preferred to outsource that function in favor of driving. Maydwell has assisted the Security Committee with its inspections solely at the Committee's request.  If he is told that a driver has violated one of the Committee's rules, he will look into it if a Security Committee member requests his assistance.  Maydwell Dep. P. 43:20-25; 135-136, 250:12-24; Slinin Aff. 89-91."  Defs.' MOL at 14.

Response: **Deny**.  The Slinin affidavit cited in support of this assertion is not in admissible form as required by Fed. R. Civ. P. 56(c)(4) because Slinin has neither established that he has personal knowledge of drivers who allegedly approached Greg Mastrangelo nor that he is competent to testify to the same.  This statement in the Slinin affidavit is hearsay.  The cited testimony by Joseph Maydwell does not support the assertions that he has assisted any Security Committee solely at the Committee's request or that he responds to rule violations at the request of Committee members.  In fact, Joseph Maydwell has repeatedly inspected cars and fined drivers at the request of CTG management or on his own initiative.  Ex. KK (Maydwell Tr.) 344:14-345:4; Ex. NN (Email, dated Oct. 12, 2012), CTG30560-61 ("Joe M., please kindly bring this driver in for a full inspection."); Ex. LL (Email, dated Dec. 15, 2012), CTG31335 ("You bring the driver in for car inspection"); Ex. 26 (Email, dated Mar. 26, 2013), CTG18377-78 ("please fine the following drivers $50 each.  During random routine inspection these drivers were found not wearing proper dress attire"); Ex. YY (Email, dated May 14, 2012), CTG23191 ("a random inspection was conducted at the base by Joe Maydwell . . . please fine this driver

$50"); Ex. 27 (Email, dated Jan. 23, 2013), CTG18194 ("At Eddie's request the driver is to be

fined $1,000"); Ex. 28 (Email, dated Aug. 22, 2012), CTG17874 ("please fine driver #392

$1000.00 for refusing to pick up customer . . . refusing to bail out on the job and using profanity

while arguing with dispatch."). The Security Committee has never requested Maydwell's

assistance, and the Communications Committee for NYC 2 Way does not have authority to

delegate authority for rule enforcement to Maydwell. Ex. 29 (Siddiqui Decl.) ¶¶ 18-23, 24-26;

Ex. HHHH (Siddiqui Tr. Day 2) 337:7-25. The cited document was produced after the close of

discovery and was never authenticated. *See* Scimone Opp. Decl.. in Opp. to Defs.' Mot., ¶ 21.

298.    "When deciding whether to impose a fine on a driver, the Security Committees

adjudicate rule book violations themselves. Slinin and other management personnel are not

invited to, and do not attend, disciplinary hearings. Slinin Aff. ¶ 82." Defs.' MOL at 14.

Response: **Deny**. Members of CTG management have attended disciplinary hearings by

Security Committees. Ex. LLL (Bhatti Tr. Day 1) 204:16-105:9, Ex. 25 (Bhatti Decl.) ¶ 11; Ex.

29 (Siddiqui Decl.) ¶ 10; and have imposed fines on drivers themselves. Thering Decl. Ex. 35

(Unproduced document), p. 22.

299.    "On rare occasions, a Security Committee member will ask Slinin for his thoughts

on how a complaint against a driver should be handled; Slinin will express his view if solicited.

Slinin Dep. 175:12-14." Defs.' MOL at 14.

Response: **Deny**. The cited testimony does not support the assertion. The cited

testimony refers to unsolicited recommendations that Slinin offered to Security Committee

members.

300.    "All members and the chairs of the Committees are drivers, periodically elected

by drivers – who decide for themselves when to hold elections. Avagyan Aff., Rider A ¶ 7;

Mughal Aff., Rider A ¶ 7; Nusenbaum Aff., Rider A, ¶ 8; Slinin Aff. ¶ 92; Valery Aff., Rider A ¶ 7." Defs.' MOL at 14.

Response: **Deny**.  The cited testimony by Avagyan, Mughal, Nusenbaum, and Veleiy do not support the assertion, and state only that each declarant was elected to a Committee position by drivers for Excelsior (Avagyan), Aristacar (Mughal and Nusenbaum), and Allstate (Valeiy). The cited testimony by Eduard Slinin does not support the assertion, and speaks only to Slinin's attendance at a single Security Committee election.

301.    "On October 22, 2011, Slinin was invited to speak at a meeting of all NYC 2 Way drivers.  Among other agenda items was an election by the drivers of a new chairman of the NYC 2 Way Security Committee.  Slinin was asked to speak about the state of the black car industry and what innovations, if any, CTG was making in its dispatching services to try to increase earnings opportunities for the drivers.  Slinin accepted this request and spoke at the meeting.  He did not vote in the election, nor did he supervise the election, influence the election results, or change the election results.  Slinin has never engaged in any such conduct.  The drivers run their own elections and resolve any election disputes themselves.  Slinin Aff. ¶ 92." Defs.' MOL at 14.

