UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                   :

MAZHAR SALEEM et al.,                    :

                              :

                  Plaintiffs,              :           12-CV-8450 (JMF)

                              :

                  -v-                  :          OPINION AND ORDER

                              :

CORPORATE TRANSPORTATION GROUP, LTD. et al.,  :

                              :

                  Defendants.           :

                              :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Together, the Defendants in this action operate a "black car" business that provides

ground transportation services around New York, New Jersey, and Connecticut.  Plaintiffs are

drivers who work, or have worked, for Defendants.  Plaintiffs allege violations of the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York State Labor Law

("NYLL"), N.Y. Lab. Law § 650 *et seq.*, claiming, *inter alia*, unpaid overtime.  The Court

previously conditionally certified the case as a collective action under the FLSA, but denied class

certification of Plaintiffs' state law claims under Rule 23 of the Federal Rules of Civil Procedure.

      Now pending are two motions.  First, Plaintiffs move for partial summary judgment,

seeking a declaration that the twelve named Plaintiffs are "employees" for purposes of the FLSA

(but not the NYLL), and that Eduard Slinin, president of the corporate Defendants, is

individually liable under the FLSA as Plaintiffs' employer.  (Docket No. 480; Mem. Law Supp.

Pls.' Mot. Partial Summ. J. (Docket No. 481) ("Pls.' Mem.") 1 & n.7).  Second, Defendants also

move for summary judgment, seeking to dismiss all of Plaintiffs' claims on the ground that they

are "independent contractors" for purposes of both the FLSA and the NYLL.  (Docket No. 464).

In the alternative, Defendants request that the Court de-certify the FLSA collective, hold that the named Plaintiffs are independent contractors, strike certain opt-in Plaintiffs, and dismiss the claims against three Defendants.  (*Id.*; Mem. Law Supp. Defs.' Mots.: (i) Summ. J. Dismissing Pls.' FLSA & NYLL Claims; (ii) Decertify Collective Action Pursuant to Section 216(b) FLSA; (iii) Strike Plaintiffs Jose Pinto, Ismael Mejia, John M. Hidalgo & Nick Wijesinghe Or Point To Point Car & Limo Inc. (Docket No. 482) ("Defs.' Mem.") 38).

For the reasons stated below, the Court finds that all Plaintiffs in this suit — both named Plaintiffs and opt-in Plaintiffs — are independent contractors for purposes of the FLSA and the NYLL.  Accordingly, Defendants' motion is granted, and the case is dismissed.

## FACTUAL BACKGROUND

The following facts, drawn from the admissible materials submitted by the parties, are undisputed except where noted.  *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

### A.    Defendants

Defendants in this lawsuit operate a "black car" business that provides ground transportation services, primarily to corporate clients in New York, New Jersey, and Connecticut.[1]  (Defs.' Counter 56.1 Statement Pls.' Statement Undisputed Material Facts Under Local Civil Rule 56.1 (Docket No. 503) ("Pls.' Rule 56.1 Statement") ¶¶ 1, 2-8; First Supplemental Decl. Michael J. Scimone Supp. Pls.' Mot. Partial Summ. J. (Docket No. 491)

---

[1]     Defendants Corporate Transportation Group International and Corporate Transportation Group Worldwide, Inc. provide billing and other administrative support services for transportation services abroad and in the western United States.  (Pls.' Rule 56.1 Statement ¶¶ 10-12; Aff. Eduard Slinin (Docket No. 478) ("Slinin Aff.") ¶ 9).  The Plaintiffs in this action, however, work predominantly in New York, New Jersey, and Connecticut.  (Defs.' Rule 56.1 Statement ¶ 33).

("First Scimone Decl."), Ex. A ("Civello Dep.") 27:3-11).  The business is divided into two types of corporate entities that serve distinct functions.  The first group — the "CTG Defendants" — includes Corporate Transportation Group, Ltd. ("CTG"); Corporate Transportation Group International ("CTG International"); and Corporate Transportation Group Worldwide, Inc. ("CTG Worldwide").  The second group — the "Franchisor Defendants" — includes NYC 2 Way International, Ltd. ("NYC2Way"); AllState Private Car & Limousine, Inc. ("AllState"); Aristacar & Limousine, Ltd. ("Aristacar"); TWR Car and Limo, Ltd. ("TWR"); Excelsior Car and Limo, Inc. ("Excelsior"); and Hybrid Limo Express, Inc. ("Hybrid").

The six Franchisor Defendants each own what is known as a "base license," which authorizes the operation of a black car service in New York City, pursuant to regulations promulgated by the New York City Taxi and Limousine Commission (the "TLC").  (First Scimone Decl., Ex. C ("Slinin Dep.") 12:9-13:2; *see also* 35 N.Y.C.R.R. § 59B).  The CTG Defendants, by contrast, provide administrative support for the Franchisor Defendants by, among other things, processing drivers' payments and coordinating requests for rides between customers and drivers.  (Pls.' Counter-Statement Material Facts Pursuant Local Rule 56.1(b) (Docket No. 502) ("Defs.' Rule 56.1 Statement") ¶¶ 11-13; Pls.' Rule 56.1 Statement ¶¶ 10-12; Slinin Aff. ¶¶ 6-9; Civello Dep. 37:4-39:13).  Eduard Slinin is president of all corporate Defendants.  (Slinin Aff. ¶ 2).  He is also the sole owner of CTG, a part owner of CTG Worldwide, and at least a part owner of all Franchisor Defendants.  (Slinin Dep. 7:7-11:19).  His wife, Galina Slinin, is a part owner of Aristacar, TWR, Excelsior, and possibly Hybrid; the Chief Executive Officer and Principal Executive Officer of CTG Worldwide; and the Chief Executive Officer of Excelsior and Hybrid.  (Slinin Dep. 9:20-11:23; Aff. Galina Slinin (Docket No. 476) ¶¶ 6-7).  The only

other individual with an ownership stake in any of the corporate Defendants is Eduard's brother, Mark Slinin.  (Slinin Dep. 11:24-12:2).

The Franchisor Defendants establish accounts with corporate clients, enabling customers with access to an account to request a car from one of the Franchisor Defendants.  (Pls.' Rule 56.1 Statement ¶ 49; Civello Dep. 38:13-15).  They do so by telephone, a website, or a smartphone application.  (Slinin Aff. ¶ 49; Civello Dep. 163:19-166:17).   The accounts are solicited by salespeople who work at CTG — and, on occasion, by Eduard Slinin himself — although negotiations are conducted on behalf of the individual Franchisor Defendants.  (Civello Dep. 67:12-68:22; Slinin Dep. 200:25-201:5; First Scimone Decl., Ex. B, Request Nos. 26-27).

## B.      The Franchisees and the Drivers

### 1.       Franchise Agreements and Franchises

As noted, Plaintiffs are drivers for the Defendants.  (For purposes of the FLSA collective, the Court authorized notice to "drivers who worked for [the Defendants] at any time since November 19, 2009."  (Docket No. 67, at 8).)  The drivers are engaged by Defendants through franchising agreements.  Under those agreements, the Franchisor Defendants sell or lease franchises to individuals and corporate entities ("Franchisees"); in turn, the Franchisor Defendants grant a Franchisee the right to receive fare referrals through a dispatch system (which is described in detail below).  (Pls.' Rule 56.1 Statement ¶ 23; First Scimone Decl., Ex. E ("Kumar Dep.") 11:24-13:8; 14:11-15; 35:24-36:5; *see also id.*, Exs. F-W (Franchise Agreements for NYC2Way, Aristacar, and TWR); Decl. Margaret C. Thering (Docket No. 477) ("Thering Decl."), Exs. 24-29 (excerpts of Franchise Agreements for Allstate, Aristacar, Excelsior, Hybrid, NYC2Way, and TWR)).  Franchisees can, and often do, become drivers themselves, but they can also retain other drivers to work for them or lease or sell their franchises

to others on the secondary market.  (Defs.' Rule 56.1 Statement ¶¶ 45-46, 48-49).  If a Franchisee wishes to sell his or her franchise, the purchaser of the franchise must pay a transfer fee to the relevant Franchisor Defendant (Civello Dep. 228:1-11), and the sale must be approved, although there is some dispute as to who has authority to approve a transfer (*see* Defs.' Rule 56.1 Statement ¶ 32; Pls.' Rule 56.1 Statement ¶¶ 29-32; Pls.' Additional Statement Disputed Material Facts Pursuant Local Civil Rule 56.1(a) (Docket No. 502, at 98) ("Pls.' Statement Additional Facts") ¶ 31).