Response: **Admit** that Slinin attended an NYC 2 Way Security Committee election on October 22, 2011, and admit the topics on which he spoke, but **deny** the remainder of the statement.  The cited testimony is inadmissible as it lacks foundation sufficient to establish that Slinin has knowledge of security committee elections or is competent to testify as to the same.

302.    "While, occasionally, a customer requested never to have a certain driver again, Defendants did not bar those drivers from servicing other customers.  Slinin Aff. ¶ 59."  Defs.' MOL at 15.

<u>Response</u>: **Deny**.  The cited testimony does not support this assertion.  The cited testimony speaks to drivers who asked to be removed from accounts, not about customers who asked to have drivers removed from their accounts.  Defendants at times responded to customer complaints by removing drivers from multiple accounts, not just the account associated with the complaining customer.  Ex. PP (Email, dated Feb. 3, 2012), CTG17077-81; Ex. RR (Email, dated Aug. 21, 2012), CTG30408-18 ("The driver as of now is permanently off the air and all accounts until he comes to the base and is interviewed by me."); Ex. JJ (complaint spreadsheet), CTG27719, at cell K67 (indicating that Greg Mastrangelo concurred with decision to remove driver from airport jobs for one week).

303.    "With respect to every job offer, drivers ultimately choose whether to accept the offer or whether it is economically (or for other reasons) more beneficial to 'bail out' and book in again after three hours have passed.  Civello Dep. p. 200:1-16; Slinin Dep. p. 310:16-312:2; Slinin Aff. ¶ 55; 56.1 ¶¶ 152-155." Defs.' MOL at 15-16.

<u>Response</u>: **Deny**.  Responses to ¶¶ 152-153 are contained *supra*.  The remaining testimony does not support the assertions.  Defendants actively discourage drivers from making rational economic decisions about whether to bail out of a job.  See Ex. 30 (Email, dated Jun. 21, 2012), CTG29748-49 ("I would like to conduct an investigation on this driver.  Apparently she kicks back jobs all the time because she doesn't like local jobs."); Ex. HH (Mastrangelo Tr.) 46:6-15 (referring to driver who bailed out of local jobs as a "problem child."); Ex. A (Civello Tr.) 200:17-201:3 (explaining that bailout penalty is lower where driver has a reason to bail out other than not wanting to take the passenger.).

### UNSUPPORTED FACTUAL ASSERTIONS RELIED UPON BY DEFENDANTS IN THEIR MEMORANDUM OF LAW

304.   "Rule Books do exist; however, they were neither drafted nor enforced by Defendants."  Defs.' MOL at 12.

Response:  **Admit** that Rulebooks for the various Franchisor companies exist, but **deny** the remainder of the statement.  The testimony cited *supra* to support the assertion that Defendants did not draft the Rulebooks is inadmissible.  See Resp. to ¶ 231 *supra*.  CTG management rebuffed efforts by drivers to modify the Rulebooks. Ex. MMM (J. Choudhary Tr.) 25:18-26:10; Ex. LLL (Bhatti Tr. Day 1) 198:10-199:16; Ex. 25 (Bhatti Decl.) ¶¶ 25-27.  The Rulebooks were routinely enforced by the Defendants and/or by agents acting under their direction.  Ex. HH (Mastrangelo Tr.) 325:11-22; Ex. D (Doetsch Tr.) 238:15-239:11; Ex. KK (Maydwell Tr.) 253:13-254:13.

305.   "Drivers formed 'Security Committees' to enforce the rules.  These committees investigate customer complaints and remind drivers of the rules so that everyone's investment is protected and enhanced."  Defs' MOL at 12.

Response:  **Admit** that drivers formed the Security Committee for NYC 2 Way, see Resp. to ¶ 229 *supra*, but **deny** the remainder of the statement.  There is no competent testimony cited or in the record to support these assertions.  CTG management and its agents routinely investigate customer complaints, Ex. HH (Mastragelo Tr.) 28:15-29:22, 240:21-242:8; Ex. RR (Email, dated Aud. 21, 2012), CTG 30408-18; Ex. BBB (Email, dated July 31, 2012), CTG17752-55; Ex. 31 (Email, dated Aug. 20, 2012), CTG17844-49 ("if this claim is founded this driver needs to be dealt with harshly"); Ex. 25 (Bhatti Decl.) ¶¶ 14-15, 21; and reminds drivers of the rules.  Ex. HH (Mastrangelo Tr.) 183:15-184:5; Thering Decl. Ex. 35 (Unproduced

document), p. 22. CTG management reminds drivers of the rules in order to promote good customer service. *Id.*, 185:5-186:12.

306. "The Security Committees may decide to take a driver off the air i.e., not allow the driver to 'book in' for a certain period of time) or fine a driver for a rule book infraction, but these decisions are made solely by the drivers, not by Defendants." Defs.' MOL at 12.