The price of a franchise ranges from approximately $20,000 to $60,000, or a franchisor can rent a franchise for $130 to $150 per week, plus a security deposit.  (Defs.' Rule 56.1 Statement ¶¶ 45, 53; Slinin Aff. ¶ 22; Thering Decl., Exs. 24-27, 29).  Prior to July 2012, franchise agreements ran for renewable terms of three years each; in July 2012, the agreements were amended to run for an unlimited period of time.  (Pls.' Rule 56.1 Statement ¶¶ 26-27).  Among the twelve named Plaintiffs in this action, eleven purchased franchises from their respective franchisors, and one (Jagjit Singh) rented his franchise from another driver.  (Pls.' Rule 56.1 Statement ¶¶ 214, 219, 224, 229, 231, 235, 240, 250, 254, 258, 260, 263, 265; Second Supplemental Decl. Michael J. Scimone Supp. Pls.' Mot. Partial Summ. J. (Docket No. 492) ("Second Scimone Decl."), Ex. WWW (Saleem); *id.*, Ex. III ("Singh Dep.") 49:21-24; *id.*, Ex. ZZZ (Ali); *id.*, Ex. KKK ("Bautista Dep.") 24:14-25:8; *id.*, Ex. AAAA (Bhatti); *id.*, Ex. MMM ("Choudhary Dep.") 17:19-24; *id.*, Ex. NNN ("Chowdhury Dep.") 76:18-77:4; *id.*, Ex. OOO ("Koura Dep.") 19:23-20:9; *id.*, Ex. BBBB (Siddiqui); *id.*, Ex. QQQ ("Pinedo Dep.") 8:2-9:14; *id.*, Ex. DDDD (M. Singh); *id.*, Ex. SSS ("J. Solorzano Dep.") 28:11-29:9; *id.*, Ex. TTT ("M. Solorzano Dep.") 8:16-9:8, 25:14-25).

In addition to buying or renting a franchise (or being hired by someone who has bought or rented a franchise), a driver must procure the car in which he or she intends to drive customers.  Defendants do not rent or sell cars to drivers; instead, Plaintiffs purchased or rented their cars from other drivers or from unrelated third parties, such as independent car dealers. (Defs.' Rule 56.1 Statement ¶¶ 189, 193-97; Choudhary Dep. 36:6-24; Pinedo Dep. 55:6-16; M. Solorzano Dep. 37:9-10, 39:7-19).  In addition, Plaintiffs are responsible for paying the costs associated with maintaining their vehicles, obtaining the required TLC "For-Hire Drivers License," and procuring business insurance. (Defs.' Rule 56.1 Statement ¶¶ 40, 68-69, 198-99, 200, 215-18; Thering Decl., Ex. 1 ("Pls.' Responses & Objections Defs.' RFA")).

Although each Franchisor Defendant sells its franchises pursuant to its own franchise agreement, the terms of the franchise agreements are similar in at least three material respects. First, the franchise agreements provide that for each job a driver completes, he or she is paid a percentage of the total fare charged to the client (which, itself, is based on a rate that has previously been negotiated between the client and the franchisor), less a $1 processing fee that is paid to CTG and other deductions that the driver has previously authorized.  (Pls.' Rule 56.1 Statement ¶ 33; Slinin Aff. ¶ 28; Kumar Dep. 42:11-43:4; *see also, e.g.*, First Scimone Decl., Ex. F at CTG15472-74 ¶ 37; i*d.*, Ex. K at CTG13690-92 ¶ 37; *id.*, Ex. P at CTG16017-20 ¶ 37). Drivers receive this payment by having customers sign a voucher when the drivers complete a job, and then delivering the vouchers to CTG's offices whenever they choose.  (Defs.' Rule 56.1 Statement ¶¶ 56-57, 61-62; Civello Dep. 158:11-20; Second Scimone Decl., Ex. RRR 59:17-21). CTG processes the payments daily, weekly, or every three weeks — based on the driver's choice.  (Civello Dep. 309:15-22).  Second, the franchise agreements contain provisions that prohibit drivers, for a specified amount of time, from "solicit[ing] or do[ing] business with any

company or individual which was serviced as a client of [the Franchisor Defendant], or franchisees or employees of [the Franchisor Defendant]." (*See, e.g.*, First Scimone Decl., Ex. F at CTG15475 ¶ 42; *see also id.*, Ex. K at CTG13693 ¶ 42; *id.*, Ex. W at CTG15574 ¶ 41; Pls.' Rule 56.1 Statement ¶ 34).  The agreements do not, however, prohibit drivers from working for competitor black car companies or driving their own private customers, and many drivers have done so, even though such behavior may be prohibited by TLC regulations.  (Defs.' Rule 56.1 Statement ¶¶ 184, 257-258; Choudhary Dep. 41:14-17).  Third, the franchise agreements require drivers to follow a set of rules, and subject drivers to a set of penalties, that are laid out in each respective Franchisor's "Rulebook."  (Pls.' Rule 56.1 Statement ¶ 36; *see also, e.g.*, First Scimone Decl., Ex. F at CTG15470 ¶ 23; *id.*, Ex. K at CTG13693 ¶ 42; *id.*, Ex. W at CTG15569, CTG15574-75 ¶¶ 25, 42).

## 2.    The Rulebooks, the Committees, and Driver Discipline

The Rulebooks govern various matters, including the way the drivers dress, maintain their cars, communicate with their franchisors, and interact with customers.  (Pls.' Rule 56.1 Statement ¶ 37; *see also* First Scimone Decl., Ex. Y at CTG34785-801 ("NYC2Way Rulebook"); *id.*, Ex. Z at CTG 34751-67 ("Aristacar Rulebook"); *id.*, Ex. AA at CTG34802-18 ("TWR Rulebook"); Decl. Michael J. Scimone Opp'n Defs.' Mots.: (i) Summ. J. Dismissing Pls.' FLSA & NYLL Claims; (ii) Decertify Collective Action Pursuant Section 216(b) FLSA; (iii) Strike Pls.' Jose Pinto, Ismael Mejia, John M. Hidalgo, & Nick Wijesinghe Or Point To Point Car & Limo Inc. (Docket No. 506) ("Scimone Opp'n Decl."), Ex. 20 ("Excelsior Rulebook"); *id.*, Ex. 21 ("Allstate Rulebook")).  For instance, the NYC2Way Rulebook requires male drivers to wear dark dress slacks, a white button-down shirt with a collar, a sport or suit jacket, an overcoat or trench coat, a pullover V-neck sweater or vest, and a tie.  (NYC2Way

Rulebook 7; *see also* Aristacar Rulebook 7; TWR Rulebook 6-7; Excelsior Rulebook 7; Allstate Rulebook 6-7).  It also mandates that drivers "maintain their vehicle in a clean, professional operation," and that cars be "simonized or waxed at all times."  (NYC2Way Rulebook 7; *see also* Aristacar Rulebook 7; TWR Rulebook 7; Excelsior Rulebook 7; Allstate Rulebook 7).  The Rulebooks also prescribe the penalties to be imposed in the event that rules are violated.  For instance, the NYC2Way Rulebook specifies a $150 fine for a driver who is in violation of the dress code and a $75 fine for a driver who is in violation of the car code.  (NYC2Way Rulebook 15; *see also* Aristacar Rulebook 15; TWR Rulebook 15; Excelsior Rulebook 15; Allstate Rulebook 7; Pls.' Rule 56.1 Statement ¶ 38).