Response: **Admit** that the Security Committees from time to time issue fines or take drivers off the air, but **deny** that such decisions are made solely by the drivers. Defendants do fine drivers, Ex. HHH (Saleem Tr., Confidential portion) 151:11-152:5; 154:6-8; Ex. NNN (A. Chowdhury Tr.) 116:9-118:25; Ex. JJ (complaint spreadsheet), CTG27719, at cell K308, Ex. 27 (Email, dated Jan. 23, 2013), CTG18194, and do take drivers off the air, Ex. PP (Email, dated Feb. 3, 2012), CTG17077-81; Ex. JJ (complaint spreadsheet), CTG27719, at cell I190, Thering Decl. Ex. 35 (Unproduced document), p. 22., both for rule book infractions and for other reasons, e.g., to coerce drivers to come to CTG's headquarters. Ex. HH (Mastrangelo Tr.) 241:15-242:8.

307. "While CTG management does receive and respond to customer complaints, management (usually Greg Mastrangelo, Vice President of Operations of CTG), only deals with the customer side of the complaint. The driver side is left for the Security Committees." Defs.' MOL at 13.

Response: **Admit** that CTG management receives and responds to customer complaints, and **admit** that CTG management deals with the "customer side" of the complaint, but **deny** that the "driver side" is left for the Security Committees. See Resp. to ¶ 306 *supra.*

308. "It is true that once Plaintiffs accepted a job, if they then 'bailed out,' they had to spend three hours off the air, but this was per the drivers' Security Committees' rules, not per Defendants." Defs.' MOL at 19.

<u>Response</u>: **Deny**.  There is no admissible evidence supporting the assertion that the bailout penalty is a rule established by the Security Committee.  CTG management has refused to change the bailout penalty when asked to do so by the Security and/or Communications Committees.  Ex. LLL (Bhatti Tr. Day 1) 198:10-199:16; Ex. MMM (J. Choudhary Tr.) 25:18-26:10.

## PLAINTIFFS' ADDITIONAL STATEMENT OF DISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1(a)

1.      CTG uses GPS to ensure that drivers arrive at jobs when they should be there. Ex. D (Doetsch Tr.) 13:7-16:7; Ex. HH (Mastrangelo Tr.) 29:17-22; Ex. CC (Kandov Tr.) 25:6-18; 26:10-17.

2.      Drivers must notify CTG when they are "on scene" at a job by pressing a button on the screen of the dispatch device.  Ex. UUU (CTG Dispatch Manual), CTG09239-53, at CTG09242; Ex. A (Civello Tr.) 191:12-19.

3.      Drivers must notify CTG when they drop off a passenger by pressing a button marked "unload" on the screen of the dispatch device.  Ex. UUU (CTG Dispatch Manual), CTG09239-53, at CTG09243; Ex. A (Civello Tr.) 193:8-14.

4.      When a driver accepts a job, he transmits an estimated time of arrival ("ETA") through his handheld device to an operator in the dispatch room.  Ex. C (Civello Tr.) 87:25-88:14.

5.      Until a dispatcher "releases" a driver from a job, the driver cannot take on new assignments through the dispatch system.  Ex. A (Civello Tr.) 59:17-60:21.

6.      CTG uses the dispatch system to transmit fleet messages, which can direct drivers to go to a particular zone, among other messages.  Ex. GG (List of canned messages),

CTG16552-53; Ex. EE (Toska Tr.) 72:22-73:10; 74:9-75:9; 76:7-15; Ex. HHH (Saleem Tr., Confidential portion) 87:19-88:2; Ex. III (J. Singh Tr., Confidential portion) 59:20-60:3; Ex. OOO (Koura Tr.) 74:6-12; Ex. RRR (M. Singh Tr.) 86:16-20; 91:5-9; Ex. DDD (Email, dated Sep. 29, 2010), CTG 27456-57; Ex. 25 (Bhatti Decl.) ¶ 21.

7.      CTG managers and employees have inspected drivers' cars.  Ex. E (Kumar Tr.) 84:6-9; Ex. HH (Mastrangelo Tr.) 209:13-19; 210:4-6; Ex. PP (Email, dated Feb. 3, 2012), CTG17077; Ex. 25 (Bhatti Decl.) ¶¶ 14-15, 21.

8.      Joseph Maydwell has inspected drivers' cars at CTG's direction.  Ex. KK (Maydwell Tr.) 344:14-345:4; Ex. LL (Email, dated Dec. 15, 2012), CTG31335-36; Ex. NN (Email, dated October 12, 2012), CTG 30560-61.

9.      Stephen Aliberti has inspected drivers' cars at CTG's direction.  Ex. MM (Email, dated November 1, 2011), CTG28370-74; Ex. OO (Email, dated March 7, 2011), CTG 27730-31; Ex. 25 (Bhatti Decl.) ¶ 21.

10.     Drivers are aware that CTG monitors them, and that they may be fined if they are out of dress code or drive dirty cars.  Ex. JJJ (Ali Tr.) 51:12-15; Ex. HHHH (Siddiqui Tr., Day 2) 254:14-17; Ex. LLL (Bhatti Tr.) 56:12-15; Ex. OOO (Koura Tr.) 49:8-12; Ex. NNN (A Chowdhury Tr.) 116:9-118:25.