The genesis of the Rulebooks, however, and the manner in which they are enforced, are matters of some dispute.  Defendants disclaim any responsibility for the Rulebooks, arguing that drivers from each franchise independently formed committees that both drafted and now enforce the Rulebooks, to ensure that all customers of a given franchise receive a high level of service, thereby protecting the franchisees' investments in their franchises.  (Defs.' Mem. 12-13; Defs.' Opp'n Pls.' Mot. Partial Summ. J. ("Defs.' Opp'n Mem.") 13-15; Defs.' Reply Pls.' Opp'n Defs.' Mots.: (i) Summ. J. Dismissing Pls.' FLSA & NYLL Claims; (ii) Decertify Collective Action Pursuant Section 216(b) FLSA; (iii) Strike Pls.' Jose Pinto, Ismael Mejia, John M. Hidalgo, & Nick Wijesinghe Or Point To Point Car & Limo Inc. ("Defs.' Reply Mem.") 8).  In particular, Defendants contend that "Communications Committees" wrote the original Rulebooks and have authority to revise them, and that "Security Committees" enforce them.  (Defs.' Mem. 12-13).  In addition, Defendants point out that any penalties imposed by the Security Committees do not flow to CTG or any of the Franchisor Defendants; instead, they are routed to "Sunshine Funds," from which drivers can receive loans.  (Defs.' Mem. 12-13; Defs.' Rule 56.1 Statement

¶¶ 239, 245-46; Koura Dep. 81:22-25; M. Solorzano Dep. 83:7-9; Aff. Gregory Reyderman (Docket No. 467), Rider A ¶ 12; Aff. Oleg Gluzman (Docket No. 472), Handwritten Pages ¶ 17).

Plaintiffs acknowledge both the existence of the Communications and Security Committees, and that the committees are composed exclusively of drivers, but argue that Defendants nevertheless exert substantial influence over the committees. (Pls.' Mem. 7; Pls.' Mem. Law Opp'n Defs.' Mots.: (i) Summ. J. Dismissing Pls.' FLSA & NYLL Claims; (ii) Decertify Collective Action Pursuant Section 216(b) FLSA; (iii) Strike Pls.' Jose Pinto, Ismael Mejia, John M. Hidalgo, & Nick Wijesinghe Or Point To Point Car & Limo Inc. (Docket No. 501) ("Pls.' Opp'n Mem.") 12-14; Pls.' Reply Mem. Law Supp. Mot. Partial Summ. J. (Docket No. 510) ("Pls.' Reply Mem.") 8; Defs.' Rule 56.1 Statement ¶ 227).[2] First, Plaintiffs cite testimony suggesting that changes to the Rulebooks had to be approved by Eduard Slinin and CTG management (Second Scimone Decl., Ex. PPP ("Siddiqui Dep. Day 1") 162:19-163:9; Choudhary Dep. 25:18-26:10); that CTG and Eduard Slinin exercised control over the membership of the committees (Second Scimone Decl., Ex. XXX ("Saleem Dep.") 74:11-78:8, 85:3-22; *id.*, Ex. HHHH ("Siddiqui Dep. Day 2") 277:16-24); and that Eduard Slinin sometimes overrules the Security Committee's rulings as to whether a driver should be fined (Siddiqui Dep.

---

[2]      Plaintiffs argue that certain decisions by the Regional Directors of the National Labor Relations Board establish, with preclusive effect, that the Security Committees are Defendants' agents. (Pls.' Opp'n Mem. 11 & n.5; *Aristacar & Limousine Ltd.*, Case No. 29-RC-9410, at 39-41 (Decision and Direction of Election, July 19, 2000); *N.Y.C. 2 Way Int'l*, Case No. 29-RC-9411, at 69-70 (Decision and Direction of Election, July 31, 2000)). "The question of whether an agency relationship exists," however, "is a mixed question of law and fact," *Mouawad Nat'l Co. v. Lazare Kaplan Int'l, Inc.*, 476 F. Supp. 2d 414, 420-21 (S.D.N.Y. 2007) (internal quotation marks omitted), and such questions, when decided in an administrative proceeding, are not entitled to preclusive effect because they are "imbued with policy considerations as well as the expertise of the agency," *Akgul v. Prime Time Transp., Inc.*, 741 N.Y.S.2d 553, 556-57 (2d Dep't 2002) (internal quotation marks omitted); *see also Romano v. SLS Residential, Inc.*, 812 F. Supp. 2d 282, 290 (S.D.N.Y. 2011); *Lee v. Jones*, 659 N.Y.S.2d 549, 552 (3d Dep't 1997).

Day 2, at 282:10-283:5).  In addition, Plaintiffs point to evidence suggesting that Defendants retained Stephen Aliberti and Joseph Maydwell to conduct inspections of drivers' vehicles, report the results of those inspections to CTG management, and fine drivers for infractions, although Defendants contend that all such inspections were requested by the Security Committees, not Defendants.  (Pls.' Mem. 6-7; Pls.' Reply Mem. 8-9; Defs.' Opp'n Mem. 14-15; Pls.' Rule 56.1 Statement ¶¶ 77-80, 93-94, Defs.' Rule 56.1 Statement ¶ 297; Pls.' Statement Additional Facts ¶¶ 8-9; First Scimone Decl., Ex. KK ("Maydwell Dep.") 344:14-345:4; *id.*, Ex. LL at CTG31335-36; *id.*, Ex. NN at CTG 30560-61; *id.*, Ex. MM at CTG28370-74; *id.*, Ex. OO at CTG 27730-31).

Plaintiffs also note that Defendants — particularly Eduard Slinin and other members of CTG management — would sometimes report suspected rule violations to the committees for investigation, follow up with the committees to ensure that violations are addressed, and recommend fines and other disciplinary action that they would like the committees to take (or not take) against the drivers.  (Pls.' Opp'n Mem. 12; Pls.' Rule 56.1 Statement ¶¶ 107-09; Pls.' Statement Additional Facts ¶¶ 16-18; Defs.' Rule 56.1 Statement ¶¶ 282-87; Civello Dep. 99:19-100:5, 103:11-19; Kumar Dep. 160:13-18; First Scimone Decl., Ex. HH ("Mastrangelo Dep.") 54:11-17; Slinin Dep. 143:18-144:6, 165:24-166:15, 187:8-188:9; Scimone Opp'n Decl., Ex. 25 ("Bhatti Decl.") ¶ 19).  And finally, Plaintiffs point out that Defendants review and investigate customer complaints and, on occasion, remove drivers from certain accounts without consulting the Security Committee for the Franchisor Defendant in question.  (Pls.' Rule 56.1 Statement ¶ 85; Mastrangelo Dep. 59:4-20).

### 3.      The Dispatch System and Driver Assignments

Regardless of whether a driver owns a franchise, rents a franchise, or simply works for someone who owns or rents a franchise, the most common way to receive a driving assignment is by using CTG's dispatch system.  Drivers use this system by "booking" in — or signaling his or her availability to work — with a "dispatch device" (currently, a smartphone manufactured by LG) that is provided to the driver by Defendants, and which comes pre-loaded with software designed by Defendants.  (Defs.' Rule 56.1 Statement ¶ 121; Civello Dep. 167:24-168:25, 169:1-25).  The driver must first open the CTG application on the device, and then sign into the CTG application using a "driver ID" and password.  (Civello Dep. 173:17-25).  The driver is then able to access the "zone info screen," which displays how many jobs are available in any one of a series of geographically divided zones around New York City, the number of reservations that are to be dispatched in each zone within a certain period of time, and the number of cars already booked in to each zone.  (*Id.* 174:14-25, 179:8-182:8; Second Scimone Decl., Ex. UUU at CTG 09243).  At that point, the driver may book into any zone that he or she likes, thereby placing him or her at the bottom of a queue of drivers who are available to pick up customers within that zone.  (Pls.' Rule 56.1 Statement ¶ 116; Defs.' Rule 56.1 Statement ¶ 134; Civello Dep. 178:13-21).