11.     CTG's management speaks to drivers about dress code in order to "follow up with the drivers just as a matter of keeping them aware that we're watching what's going on, that they will be referred to the security committee if this continues, if it warrants it."  Ex. HH (Mastrangelo Tr.) 183:15-184:11.

12.     When CTG cannot contact a driver to summon him to the base for inspection, it shuts off the driver's device so that he is unable to receive jobs and is forced to return to the base

so CTG will restore his ability to work.  Ex. C (Slinin Tr.) 156:5-15; Ex. HH (Mastrangelo Tr.)
241:9-242:8; Ex. RR (Email, dated August 21, 2012), CTG30408-18; Ex. LLL (Bhatti Tr. Day 1)
126:12-127:20; Ex. NNN (A. Chowdhury Tr.) 112:20-116:8; Ex. HHHH (Siddiqui Tr. Day 2)
268:17-269:7.

13.     Drivers for all the Franchisor companies are subject to a dress code that governs
standards of dress and a car code that governs standards for car cleanliness.  Ex. Y (NYC 2 Way
Rulebook), CTG34785-801; Ex. Z (Aristacar Rulebook), CTG 34751-67; Ex. AA (TWR
Rulebook), CTG34802-18; Ex. 20 (Excelsior Rulebook), CTG34768-84; Ex. 21 (Allstate
Rulebook), CTG34734-50.

14.     Defendants enforced the dress code and car code in the various Rulebooks by
fining drivers who were out of dress code.  Ex. HH (Mastrangelo Tr.) 325:6-22; Ex. HHH
(Saleem Tr., Confidential portion) 151:11-152:5; 154:6-8; Ex. NNN (A. Chowdhury Tr.) 116:9-
118:25; Ex. JJ (complaint spreadsheet), CTG27719, at cell K308, Ex. 27 (Email, dated Jan. 23,
2013), CTG18194.

15.     When purchasing a franchise, a driver is required to follow the rules of the
Security Committee for that company, and is subject to discipline by that Committee.  Ex. F
(NYC 2 Way Franchise Agreement, effective July 24, 2007), CTG15438-529 at CTG15470, ¶
23, CTG15475, ¶ 43, CTG15479, ¶ 59; Ex. G (NYC 2 Way Franchise Agreement, effective
December 11, 2008), CTG15358-437 at CTG15397, ¶ 23, CTG15402-03, ¶43, CTG15406, ¶ 59;
Ex. H (NYC 2 Way Franchise Agreement, effective August 18, 2009), CTG15269-357 at
CTG15308, ¶ 23, CTG15314, ¶ 43, CTG15315, ¶ 59; Ex. I (NYC 2 Way Franchise Agreement,
effective July 6, 2010), CTG15166-268 at CTG15205, ¶ 23, CTG15211, ¶43, CTG15215, ¶ 59;
Ex. J (NYC 2 Way Franchise Agreement, effective July 6, 2011), CTG14971-5069 at

CTG15010, ¶ 23, CTG15016, ¶ 43, CTG15020, ¶59; Ex. K (Aristacar Franchise Agreement,

effective July 23, 2007), CTG13654-738 at CTG13688, ¶ 23, CTG13693-94, ¶ 43, CTG13697, ¶

59; Ex. L (Aristacar Franchise Agreement, effective January 13, 2009), CTG13568-653 at

CTG13606, ¶ 23, CTG13611-12, ¶ 43, CTG13615, ¶59; Ex. M (Aristacar Franchise Agreement,

effective August 13, 2009), CTG13476-567 at CTG13515, ¶ 23, CTG13521-22, ¶ 43,

CTG13526, ¶ 59; Ex. N (Aristacar Franchise Agreement, effective July 7, 2010), CTG13382-475

at CTG13422, ¶ 23, CTG13429, ¶ 43, CTG13433, ¶ 59; Ex. O (Aristacar Franchise Agreement,

effective July 6, 2011), CTG13290-381 at CTG13330-31, ¶ 23, CTG13337, ¶ 42, CTG13341, ¶

58; Ex. P (TWR Franchise Agreement, effective July 23, 2007), CTG15981-6064 at CTG16015,

¶ 23, CTG16020-21, ¶43, CTG16024, ¶ 59; Ex. Q (TWR Franchise Agreement, effective

January 19, 2009), CTG15891-980 at CTG15928, ¶ 23, CTG15933-34, ¶ 43, CTG15937, ¶ 59;

Ex. R (TWR Franchise Agreement, effective August 13, 2009), CTG15800-890 at CTG15838, ¶

23, CTG15844-45, ¶43, CTG15849, ¶ 59; Ex. S (TWR Franchise Agreement, effective July 7,

2010), CTG15708-799 at CTG15748, ¶ 24, CTG15753-54, ¶43, CTG15757-58, ¶59; Ex. T

(TWR Franchise Agreement, effective August 10, 2011), CTG15617-707 at CTG15658, ¶ 23,