When a job becomes available, the driver at the top of the queue in the relevant zone is given the option of accepting or rejecting the job.  (Pls.' Rule 56.1 Statement ¶ 118).  If the driver accepts the job, he or she is provided with additional information about it, including the address where the customer will be picked up, the customer's destination, and the rate of the fare.  (Pls.' Rule 56.1 Statement ¶ 125; Civello Dep. 186:24-187:5).  At that point, it is presumed that the driver will pick up the passenger, but the driver may still "bail out" of the job by

requesting to be taken off of the job by the dispatcher.  (Pls.' Rule 56.1 Statement ¶ 130; Defs.'

Rule 56.1 Statement ¶ 152; Civello Dep. 199:13-19).  If the driver bails out, however, he or she

is preventing from booking in to any zone — in other words, the driver is "booked off" of all

zones — for the next three hours.  (Pls.' Rule 56.1 Statement ¶ 131; Civello Dep. 200:10-16).  If

the driver rejects the job offer before having accepted it, he or she is booked off the zone into

which he or she had booked in for the next five minutes; the same consequence follows if the

driver is offered a job but fails to respond to it within forty-five seconds.  (Pls.' Rule 56.1

Statement ¶¶ 126-27; Civello Dep. 184:4-185:11; Second Scimone Decl., Ex. UUU).

Although the dispatch system is the most typical channel through which drivers receive

assignments, they may also receive work in two other ways.  First, drivers may work on the New

York City Metropolitan Transit Authority ("MTA") account, through which they pick up

passengers who are unable to use the New York City public transportation system.  (Civello Dep.

73:2-22).  In order to signal their desire to work on that account, drivers call a CTG hotline,

indicating when they are available to pick up MTA customers the following day, and in which

borough they would like to start work.  (Defs.' Rule 56.1 Statement ¶¶ 165-73; Slinin Dep.

287:24-289:7; First Scimone Decl., Ex. EE ("Toska Dep.") 171:20-173:20).  Second, drivers

may bypass the dispatch system and proceed directly to one of ten lines of cars at various points

in Manhattan, where cars wait outside certain high volume clients.  (Defs.' Rule 56.1 Statement

¶¶ 160-64; Civello Dep. 196:20-197:3; Slinin Aff. ¶¶ 63-64).

## PROCEDURAL HISTORY

On November 19, 2012, Plaintiffs Mahzar Saleem and Jagjit Singh filed the Complaint,

seeking to recover unpaid overtime and other wages under the FLSA and the NYLL on behalf of

a class and collective of similarly situated drivers.  (Docket No. 1).  On June 17, 2013, the Court

conditionally certified a collective action pursuant to Section 216(b) of the FLSA and approved a

notice to be sent to potential opt-in Plaintiffs.  (Docket No. 67).  On July 22, 2013, Plaintiffs

filed a motion for a preliminary injunction, seeking an order enjoining Defendants from, *inter*

*alia*, communicating directly with prospective collective members about issues relating to this

lawsuit because "CTG [had allegedly] engaged in a concerted effort to intimidate and threaten

Plaintiffs and mislead them about tax consequences if they prevail in this case."  (Docket No.

121, at 1).  Plaintiffs' motion relied primarily on the behavior of three alleged employees of

CTG.  After an evidentiary hearing, however, the Court denied the motion, finding that the

communications by two of the three were not sufficiently threatening or improper to justify such

a broad injunction, and that Plaintiffs had not demonstrated that the third person was acting as

Defendants' agent when he made the relevant communications.  (Docket Nos. 215, 440).  By

Opinion and Order entered November 15, 2013, the Court denied Plaintiffs' motion for class

certification of their NYLL claims, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

*See Saleem v. Corporate Transp. Grp.*, No. 12-CV-8450 (JMF), 2013 WL 6061340 (S.D.N.Y.

Nov. 15, 2013) (Docket No. 430).  The parties now cross-move for summary judgment.[3]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the admissible evidence and pleadings

demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over an issue of material fact qualifies as

---

[3]      Two *amicus* briefs were submitted in support of Defendants' motion for summary
judgment: one by the Black Car Assistance Corporation, a trade association comprised of black
car bases in the New York City area, and the other by a group of twenty-three franchisees who
purchased franchises from the Franchisor Defendants and did not opt in to the FLSA collective
action.  (Docket Nos. 493, 494).  Plaintiffs argue that the Court should disregard the *amicus*
briefs for various reasons.  (Pls.' Opp'n Mem. 25-28).  The issue is moot, however, as the Court
has not relied on either *amicus* brief in rendering this Opinion and Order.

genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and a court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  When, as here, both sides move for summary judgment, a court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011).  Thus, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  By contrast, to defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or

on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## FLSA AND NYLL STANDARDS

The FLSA defines an "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and, most unhelpfully, defines an "employer" circularly as "any person acting directly or indirectly in the interest of an employer in relation to an employee," *id.* § (203)(d); *see Landaeta v. N.Y. & Presbyterian Hosp., Inc.*, No. 12-CV-4462 (JMF), 2014 WL 836991, at *3 (S.D.N.Y. Mar. 4, 2014). In assessing whether an individual is an employee under the FLSA, courts in this Circuit consider the following factors:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988); *see also Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 912 (S.D.N.Y. 2013). The overriding consideration under the FLSA is the "economic reality" of the relationship — that is, whether "the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock*, 840 F.2d at 1059.

The NYLL defines an "employee" as "any person employed for hire by an employer in any employment," N.Y. Lab. Law § 190(2), and an "employer" as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business, or service," *id.* § 190(3). In determining whether a worker is an employee or independent contractor under the NYLL, courts consider factors similar to those used in the FLSA inquiry, although with a slightly different emphasis. Specifically, courts consider the factors outlined in *Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193 (2003): "whether the worker

(1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule."  *Id.* at 198; *see also Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 598 (E.D.N.Y. 2012).  Unlike the FLSA, which focuses on the economic reality of the relationship, "the critical inquiry in determining whether an employment relationship exists [under the New York Labor Law] pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results."  *Bynog*, 1 N.Y.3d at 198.  Nevertheless, many courts have commented upon the similarity of the two tests, and some courts have even analyzed the two together.  *See, e.g.*, *Sellers v. Royal Bank of Canada*, 12 Civ. 1577 (KBF), 2014 WL 104682, at *6 (S.D.N.Y. Jan. 8, 2014); *Browning*, 885 F. Supp. 2d at 599; *Velu v. Velocity Express, Inc.*, 666 F. Supp. 2d 300, 306-07 (E.D.N.Y. 2009); *see also Hart*, 967 F. Supp. 2d at 924 ("[T]here appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa).").

While "[t]he existence and degree of each factor is a question of fact . . . the legal conclusion to be drawn from those facts — whether workers are employees or independent contractors — is a question of law."  *Brock*, 840 F.2d at 1059.  The inquiry under both the FLSA and the NYLL is necessarily fact-intensive, leading courts in other cases involving private car drivers to reach different results depending on the particulars of the given case.  In one recent case, for example, a court in this Circuit concluded that triable issues of fact existed as to whether the plaintiff-driver was an employee under the FLSA and the NYLL, noting that, among other things, the defendant "dictated the hours the drivers worked" and may have prevented drivers from working for its competitors.  *Arena v. Plandome Taxi Inc.*, No. 12-CV-1078 (DRH), 2014 WL 1427907, at *5 (E.D.N.Y. Apr. 14, 2014) ("*Plandome Taxi*"); *see also, e.g.*, *Rivera v.*

16

*Fenix Car Serv. Corp.*, 903 N.Y.S.2d 690, 695 (N.Y. Sup. Ct. 2010) (denying a car service's motion for summary judgment on a vicarious liability claim where, *inter alia*, the defendant "reserve[d] the right to impose penalties in the event a driver fails to comply with . . . regulations"); *Matter of Jhoda v. Mauser Serv., Inc.*, 719 N.Y.S.2d 388 (3d Dep't 2001) (affirming a decision of the Workers' Compensation Board finding that a livery car driver was an employee for purposes of workers' compensation).  By contrast, in another recent case (apparently involving the same plaintiff, but different defendants), the court granted the defendant car services' motion for summary judgment, finding it "very persuasive that Defendants had little control over when Plaintiff drove, how much he drive[s], or how frequently."  *Arena v. Delux Transp. Servs., Inc.*, No. 12-CV-1718 (LDW), 2014 WL 794300, at *9 (E.D.N.Y. Feb. 26, 2014) ("*Delux Transportation*"); *see also Leach v. Kaykov*, No. 07-CV-4060 (KAM), 2011 WL 1240022, at *23 (E.D.N.Y. Mar. 30, 2011) (holding, on summary judgment, that a for-hire dispatch service was not the employer of a driver under New Jersey agency law, noting that the driver "owned his own vehicle and other instrumentalities necessary for the business and was under no obligation to follow certain routes"); *Chaouni v. Ali*, 963 N.Y.S.2d 27, 28 (1st Dep't 2013) (affirming a motion for summary judgment granted in favor of a car and limousine service on the grounds that drivers "own their own vehicles, were responsible for the maintenance thereof, paid for the insurance, and had unfettered discretion to determine the days and times they worked, with no minimum or maximum number of hours or days").