CTG15663-64, ¶ 42, CTG15668, ¶58; Ex. U (NYC 2 Way Franchise Agreement, effective July

2, 2012), CTG15070-165 at CTG15110, ¶25, CTG15115, ¶ 42; Ex. V (Aristacar Franchise

Agreement, effective July 5, 2012), CTG13204-289 at CTG13241, ¶ 25, CTG13246-47, ¶ 42;

Ex. W (TWR Franchise Agreement, effective July 5, 2012), CTG15530-616 at CTG15569, ¶ 25,

CTG15574-75, ¶ 42; Ex. 2 (Hybrid Limo Express, Inc. ("Hybrid") Franchise Agreement,

effective Jan. 16, 2008), CTG14544-640 at CTG14582, ¶ 23; CTG14587, ¶ 43; CTG14591, ¶ 59;

Ex. 3 (Hybrid Franchise Agreement, effective June 2, 2010), CTG14866-970 at CTG14909, ¶

23; CTG14913, ¶ 43; CTG14917-18, ¶ 59; Ex. 4 (Hybrid Franchise Agreement, effective Jan. 5,

2011), CTG144-543 at CTG14471, ¶ 23; CTG14477, ¶ 43; CTG14481-82, ¶ 59; Ex. 5 (Hybrid

Franchise Agreement, effective Aug. 19, 2011), CTG14641-757 at CTG14706, ¶ 22;

CTG14712-13, ¶ 42; CTG14717, ¶ 58; Ex. 6 (Hybrid Franchise Agreement, effective July 5,

2012), CTG14758-865 at CTG14799, ¶ 25; CTG14805 ¶ 45; Ex. 7 (Excelsior Car & Limo, Inc.

("Excelsior") Franchise Agreement, effective July 24, 2007), CTG14316-427 at CTG14350, ¶¶

23-24; CTG14356, ¶ 43; CTG14359, ¶ 59; Ex. 8 (Excelsior Franchise Agreement, effective Jan.

12, 2009), CTG14201-315 at CTG14242, ¶ 23; CTG14248, ¶ 43; CTG14252, ¶ 59; Ex. 9

(Excelsior Franchise Agreement, effective Aug. 18, 2009), CTG14086-200 at CTG14128, ¶ 23;

CTG14134-35, ¶ 43; CTG14138, ¶ 59; Ex. 10 (Excelsior Franchise Agreement, effective July 7,

2010), CTG13851-4085 at CTG14010, ¶ 23; CTG14015-16, ¶ 43; CTG14020, ¶ 59; Ex. 11

(Excelsior Franchise Agreement, effective July 5, 2012), CTG13739-850 at CTG13781, ¶ 25;

CTG13805, ¶ 42; Ex. 12 (Allstate Private Car & Limousine, Inc. ("Allstate") Franchise

Agreement, effective July 23, 2007), CTG13130-203 at CTG13152-53, ¶¶ 29, 30; CTG13155, ¶

48; CTG13158, ¶ 67; Ex. 13 (Allstate Franchise Agreement, effective Jan. 13, 2009),

CTG13055-129 at CTG13088, ¶¶ 29, 30; CTG13091-92, ¶ 48; Ex. 14 (Allstate Franchise

Agreement, effective Aug. 18, 2009), CTG12968-3054 at CTG13003, ¶¶ 28-29; 13006, ¶ 48;

13009, ¶ 59; Ex. 15 (Allstate Franchise Agreement, effective July 7, 2010), CTG12882-967 at

CTG12918, ¶¶ 28-29; CTG12921-22, ¶ 48; CTG12925, ¶ 59; Ex. 16 (Allstate Franchise

Agreement, effective Jan. 11, 2011), CTG12801-81 at CTG12841, ¶¶ 34, 35; CTG12844, ¶ 54;

CTG12847, ¶65; Ex. 17 (Allstate Franchise Agreement, effective Aug. 10, 2011), CTG12710-

800 at CTG12749, ¶ 32; CTG12752-53, ¶ 51; CTG12756, ¶ 68; Ex. 18 (Allstate Franchise

Agreement, effective July 5, 2012), CTG12613-709 at CTG12650, ¶ 25-26, CTG12655, ¶42.

16.     Defendants report rule violations to the committees and follow up to ensure that they are addressed.  Ex. 25 (Bhatti Decl), ¶ 19; Ex. A (Civello Tr.) 99:19-100:5; 103:11-19; Ex. E (Kumar Tr.) 160:13-18; Ex. HH (Mastrangelo Tr.) 54:11-17; Ex. C (Slinin Tr.) 143:18-144:6; 165:24-166:11; Ex. Y (NYC 2 Way Rulebook), CTG34785-801; Ex. Z (Aristacar Rulebook), CTG 34751-67; Ex. AA (TWR Rulebook), CTG34802-18; CTG34802-18; Ex. 20 (Excelsior Rulebook), CTG34768-84; Ex. 21 (Allstate Rulebook), CTG34734-50

17.     CTG recommends fines and other actions to the Security Committees.  Ex. C (Slinin Tr.) 143:18-144:6; 165:24-166:15; 187:8-188:9; Ex. GGG (Email, dated Sep. 29, 2010), CTG 32873-74.