The question here is on which side of that divide this case lies, and to that question the Court will now turn.  Because the inquiries under the FLSA and NYLL have slightly different emphases, and because the question of whether "the tests for 'employer' status are the same . . .

has not been answered by the New York Court of Appeals," *Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013), the Court will conduct the two inquiries separately.

## DISCUSSION

### A.    The FLSA

#### 1.  Degree of Control

The first factor of the FLSA inquiry, "the degree of control exercised by [Defendants] over the workers" favors independent contractor status, but not overwhelmingly so.  *Brock*, 840 F.2d at 1058.  Particularly relevant to the control factor is whether a worker is "free to set his own schedule and take vacations when he wished," *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 171 (2d Cir. 1998), and it is undisputed that Plaintiffs here could do so.  Not only did drivers "decide for themselves when to provide ground transportation services" (Defs.' Rule 56.1 Statement ¶ 112; *see also* Pls.' Responses & Objections Defs.' RFA ¶¶ 9, 21-24), but they could also take vacations whenever they wished, without notifying Defendants in advance, for even months at a time (Pls.' Responses & Objections Defs.' RFA ¶¶ 79-80; Civello Dep. 305:24-306:23; Toska Dep. 186:14-20).  Plaintiffs could book in on whatever days and at whatever times they pleased, and they were under no obligation to accept a particular job.  (Defs.' Rule 56.1 Statement ¶¶ 123-24; Slinin Aff. ¶ 15; Pls.' Responses & Objections Defs.' RFA ¶ 19; Civello Dep. 318:18-319:4).  Of course, once a driver accepted a job, he or she could not back out without some cost, but the cost of rejecting a job in the first place was minimal (a five minute book-out period), and even the three-hour book-out period that Plaintiffs received for bailing out of a job after having accepted it does not support a finding that Plaintiffs were subject to Defendants' control.  *See Browning*, 885 F. Supp. 2d at 601 (noting that an assignment system for drivers where the consequence of refusing a job was that "the next available assignment

would be offered to other waiting drivers before it would be offered to the Plaintiffs again" did

not "render the refusal subject to a 'penalty,'" which would have supported a finding that the

plaintiffs were employees).  In this respect, this case is similar to *Delux Transportation*, in which

the Court granted summary judgment in favor of a transportation company where the company

"had little control over when [drivers] drove, how much [they] drive, or how frequently" they

drove.  2014 WL 794300, at *9.  By contrast, it is distinguishable from *Plandome Taxi*, in which

the Court reached an opposite conclusion about the drivers' status because the defendant-

transportation company "dictated the hours drivers worked, and required the drivers to work on

holidays," and the drivers were "not permitted to take unauthorized breaks or go home without

[Defendant's] permission."   2014 WL 1427907, at *5.

Also indicative of Defendants' limited control over the drivers is the fact that the drivers

were free to — and frequently did — work for other car services and provide transportation to

private customers.  (Defs.' Rule 56.1 Statement ¶¶ 257-62).  *See Herman v. Express Sixty-*

*Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (finding the degree of control

exercised by a delivery service over its drivers minimal where "[t]he drivers [could] work for

other courier delivery systems").  In fact, some drivers even set up their own credit card

merchant accounts to process payments from private clients, bypassing CTG's payment system.

(Defs.' Rule 56.1 Statement ¶¶ 263-64).  The fact that the franchise agreements contain a non-

compete clause does not call for a different conclusion.  (*See* Pls.' Mem. 23).  First, the inquiry

concerns "degree of control *exercised* by the [Defendants]," *Brock*, 840 F.2d at 1058, and the

clause was only sometimes enforced (*see* J. Solorzano Dep. 36:25-39:8 (indicating that he

regularly serviced a client, and bypassed Defendants' payment system, with whom he initially

came into contact through TWR)).  Second, the clause does not restrict drivers' ability to work

for other car services or service their own, independently solicited clients.  It is also irrelevant

that TLC regulations may have prohibited drivers from engaging in such behavior, both because

the overall FLSA inquiry focuses on the "economic reality" of the relationship and because the

control factor focuses on the control exercised by *Defendants*.  *Brock*, 840 F. 2d at 1059.  (*See*

Pls.' Mem. 3).  In addition, Plaintiffs could hire other drivers to work on their behalf (Pls.'

Responses & Objections Defs.' RFA ¶ 78); *see Gate Guard Servs. L.P. v. Solis,* No. V-10-91,

2013 WL 593418, at *5-6 (S.D. Tex. Feb. 13, 2013) (noting that plaintiffs' ability to hire other

workers weighed in favor of independent contractor status), and were never given instructions on

how to navigate the areas in which they operated, but received only a single, two-hour training

session on how to use CTG's internally developed dispatch system.  (Pls.' Rule 56.1 Statement

¶¶ 40-42; Civello Dep. 268:20-269:20).

　　　　On the other side of the balance, the evidence suggests that Defendants did — at least to a

limited degree — engage in some monitoring and discipline of drivers.  The Court would not, as

Plaintiffs do, characterize the monitoring as "consistent" (Pls.' Opp'n Mem. 9); much of the

cited materials simply show that Defendants used GPS data to investigate specific customer

complaints (*see, e.g.*, First Scimone Decl., Ex. D ("Doetsch Dep.") 13:20-14:25).  Defendants

did, however, require drivers to provide periodic updates regarding the status of their

assignments (Civello Dep. 87:25-88:14, 191:12-19, 193:8-14), a fact that at least one court has

found suggestive of "control" for purposes of the FLSA.  *See Scantland v. Jeffry Knight, Inc.*,

721 F.3d 1308, 1314 (11th Cir. 2013).  *But see Browning*, 885 F. Supp. 2d at 607 (finding the

fact that the plaintiffs were required to "remain in frequent contact with the Defendants . . . [not

to] weigh against a finding of independent contractor status" for purposes of the NYLL).

Further, there are genuine disputes over whether disciplinary measures imposed by the Security

Committees were free from the influence of CTG management, particularly in light of clear evidence that Defendants would refer complaints to the committees using "10/5" forms (Kumar Dep. 160:13-18; Mastrangelo Dep. 54:11-17), and that Slinin recommended specific fines to the committees (Slinin Dep. 165:24-166:15; *see also* Scimone Second Decl., Ex. GGG (e-mail from Greg Mastrangelo, CTG's vice president of operations, stating "[w]e should reach out to the communications and security committee chairmen to assess a $ penalty when a customer complains that driver was late for the pick up")).