18.     CTG management has met at times with the Security Committees to discuss issues they would like them to handle.  Ex. EEE (Email, dated June 29, 2010), CTG32861; Ex. FFF (Email, dated Aug. 10, 2010), CTG 25496-97

19.     CTG dispatchers and managers have the ability to change the limits on how many cars can book into a zone.  Ex. A (Civello Tr.) 207:9-11.

20.     CTG managers and other personnel enforce the rules in the Security Committee rulebooks.  Ex. D (Doetsch Tr.) 13:7-16:7; 238:15-239:11; Ex. HH (Mastrangelo Tr.) 29:17-22; 59:4-20; 62:7-24; 137:5-21; 183:15-184:11; 209:13-19; 210:4-6; 325:6-22; Ex. KK (Maydwell Tr.) 253:13-254:13; Ex. JJ (Complaint Spreadsheet), CTG27719, at cells K31, M31 (NYC 2 Way driver removed from account by Greg Mastrangelo), K41, M41 (TWR driver disciplined by Eduard Slinin), J103, M103 (Allstate driver disciplined by Eduard Slinin), J113, M113 (Aristacar driver disciplined by Eduard Slinin), K308, M308 (Excelsior driver given $2,000 fine by Eduard Slinin).

21.     Anwar Bhatti, the Chairman of the NYC 2 Way Security Committee from 2005 through October 2011, never authorized CTG managers to take any action to enforce rules against drivers.  Ex. 25 (Bhatti Decl.), ¶ 13.

22.     Anwar Bhatti never requested that CTG assign Steven Aliberti to do inspections in conjunction with the Security Committee and has never seen the letter bates-stamped CTG38264, Thering Decl. Ex. 63.  Ex. 25 (Bhatti Decl.), ¶ 24.

23.     Mohammad Siddiqui, the Chairman of the NYC 2 Way Security Committee from October 2011 to the present, never authorized Joseph Maydwell to take any action to enforce rules against drivers, and was unaware of any such request being made.  Ex. 29 (Siddiqui Decl.), ¶¶ 23, 25.

24.     CTG instructs drivers on how to interact with customers.  Ex. HH (Mastrangelo Tr.) 242:17-243:5 (instructions on how to service customers); 331:16-333:9 (drivers may not call customers); 333:14-335:3 (drivers must hold a sign when greeting customers).

25.     Plaintiffs could not reject jobs without being removed from CTG's dispatch system, and if they did so after accepting a job, they were not allowed to receive dispatches for three hours.  Ex. A (Civello Tr.) 185:8-17; 199:13-200:16.

26.     When booked into a zone, drivers cannot see any information about the clients, destination, or price of jobs.  This information is only available to a driver once he receives a job offer and presses "accept."  Ex. A (Civello Tr.) 179:8-182:8; 184:4-13; 186:24-187:5.

27.     A driver who does not want to or cannot complete a job after accepting must "bail out" and is subject to being removed from the dispatch system for three hours.  If a driver bails out due to car trouble or some other reason that caused him to be unable to complete the job, he is bailed out for one hour.  Ex. A (Civello Tr.) 200:10-16-201:5.

28.     In June 2012, a CTG employee in driver relations, Melissa Rodriguez, requested an investigation of a driver who consistently bailed out of local jobs.  Rodriguez requested that the driver be taken off the air, saying "she just looks at where the job is going then bails out." Ex. 30 (Email, dated Jun. 21, 2012), CTG29748-49 ("I would like to conduct an investigation on this driver.  Apparently she kicks back jobs all the time because she doesn't like local jobs.").

29.     A driver who consistently bails out of local jobs can cause customer service disruptions, and might be referred to the Security Committee for further action.  Ex. HH (Mastrangelo Tr.) 45:13-47:22 (". . . apparently, there's a problem child here . . . it's affecting our business and, you know, we want to make sure that we stay on top of what is going on . . . the security committee will meet with the driver . . . and basically correct whatever the conduct is that this driver is performing.").

30.     CTG's bailout penalties are programmed into the dispatch system and are consistently applied by CTG dispatchers.  Ex. A (Civello Tr.) 199:13-200:16

31.     Eduard Slinin must approve all franchise transfers between CTG drivers.  Ex. E (Kumar Tr.) 58:4-59:13.

32.     Eduard Slinin decides how much to charge drivers as a "transfer fee" when they transfer a franchise from one driver to another.  Ex. C (Slinin Tr.) 189:7-16.

33.     Plaintiffs have paid transfer fees as high as $5,000; Ex. JJJ (Ali Tr.) 21:20-23; Ex. PPP (Siddiqui Tr. Day 1) 132:5-17; 133:14-134:11.