There is also evidence suggesting that Mastrangelo, CTG's vice president of operations, sometimes inspected drivers' cars himself and directed CTG employees and consultants do so on his behalf.  (Mastrangelo Dep. 209:20-210:6; Maydwell Dep. 344:14-345:5; *see also* Pls.' Rule 56.1 Statement ¶ 79).  And finally, the Rulebooks did impose a dress code on the drivers, although courts have often afforded that fact little weight in the employee-versus-independent-contractor inquiry.  *See, e.g.*, *Delux Transp.*, at *9 (finding the requirement that driver "follow a dress code of black pants with a white collared sh[irt] . . . do[es] not rise to the level of control necessary to impute an employment relationship"); *DeSouza v. EGL Eagle Global Logistics LP*, 596 F. Supp. 2d 456, 464 (D. Conn. 2009) ("Some of above-mentioned impositions mentioned by the Plaintiff, such as wearing a uniform, having a logo on his truck, or providing paperwork to the Defendant, were ancillary to his independent driving, and the imposition of timetables and schedules does not strip an independent contractor of his status.").

Even accepting that Defendants engaged in some monitoring and discipline, however, the Court finds that the first factor slightly favors independent contractor status.  *See Browning*, 885 F. Supp. 2d at 608 (noting that while "the Defendants certainly had some degree of control over the overall safe performance of the Plaintiffs in their tasks[,] . . . the degree of control is not so

great as to weigh in favor of finding the Plaintiffs to be employees as opposed to independent contractors"); *Scruggs v. Skylink Ltd.*, No. 10-CV-789, 2011 WL 6026152, at *5 (S.D.W.Va. Dec. 2, 2011) (noting that, even accepting that failure to attend weekly meetings could subject plaintiffs to discipline, "no reasonable trier of fact could take these issues in context with the undisputed facts, and conclude that Plaintiffs were employees"); *cf. Leach*, 2011 WL 1240022, at *23 ("[E]ven assuming that, for the purposes of this motion, [Defendant] did actually exercise or retain control over [Plaintiff] as set forth in the Franchise Agreement and the Rulebook . . . the court finds that the totality of the circumstances weighs in favor of finding that an independent contractor relationship existed as a matter of law.")

### 2. The Opportunity for Profit or Loss and Investment in the Business

Turning to the next factor, there is no question that drivers had an opportunity for profit and loss in their businesses. As in *Browning*, the franchise agreements "did not guarantee a certain amount of work to the Plaintiffs." 885 F. Supp. 2d at 608. Instead, drivers principally "controlled . . . how much overall money [they] earned as a result of the number of [jobs they] took." *Delux Transp.*, 2014 WL 794300, at *10. In addition, drivers made numerous decisions that would affect their overall profitability, such as whether to rent or buy a franchise, whether to hire other drivers, whether to work for other car service companies, and whether to solicit private clients. (Defs.' Rule 56.1 Statement ¶¶ 109, 111-19, 142-47, 184; Pls.' Responses & Objections Defs.' RFA ¶ 78). Drivers also made substantial investments in their businesses. Not only did most drivers either buy or rent franchises, which they could in turn sell or lease, but they also spent money buying or renting their cars, maintaining their cars, buying gasoline, paying the costs associated with their TLC licenses, and procuring insurance. (Defs.' Rule 56.1 Statement

¶¶ 45-46, 48-49, 193-209, 215-19).  Such investments totaled thousands or tens of thousands of dollars per year, as documented in Plaintiffs' tax returns.  (*See* Thering Decl., Exs. 41-53).

Speaking of tax returns, there is no merit to Defendants' argument that Plaintiffs are "judicially estopped from . . . arguing that that they are entitled to benefits as employees" because they classified themselves as independent contractors on their tax filings.  (Defs.' Mem. 32; Defs.' Opp'n Mem. 2-3).  Put simply, the argument is wrong and has been consistently rejected by numerous courts, including this one.  *See, e.g., Landaeta*, 2014 WL 836991, at *5 (noting that while Plaintiffs' tax filings are "relevant to the independent contractor versus employee inquiries . . . they do not preempt the inquiries altogether"); *Hart*, 967 F. Supp. 2d at 924 (stating that in both inquiries "it is not significant . . . how the worker identified herself on tax forms"); *In re Stuckelman*, 791 N.Y.S.2d 225, 226 (3d Dep't 2005) (affirming ruling that claimant was an employee despite "[t]he fact that the . . . claimant deducted expenses on her federal tax return as if she were self-employed").  But while not dispositive of the inquiry, the fact that Plaintiffs classified themselves as independent contractors on their tax returns and took business deductions certainly weighs in favor of independent contractor status, as does the fact that drivers did not receive any benefits from Defendants.  *See, e.g.*, *Velu*, 666 F. Supp. 2d at 307 (noting that the defendant's limited provision of benefits weighed in favor of independent contractor status for purposes of the FLSA); *Sellers*, 2014 WL 104682, at *8 ("Plaintiff received 1099 forms . . . and defendants did not withhold payroll or other employment-related taxes or issue W–2 forms to plaintiff.  Plaintiff[']s tax treatment by defendants signifies that he was in fact an independent contractor."); *cf. Kalloo v. Unlimited Mech. Co. of N.Y.*, 977 F. Supp. 2d 187, 202 (E.D.N.Y. 2013) ("That Mr. Kalloo received a 1099 form does not outweigh the other, more substantial aspects of his relationship with defendants.").

In the face of this evidence, Plaintiffs argue that the drivers' investments should be compared to the capital outlays made by Defendants and that, when viewed in that light, the profit-and-loss factor weighs in favor of employee status.  (Pls.' Opp'n Mem. 22-23; Pls.' Reply Mem. 5-6).  Although the Second Circuit does not appear to have addressed the issue, there is some authority from courts in this District suggesting that a comparative analysis is appropriate. *See, e.g.*, *Hart*, 967 F. Supp. 2d at 919-20; *Campos v. Zopounidis*, No. 09-CV-1138 (VLB), 2011 WL 2971298, at *6 (D. Conn. July 20, 2011).  Even so, the purpose of such an analysis is to compare "[t]he extent of the economic risk which the [workers] incurred . . . [with] the risk that [the Defendant] undertook."  *Hart*, 967 F. Supp. 2d at 920.  Here, it is not obvious which party undertook more economic risk, given the large sums of money Plaintiffs expended on their businesses as compared to their total incomes (*see* Thering Decl., Exs. 41-53), as well as the numerous decisions that Plaintiffs had to make that could and did affect their profitability.[4] Accordingly, this case is far different from *Hart*, where the economic risk undertaken by the defendant strip-club — a business that invested millions of dollars per year to operate the establishment — vastly outweighed the risks undertaken by the plaintiff exotic dancers, who simply had to pay for clothes, make-up, a fee to perform at the club, and tips for certain

---

[4]     For the same reasons, the Court also rejects Plaintiffs' suggestion that Defendants controlled all the "major determinants of drivers' income."  (Pls.' Mem. 15).  The Court also notes that whether a party "controls all of the determinants of [its workers'] income" (Pls.' Mem. 19) is not a factor that the Second Circuit has explicitly incorporated into the FLSA independent contractor analysis.  *Compare Hopkins v. Cornerstone America*, 545 F.3d 338, 344 (5th Cir. 2008) ("We next consider whether the worker or the alleged employer controlled the major determinants of the amount of profit which the worker could make." (internal quotation marks and alterations omitted)).  That said, the factor does bear on the ultimate concern as to whether "the workers depend upon someone else's business for the opportunity to render service or are in business for themselves."  *Brock*, 840 F.2d at 1059.

employees, costs that the Court noted were "readily offset by performance fees and cash tips from customers that the dancer was highly likely to be given."  967 F. Supp. 2d at 920.[5]

In addition, the Court is not persuaded by Plaintiffs' arguments that Defendants' dispatch system eliminated their ability to make rational economic choices about their work (Pls.' Opp'n Mem. 20), or that the drivers who rented out their franchises did not have the opportunity for profit or loss (Pls.' Opp'n Mem. 23).  As for the first argument, while it is true that drivers received limited information before deciding whether to accept a job — most significantly, the information did not include the rate of pay — drivers were never obligated to book into the dispatch system in the first instance, and were able to make numerous other economic choices about their work, as described above.  In addition, drivers could bail out of jobs that they found undesirable, which they did with varying degrees of frequency.  (Defs.' Rule 56.1 Statement ¶¶ 153-54; Defs.' Opp'n Mem. 13 n.17).  As for the second argument, while it is true that drivers who rented their franchises limited their opportunity for profit or loss by receiving a fixed income in lieu of the more variable pay that they would receive by doing the driving themselves, no drivers were *required* to rent out their franchises; indeed, the fact that the drivers could choose whether they would rent out their franchises reflects the limited control that Defendants exercised over them.