34.     To begin driving for CTG, a driver does not need to possess any prior knowledge or experience.  Ex. A (Civello Tr.) 46:3-13.

35.     Plaintiffs who rented a franchise from another driver were subject to all the restrictions of the franchise agreement.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 47; Ex. E (Kumar Tr.) 30:19-31:12.

36.     Franchise owners who rented franchises out to drivers did not exercise managerial control over the drivers or impose rules for their conduct.  Ex. III (J. Singh Tr., Confidential Portion) 140:18-142:8; Ex. LLL (Bhatti Tr., Day 1) 99:13-25; Ex. MMM (J. Choudhary Tr.) 53:3-33.

37.     Plaintiffs generally worked at times and in zones where the most jobs were available.  Ex. HHH (Saleem Tr., Confidential portion) 90:4-8; Ex. III (J. Singh Tr., Confidential portion) 64:6-20; Ex. JJJ (Ali Tr.) 82:12-21; Ex. KKK (Bautista Tr.) 80:6-22; Ex. LLL (Bhatti Tr. Day 1) 90:15-91:14; Ex. MMM (J. Choudhary Tr.) 58:12-17; Ex. NNN (A. Chowdhury Tr.) 83:4-12; Ex. OOO (Koura Tr.) 33:20-34:10; Ex. PPP (Siddiqui Tr. Day 1) 166:6-24; Ex. QQQ (Pinedo Tr.) 39:17-22; Ex. RRR (M. Singh Tr.) 34:14-22; Ex. SSS (J. Solorzano Tr.) 54:15-55:5; Ex. TTT (M. Solorzano Tr.) 49:2-7.

38.     CTG does not serve the general public, but rather serves primarily corporate customers and disabled persons through a contract with the MTA. Ex. A (Civello Tr.) 27:3-11; Ex. C (Slinin Tr) 36:19-23

39.     From time to time, CTG provided remedial training in the form of instructions to drivers on how to provide good customer service.  Ex. HH (Mastrangelo Tr.) 62:7-24; 232:8-13; 242:17-243:5; 333:14-334:7.

40.     If drivers do not respond to a job offer within 45 seconds, they lose the opportunity to complete that job, and are booked off of the dispatch system.  Ex. A (Civello Tr.) 184:4-185:7; 186:20-23; Ex. UUU (CTG Dispatch Manual), CTG09239-53, at CTG09241.

41.     Drivers who sign up for MTA jobs cannot refuse to complete the jobs assigned or they will be subject to a fine.  Ex. KKK (Bautista Tr.) 108:5-24

42.     Hassan Siblini does not have authority as Communications Chairman for NYC 2 Way to delegate the authority to fine drivers.  Only members of the Security Committee have the authority to fine drivers.  Ex. 29 (Siddiqui Decl.) ¶ 26.

43.     CTG's headquarters is an approximately 20,000 square foot office space located at 335 Bond Street, in Brooklyn, New York.  Ex. D (Doetsch Tr.) 57:19-58:7.

44.     CTG owns, maintains, and operates six TLC base licenses.  Ex. C (Slinin Tr.) 12:16-13:5.

45.     CTG has approximately 162 employees in its sales, dispatch, billing, and other departments.  Ex. C (Slinin Tr.) 24:7-25:11; Slinin Aff., ¶ 34.

46.     CTG has an information technology infrastructure consisting of several computers, an internal computer network, a cellular network, and database management software.  Ex. EE (Toska Tr.) 15:6-18:12.

47.     CTG owns and operates a computerized system that transmits work assignments from servers in CTG's dispatch room to handheld dispatch devices carried by drivers.  Ex. B (Defs.' Resp. to Pls.' RFAs), RFA No. 36; Ex. A (Civello Tr.) 163:15-164:7.

48.     CTG's proprietary dispatch platform was designed and built "in-house" by CTG's programmers with input from a range of CTG personnel, drivers, and clients.  Ex. A (Civello Tr.) 169:1-25.

49.     CTG's website advertises that it is able to "service large market relationships with overwhelming fleet resources, extended by a single management entity, enjoying the benefits of consolidated [sic]."  Ex. DD (CTG website page).

107

50.     Plaintiffs typically worked for Defendants for extended periods of time, in come cases in excess of 16 years.  Ex. XXX (Saleem Tr., Non-confidential portion) 16:15-17:14 (eight years); Ex. III (J. Singh. Tr., Confidential portion) 69:4-21 (five years); Ex. JJJ (Ali Tr.) 19:23-20:18 (four years); Ex. KKK (Bautista Tr.) 8:17-9:14; 24:14-15 (16 years); Ex. LLL (Bhatti Tr. Day 1) 29:8-23 (14 years); Ex. MMM (J. Choudhary Tr.) 31:24-32:3 (17 years); Ex. NNN (A. Chowdhury Tr.) 12:9-17 (two and a half years); Ex. OOO (Koura Tr.) 21:21-22:2 (three years); Ex. PPP (Siddiqui Tr. Day 1) 158:5-8; 122:16-123:5 (five years); Ex. QQQ (Pinedo Tr.) 8:2-11 (eight years); Ex. RRR (M. Singh Tr.) 13:18-23; 9:18-23 (two years); SSS (J. Solorzano Tr.) 26:4-11 (18 years); Ex. TTT (M. Solorzano Tr.) 8:16-9:8 (18 years).