### 3.  The Degree of Skill and Independent Initiative

The Court turns then to the third factor, the degree of skill or independent initiative required to perform the work.  Plaintiffs are surely correct that driving is not a "specialized

---

[5]     The Court also notes that, unlike in *Campos*, 2011 WL 2971298, at *6, where the Plaintiff used the vehicle he supplied for personal purposes as well as to make deliveries, some Plaintiffs in this action used their cars only for business purposes.  (Defs.' Rule 56.1 Statement ¶ 210; Siddiqui Dep. Day 1, at 84:5-7; Second Scimone Decl., Ex. EEEE 86:20-24; M. Solorzano Dep. 93:10-11).

skill," a conclusion reinforced by the fact that drivers were not required to demonstrate any level of knowledge upon commencing work for the Defendants.  (Pls.' Rule 56.1 Statement ¶ 39; Civello Dep. 45:14-46:13).  *See Campos*, 2011 WL 2971298, at *7 (finding "no evidence that [the plaintiff's] job as a delivery person required him to possess any particular degree of skill," and that the plaintiff "did not need education or experience to perform his job"); *Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 326 (S.D.N.Y. 2001) (noting no dispute that the plaintiff's duties as a chauffeur required no specialized skill).  *But see Browning*, 885 F. Supp. 2d at 608 ("Plaintiffs needed to have professional driving skills, business management skills, knowledge of Department of Transportation regulations, and freight-handling skills."); *Leach*, 2011 WL 1240022, at *19 ("Although operating a vehicle and navigating it from point to point may not be considered a highly skilled trade . . . [the dispatcher] relied on [the driver's] ability to operate his car, navigate to destinations, and maintain his licenses.").

At the same time, in order to be a successful driver for Defendants in this lawsuit, one needed to exercise a significant degree of independent initiative.  As discussed in the context of the second factor, Defendants did not guarantee any level of work to drivers; in order to procure even a single job, drivers were required to take affirmative steps, such as booking into a zone, calling the MTA hotline, or waiting on one of the high-volume lines at points around Manhattan. Working for the instant Defendants thus necessitated a greater degree of initiative than working for the defendant in *Plandome Taxi*, where "all trip arrangements were made by [the defendant], and the drivers were not permitted to independently cruise the neighborhoods to find passengers."  2014 WL 1427907, at *6.  Instead, the relationship here more resembles the relationship in *Delux Transportation*, where drivers needed to "have initiative to accept dispatched calls."  2014 WL 794300, at *10.  Because the work may not have required a high

degree of skill, but did require the exercise of independent initiative, the Court concludes that this factor does not weigh strongly in either direction.

### 4.   The Permanence or Duration of the Relationship

The fourth factor — the permanence or duration of the working relationship — favors a finding of independent contractor status.  Plaintiffs argue to the contrary, noting that many of the drivers have been engaged in franchise relationships with Defendants for many years.  (Pls.' Mem. 26; Pls.' Opp'n Mem. 25).  Although that may be true, and the agreements are of an indefinite duration (or at least have been since July 2012), drivers could terminate the agreements at will, a fact that courts have found favors a finding of independent contractor status.  (First Scimone Decl., Ex. U at CTG15096; *id.*, Ex. V at CTG13228; *id.*, Ex. W at CTG15555).  *See Browning*, 885 F. Supp. 2d at 610; *cf. Kravis v. Karr Barth Assocs.*, No. 09-CV-485, 2010 WL 337646, at *5 (E.D. Pa. Jan. 26, 2010) (noting, in the context of a twenty-year relationship, that "[a]lthough this lengthy duration would generally weigh in favor of finding [the plaintiff] is an 'employee,' both [the plaintiff] and Defendants retain the power to terminate the Agreement at any time").  In addition, and as was discussed in the context of the control factor, drivers were free to take extended breaks from driving whenever they wished, were never under any obligation to book into the dispatch system at a particular time, and were free to work for competitor car services.  *See Brock*, 840 F.2d at 1060 (noting that the permanency factor weighed "slightly in favor of independent contractor status" where employees "typically work[ed] for several employers" and "most work[ed] for [the defendant] only a small percentage of the time"); *Scruggs*, 2011 WL 6026152, at *7-8 (finding this factor to weigh in favor of independent contractor status where plaintiffs worked for defendant's competitors).  Perhaps most fundamentally, "[w]hile the term of the Franchise Agreement was indefinite, each job was

separately contracted, suggesting the existence of an independent contractor relationship."
*Leach*, 2011 WL 1240022, at *21; *see also Gate Guard*, 2013 WL 593418, at *10-11 (finding
this factor to weigh in favor of independent contractor status where the plaintiffs worked on a
"project-by-project basis," and "took significant breaks between projects"); *Baker v. Flint Eng'g
& Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) ("Generally speaking, independent
contractors often have fixed employment periods and transfer from place to place as particular
work is offered to them, whereas employees usually work for only one employer and such
relationship is continuous and of indefinite duration." (internal quotation marks omitted)).

     **5.   The Extent to Which Employees Are Integral to Business**

     Turning to the final factor, the Court does find that drivers were integral to Defendants'
business.  Indisputably, Defendants' business could not function without drivers, and Defendants
wisely do not argue to the contrary.  (*See* Defs.' Mem. 19).  *See also Ansoumana v. Gristede's
Operating Corp.*, 255 F. Supp. 2d 184, 191-92 (holding, where the defendants "engaged
primarily in the business of providing delivery services," that on-foot delivery workers
"constitute[d] an integral part of the . . . defendants' business").  In addition, while Defendants
cite *Velu* and *Browning* for the proposition that the drivers' work was "interchangeable with the
work of other drivers" (Defs.' Mem. 32-33 (citing *Velu*, 666 F. Supp. 2d at 307; *Browning*, 885
F. Supp. 2d at 610)), this case is somewhat distinguishable, at least for purposes of the FLSA
claims, as here there are currently over two hundred FLSA opt-in Plaintiffs, whereas *Velu*
concerned only a single plaintiff and *Browning* involved only five (Pls.' Mem. 1 n.1); *Velu*, 666
F. Supp. 2d at 303; *Browning*, 885 F. Supp. 2d at 592.

### 6. The Totality of the Circumstances

Notwithstanding that the final factor favors employment status, the Court ultimately concludes that, as a matter of law, Plaintiffs are properly classified as independent contractors rather than employees for purposes of the FLSA. *See Browning*, 885 F. Supp. 2d at 610 ("[W]hile the Plaintiffs' work was integral to [the Defendant], this factor only weighs slightly in favor of finding that the Plaintiffs should qualify as employees under the FLSA, and would not prevent this Court from finding, as a matter of law, that the Plaintiffs are independent contractors."); *Nichols v. All Points Transp. Corp. of Mich., Inc.*, 364 F. Supp. 2d 621, 634 ("Defendant does not dispute that the drivers constitute an integral part of its business. On balance, however, the six factors demonstrate that the drivers are independent contractors."). At bottom, the "ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock*, 840 F. 2d at 1059. Weighing all of the *Brock* factors and considering the totality of the circumstances, the Court concludes that the drivers here fall into the latter category as a matter of law; not only "could [they]. . . go out the next day with their [cars] and equipment and immediately work for another [car service,]" *Browning*, 885 F. Supp. 2d at 610, but many of them did so, frequently. (*See* Defs.' Rule 56.1 Statement ¶¶ 257-59). Accordingly, Defendants' motion for summary judgment dismissing Plaintiffs' FLSA claims is granted.[6]

---

[6]     In light of the Court's conclusion, there is no need to reach Defendants' alternative argument that Plaintiffs are exempt from the FLSA under 29 U.S.C. § 213(b)(17), which exempts "any driver employed by an employer engaged in the business of operating taxicabs." (Defs.' Mem. 34-35; *see* Pls.' Opp'n Mem. 32-34 (addressing the issue)).