51.     Until July 2012, CTG franchise agreements ran for three-year terms that could be renewed for $1.  Ex. F (NYC 2 Way Franchise Agreement, effective July 24, 2007), CTG15438-529 at CTG15481, ¶ 73; Ex. G (NYC 2 Way Franchise Agreement, effective December 11, 2008), CTG15358-437 at CTG15409, ¶ 73; Ex. H (NYC 2 Way Franchise Agreement, effective August 18, 2009), CTG15269-357 at CTG15320, ¶ 73; Ex. I (NYC 2 Way Franchise Agreement, effective July 6, 2010), CTG15166-268 at CTG15218, ¶ 73; Ex. J (NYC 2 Way Franchise Agreement, effective July 6, 2011), CTG14971-5069 at CTG15022-23, ¶ 73; Ex. K (Aristacar Franchise Agreement, effective July 23, 2007), CTG13654-738 at CTG13700, ¶ 73; Ex. L (Aristacar Franchise Agreement, effective January 13, 2009), CTG13568-653 at CTG13618, ¶ 73; Ex. M (Aristacar Franchise Agreement, effective August 13, 2009), CTG13476-567 at CTG13529, ¶ 73; Ex. N (Aristacar Franchise Agreement, effective July 7, 2010), CTG13382-475 at CTG13436, ¶ 73; Ex. O (Aristacar Franchise Agreement, effective July 6, 2011), CTG13290-381 at CTG13344, ¶ 73; Ex. P (TWR Franchise Agreement, effective July 23, 2007), CTG15981-6064 at CTG16027, ¶ 73; Ex. Q (TWR Franchise Agreement, effective January 19,

2009), CTG15891-980 at CTG15940, ¶ 73; Ex. R (TWR Franchise Agreement, effective August

13, 2009), CTG15800-890 at CTG15852, ¶ 73; Ex. S (TWR Franchise Agreement, effective July

7, 2010), CTG15708-799 at CTG15761, ¶ 73; Ex. T (TWR Franchise Agreement, effective

August 10, 2011), CTG15617-707 at CTG15670, ¶ 72.

52.     Beginning in July 2012, CTG franchise agreements did not contain a fixed term of

years, and ran for an unlimited period of time.  Ex. U (NYC 2 Way Franchise Agreement,

effective July 2, 2012), CTG15070-165 at CTG15096; Ex. V (Aristacar Franchise Agreement,

effective July 5, 2012), CTG13204-289 at CTG13228; Ex. W (TWR Franchise Agreement,

effective July 5, 2012), CTG15530-616 at CTG15555.

53.     CTG's consolidated structure allows it to capture profitable corporate contracts in

competition with other black car companies.  Ex. A (Civello Tr.) 44:14-45:13.

54.     On a regular basis, CTG's computerized billing system determines which drivers

are owed payments, calculates the compensation owed to each of them, and cuts checks from

CTG.  Ex. A (Civello Tr.) 233:10-234:4.

55.     Mazhar Saleem was fined by CTG on multiple occasions, for infractions,

including arguing with the Security Chairman, arguing with a dispatcher, not reporting to a

checkpoint, and accepting a street hail.  Ex. HHH (Saleem Tr., Confidential portion) 151:11-

152:5; 154:6-8; Ex. YYY (Security Deduction Report), CTG16065-72

56.     Jagjit Singh was "bailed out" by CTG on at least ten occasions when he accepted

a job that he was unable to complete.  Ex. III (J. Singh Tr., Confidential portion) 85:16-88:6

57.     CTG holds itself out to the public under the trade names of its various Franchisor

companies as a "limo service" or "private car and limo service."  Ex. FF (CTG website page).

58.     CTG charges its customers rates that are based on travel between zones, as opposed to using taximeters.  Ex. A (Civello Tr.) 174:14-25; Ex. 32 (CTG rate book), P000262-312, at P000264.

Dated: New York, New York
        February 4, 2014

                                        Respectfully submitted,

                                        /s/ Adam T. Klein

                                        Adam T. Klein
                                        Rachel Bien
                                        Michael J. Scimone
                                        Michael N. Litrownik
                                        **OUTTEN & GOLDEN, LLP**
                                        3 Park Avenue, 29th Floor
                                        New York, NY  10016
                                        Telephone:  (212) 245-1000
                                        Facsimile:  (212) 977-4005

                                        **KAHN OPTON, LLP**
                                        Stephen H. Kahn
                                        One Parker Plaza
                                        Fort Lee, New Jersey 07024
                                        Telephone: (201) 947-9200

                                        *Attorneys for Plaintiffs*