B.      **The NYLL**

Turning to the NYLL, although the Court engages in a similar inquiry, the primary

emphasis, as discussed above, is on the "degree of control exercised by the purported employer

over the results produced or the means used to achieve the results." *Bynog*, 1 N.Y.3d at 198.  As

noted, the factors to be considered in the course of that inquiry include "whether the worker (1)

worked at his own convenience, (2) was free to engage in other employment, (3) received fringe

benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Id.*

The Court has already addressed the first factor — whether the worker "worked at his

own convenience" — in the context of the FLSA analysis.  It is abundantly clear that the drivers

here did so, and the first factor therefore factors independent contractor status.  The Court has

also found that drivers were "free to engage in other employment."  The only restriction on their

ability to do so imposed by Defendants was that they could not "solicit or do any business with

any company or individual which was serviced as a client of [Defendants]," and even that

restriction appears to have been enforced only some of the time. (First Scimone Decl., Ex. U at

CTG 15114 ¶ 41; *see also* Defs.' Rule 56.1 Statement ¶ 55; J. Solorzano Dep. 36:25-39:7).

More to the point, Defendants did not restrict drivers' ability to work for other car services or

drive personal clients that they found independently from Defendants.  (*See, e.g.*, Ali Dep. 108:8-

16 (stating that a customer who had initially hailed him on the street became his repeat private

customer)).  The fact that Plaintiffs had "no choice about the jobs they were offered" is

irrelevant, as the drivers were never under any obligation to book into a particular zone or accept

a particular job offer.  (Pls.' Opp'n Mem. 30; Defs.' Rule 56.1 Statement ¶¶ 123-24).  And, as

discussed above, the fact that drivers may have been prohibited by the TLC from working for

other car services or taking street hails is not relevant either, as the NYLL focuses on the "degree

of control exercised by the *purported employer*." *Bynog*, 1 N.Y.3d at 198 (emphasis added). In

that respect, then, the second factor distinguishes the instant case from many cited by Plaintiffs.

*See, e.g.*, *Matter of Jarzabek*, 653 N.Y.S.2d 165, 165 (3d Dep't 1997) ("Claimant was required to

be available for driving assignments during certain hours."); *Lefevre v. Tel-A-Car of N.Y.*, 603

N.Y.S.2d 600, 601 (3d Dep't 1993) (claimant for worker's compensation was required to answer

twenty calls per week).

The third and fourth factors unquestionably favor independent contractor status, as

Plaintiffs admit that "Defendants do not provide Plaintiffs with any benefits" (Defs.' Rule 56.1

Statement ¶¶ 252-54; *see also* Pls.' Responses & Objections Defs.' RFA ¶¶ 191-92), and that

Plaintiffs were paid as non-employees on a daily basis, weekly basis, or every three weeks,

depending on what cycle the driver chose.  (Defs.' Rule 56.1 Statement ¶¶ 61-64, 255; *see also*

Pls.' Responses & Objections Defs.' RFA ¶ 121; Civello Dep. 309:15-310:6).  In addition, the

fact that drivers "received no salary but only retained a percentage of the fares" counsels in favor

of a finding of independent contractor.  *Barak v. Chen*, 929 N.Y.S.2d 315, 318 (2d Dep't 2011);

*see also Chaouni*, 963 N.Y.S.2d at 28; *Abouzeid v. Grgas*, 743 N.Y.S.2d 165, 166 (2d Dep't

2002); *Irrutia v. Terrero*, 642 N.Y.S.2d 328, 329 (2d Dep't 1996).  And the fact that Plaintiffs

"sought significant tax benefits associated with their independent contractor status" weighs

heavily in favor of independent contractor status.  *Browning*, 885 F. Supp. 2d at 605; *see also*

*Gagen v. Kipany Prods., Ltd.*, 812 N.Y.S.2d 689, 691 (3d Dep't 2006) (affirming the lower

court's determination, on summary judgment, that the plaintiff was an independent contractor

where "his tax returns contained numerous deductions for business purposes associated with

independent contractor status").  (Thering Decl., Exs. 41-53).

The Court has already discussed the fifth factor as well; there is no dispute that drivers were not "on a fixed schedule."  Instead, drivers were permitted to book in and out as they pleased, could take long breaks from driving whenever they wished, and were free to reject job offers as they liked, with only limited consequences.  *See, e.g.*, *Chaouni*, 963 N.Y.S.2d at 28 (holding that a driver was an independent contractor where he "had unfettered discretion to determine the days and times [he] worked, with no minimum or maximum number of hours or days imposed by [the defendant]"); *Barak*, 929 N.Y.S.2d at 318 (holding that the lower court should have awarded summary judgment in favor of the defendant limousine company where drivers "scheduled their own working hours" and "had discretion to reject dispatches"); *Abouzeid*, 743 N.Y.S.2d at 166 (affirming summary judgment in favor of a for-hire car company where the drivers set their own hours).

In short, all five NYLL factors favor independent contractor status.  Accordingly, the Court finds, as a matter of law, that Plaintiffs are independent contractors for purposes of the NYLL, a conclusion consistent with that reached by many New York courts that have considered similar business relationships.  *See, e.g.*, *Chaouni*, 963 N.Y.S.2d 424; *Barak*, 929 N.Y.S.2d 315; *Holcomb v. TWR Express, Inc.*, 11 782 N.Y.S.2d 840 (2d Dep't 2004); *Matter of Jarzabek*, 738 N.Y.S.2d 742; *Abouzeid*, 743 N.Y.S.2d 165; *Irrutia*, 642 N.Y.S.2d 328.  Defendants' motion for summary judgment dismissing Plaintiffs' NYLL claims is therefore granted as well.

## CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is granted, Plaintiffs' motion for partial summary judgment is denied, and the case is dismissed. Defendants' requests to de-certify the FLSA collective, hold that the named Plaintiffs are independent contractors, strike certain opt-in Plaintiffs, and dismiss the claims against three of

the Defendants are all denied as moot.  So too is Plaintiffs' request to declare Eduard Slinin individually liable under the FLSA, as Plaintiffs are not protected by the statute at all.

Finally, in rendering this Opinion and Order, the Court has relied on certain documents that Plaintiffs did not file on ECF, but rather sent directly to Chambers on a compact disc.  In particular, the Court has relied on Exhibits A, C, D, E, EE, HH, and KK to the First Scimone Declaration (Docket No. 491), and Exhibits III, KKK, MMM, NNN, OOO, PPP, QQQ, RRR, SSS, TTT, XXX, EEEE, and HHHH to the Second Scimone Declaration (Docket No. 492).  As those documents are "relevant to the performance of the judicial function and useful in the judicial process," they qualify as "judicial documents" to which the common law right of public access attaches.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (internal quotation marks omitted).  Accordingly, within **one week** of the date of this Opinion and Order, Plaintiffs shall file those documents on ECF unless they believe that any of the documents should be filed under seal or in redacted form, in which case they shall file a memorandum of law by the same date, not to exceed ten pages, explaining why the relevant document or documents should be so filed.  If Plaintiffs do file such a memorandum, any reply from Defendants, also not to exceed ten pages, shall be filed within **one week** thereafter.

The Court has also relied on sealed Exhibits 41-53 to the Declaration of Margaret Thering (Docket No. 477), but those documents are Plaintiffs' tax returns, which contain sensitive financial information.  Accordingly, Defendants are not required to file those documents electronically.  Within one week of the date of this Opinion and Order, however, Defendants shall file those documents under seal with the Clerk of the Court.

The Clerk of Court is directed to terminate Docket Nos. 464 and 480 and to close the

case.

SO ORDERED.

Date:   September 16, 2014
        New York, New York

_____
JESSE M. FURMAN
United States District Judge